**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　*Defendants*. | Civil Action No. 17-cv-2325 (CRC) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................5

    A.  Deferred Action Generally.............................................................................................5

    B.  DACA and DAPA..........................................................................................................6

    C.  The *Texas* Litigation ....................................................................................................8

    D.  Rescission of DACA ......................................................................................................9

    E.  The Instant Action.......................................................................................................10

LEGAL STANDARDS ...............................................................................................................11

ARGUMENT ..............................................................................................................................13

    I.  THIS CASE IS NOT JUSTICIABLE..............................................................................14

        A.  The Rescission Policy Is Not Justiciable Because this Immigration
            Enforcement Policy Is a Matter Committed to Agency Discretion
            by Law .....................................................................................................................14

        B.  The INA Deprives District Courts of Jurisdiction over Challenges to
            Denials of Deferred Action .....................................................................................21

        C.  The Non Individual Plaintiffs' Claims Are Not Cognizable ......................................24

            1.  Plaintiffs Lack Article III Standing........................................................................24

            2.  Plaintiffs Lack a Cause of Action Under the APA ................................................25

        D.  The Government's Justiciability Objections Are Not Inconsistent
            with the Acting Secretary's Reliance on the Fifth Circuit's Decision........................26

    II.  PLAINTIFFS FAIL TO STATE A CLAIM ...................................................................27

        A.  Plaintiffs Fail to State an APA Claim ........................................................................27

            1.  The Acting Secretary Rationally Explained Her Decision to Wind
               Down DACA, Particularly Given the Imminent Risk of a Nationwide
               Injunction. ...........................................................................................................27

2.   The Rescission Policy is Exempt from Notice and Comment ...............................34

B.  Plaintiffs Fail to State an Equal Protection Claim .......................................................37

C.  Plaintiffs Fail to State a Procedural Due Process Claim ..............................................38

D.  Plaintiffs Fail to State a Substantive Due Process Claim. ...........................................41

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
     IMPERMISSIBLE .............................................................................................................44

CONCLUSION ......................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   787 F.3d 524 (D.C. Cir. 2015) ................................................................. 43

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2007) .............................................................. 12

*Aetna Life Ins. Co. of Hartford v. Haworth*,
   300 U.S. 227 (1937) ................................................................................ 44

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) .................................................................................. 39

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) .............................................................. 11

*Arizona v. United States*,
   567 U.S. 387 (2012) ........................................................................... 5, 16

*Arpaio v. Obama*,
   136 S. Ct. 900 (2016) ............................................................................... *5*

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ......................................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................ 12

*Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*,
   283 F.3d 339 (D.C. Cir. 2002) ................................................................ 17

*Bates v. Donley*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ..................................................... 12, 27

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) ................................................................................ 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................ 12

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................ 34

*Botezatu v. INS*,
   195 F.3d 311 (7th Cir. 1999) ........................................................................ 22, 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ...................................................................................... 30, 31

*Browning v. Clinton*,
   292 F.3d 235 (D.C. Cir. 2002) ........................................................................... 11

*C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.*,
   310 F.3d 197 (D.C. Cir. 2002) ........................................................................... 44

*Califano v. Sanders*,
   430 U.S. 99 (1977) ............................................................................................ 16

*Camp v. Pitts*,
   411 U.S. 138 (1973) .......................................................................................... 29

*Chaudhry v. Holder*,
   705 F.3d 289 (7th Cir. 2013) ............................................................................... 6

*Chavez v. Martinez*,
   538 U.S. 760 (2003) .......................................................................................... 42

*Chevron U.S.A. Inc. v. Echazabal*,
   536 U.S. 73 (2002) ............................................................................................ 30

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .......................................................................................... 35

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................................... 15, 28

*Clarke v. Secs. Indus. Ass'n*,
   479 U.S. 388 (1987) ...................................................................................... 25, 26

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ........................................................................... 35

*Conn. Bd. of* Pardons v. Dumschat,
   452 U.S. 458 (1981) .......................................................................................... 42

*Consumer Energy Council of Am. v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ........................................................................... 34

*Crowley Caribbean Transp., Inc. v. Pena*,
37 F.3d 671 (D.C. Cir. 1994) ............................................................... 17

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ................................................................... 42, 44

*Davis v. Fed. Bureau of Prisons*,
517 F. Supp. 2d 460 (D.D.C. 2007) ...................................................... 14

*Dixon v. District of Columbia*,
666 F.3d 1337 (D.C. Cir. 2011) ...................................................... 37, 38

*Doe v. Rogers*,
139 F. Supp. 3d 120 (D.D.C. 2015) ...................................................... 38

*Elgharib v. Napolitano*,
600 F.3d 597 (6th Cir. 2010) ............................................................. 21

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................................... 28, 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ............................................................. 26

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ...................................................................... 28

*George Washington Univ. v. Dist. of Columbia*,
318 F.3d 203 (D.C. Cir. 2002) ........................................................... 42

*Gerhart v. Lake Cnty.*,
637 F.3d 1013 (9th Cir. 2011) ........................................................... 42

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................. *passim*

*Herbert v. Nat'l Acad. of Scis.*,
974 F.2d 192 (D.C. Cir. 1992) ........................................................... 12

*Hoffman Plastic Compounds, Inc. v. NLRB*,
535 U.S. 137 (2002) ...................................................................... 38

*Hurd v. Dist. of Columbia*,
864 F.3d 671 (D.C. Cir. 2017) ........................................................... 13

*Hyuk Joon Lim v. Holder*,
   710 F.3d 1074 (9th Cir. 2013) ........................................................................ 43

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
   482 U.S. 270 (1987) ................................................................................. 14, 17

*Ky. Dep't of Corrs. v. Thompson*,
   490 U.S. 454 (1989) ........................................................................................ 39

*Lepelletier v. F.D.I.C.*,
   164 F.3d 37 (D.C. Cir. 1999) ........................................................................ 25

*Lewis* v. Casey,
   518 U.S. 343 (1996) ........................................................................................ 45

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ........................................................................................ 14

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ........................................................................................ 24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 11, 24, 34

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) .................................................................. 16, 17

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ........................................................................................ 45

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) .................................................................... 13

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) .......................................................................................... 26

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ........................................................................................ 45

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) .......................................................................................... 28

*Munoz v. Ashcroft*,
   339 F.3d 950 (9th Cir. 2003) ........................................................................ 43

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
  851 F.2d 1424 (D.C. Cir. 1988) .................................................................. 37

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ..................................................................... 35

*Omar v. McHugh*,
  646 F.3d 13 (D.C. Cir. 2011) ....................................................................... 40

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
  506 F.2d 33 (D.C. Cir. 1974) ................................................................ 35, 36

*Patterson v. United States*,
  999 F. Supp. 2d 300 (D.D.C. 2013) ............................................................ 13

*Perales v. Casillas*,
  903 F.2d 1043 (5th Cir. 1990) ..................................................................... 16

*Plyler v. Doe*,
  457 U.S. 202 (1982) ..................................................................................... 37

*Powers v. Ohio*,
  499 U.S. 400 (1991) ..................................................................................... 25

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*,
  463 U.S. 1216 (1983) ................................................................................... 35

*Rempfer v. Sharfstein*,
  583 F.3d 860 (D.C. Cir. 2009) ............................................................... 12, 13

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) ............................................................................ *passim*

*Robinson v. Huerta*,
  123 F. Supp. 3d 30 (D.D.C. 2015) .............................................................. 38

*Romeiro de Silva v. Smith*,
  773 F.2d 1021 (9th Cir. 1985) ..................................................................... 40

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973) ......................................................................................... 38

*Syncor Int'l Corp. v. Shalala*,
  127 F.3d 90 (D.C. Cir. 1997) ....................................................................... 36

*Syracuse Peace Council v. FCC*,
   867 F.2d 654 (D.C. Cir. 1989) ............................................................... 31

*Tefel v. Reno*,
   180 F.3d 1286 (11th Cir. 1999) ............................................................. 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................ 13

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ........................................................ *passim*

*Texas v. United States*,
   No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016) ............................................ 9

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005)................................................................................ 39

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017)............................................................................ 45

*Troy Corp. v. Browner*,
   120 F.3d 277 (D.C. Cir. 1997) ............................................................... 29

*United States v. Armstrong*,
   517 U.S. 456 (1996)........................................................................ 15, 19

*United States v. Texas*,
   136 S. Ct. 900 (2016).............................................................................. 5

*United States v. Texas*,
   136 S. Ct. 2271 (2016)............................................................................ 8

*United States v. Texas*,
   137 S. Ct. 285 (2016).............................................................................. 8

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
   173 F.3d 438 (D.C. Cir. 1999) ............................................................... 13

*Vasquez v. Aviles*,
   639 F. App'x 898 (3d Cir. 2016) ............................................................ 22

*Velasco-Gutierrez v. Crossland*,
   732 F.2d 792 (10th Cir. 1984) ............................................................... 40

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ..................................................................................................... 42

*Washington v. Trump*,
   858 F.3d 1168 (9th Cir. 2017) ..................................................................................... 25

**Statutes**

5 U.S.C. § 553 .............................................................................................................. 3, 34, 35

5 U.S.C. § 701 ........................................................................................................ 14, 15, 17, 24

5 U.S.C. § 702 ........................................................................................................................ 26

5 U.S.C. § 704 ........................................................................................................................ 34

5 U.S.C. § 706 ........................................................................................................................ 28

6 U.S.C. § 202 ........................................................................................................................ 21

6 U.S.C. § 251 ........................................................................................................................ 21

6 U.S.C. § 557 ........................................................................................................................ 21

8 U.S.C. § 1103 ........................................................................................................................ 5

8 U.S.C. § 1154 ........................................................................................................................ 6

8 U.S.C. § 1158 ........................................................................................................................ 5

8 U.S.C. § 1182 ........................................................................................................................ 5

8 U.S.C. § 1229b ...................................................................................................................... 5

8 U.S.C. § 1252 ................................................................................................................ *passim*

28 U.S.C. § 2201 .................................................................................................................... 44

Personal Responsibility And Work Opportunity Reconciliation Act of 1996,
   Pub L. No. 104–193, 110 Stat 2105 .......................................................................... 37

**Regulations**

8 C.F.R. § 274a.12(c)(14) ...................................................................................................... 5, 6

**Federal Rules**

Fed R. Civ. P. 12 ...................................................................................... 11, 12, 19, 26

**Constitution**

U.S. Const. amend. V ........................................................................................... 39

**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act (1947) ................................... 35

Press Release, DHS
  Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
  https://go.usa.gov/xncuM ................................................................................. 30

U.S. Dep't of Justice, Office of Legal Counsel,
  *The Department of Homeland Security's Authority to Prioritize Removal of
  Certain Aliens Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
  https://www.justice.gov/file/179206/download ............................................. 6, 20, 33

USCIS, *Frequently Asked Questions* (last updated Oct. 6, 2017),
  https://go.usa.gov/xngCd ....................................................................... 7, 40, 41, 43

USCIS, *Policy Memorandum*  (Nov. 7, 2011),
  https://go.usa.gov/xncPK ............................................................................... 7, 41

# INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals.  DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time— available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans.  DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients.  On the other, continued litigation would in all likelihood result in a nationwide

injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will generally remain valid for the remainder of their stated duration (usually two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal. And although the agency has stopped accepting new DACA requests, it will finish adjudicating those it had received by September 5, 2017, when the Rescission Policy was announced.

In this case, Plaintiffs—one university, one corporation, and one DACA recipient— challenge the Rescission Policy on a variety of statutory and constitutional grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA. Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.- Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g).  Also, at a minimum, the non-individual Plaintiffs cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock

limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law. Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported by the record is fundamentally misguided. Agencies are always free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results. Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, served contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing. The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies. Indeed, DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and

comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further.  Plaintiffs have failed to identify a suspect class or a fundamental right implicated by the Rescission Policy, and the Acting Secretary's decision easily survives rational-basis review.

Plaintiffs' due process claims also cannot survive a motion to dismiss.  DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012.  Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal.  DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court.  The original DACA policy is materially indistinguishable as a legal matter.  At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts.  To state the premise of this claim is to refute it.

This case should be dismissed.

# BACKGROUND

## A.   Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396 (citation omitted).  DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b.  "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,'" which entails temporarily postponing the removal of individuals unlawfully present in the United States."  *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises his or her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

government which gives some cases lower priority"). Although originally "developed without express statutory authorit[y]," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.[1]

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

## B.   DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo).

---

[1] *See generally* U.S. Dep't of Justice, Office of Legal Counsel, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present, 38 Op. O.L.C. 1, 12–20 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws.  DACA Memo at 1 (AR 1).  Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal.  *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2).  Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 3 (AR 3).

In public guidance published on the U.S. Citizenship and Immigration Service website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [U.S. Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  USCIS, *Frequently Asked Questions*, FAQ No. 19 (last updated Oct. 6, 2017), (hereinafter DHS DACA FAQ), https://go.usa.gov/xngCd; *see* USCIS, *Policy Memorandum*, (Nov. 7, 2011) (hereinafter Notice to Appear Guidance), https://go.usa.gov/xncPK.  DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA.

*See* AR 37–41 (hereinafter DAPA Memo).   DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39).   The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.   *Id.* at 3–4 (AR 39–40).

### C.        The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.   Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.   *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).   Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.   *Id.* at 168.   It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.   *Id.*   Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."   *Id.* at 178 n. 156.   And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one."   *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec. (June 15, 2017) (AR 235–37). Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo. *See* AR 238–40 (Paxton Letter).

### D.      Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 ("Rescission Policy" or "Policy"). As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).

Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.    The Instant Action

Plaintiffs' complaint raises five claims. In Count I, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without authority and without notice and comment.

Pls.' Compl. ¶¶ 65–72, ECF No. 1.  In Count II, Plaintiffs allege that the Rescission Policy violates the APA because it constitutes a change in agency policy without an adequate explanation.  *Id.* ¶¶ 73–89.  In Count III, Plaintiffs allege that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it allegedly discriminates against DACA recipients on the bases of their undocumented status.  *Id.* ¶¶ 90–93.  In Count IV, Plaintiffs allege that the rescission violates procedural due process because, without notice and an opportunity to be heard, (a) Princeton University will be deprived of its interest in having DACA recipients as enrolled students, (b) Microsoft will be deprived of its interests in the investments it made in employees who are DACA recipients, and (c) DACA recipients will be deprived of their interest in their DACA.  *Id.* ¶¶ 94–103.  In Count V, Plaintiffs allege that the government's supposedly new information-sharing policy violates substantive due process.  *Id.* ¶¶ 104–109.  Plaintiffs ask the Court to declare that the DACA policy was lawful, declare that the Rescission Policy is unlawful, and enjoin Defendants from rescinding DACA as well as from allegedly impermissible information sharing.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the Court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering such a motion, the Court must accept all well-pleaded allegations as true.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The Court need not, however, accept inferences that are unsupported by facts alleged in the complaint or that amount to mere legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating subject-matter jurisdiction, the court may, when necessary, look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as ... factual allegation[s]" are "disentitle[d] ... to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider materials incorporated into the complaint by reference, as well as judicially noticeable materials, without converting the motion into one for summary judgment. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

With respect to Plaintiffs' APA claims, "a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment, or it may convert the motion into a motion for summary judgment under Rule 12(d)." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (internal citation omitted). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (alterations in original) (citation omitted); *see also Bates*, 935 F. Supp. 2d at 17. "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question

on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage ... and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted).  Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer*, 583 F.3d at 865; *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of … judicial notice." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court may also consider exhibits that are submitted with the complaint, *see Hurd*, 864 F.3d at 678, as well as "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss," such as when the complaint "quotes from and discusses a document extensively." *Patterson v. United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013) (internal citations and alterations omitted).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws.  The Court need not consider this extraordinary request, however, because this case is not justiciable.  The exercise of enforcement discretion in the Rescission Policy is

committed to agency discretion by law and is therefore unreviewable.  In fact, Congress has gone

so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

here.  At a minimum, the non-individual plaintiffs lack standing.  And in all events, Plaintiffs fail

to state a claim.  This case should therefore be dismissed.

## I.   THIS CASE IS NOT JUSTICIABLE.

### A.  The Rescission Policy is Not Justiciable because this Immigration Enforcement Policy is a Matter Committed to Agency Discretion by Law.

**1.**   The APA bars judicial review of certain categories of decisions that "courts traditionally

have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)

(quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists

"no meaningful standard against which to judge the agency's exercise of discretion" in these areas.

*Chaney*, 470 U.S. at 830; *see Davis v. Fed. Bureau of Prisons*, 517 F. Supp. 2d 460, 461 (D.D.C.

2007) ("The APA, however, also provides an exception to the waiver of sovereign immunity ...

when ... agency action is committed to agency discretion."), *aff'd in part and remanded*, 334 F.

App'x 332 (D.C. Cir. 2009).  This bar applies even when "the agency gives a 'reviewable' reason

for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283

(1987).

Among the decisions committed to executive discretion are "an agency's exercise of

enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing

of … factors which are peculiarly within [an agency's] expertise," including "whether agency

resources are best spent on this violation or another, whether the agency is likely to succeed if it

acts, whether the particular enforcement action requested best fits the agency's overall priorities,

and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.

As there is "no meaningful standard against which to judge the agency's exercise of discretion" in

weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency [] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to states' use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative

decisionmakers"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration.  On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97.  Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396.  One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time.  *Arpaio*, 797 F.3d at 17; *see supra* at 5–6.  Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.  Such determinations are thus presumptively unreviewable.  *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion.  *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations").  Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable).  To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former.  *Mada-*

16

*Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.**   As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone.   Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.   For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16.   Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other.   Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable.   That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.[2]   For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly

---

[2] Of course, if the non-reviewable enforcement policy contains an embedded interpretive rule, that may be reviewable as such.   *See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676–77 (D.C. Cir. 1994), declined to extend by *Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*, 283 F.3d 339 (D.C. Cir. 2002).   It does not follow, however, that the enforcement policy itself is reviewable. *See BLE*, 482 U.S. at 283.   For present purposes, the Rescission Policy does not contain an embedded interpretative rule that would be otherwise reviewable.   Rather, it merely contains a non-reviewable decision about the exercise of enforcement discretion.   *See id.*

stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488, subject to the "possib[le] exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or

18

other sensitive matters as well.  *Id.* at 490–91.  Finally, the idea that "an ongoing violation of United States law ... must be allowed to continue because it has been improperly selected is not powerfully appealing."  *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively unreviewable exercise of enforcement discretion."  Mem. & Order at 23, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (hereinafter *Batalla Vidal* Mem. & Order) (granting in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants' Rule 12(b)(6) motion).  In so holding, however, the court incorrectly labeled the Acting Secretary's decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals who previously enjoyed some protection from removal to coercive state authority," *id.* at 25.  To the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of itself, which is best described as reordering the agency's enforcement priorities in light of litigation risk.  *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'").  It is, therefore, equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement cases that the Supreme Court has found are committed to executive discretion.  *See, e.g.*, *Chaney*, 470 U.S. at 832–33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that

DACA was unlawful, a rationale for which the court held there was "law to apply." *Batalla Vidal*

Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253–55 (Rescission Policy)).   The

Attorney General's determination that DACA was unconstitutional was but one factor that the

Acting Secretary considered.   As the Rescission Policy makes clear, in determining to wind down

the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied

on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as

well as the self-evident complexities associated with ending DACA, a policy that impacts nearly

800,000 individuals.   Rescission Policy at 2–4 (AR 253–55).   The balancing of those

considerations is not amenable to review in light of the sources cited by the *Batalla Vidal* court,

such as statutory text, the history of the use of deferred action, or the 2014 Office of Legal Counsel

(OLC) opinion.[3]  *Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement

decisions are committed to agency discretion even where they rest on broad legal policy judgments

rather than individualized considerations.   *BLE*, 482 U.S. at 283.   *BLE* specifically gave the

example of a criminal prosecutor's decision not to prosecute a certain category of crimes based on

the prosecutor's view of the legal merits of the prosecution.   *Id.*  Although a court may be qualified

to consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject

of judicial review."   *Id.*   Just as in the analogy provided in *BLE*, the Acting Secretary's

consideration, among other things, of the lawfulness of the DACA policy merely explains how she

plans to exercise her discretion to rescind the policy and that decision, regardless of the court's

ability to review the legal merits of DACA, is nonreviewable.   *Id.*  *BLE*'s point applies *a fortiori*

---

[3] OLC Op. 18 n. 8.

in the immigration context where the Supreme Court has emphasized the problems with questioning the government's exercise of its broad discretion.  *See AADC*, 525 U.S. at 489–90.

### B. The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation … where" the Executive had "chose[n] *not* to exercise it."  *Id.* at 484.  Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion."  *Id.* at 485 (citation omitted).  To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[4]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be

---

[4] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, … the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28–31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29–30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming

expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action over a two-and-a-half-year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy. 8 U.S.C. § 1252(g) (emphasis added).[5]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar

---

[5] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien. *Batalla Vidal* Mem. & Order at 31. However, the fundamental concerns of § 1252(g) apply whether the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien). *See AADC*, 525 U.S. at 485. In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended. *Id.* Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the non-individual Plaintiffs in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiff and all other DACA recipients. To the extent the non-individual Plaintiffs would benefit from an order setting aside the Rescission Policy, *but see infra* Section I.C.1, their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

### C.  The Non-Individual Plaintiffs' Claims Are Not Cognizable.

#### 1. Plaintiffs Lack Article III Standing.

At a minimum, the Court should dismiss the claims brought by the Trustees of Princeton University and Microsoft Corporation for lack of standing. To establish Article III standing, these parties must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, these Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id.* at 562. That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, the parties are relying primarily on the incidental effects of federal immigration policies. *See* Pls.' Compl. ¶ 61 (alleging that Princeton suffers harm from diminished "economic value of [DACA recipients'] education and

Princeton's investment in them" as well as the lost "opportunity to matriculate new [DACA recipients]"); *id.* ¶ 62 (alleging that Microsoft is harmed by "eliminating a valuable pool of employees" and causing Microsoft to "spend additional resources to recruit, train, and promote replacement employees").[6]  It would be extraordinary to find Article III standing based on these assertions, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects does not provide carte blanche to challenge such enforcement decisions whenever there is a disagreement about federal immigration policy.

### 2. Plaintiffs Lack a Cause of Action under the APA.

Even if the non-individual Plaintiffs could establish Article III standing, they would lack a cause of action under the APA.  The APA does not "allow suit by every person suffering [an] injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning

---

[6] Princeton also asserts that it brings this suit "on behalf of its students," *see* Pls.' Compl. at 2, but it fails to allege facts sufficient to demonstrate third-party standing, which requires that (1) Princeton "'ha[s] suffered an 'injury in fact,' thus giving [it] a 'sufficiently concrete interest' in the outcome of the issue in dispute,'" (2) that it "ha[s] a close relation to the third party," and (3) that "there . . . exist[s] some hindrance to the third party's ability to protect his or her own interests." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 43 (D.C. Cir. 1999) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  As explained above, the incidental effects of the Rescission Policy allegedly borne by Princeton do not rise to the level of "injury in fact" sufficient to establish standing in Princeton's own right.  And even assuming a close relationship between Princeton and its DACA recipient-students for purposes of the challenge at issue in this suit, Princeton has not shown that circumstances exist that prevent these students from asserting their own interests.  Indeed, such a claim would be rebutted by the fact that one of Princeton's DACA-recipient students, Ms. Perales-Sanchez, is in fact a Plaintiff in this matter.  *See Washington v. Trump*, 858 F.3d 1168, 1188 (9th Cir. 2017) (Bea, J., dissenting from denial of *en banc* rehearing) (holding that the panel's analysis ignored the third-party standing requirements of *Powers* and finding that the States' universities did not show that students, faculty, and scholars allegedly harmed by Executive Order 13769, "Protecting the Nation from Foreign Terrorist Entry Into the United States," were unable to protect their own interests).

of a relevant statute."  5 U.S.C. § 702.  To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question."  *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the non-individual Plaintiffs from bearing any incidental effects of a denial of deferred action.[7]  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### D.  The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.  First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.  Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.  *See Mississippi v. Johnson*, 71 U.S. 475,

---

[7] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing properly addressed under Rule 12(b)(6). *Batalla Vidal* Mem. & Order at 46–47.  Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch).

Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's]

statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy,

a classic exercise of agency enforcement discretion, open to challenge.  After all, the Fifth Circuit

itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively

would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a

"*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable,

*id.* at 168.  Denials of deferred action under a return to a more traditional enforcement policy

should be treated no differently.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM.

Even if Plaintiffs could establish standing and justiciability, the Court should dismiss this

case in its entirety for failure to state a claim.[8]

### A.  Plaintiffs Fail to State an APA Claim.

#### 1. The Acting Secretary Rationally Explained Her Decision to Wind Down DACA, Particularly Given the Imminent Risk of a Nationwide Injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it

constitutes a change in agency policy without an adequate explanation.  Pls.' Compl. ¶¶ 73–89.

That argument misapprehends the nature of the inquiry under the APA.  It is black-letter law that

agencies are free to change course on policy matters so long as they provide a rational explanation.

Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this

deferential standard, particularly in view of the imminent risk of a nationwide injunction, which

could have prompted an immediate—and chaotic—end to the policy.

---

[8] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

**1.**   Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).[9]  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id.*  And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted).  If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the

---

[9] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 87.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Section II.B–D, *infra*.

agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. While the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the Administrative Record, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

 **2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

 The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass

legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She explained her reasonable decision to rescind DACA, and the APA requires no more. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").[10] And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.** Plaintiffs' allegations entirely ignore the Acting Secretary's assessment of litigation risk, which is reason enough to reject their arbitrariness claim. To the extent Plaintiffs suggest that

---

[10] For these same reasons, Plaintiffs' inconsistent allegations that the government both improperly provided for a wind down period, Pls.' Compl. ¶ 86, and, at the same time, inadequately explained the dates chosen for the wind down process and, in any event, made the wind down period unreasonably short, *id.* ¶ 81, fail to state a claim under the APA.

the Acting Secretary's consideration of the Attorney General's views about DACA's legality somehow rendered her decision arbitrary and capricious, the argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.  Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 3–4 (AR 254–55).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.  *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (citation omitted) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254) (citation omitted).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court

should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court.  The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it.  *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator").  Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself.  *Id*. at 172.  On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice:  Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73.  Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's view that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by

the Fifth Circuit.  OLC Op. 18 n.8.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  *Id.*  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by-case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria" (footnote and citation omitted)).  Further, the original DACA policy largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new policy that it approved.

**4.**  Plaintiffs also allege that the Rescission Policy is arbitrary and capricious because the Acting Secretary failed to sufficiently consider the "serious reliance interests by [DACA] participants."  Pls.' Compl. ¶¶ 76–79.  But as set forth in 6–8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time.  And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based on the looming risk of a nationwide injunction ending the DACA policy altogether.  Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than would an immediate injunction terminating the policy.  *See supra* 9–10.  Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

**5.**   Plaintiffs also allege that Defendants violated the APA by failing "to provide any reasoned analysis to support the changes to the confidentiality of applicant information."  Pls.' Compl. ¶ 82.  As explained *infra*, Section II.D, DHS's information sharing policy has not changed. Thus, there is no "final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that "final agency action" must "mark the consummation of the agency's decisionmaking process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action"). Accordingly, such claim fails as a matter of law.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.   Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

### 2. The Rescission Policy is Exempt from Notice and Comment.

Plaintiffs likewise miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶¶ 65–72; *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy.  That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing (citation omitted)).[11]

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425,

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties— and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the APA 30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  *McCarthy*, 758 F.3d at 252.  It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general statement of policy, like a press

---

447 n.79 (D.C. Cir. 1982) *aff'd sub nom, Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831 (citations omitted). It does not immediately deprive any DACA recipient of his or her current deferred action, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century,

36

generally without going through the full notice-and-comment process.[12]

That is as it should be.  An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37).  Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied:  it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

## B.  Plaintiffs Fail to State an Equal Protection Claim.

Plaintiffs first allege that the Rescission Policy violates equal protection principles by impermissibly discriminating against DACA recipients on the basis of their undocumented status. Pls.' Compl. ¶¶ 90–93.  However, because "[u]ndocumented aliens cannot be treated as a suspect class," *Plyler v. Doe*, 457 U.S. 202, 223 (1982), *superseded by statute*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub L. No. 104–193, 110 Stat 2105, and Illegal Immigration Reform & Immigrant Responsibility Act of 1996, Pub L. NO. 104–208, Div. C., 110

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule.  Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156.  In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

Stat. 3009, the Rescission Policy can be subject only to rational-basis review.  *See Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011).  The Rescission Policy easily survives that standard for the reasons above, *see supra* Section II.A.1.

Plaintiffs next appear to allege that Defendants violate equal protection principles by depriving "DACA recipients of their interest in furthering their education or pursuing a livelihood."  Pls. Compl. ¶ 92.  This claim fails for the simple reason that Plaintiffs have failed to identify any "fundamental rights" implicated by the Rescission Policy.  Even for U.S. Citizens, "the right to practice a chosen profession" is not a fundamental right.  *See Doe v. Rogers*, 139 F. Supp. 3d 120, 154–57 (D.D.C. 2015); *Robinson v. Huerta*, 123 F. Supp. 3d 30, 41 n. 7 (D.D.C. 2015) (collecting cases).  Nor, for that matter, is the right to further an education.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973).  If the contrary were true, then all sorts of regulations addressing employment and education, including various licensing laws, would suddenly be subject to strict scrutiny.  Unlawfully present aliens, who do not even have a fundamental right to remain in the United States, *see infra* Section II.C, cannot invoke a right to pursue a calling or further an education.  Indeed, an alternate rule would call into question longstanding immigration laws.  *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (discussing "[Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States" (citations omitted)).  As Plaintiffs have failed to identify a fundamental right, rational-basis review applies, *see Dixon*, 666 F.3d at 1342, and thus, as demonstrated *supra*, Plaintiffs' claims fail as a matter of law.

### C.  Plaintiffs Fail to State a Procedural Due Process Claim.

Plaintiffs allege that the rescission violates due process norms by depriving them of protected liberty and property interests without notice and comment.  *See* Pls.' Compl. ¶¶ 94–103.

This claim fails on the merits for the simple reason that no Plaintiff identifies a protected liberty or property interest implicated by the rescission that would entitle them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits." *Roth*, 408 U.S. at 577.

To the extent that Plaintiffs argue that Ms. Perales-Sanchez possesses a protected liberty interest in her DACA, *see* Pls.' Compl. ¶ 100, DACA is not a protected entitlement because "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted).

The DACA policy contains no such "explicitly mandatory language." *Id*. at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a

"policy" for the "exercise of prosecutorial discretion."  DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'").  And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.

The D.C. Circuit has recognized that, under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3).  Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectible liberty interest in deferred action, nor does it create a protectible interest in being considered for deferred action status").

Plaintiffs also allege that the rescission deprives Microsoft and Princeton University of "interests cognizable under the Constitution" without notice and comment to the extent that Microsoft will lose investment in employees who are DACA recipients, as well as suffer business disruptions when these employees lose work authorization, and Princeton will lose the "resources . . . invested in [DACA recipients'] education," as well as "the benefits associated with their future success.  Pls.' Compl. ¶¶ 98–99.  The legal basis for this claim is unclear at best, and in any event

to the extent this Court finds that individual DACA recipients lack due process rights, *a fortiori* universities, corporations, and other entities would also lack any such rights.

### D.  Plaintiffs Fail to State a Substantive Due Process Claim.

Plaintiffs assert that DHS has changed its information-sharing policy and that the alleged "use of information obtained through implementation and operation of DACA ... for any purpose related to immigration enforcement" that was not "previously provided under the DACA program," does not comport with "fundamental fairness" and thus violates substantive due process. Pls.' Compl. ¶ 108.

As a threshold matter, Plaintiffs do not allege facts sufficient to show that there actually has been a substantive change in policy regarding information sharing.  They rely solely on the use of one word in the Rescission FAQs indicating that information will not be "proactively" provided to other law enforcement entities, Pls.' Compl. ¶ 108 (quoting DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) ("Rescission FAQs"), that language is entirely consistent with DHS's policy regarding the protection of DACA information.  The agency's information-sharing policy in fact contains (and has always contained) a number of exceptions.

For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19,

nothing in the Rescission Policy purports to change it, and it currently remains in effect. *Cf. Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1020–21 (9th Cir. 2011) ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government . . . . '[A] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past.'" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)) (citations omitted)).

In any event, Plaintiffs fail to state a substantive due process claim. Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted).  The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003).  "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). "Although that doctrine normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Wash. Univ. v. Dist. of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003).  As DHS' information sharing policy has not substantively changed, and Plaintiffs cannot identify an instance where any DACA

recipient's information was allegedly shared in violation of this policy, Plaintiffs' substantive due process claim fails for the simple reason that they have not identified any actual deprivation of liberty or property. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (holding that substantive due process claim failed because Plaintiff "ha[d] not alleged facts [that] suggest[ed] he ha[d] been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest"); *see also Hyuk Joon Lim v. Holder*, 710 F.3d 1074, 1076 (9th Cir. 2013) ("Cancellation of removal is a form of discretionary relief which does not give rise to a 'substantive interest protected by the Due Process Clause.'") (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003)); *Tefel v. Reno*, 180 F.3d 1286, 1300–01 (11th Cir. 1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension," that "prior generosity in awarding wholly and expressly discretionary relief does not prove the existence of a constitutional entitlement," and that "awarding and then revoking discretionary relief does not offend due process" (quotation marks omitted)).[13]

Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be modified, superseded, or rescinded at any time." DHS DACA FAQ No. 19. It therefore creates no judicially enforceable rights. And even if Plaintiffs had identified an actual and cognizable deprivation of a liberty or property interest, nothing about

---

[13] Although the court in *Batalla Vidal* found (incorrectly) that, once a DACA recipient's deferred action expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them, *see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their deferred action.

DHS' information sharing policy is so outrageous as to "shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n. 8.

## III.    NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission Policy, Plaintiffs seek a declaratory judgment that DACA is "lawful." *See* Pls.' Compl. ¶¶ 110–14.  The Declaratory Judgment Act provides a remedy, not a source of rights independent of substantive federal law.  *C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).  To establish standing and to seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief.  28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239–40 (1937).  The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests."  *Aetna*, 300 U.S. at 240–41.

Here, even assuming DACA was "lawful," any declaratory relief that this Court might provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy.  *See supra* Section I.A.  Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious.  Any after-the-fact conclusion by this Court that DACA was "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting.  Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek an "injunction against enforcement and implementation of the DACA Rescission Memorandum" and "an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers ... except as previously provided under the DACA program."  Pls.' Compl. at 41, Prayer for Relief.  Even if the Court were to conclude that Plaintiffs

were entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief.  Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996).  "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").  Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case or, in the alternative, grant summary judgment to Defendants on all claims.

Dated: November 22, 2017  Respectfully submitted,

          CHAD A. READLER
          Principal Deputy Assistant Attorney General

          BRETT A. SHUMATE
          Deputy Assistant Attorney General

          JENNIFER D. RICKETTS
          Director

          JOHN R. TYLER
          Assistant Branch Director

          */s/   Rachael Westmoreland*
          RACHAEL WESTMORELAND (GA Bar. No.
          539498)
          Trial Attorney
          United States Department of Justice
          Civil Division, Federal Programs Branch
          20 Massachusetts Avenue NW
          Washington, DC 20530
          Phone: (202) 514-1280
          Fax: (202) 616-8470
          Email: rachael.westmoreland@usdoj.gov

          *Counsel for Defendants*