**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, KRISTJEN NIELSON, in her official capacity as Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and KRISTJEN NIELSON, in her official capacity as Secretary of the Department of Homeland Security, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Civil Action No. 17-cv-1907 (CRC)

Civil Action No. 17-cv-2325 (CRC)

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

BACKGROUND ..........................................................................................................................2

    A.  The Creation of DACA.................................................................................................2

    B.  The Rescission of DACA ............................................................................................3

STANDARD OF REVIEW ..........................................................................................................4

ARGUMENT ...............................................................................................................................5

I.    No Statute Bars Judicial Review In This Case. ...................................................................5

    A.  Rescinding DACA Is Not A Decision "Committed To Agency Discretion By Law." .........................................................................................................................5

    B.  Judicial Review of DACA's Rescission Is Not Barred by INA § 1252(g). ..............10

II.   Plaintiffs Have Article III Standing To Sue......................................................................12

    A.  Princeton And Microsoft Have Standing To Challenge DACA's Rescission............13

        1.  Proprietary Injuries ........................................................................................ 13

        2.  Third-Party Standing ...................................................................................... 17

    B.  The NAACP And Labor Unions Have Associational Standing. ................................18

        1.  Each Association Plaintiff Has Members With Standing To Sue. ..................... 18

        2.  The Germaneness Requirement Is Satisfied...................................................... 19

        3.  The Participation Of Individual Members Is Not Required. ............................. 20

III.  Plaintiffs Have A Cause of Action Under The APA. .........................................................20

    A.  Princeton And Microsoft Have A Cause of Action Under The APA..........................21

    B.  The Association Plaintiffs Have A Cause Of Action Under The APA. ....................22

IV.  Plaintiffs State Claims Upon Which Relief May Be Granted............................................23

    A.  Relief May Be Granted On Plaintiffs' APA Claims...................................................23

        1.  Plaintiffs Have Adequately Pleaded Their Substantive APA Claim................. 23

        2.  Plaintiffs Have Adequately Pleaded Their Procedural APA Claim. ................. 24

    B.  Plaintiffs' Equal Protection Claims Are Adequately Pleaded. ..................................24

        1.  Defendants Must Advance A Substantial Justification For Rescission............. 25

        2.  Defendants Have Advanced No Substantial Justification For Rescission. ........ 26

    C.  Plaintiffs State Due Process Claims Upon Which Relief Can Be Granted. ..............27

        1.  Plaintiffs Have Adequately Pleaded That Rescission Violates Due Process....................................................................................................... 27

            a.  Plaintiffs Have Adequately Pleaded Protected Interests. ........................... 27

         b.    Defendants Did Not Employ Adequate Procedures When Depriving
Plaintiffs Of Their Protected Interests.............................................................. 31

     2.    Plaintiffs Have Adequately Pleaded That Defendants' Revised
Information-Sharing Policy Violates Due Process. ............................................. 32

D.   Plaintiffs State a Claim Under the Regulatory Flexibility Act. ................................... 35

E.   Nationwide Declaratory and Injunctive Relief Is Permissible and Warranted. .......... 35

CONCLUSION ................................................................................................................................ 37

97025.8

## TABLE OF AUTHORITIES[*]

CASES

*2910 Georgia Avenue, LLC v. District of Columbia*, 234 F. Supp. 3d 281 (D.D.C. 2017) ......................................................................................................................32

*\*3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003) ...............................................................................27, 28, 29, 30, 31

*AARP v. EEOC*, 226 F. Supp. 3d 7 (D.D.C. 2016) ...........................................18, 19, 20

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) .................................................15

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) ...........................................................................................16

*American Horse Protection Ass'n v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987) .......................9

*Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998)...........16

*ANR Pipeline Co. v. Corporate Commission of Oklahoma*, 860 F.2d 1571 (10th Cir. 1988) ..................................................................................................14

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) .........................30, 31

*Arizona v. United States*, 567 U.S. 387 (2012) ...........................................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................... 4-5

*\*Batalla Vidal v. Duke*, No. 16-CV-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) ...................................................................5, 6, 7, 9, 10, 11, 12, 35

*Bates v. Donley*, 935 F. Supp. 2d 14 (D.D.C. 2013)......................................................5

*Bell v. Burson*, 402 U.S. 535 (1971) .....................................................................29, 31

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)................................28

*Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986) .....................5

*Center for Sustainable Economy v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015).................18

*Chavez v. Martinez*, 538 U.S. 760 (2003).................................................................33

*Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309 (D.C. Cir. 1995) .........20

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

97025.8

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................... 33

*Cox v. Louisiana*, 379 U.S. 536 (1965) ......................................................................... 33

\*Crowley Caribbean Transportation, Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994) ....... 7

*D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191 (D.C. Cir. 2000) ........................ 13

*Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35 (D.D.C. 2015) ..................... 4, 5

*Doe 1 v. Trump*, No. CV 17-1597, 2017 WL 4873042 (D.D.C. Oct. 30, 2017) ........... 19

*Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) ............................................................. 19

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) .............................................................. 8, 9

*Edison Electric Institute v. U.S. EPA*, 996 F.2d 326 (D.C. Cir. 1993) .......................... 7

*Electronic Privacy Information Ctr. v. United States Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011) ....................................................................... 24

*Evangelical Lutheran Church in America v. INS*, 288 F. Supp. 2d 32 (D.D.C. 2003)
...................................................................................................................................... 11

*Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) ............................................................................................................................. 22

*Foucha v. Louisiana*, 504 U.S. 71 (1992) .................................................................... 29

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ...................................................................... 29

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................................... 14

*Gulf Coast Maritime Supply, Inc. v. United States*, 867 F.3d 123 (D.C. Cir. 2017) ... 18

*Haitian Refugee Center, Inc. v. Baker*, 789 F. Supp. 1552 (S.D. Fla. 1991) ............... 18

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) .............................................. 36

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .............................................. 15

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *vacated on mootness grounds by Trump v. Hawaii*, 2017 WL 4782860 (U.S. Oct. 24, 2017) ................................... 15, 22

*Heckler v. Chaney*, 470 U.S. 821 (1985) ..................................................................... 5, 6

*Horne v. Flores*, 557 U.S. 433 (2009) .......................................................................... 13

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988) ....... 19, 23

*INS v. Yueh-Shaio Yang*, 519 U.S. 26 (1996) ...............................................................9

*International Refugee Assistance Project v. Trump*, No. 17-361, 2017 WL 4674314
  (D. Md. Oct. 17, 2017)............................................................................................22

*Kent v. Dulles*, 357 U.S. 116 (1958) ...........................................................................29

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)................................................................15

*L. Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017) .......................................................9

*Lewis v. Casey*, 518 U.S. 343 (1996)...........................................................................36

*Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377
  (2014)....................................................................................................................21

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ...........................................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................17

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) ............................................7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.
  209 (2012)..............................................................................................................21

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...................................................................32

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941) .....................37

*Medina v. United States Department of Homeland Security*, No. 17-cv-0218, 2017
  WL 5176720 (W.D. Wash. Nov. 8, 2017) ................................................28, 30, 31

*Meina Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015) ......................................................9

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ............................................................28, 29

*Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996)..................14, 21

*National Mining Ass'n v. United States Army Corps of Engineers*, 145 F.3d 1399
  (D.C. Cir. 1998) ....................................................................................................35

*National Telephone Cooperative Ass'n v. FCC*, 563 F.3d 536 (D.C. Cir. 2009) ..........35

*National Treasury Employees Union v. Horner*, 854 F.2d 490 (D.C. Cir. 1988)......................7, 8

*National Wildlife Federation v. United States EPA*, 980 F.2d 765 (D.C. Cir. 1992) .....................7

*Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193
  (2009)....................................................................................................................13

v

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ........................................................................27

*OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998) ...............................7

*Padula v. Webster*, 822 F.2d 97 (D.C. Cir. 1987) ...............................................................10

*Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ...............14

*Perales v. Castillo*, 903 F.2d 1043 (5th Cir. 1990) ...............................................................9

*Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated on other grounds by*
    Hollingsworth v. Perry, 133 S. Ct. 2652 (2013) ...............................................................26

*PETA v. USDA*, 97 F.3d 1087 (D.C. Cir. 2015) ...........................................................15, 16

*Pickus v. United States Board of Parole*, 543 F.2d 240 (D.C. Cir. 1976) .....................32

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...............................................................13

*Plyler v. Doe*, 457 U.S. 202 (1982) ...........................................................................25, 26, 27

*Raduga USA Corp. v. United States Department of State*, 440 F. Supp. 2d 1140
    (S.D. Cal. 2005) ...............................................................................................................22

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ...........7, 11, 12

*Richardson v. Town of Eastover*, 922 F.2d 1152 (4th Cir. 1991) .................................28

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985) .............................................................6

*Romeiro de Silva v. Smith*, 773 F.2d 1021 (9th Cir. 1985) .............................................30

*Romer v. Evans*, 517 U.S. 620 (1996) ...............................................................................26

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ......................13

*Runyon v. McCrary*, 427 U.S. 160 (1976) .........................................................................17

*Scenic America, Inc., v. United States Department of Transportation*, 836 F.3d 42
    (D.C. Cir. 2016) ........................................................................................................30, 31

*Singleton v. Wulff*, 428 U.S. 106 (1976) .............................................................................17

*Stanley v. Illinois*, 405 U.S. 645 (1972) ...........................................................................29

*Taylor v. Resolution Trust Corp.*, 56 F.3d 1497 (D.C. Cir. 1995) ...............................29

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) .....................................................36

*United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014) .................................................10

*Velasco-Gutierrez v. Crossland*, 732 F.2d 792 (10th Cir. 1984) .................................30

*Warth v. Seldin*, 422 U.S. 490 (1975) ..........................................................................18

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .........................................................33

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ...........................................15, 17

*Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164 (1972) ......................................25

*Webster v. Doe*, 486 U.S. 592 (1988) ...........................................................................10

*Wilmina Shipping AS v. United States Department of Homeland Security*, 934 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................ 27-28, 31

*Young America's Foundation v. Gates*, 560 F. Supp. 2d 39 (D.D.C. 2008), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009) .................................................................................19

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 4 ............................................................................................36

5 U.S.C. § 553 ................................................................................................................24

5 U.S.C. § 601 *et seq*. ...................................................................................................35

5 U.S.C. § 706(2)(A) ......................................................................................................23

8 U.S.C. § 1101 *et seq*. ..................................................................................................21

8 U.S.C. § 1101(a)(15)(H) .............................................................................................21

8 U.S.C. § 1101(a)(15)(J) ..............................................................................................21

8 U.S.C. § 1101(a)(15)(O) .............................................................................................22

8 U.S.C. § 1252(g) .........................................................................................................11

8 U.S.C. § 1611(b)(2) .......................................................................................................3

8 U.S.C. § 1611(b)(3) .......................................................................................................3

8 U.S.C. § 1621(d) ............................................................................................................3

8 U.S.C. § 1324a .............................................................................................................22

## OTHER AUTHORITIES

8 C.F.R. § 1.3(a)(4)(vi) ................................................................................................................3

8 C.F.R. § 212.5(f) ......................................................................................................................3

8 C.F.R. § 274a.12(c)(14) ......................................................................................................3, 29

42 C.F.R. § 417.422(h) .........................................................................................................3, 29

42 C.F.R. § 422.50(a)(7) .......................................................................................................3, 29

USCIS, *Frequently Asked Questions: Rejected DACA Requests*, https://www.uscis.gov/daca2017/mail-faqs (last updated Dec. 7, 2017) ...................................................................................................................................33

97025.8

## INTRODUCTION

This Court has jurisdiction to review Defendants' decision to rescind the "Deferred Action for Childhood Arrivals" Program (DACA), and Plaintiffs have stated valid claims for relief challenging that decision under the Administrative Procedure Act (APA) and the Constitution. Defendants' motions to dismiss therefore should be denied.

As explained below, Defendants' attempts to avoid adjudication on the merits fail. *First*, neither the APA nor the Immigration and Nationality Act (INA) prohibits judicial review here. Bars to judicial review of agency action are very narrowly construed, and Defendants' claim that Congress intended to foreclose all review of an Executive Branch decision with grave consequences for nearly a million people should be viewed with particular suspicion. *Second*, each of the Plaintiffs in these cases has standing under Article III: Perales Sanchez's standing, as a DACA beneficiary, is so clear Defendants do not dispute it; Princeton and Microsoft have organizational standing based on their own interests, and Princeton has third-party standing to represent its DACA-beneficiary students as well; and the NAACP and the Labor Union Plaintiffs—the American Federation of Teachers (AFT) and United Food and Commercial Workers (UFCW)—each have associational standing to represent their DACA-beneficiary members. *Third*, each of these Plaintiffs has a cause of action under the APA, as each brings this suit to vindicate concerns well within the "zone of interests" the INA serves to protect.

On the merits, Plaintiffs have stated viable claims for relief. *First*, as discussed more fully in Plaintiffs' Motion for Summary Judgment, Defendants' rescission of DACA is arbitrary and capricious under the APA: It was supported by no meaningful explanation, it reverses course without engaging the considerations that underlay the prior policy, it rests on a false legal premise, and it is now being defended only on the basis of a *post hoc* rationalization. *Second*, it is invalid under the APA because it is a substantive, binding rule that concededly was adopted without notice

or any opportunity for public comment. *Third*, the rescission of DACA violates the Equal Protection Clause because it withdraws vital benefits solely from a uniquely vulnerable group of undocumented young people, and does so with no good reason. *Finally*, Defendants' apparent effort to walk back its promises to DACA beneficiaries respecting the use of their personal information violates the Due Process Clause.

In sum, nothing bars this Court from reviewing the rationality, procedural regularity, and constitutionality of Defendants' decision to end DACA. Plaintiffs have stated a claim that the decision falls short on all three scores.

## BACKGROUND[1]

### A.   The Creation of DACA

Prior to 2012, millions of young people brought here as children and raised in this country (known as "Dreamers") lived in the shadows. They suffered many hardships: they often could not secure government-issued identification and, accordingly, could not travel by plane to visit family or attend college far from home; they could not obtain work authorization; they could not open bank accounts or access credit; they could not access public benefits; and they lived in fear of law enforcement and potential removal from the country. *See* ECF 1, No. 1:17-cv-2325 ("Princeton Compl.") ¶¶ 1-2, 6, 41, 63-64; ECF 10, No. 1:17-cv-1907 ("Associations Compl.") ¶ 2.

On June 15, 2012, the then-Secretary of Homeland Security issued a memorandum establishing DACA ("DACA Memorandum"). *See* Princeton Compl. ¶ 30; Associations Compl. ¶ 24. Under DACA, Dreamers who meet certain criteria may obtain renewable two-year grants of "deferred action" (a decision not to pursue removal), as well as associated benefits conferred by

---

[1] Plaintiffs include only a brief account of the facts here because a more complete description is included in their Motion for Summary Judgment ("Plaintiffs' Mot."). *See* Plaintiffs' Mot. Part I; *see also* Princeton Compl. ¶¶ 30-64; Associations Compl. ¶¶ 24-50.

longstanding regulations on those who hold this status.  Princeton Compl. ¶¶ 31, 41; Associations Compl. ¶¶ 24, 37.   They may seek Social Security numbers and employment authorization, allowing them to work and access credit.  8 C.F.R. § 1.3(a)(4)(vi) (Social Security numbers); *id.* § 274a.12(c)(14) (work authorization).  They may apply for advance parole, allowing them to travel abroad and re-enter the United States.  *Id.* § 212.5(f).  And they may obtain driver's licenses, health insurance, and other public benefits.  8 U.S.C. § 1611(b)(2)-(3) (Social Security benefits and Medicare); *id.* § 1621(d) (state benefits); 42 C.F.R. §§ 417.422(h), 422.50(a)(7) (certain types of health insurance).

Although many potential beneficiaries were reluctant to hand over their personal information, the Government encouraged qualifying Dreamers to apply and told them they would be eligible to renew DACA status for the foreseeable future.  *See* Princeton Compl. ¶ 38; Associations Compl. ¶ 36.  In addition, the Government assured them that their information would not be used for other immigration-related purposes, including to facilitate their removal.  The official instructions accompanying the U.S. Citizenship and Immigration Service (USCIS) DACA application form promised that "[i]nformation provided in this request is protected from disclosure to [U.S. Immigration and Customs Enforcement (ICE)] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings" unless certain narrow criteria were met.  *See* Princeton Compl. ¶ 34; Associations Compl. ¶¶ 32-33.

Since DACA's inception in 2012, nearly 800,000 individuals have enrolled in and benefited from this life-changing program.  *See* Princeton Compl. ¶ 41; Associations Compl. ¶ 4.

### B.   The Rescission of DACA

On September 4, 2017, Attorney General Sessions announced, in a one-page letter, that DACA was unlawful.  The Attorney General's letter did not provide any substantive legal analysis, other than to reference litigation related to another program, "Deferred Action for Parents of

Americans" (DAPA).  *See* Princeton Compl. ¶ 48; Associations Compl. ¶ 42.  The next day, Acting

Secretary of Homeland Security Duke issued a memorandum formally rescinding DACA (the

"Rescission Memorandum").     The Acting Secretary's September 5, 2017 Rescission

Memorandum added little to the Attorney General's conclusory letter.  *See* Princeton Compl. ¶ 48;

Associations Compl. ¶ 6.  The Rescission Memorandum instructed DHS immediately to stop

accepting new DACA applications or approving new applications for advance parole; to accept

renewal applications only from individuals whose current deferred action would expire by March

5, 2018; and to accept such renewals only until October 5, 2017.  *See* Princeton Compl. ¶ 86.

In addition to rescinding DACA, Defendants have revised their assurances about the use

of DACA beneficiaries' personal information.   *See* Princeton Compl. ¶ 108; Associations Compl.

¶ 57.  Instead of promising to protect that information from use for immigration enforcement,

Defendants say that they will not "proactively" provide it to the DHS components responsible for

facilitating removal.   Princeton Compl. ¶ 108.   This after-the-fact qualification of Defendants'

commitment materially alters their information-sharing policy and exposes DACA beneficiaries

to grave risk.  *See id.*; Associations Compl. ¶¶ 42, 45.

## STANDARD OF REVIEW

Defendants have moved to dismiss Plaintiffs' complaints under Rules 12(b)(1) and

12(b)(6).  Under Rule 12(b)(1), Plaintiffs bear the burden of establishing that the court has subject-

matter jurisdiction, and the court "construes the allegations contained in the complaint in the

plaintiffs' favor."  *Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35, 38 (D.D.C. 2015).  The

court may also consider materials outside the pleadings and, once again, "factual discrepancies are

resolved in favor of the plaintiff."  *Id.*

Under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Ordinarily, a court considers only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Devorah*, 115 F. Supp. 3d at 38 (quotation marks omitted). In the APA context, however, a court may consider the administrative record without converting the motion into one for summary judgment. *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013).

## ARGUMENT

## I.    No Statute Bars Judicial Review In This Case.

Defendants claim judicial review of their decision to rescind DACA is precluded by the APA and the INA. But there is a "strong presumption that Congress intends judicial review of administrative action," and Defendants bear a "'heavy burden'" in rebutting that presumption. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670-72 (1986). Defendants have not met that burden here. This Court thus should follow the only other court to address a challenge to DACA's rescission and hold that this case is justiciable. *See Batalla Vidal v. Duke*, No. 16-CV-4756, 2017 WL 5201116, at *9-13 (E.D.N.Y. Nov. 9, 2017) (denying in relevant part the Government's motion to dismiss for lack of subject-matter jurisdiction).

### A.    Rescinding DACA Is Not A Decision "Committed To Agency Discretion By Law."

In arguing against judicial review, Defendants claim that their decision to rescind DACA permanently, nationwide, constitutes an action "committed to agency discretion by law" under the APA. *See* MTD Princeton 14 (citing 5 U.S.C. § 701(a)(2)).[2] In particular, they rely on the Supreme Court's holding in *Heckler v. Chaney*, 470 U.S. 821 (1985), that individual agency

---

[2] To minimize redundancy, Plaintiffs will generally cite to Defendants' Motion to Dismiss in the *Princeton et al.* matter even where Defendants make identical arguments in their Motion to Dismiss the *NAACP et al.* matter. References to Defendants' Motion to Dismiss the *Princeton et al.* matter will be to "MTD Princeton." Where a referenced argument is made only in Defendants' Motion to Dismiss in the *NAACP* matter, Plaintiffs shall refer to "MTD NAACP."

decisions not to initiate enforcement action are "presumptively unreviewable." *Id.* at 832. But *Chaney* recognized that § 701(a)(2) is only a "very narrow" exception to the APA's broad judicial review provisions, *id.* at 830, and the D.C. Circuit has consistently rejected efforts to expand this narrow exception in exactly the way Defendants now propose.

First, Defendants' appeal to *Chaney* elides the critical distinction between enforcement decisions and *non*-enforcement decisions. In *Chaney*, the Court held the FDA's non-enforcement decision unreviewable in part because "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights." *Chaney*, 470 U.S. at 832. That is a feature unique to *non*-enforcement decisions. Here, the Rescission Memorandum claws back the protection from coercive removal previously afforded to hundreds of thousands of people, and it subjects them to *new* coercive requirements, such as bars on lawful work and travel abroad. *See Batalla Vidal*, 2017 WL 5201116, at *11 (distinguishing *Chaney* because "the rescission of the DACA program subjects individuals who previously enjoyed some protection from removal to coercive state authority"); *see also Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985) ("[R]escissions of [agency] commitments … exert much more direct influence on the individuals or entities to whom the repudiated commitments were made."). *Chaney* also emphasized that when an agency simply forbears from acting, there is no apt "focus for judicial review." 470 U.S. at 832. But where, as here, "there is a specific affirmative action to be reviewed, the reviewing court can adequately focus on the limited issue at hand." *Robbins*, 780 F.2d at 47; *see id.* ("Rescissions of prior obligations clearly fall into the 'focused action' category."). Defendants' effort to extend *Chaney* beyond non-enforcement decisions is therefore misguided.[3]

_____

[3] Defendants' argument for treating enforcement and non-enforcement decisions alike rests principally on a single citation to a case that described a U.S. Attorney's decision "whether or not to prosecute" a criminal case as discretionary. MTD Princeton 15 (quoting *United States v.*

Second, the D.C. Circuit's post-*Chaney* case-law has consistently "distinguished between 'an agency's statement of a *general enforcement policy*' and a '*single-shot* nonenforcement decision,' the former being reviewable even though the latter may not be." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)); *see, e.g.*, *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (reviewing EPA enforcement policy regarding storage of toxic waste); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 772-75 (D.C. Cir. 1992) (reviewing facial challenge to content of enforcement regulations).   As the court of appeals has explained, "[t]here are ample reasons for distinguishing the two situations," including (among others) that agencies produce a "more easily reviewable" statement of reasons when they "formally articulat[e] a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc." *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994); *see also Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496 (D.C. Cir. 1988) (explaining that "a major policy decision" is "quite different from day-to-day agency nonenforcement decisions" insulated by *Chaney*).   Defendants' appeal to *Chaney* is thus foreclosed by circuit precedent, and the *Batalla Vidal* court was correct to conclude that Defendants' "affirmative decision to eliminate a program" with respect to "a large number of undocumented immigrants" is not shielded from review by the APA.  2017 WL 5201116, at *11.[4]

---

*Armstrong*, 517 U.S. 456, 464 (1996)).   There was no suggestion that the APA (with its presumption in favor of judicial review) applied in that case at all.

[4] Several of the cases Defendants rely upon in their motion involve paradigmatic "single-shot" decisions and so lend no support to their *Chaney* argument.  *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 472-74 (1999) (challenge to agency action "targeting [six individuals] for deportation"); *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) (stating that a decision "not to grant deferred action status to a particular alien" is unreviewable).

In sum, *Chaney* is doubly inapplicable here: It concerns *single-shot*, *non*-enforcement decisions, whereas the Rescission Memorandum is neither.

Once Defendants' misplaced reliance on *Chaney* is set aside, their claim of unreviewable discretion under the APA collapses.   The APA's strong presumption in favor of judicial review is rebutted only when there is "'no law to apply'"—that is, in those "'rare instances'" when "meaningful judicial review is impossible" because a governing statute confers "virtually unbridled discretion." *Drake v. FAA*, 291 F.3d 59, 70-72 (D.C. Cir. 2002) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).   The presumption is rebutted, for example, when a statute specifically authorizes an official to take a certain action whenever she "*is of the opinion*" that the action is warranted, making the official's "own beliefs" dispositive. *Id*. at 72 (quotation marks omitted).   Defendants do not attempt to identify any such extraordinary delegation here.

Instead, Defendants stress that deferred-action policies (like many immigration decisions) are "discretionary."   MTD Princeton 16.   That is true enough, but it hardly means the policies are *unreviewable*.   As the D.C. Circuit has explained: "[C]ourts are in no position to decide on their own what is necessary to the good administration" of public policy, but they are nonetheless "competent to determine whether an agency has exercised its discretion—*broad though it be*—in a manner arbitrary and capricious."   *Horner*, 854 F.2d at 495-96 (emphasis added).   Here, Plaintiffs' APA claims simply ask the Court to undertake the customary assessment of whether Defendants exercised their discretion arbitrarily (such as by failing to explain their reasons, consider important factors, or accurately understand the law), and of whether they promulgated a substantive rule without notice-and-comment.   *See, e.g.*, Princeton Compl. ¶¶ 70, 79; *see also* Plaintiffs' Mot. Part III.A.   Conducting that review will no more "entangle this Court in the sort

of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch" (MTD Princeton 17) than in any other APA case.  If anything, Defendants' burden in rebutting the presumption of reviewability should be particularly heavy in this case:  It is highly implausible that Congress authorized Defendants to make a sweeping judgment with grave consequences for hundreds of thousands of people on whatever basis they wish. *See Batalla Vidal*, 2017 WL 5201116, at *9, *12-13 (rejecting Defendants' same appeal to "the Executive Branch's wide discretion to enforce the immigration laws" and holding that there is "law to apply" in evaluating their claims).[5]

Here, moreover, the administrative record shows that Defendants' only asserted reason for rescinding DACA was their claim that DACA is unlawful. *See* AR 251, 253-55; *see also* Plaintiffs' Mot. Part III.A.1.a.i. Because that is itself a purely legal judgment, it is even clearer that there will be "meaningful standards" for the Court to apply in reviewing it. *Drake*, 291 F.3d at 71; *see Batalla Vidal*, 2017 WL 5201116, at *10 (explaining that the justification for rescinding DACA may be evaluated "in light of, among other sources, the text of the INA and other statutes, the history of the use of deferred action by immigration authorities, and the OLC Opinion" concluding that DACA was lawful); *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C. Cir. 1987) (explaining that non-enforcement decisions are presumptively unreviewable because they are "typically based

---

[5] Courts have routinely held the APA applicable to immigration-related decisions. *See, e.g.*, *L. Xia v. Tillerson*, 865 F.3d 643, 657-58 (D.C. Cir. 2017); *Meina Xie v. Kerry*, 780 F.3d 405, 405-06 (D.C. Cir. 2015).  To the extent Defendants draw a contrary lesson from *Perales v. Castillo*, 903 F.2d 1043, 1047 (5th Cir. 1990), it is an out-of-circuit precedent whose rule—that only "statutory or regulatory provisions" could form the basis for a court to review agency action—has now been superseded by Supreme Court precedent, *see INS v. Yueh-Shaio Yang*, 519 U.S. 26 (1996).  Finally, it bears noting that this case implicates neither of the specific immigration-related concerns Defendants identify: that individuals in removal proceedings might "postpon[e] justifiable deportation" by pressing selective-enforcement or similar claims; and that immigration enforcement decisions sometimes rest on "foreign-policy objectives." MTD Princeton at 18.

mainly on close consideration of the facts of the case at hand, *rather than on legal analysis*" (emphasis added)); *see also* Plaintiffs' Mot. Part III.A.1.b (explaining why Defendants' legal judgment was incorrect).[6]

Finally, even were review of Plaintiffs' statutory claims somehow precluded, review of their constitutional claims would not be.  As the Supreme Court explained in *Webster v. Doe*, 486 U.S. 592 (1988), when Congress intends to preclude judicial review of constitutional claims, "its intent to do so must be clear," so as "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* at 603-04.  Thus, "even where agency action is 'committed to agency discretion by law,' review is still available to determine if the Constitution has been violated."  *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987) (citation omitted); *see also Batalla Vidal*, 2017 WL 5201116, at *11.

## B.   Judicial Review of DACA's Rescission Is Not Barred by INA § 1252(g).

Defendants also claim that § 1252(g) of the INA bars this Court's review of Plaintiffs' allegations.  But that argument is belied by the plain text of the statute, as well as by case law (including that relied upon by Defendants) interpreting the scope of § 1252(g).

This Court's analysis of § 1252(g) must "begin with the text of the statute," *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014), which provides:

> Except as provided in this section and notwithstanding any other provision of law … , no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General *to commence proceedings, adjudicate cases, or execute removal orders against any alien* under this chapter.

---

[6] Defendants' observation that an agency's action is not rendered reviewable simply because "an 'agency gives a "reviewable" reason for otherwise unreviewable action,'" is irrelevant.  MTD Princeton 17 (quoting *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987)).  As explained above, "the decision to rescind the DACA program was *not* inherently [an unreviewable] decision." *Batalla Vidal*, 2017 WL 5201116 at *10 (emphasis added).

8 U.S.C. § 1252(g) (emphasis added).

By its plain terms, the statute only prohibits challenges brought by or on behalf of an alien to three specific government decisions or actions: the commencement of proceedings, the adjudication of cases, and the execution of removal orders. *See Evangelical Lutheran Church in Am. v. INS.*, 288 F. Supp. 2d 32, 43 (D.D.C. 2003) (holding that the "three terms" in § 1252(g) should be read "narrowly and precisely" (quotation marks omitted)).  In *Batalla Vidal*, the court concluded that the rescission of DACA—an action not even Defendants can claim "commence[s] proceedings, adjudicate[s] cases, or execute[s] removal orders against any alien"—was not one of the three types of decisions enumerated in § 1252(g), and thus the statute presented no bar to judicial review.  2017 WL 5201116, at *12.  Defendants criticize *Batalla Vidal* as engaging in an "overly narrow reading of the statute," MTD Princeton 22, yet point to no words in the statute that strip courts' jurisdiction over anything other than the three enumerated actions, none of which are at issue here.

Defendants argue that this Court should *expand* the scope of the statute beyond its plain terms, and decline to exercise jurisdiction not only over the three enumerated actions listed in the statute, but also other actions that are supposedly "ingredient[s]" of the three enumerated provisions.  MTD Princeton 22.  Not surprisingly, Defendants do not cite a single case, nor even a canon of statutory interpretation, that would support such an approach, and binding precedent is directly to the contrary.

Indeed, the Government attempted to make a similar argument to the Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), offering an interpretation of § 1252(g) as providing for "'no judicial review in deportation cases unless this section provides judicial review.'"  *Id.* at 482.  The Court squarely rejected that argument and held

to the contrary that the bar on judicial review in § 1252(g) "applies only to [the] three discrete actions" specifically identified in the text. *Id.* "There are of course many other decisions or actions that may be part of the deportation process," the Court explained, and "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." *Id.* The Court knew of "no other instance in the United States Code" in which language stripping jurisdiction over the review of specific acts "has been used to impose a general jurisdictional limitation." *Id.* Defendants cite no other examples in urging this Court to adopt such a reading here.

Defendants do not claim that the rescission of DACA is itself an action "to commence proceedings, adjudicate cases, or execute removal orders against any alien," but even if it were, § 1252(g) could not bar the claims brought by Microsoft and Princeton, neither of whom is an alien or suing solely "on behalf of" an alien. Rather, each has alleged that the rescission of DACA will hamper its *own* operations—in Princeton's case as a university, in Microsoft's case as a corporation. *See* Princeton Compl. ¶¶ 61, 62; *infra*, at 13-17 (explaining the grounds for these plaintiffs' standing). Such first-party claims by non-aliens are plainly not barred by § 1252(g). *See Batalla Vida*, 2017 WL 5201116, at *13 (rejecting application of § 1252(g) for entities not suing on behalf of aliens). Defendants' only response is that "the fundamental concerns of § 1252(g)" purportedly apply even when an "outside entity" sues "on its *own* behalf." MTD Princeton 23 n.5 (emphasis added). But, were that Congress's "fundamental concern," it would have written an entirely different statute, *not* limited only to aliens and those suing on their behalf.

## II.     Plaintiffs Have Article III Standing To Sue.

Defendants pointedly do not dispute that Perales Sanchez has Article III standing to present all claims. *See* MTD Princeton 24. That is for good reason: Perales Sanchez is unquestionably directly injured by DACA's rescission. Defendants' standing arguments are irrelevant, because

"the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). There is no reason to entertain academic challenges to the Article III standing of other plaintiffs. *See, e.g.*, *Horne v. Flores*, 557 U.S. 433, 446-47 (2009); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (warning against unnecessary decision of constitutional questions). In any event, Defendants' attacks on the other Plaintiffs' standing fail.

### A.  Princeton And Microsoft Have Standing To Challenge DACA's Rescission.

Microsoft satisfies Article III's standing requirement because it suffers concrete injury clearly traceable to Defendants' rescission of DACA. And Princeton satisfies that requirement twice over: It has standing because of its own injuries, and it has third-party standing because of the injuries to its students.

#### 1.  Proprietary Injuries

Princeton and Microsoft are injured by DACA's rescission in several ways. *First,* the loss of students and employees will frustrate Plaintiffs' investments and impose concrete pecuniary harm. Princeton has identified at least 16 students who are DACA beneficiaries. App. 37 (Leighton Decl. ¶ 5).[7] Princeton has devoted substantial resources to recruiting, supporting, and educating these individuals, including financial aid and faculty and administrative time. DACA's rescission greatly diminishes the value of these investments, as it makes it far less likely that DACA beneficiaries will be able to attend college, attain their education goals while here, and work in the United States after graduation. These injuries fall within the heart of Article III. *See, e.g.*, *Pierce v. Society of Sisters*, 268 U.S. 510, 535-36 (1925) (holding that private schools could

---

[7] Plaintiffs may reference materials outside the four corners of the Complaint in demonstrating standing. *See D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000). References to "App." refer to the Appendix filed in support Plaintiffs' Motion for Summary Judgment.

challenge a law that threatened the schools' "business and property" by "depriv[ing them] of patronage"); *see also Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 127 (1978) (recognizing a constitutional claim when state action "frustrate[s] distinct investment-backed expectations"). Similarly, Microsoft has identified at least 45 employees and interns who are DACA beneficiaries. Princeton Compl. ¶ 5.  The loss of these employees' ability to work in this country legally will disrupt numerous ongoing projects and deprive Microsoft of their contributions as employees. Microsoft will also have to recruit, train, and retain new employees to replace the veteran workers who will be lost.  App. 98 (Radu Decl. ¶ 9); App. 113 (Bozeman Decl. ¶¶ 11-12); App. 126 (Preciado Decl. ¶¶ 9-10).  All of these pecuniary injuries are cognizable under Article III.  *See, e.g.*, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232-33 (D.C. Cir. 1996) (holding that company had standing to challenge federal regulation that caused it to lay off workers); *ANR Pipeline Co. v. Corp. Comm'n of Okla.*, 860 F.2d 1571, 1578-79 (10th Cir. 1988) (explaining that "'[i]njury in fact' may be shown by out-of-pocket costs to a business").

*Second,* both Princeton and Microsoft will also lose access to the unique and valuable perspectives of DACA beneficiaries.  Princeton's longstanding commitment to a diversity of viewpoints is an essential component of its educational mission, and DACA beneficiaries make vital contributions to this goal.  *See, e.g.*, App. 17-18 (Gonzalez Decl. ¶¶ 11-12); App. 26 (Rapelye Decl. ¶¶ 11-12); *see also Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (stressing the "substantial … educational benefits that flow from student body diversity").  Microsoft, too, will be harmed by the loss of its DACA beneficiaries, who contribute to a diverse workforce.  App. 97-98 (Radu Decl. ¶¶ 7-8); App. 126 (Preciado Decl. ¶ 10); *see Grutter*, 539 U.S. at 330 (noting the importance of "exposure to widely diverse people, cultures, ideas, and viewpoints" in "today's increasingly

global marketplace"). Courts have regularly recognized such loss of access to people and ideas as Article III injuries.[8]

*Third*, DACA's rescission means that, in support of its educational mission, Princeton must spend substantial resources counteracting the harmful effects of DACA's rescission on its students. *See* App. 19 (Gonzalez Decl. ¶ 18).  Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), a "'concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[,]' and thus suffices for standing."  *PETA v. USDA*, 97 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Havens Realty*, 455 U.S. at 379).  To evaluate an organization's standing under *Havens*, the D.C. Circuit "ask[s], first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm."  *Id.* at 1094 (quotation marks and brackets omitted).

Princeton satisfies both elements.  First, in addition to the injuries to Princeton's mission identified above, DACA's rescission frustrates Princeton's efforts to provide a positive learning and social environment for its students and to empower them to access post-graduate opportunities.

---

[8] *See Kleindienst v. Mandel*, 408 U.S. 753, 764-65 (1972) (holding that U.S. academics had an interest in a foreign journalist's ability to travel to the country "to participate with them in colloquia debates[] and discussion"); *Abourezk v. Reagan*, 785 F.2d 1043, 1050-51 (D.C. Cir. 1986) (holding that organizations were "[u]nquestionably…'aggrieved' by the State Department's" actions "keep[ing] out people they have invited to engage in open discourse with them"), *judgment aff'd*, 484 U.S. 1 (1987); *see also Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017) (holding that travel restrictions "harm[ed] the State[] [university]'s interests because (1) students and faculty suspended from entry are deterred from studying or teaching at the University; and (2) students who are unable to attend the University will not pay tuition or contribute to a diverse student body"), *vacated on mootness grounds by Trump v. Hawaii*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017); *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (permitting states to challenge travel ban in their capacity as employers and educators because they could not "consider attractive student candidates and cannot hire faculty from the seven affected countries, which they have done in the past").

*See* App. 7-11 (Dolan Decl. ¶¶ 16-25).  Second, Princeton has used its resources to counteract that harm in many concrete ways.  For example, Princeton has "generated a slate of programming for DACA students," researched and assembled lists of post-graduate opportunities tailored for former DACA beneficiaries who will lack federal work authorization, and produced "elaborate" materials to connect DACA beneficiaries with appropriate resources.   App. 9-10 (Dolan Decl. ¶ 22).  Princeton has also paid for individual consultations for all DACA students, including providing appropriate legal services.  App. 42 (Leighton Decl. ¶ 20).  And, in addition to all of this formal programming, "faculty members, administrators, and non-DACA beneficiary students have devoted time and resources to providing informal support to DACA beneficiary students."  App. 19 (Gonzalez Decl. ¶ 18).  All of these undertakings further confirm Princeton's standing.  *See PETA*, 797 F.3d at 230-31; *see also Action Alliance of Senior Citizens of Greater Phil. v. Heckler*, 789 F.2d 931, 935 (D.C. Cir. 1986) (upholding standing of groups that "endeavor[ed], through informational, counseling, referral, and other services, to improve the lives of elderly citizens" to challenge a regulation that made that work more difficult).

In light of Princeton's and Microsoft's various injuries, the fact that DACA's rescission does not regulate them directly is irrelevant.  *Contra* MTD Princeton 24-25.  Parties have standing to challenge government regulations that affect them even if they are not directly regulated.  *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 440-44 (D.C. Cir. 1998) (en banc) (holding that plaintiff had standing to challenge regulation of primate dealers because he had suffered aesthetic injury during his visits to animal exhibitions).  Here, it would make no sense to say that because DACA's rescission "directly" denies Microsoft's employees authorization to keep

working for the company—and only "indirectly" denies Microsoft authorization to keep employing them—Microsoft is not injured. The two harms are inextricably intertwined.[9]

### 2.   Third-Party Standing

Princeton also has third-party standing to sue on behalf of its students. Under that doctrine, one party can assert the rights of another if those rights are "inextricably bound up with the activity the litigant wishes to pursue"; the litigant is "fully, or very nearly, as effective a proponent of the right" as a third party; and there is "some genuine obstacle" to the third party's asserting her own rights. *Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976).

All three elements are satisfied here. Princeton's interests and those of its students are "inextricably bound up" together. *Id.* As the Ninth Circuit recently explained—in holding that state universities had third-party standing to assert the rights of their students against a travel ban— "[t]he students' educational success is 'inextricably bound up' in the universities' capacity to teach them." *Washington*, 847 F.3d at 1160; *see Runyon v. McCrary*, 427 U.S. 160, 175 n.13 (1976) (holding that schools had standing to press legal claims "on behalf of their patrons"). Likewise, Princeton is likely to be as effective a proponent of DACA recipients' rights as the recipients themselves. And, finally, DACA beneficiaries face a "genuine obstacle" to asserting their own rights because of their natural desire for anonymity; indeed, the paradigmatic obstacle warranting third-party standing is the interest in "remain[ing] anonymous." *Singleton*, 428 U.S. at 116.[10]

---

[9] Both of the cases upon which Defendants rely to claim Princeton and Microsoft lack standing actually undercut their position. In *Lujan v. Defenders of Wildlife*, the Court made clear that that "standing is *not* precluded" where entities other than those directly regulated file suit. 504 U.S. 555, 562 (1992) (emphasis added). And, unlike in *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), Princeton and Microsoft have shown that they have judicially cognizable interests (including in avoiding pecuniary harm and maintaining a diverse student-body and workforce) that would be redressed by the reversal of the government's actions.

[10] Contrary to Defendants' unsupported assertion, MTD Princeton 25 n.6, Perales Sanchez's courageous decision to come forward and sue in her own name hardly undermines Princeton's

### B.   The NAACP And Labor Unions Have Associational Standing.

The NAACP, AFT, and UFCW ("Association Plaintiffs") have associational standing under Article III.  To establish this form of standing, an association must show "(1) at least one of its members would have standing to sue in his or her own right; (2) the interests [the association] seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit." *AARP v. EEOC*, 226 F. Supp. 3d 7, 16 (D.D.C. 2016).  Each requirement is satisfied here.[11]

### 1.   Each Association Plaintiff Has Members With Standing To Sue.

*First*, each of the Association Plaintiffs has members who "are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Specifically, each has members who are DACA beneficiaries, and who are affected by DACA's rescission.  *See* Associations Compl. ¶ 12 (NAACP); App. 2619 (Johnson Decl. ¶ 6) (same); Associations Compl. ¶ 14 (AFT); App. 2596 (Weingarten Decl. ¶ 5) (same); Associations Compl. ¶ 16 (UFCW); App. 2640 (Lopez Decl. ¶ 6) (same).  Defendants argue that the Association Plaintiffs must *name* those people.  MTD NAACP 16.  But no law suggests that injury-in-fact

---

standing to represent *other* students who—quite understandably—have not made that choice. *See, e.g.*, *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1562-65 (S.D. Fla. 1991) (finding that Haitian Refugee Center had third-party standing to sue on behalf of Haitian immigrants, even though individual Haitian immigrants were also plaintiffs).

[11] Defendants suggest that, simply because these plaintiffs once used the word "organizational" in their complaint—in the introduction, no less—they are not advancing an associational-standing theory.  MTD NAACP 16.  That hyper-technical argument is baseless.  *See, e.g.*, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (discussing an entity's "organizational purpose" and "organizational mission" in evaluating an associational-standing claim); *see also Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 131 n.2 (D.C. Cir. 2017) (explaining that the "labels a party invokes [in a complaint] are irrelevant" (quotation marks omitted)).  Defendants appear to appreciate as much, as they respond at length to Plaintiffs' associational standing claim.  *See* MTD NAACP 16-17 & n.2.

"actually requires a name-specific identification," *Young America's Found. v. Gates*, 560 F. Supp. 2d 39, 49 (D.D.C. 2008), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009), so long as a specific member is identified. *See, e.g.*, *Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought[.]").  Here, the Association Plaintiffs have submitted Doe Affidavits from at least one member of each of their Associations. *See* App. 2601-2671.  Those members have a strong and understandable interest in anonymity. *Cf.* App. 2673-75 (reporting that ICE agents arrested an undocumented immigrant who spoke to the press, after specifically seeking out "the one from the newspaper").  In light of the regular practice of allowing cases to proceed with John Doe plaintiffs,[12] there is no basis for Defendants' demand for names here.

### 2.   The Germaneness Requirement Is Satisfied.

*Second*, this suit is "germane" to each of the Association Plaintiffs' purpose. *AARP*, 226 F. Supp. 3d at 16.  The D.C. Circuit has underscored that this requirement is "undemanding," requiring "mere pertinence between litigation subject and organizational purpose." *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988) (emphasis added).

The NAACP's mission has long been "to ensure the political, educational, social, and economic equality of all persons," with a particular focus on "cases that significantly impact people of color."  Associations Compl. ¶ 11.  Any suggestion that DACA's rescission has no bearing on these interests blinks reality.  DACA's rescission will meaningfully impair educational, social, and

---

[12] *See, e.g.*, *Doe 1 v. Trump*, No. 17-cv-1597, 2017 WL 4873042 (D.D.C. Oct. 30, 2017) (standing established via declarations of several transgender Doe plaintiffs).

economic equality.  *See* Plaintiffs' Mot. Part III.B.3.  And it significantly impacts people of color, who make up nearly all DACA beneficiaries.  Associations Compl. ¶ 49; App. 2678.

This litigation is equally germane to the missions of the Labor Union Plaintiffs, the AFT and the UFCW.  The AFT's mission is to "champion[] fairness and economic opportunity for our members, those they serve, their families and our communities."  App. 2595 (Weingarten Decl. ¶ 3); *see* Associations Compl. ¶ 13 (noting the AFT's "longstanding history of supporting and advocating for the civil rights of its members and the communities they serve").  The UFCW "represents working men and women across the United States," with the "objective [of] … improving their wages, hours, benefits, and working conditions," and of "advanc[ing] and safeguard[ing] full employment, economic security, and social welfare."  Associations Compl. ¶ 15; App. 2639-40 (Lopez Decl. ¶ 5).  DACA's rescission obviously implicates issues of economic opportunity, access to education, and access to lawful and fair working conditions.

### 3.    The Participation Of Individual Members Is Not Required.

*Third*, the Association Plaintiffs also satisfy the final requirement of associational standing: "neither the claim asserted nor the relief requested requires the participation of an individual member in the suit." *AARP*, 226 F. Supp. 3d at 16.  Defendants have not suggested individual participation is required here, and it clearly is not:  A "broad facial challenge to [an agency action]," seeking "vacatur thereof," "do[es] not require the participation of individual members." *Comm. for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C. Cir. 1995).

## III.    Plaintiffs Have A Cause of Action Under The APA.

In a single, conclusory paragraph in each of its motions to dismiss, Defendants assert that even if the organizational Plaintiffs have Article III standing, they lack a cause of action under the APA.  *See* MTD Princeton 25-26; MTD NAACP 18.  Once again, it is unnecessary to decide that issue, because Defendants do not dispute that Perales Sanchez has a cause of action under the

APA, *see* MTD Princeton 25, and that is enough.  *See, e.g.*, *Mountain States Legal Found.*, 92 F.3d

at 1232 ("For each claim, if constitutional and prudential standing can be shown for at least one

plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.").  In any

event, all of the other Plaintiffs have a cause of action under the APA as well.

### A.   Princeton And Microsoft Have A Cause of Action Under The APA.

The APA includes an "omnibus judicial-review provision, which permits suit for violations

of numerous statutes of varying character that do not themselves include causes of action for

judicial review."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389

(2014).  Accordingly, a plaintiff has a cause of action under the APA so long as "[t]he interest he

asserts [is] 'arguably within the zone of interests to be protected or regulated by the [substantive]

statute'" at issue.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.

209, 224 (2012).  Conversely, suit is unavailable under the APA "only when a plaintiff's 'interests

are so marginally related to or inconsistent with the purposes implicit in the [relevant] statute that

it cannot reasonably be assumed" Congress authorized that plaintiff to sue.  This "lenient

approach," *Lexmark*, 134 S. Ct. at 1389, is "in keeping with Congress's 'evident intent' when

enacting the APA 'to make agency action presumptively reviewable,'" *Match-E-Be-Nash-She-*

*Wish*, 567 U.S. at 225 (citation omitted).

Princeton and Microsoft allege that Defendants' rescission of DACA is an invalid exercise

of their authority pursuant to the INA, 8 U.S.C. § 1101 *et seq*.  The INA is thus the "relevant

statute" for APA purposes.  *See* 5 U.S.C. § 702.  And, Princeton's and Microsoft's' interests in

admitting, hiring, and retaining nonimmigrants, including DACA beneficiaries, are certainly

related to the purposes and concerns of the INA.[13]  Courts have previously recognized that

---

[13] *See, e.g.*, 8 U.S.C. § 1101(a)(15)(J) (identifying students, scholars, and specialists in fields of
knowledge or skill as potential visa recipients); *id.* § 1101(a)(15)(H) (identifying aliens coming to

similarly-situated organizations have a cause of action to challenge immigration-related decisions. *See, e.g.*, *Hawaii*, 859 F.3d at 765 (holding that the loss of student enrollment and research at universities conferred statutory standing on state plaintiff); *Int'l Refugee Assistance Project v. Trump*, No. 17-361, 2017 WL 4674314, at *13 (D. Md. Oct. 17, 2017) (holding that organizations fell within the zone of interests protected by the INA because they had a "substantial interest in the effective operation of the INA, particularly its provisions for admitting foreign scholars and other foreign nationals to the United States as nonimmigrants to attend educational conferences"); *Raduga USA Corp. v. U.S. Dep't of State*, 440 F. Supp. 2d 1140, 1147 (S.D. Cal. 2005) (holding that employer's suit, challenging failure to award immigration status to a "sought-after alien employee," fell within the INA's zone of interests).[14]

Princeton also satisfies the zone-of-interests test for an independent reason: It has third-party standing to represent its DACA-beneficiary students, *see supra* at 17, and Defendants concede, as they must, that those individuals' interests support a cause of action under the APA. *See* MTD Princeton 25 (raising this argument only as to "non-individual" plaintiffs).

**B.   The Association Plaintiffs Have A Cause Of Action Under The APA.**

Defendants are likewise wrong in contending that the claims advanced by the Association Plaintiffs fall outside the INA's zone of interests.  MTD NAACP 18.  When an organization asserts associational standing, the zone-of-interests question concerns the interests of the organization's

---

perform services in a specialty occupation); *id.* § 1101(a)(15)(O) (identifying aliens with extraordinary abilities in the sciences, arts, education, business, or athletics); 8 U.S.C. § 1324a (imposing sanctions on employers who hire unauthorized workers).

[14] *Federation for American Immigration Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) (*FAIR*), provides Defendants no support.  In *FAIR*, the plaintiffs raised the generalized grievance of "immigration-related unemployment" placing increased stress on the "provision of government services."  *Id.* at 901.  That is unlike the particularized harms Microsoft and Princeton have alleged arising from Defendants' action.  *See* Princeton Compl. ¶¶ 52-64.

*members*—the ultimate interests being asserted in the suit—rather than any proprietary concerns of the organizations representing them. *See, e.g.*, *Humane Soc. of the U.S.*, 840 F.2d at 61 (evaluating whether "the interests of Humane Society *members* … fall within the zone of interests" (emphasis added)).   As explained above, the Association Plaintiffs are suing to vindicate the interests of their members who are actual and potential DACA beneficiaries. *See supra* at 18-20. Defendants do not and cannot argue that those people lack an APA claim. *See* MTD Princeton 25. The zone-of-interests test is thus satisfied with respect to the Association Plaintiffs.

## IV.   Plaintiffs State Claims Upon Which Relief May Be Granted.

### A.   Relief May Be Granted On Plaintiffs' APA Claims.

Defendants erroneously claim that Plaintiffs have failed to state both substantive and procedural claims under the APA.   MTD Princeton 27-37.   As set forth at greater length in Plaintiffs' Motion for Summary Judgment, Plaintiffs' APA claims are not only adequately pleaded, but also merit a grant of summary judgment in their favor (or at the very least, indicate they are likely to succeed on the merits). *See* Plaintiffs' Mot. Part III.

### 1.   Plaintiffs Have Adequately Pleaded Their Substantive APA Claim.

Plaintiffs have adequately pleaded that the Rescission Memorandum is arbitrary and capricious and therefore must be set aside under the APA. *See* 5 U.S.C. § 706(2)(A); Princeton Compl. ¶¶ 73-89; Associations Compl. ¶¶ 69-74. *First*, Defendants did not rationally explain the legal analysis underlying their decision, nor did they provide a reasoned analysis for abandoning their prior position. *See* Plaintiffs' Mot. Part III.A.1.a. *Second*, in any event, Defendants rested their decision on the false legal premise that DACA was unlawful. *Id.* Part III.A.1.b. *Third*, Defendants' "litigation risk" rationale, in addition to being a *post hoc* rationalization, is irrational in its own right. *Id.* Part III.A.1.c. And, *fourth*, Defendants' failure to explain or evaluate their

approach to "winding down" DACA confirms the arbitrariness of their decision to rescind it.  *Id.* Part III.A.1.d.  Defendants' arguments are addressed in Plaintiffs' Motion for Summary Judgment.

### 2.  Plaintiffs Have Adequately Pleaded Their Procedural APA Claim.

Plaintiffs also have adequately pleaded that the Rescission Memorandum violates the APA because Defendants failed to satisfy the procedural requirements of 5 U.S.C. § 553.   The Rescission Memorandum is a substantive rule subject to APA notice-and-comment requirements because it: (1) precludes DACA beneficiaries (or potential beneficiaries) from securing or maintaining important benefits; (2) precludes DHS from accepting new DACA applications or renewals; and (3) presently binds DHS to reject any DACA applications or renewals, as well as any applications for advance parole from DACA beneficiaries.  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5-7 (D.C. Cir. 2011); Plaintiffs' Mot. Part III.A.2; Princeton Compl. ¶¶ 65-72; Associations Compl. ¶¶ 72-73.  It is undisputed that DACA's Rescission did not comply with notice-and-comment requirements.  *See* MTD Princeton 3-4, 34-37.

### B.  Plaintiffs' Equal Protection Claims Are Adequately Pleaded.

Plaintiffs allege that the Rescission Memorandum discriminates against undocumented noncitizens brought to this country as children by clawing back vital benefits enjoyed by similarly-situated documented noncitizens.  Princeton Compl. ¶¶ 90-93.  Defendants openly acknowledge this discrimination, *see* MTD Princeton 37-38, but claim it is permissible.  That is incorrect.

DACA extends eligibility for important benefits to a discrete class of undocumented noncitizens who were brought to the United States as children.  As explained above, these benefits include work authorization, advance parole, access to certain federal programs, and access to credit—critical resources that documented noncitizen children have enjoyed all along.  *See supra* at 2-3.  DACA thus puts actual and potential DACA beneficiaries on a par with their documented peers, at least with respect to this suite of significant benefits and opportunities.  By rescinding

DACA, however, Defendants have withdrawn these opportunities from those the program benefited—that is, from *undocumented* young people—while allowing their *documented* peers, who are otherwise identical, to retain them all.  Defendants acknowledge this discrimination, *see* MTD Princeton 37-38, but wrongly claim it is permissible.  The Equal Protection Clause requires a substantial justification for the kind of devastating claw-back Defendants have attempted, and Defendants have furnished none.

### 1.    Defendants Must Advance A Substantial Justification For Rescission.

This case lies at the intersection of two equal protection principles which, in combination, require Defendants to advance a robust justification for the discriminatory treatment at issue here. First, while differential treatment of documented and undocumented immigrants is not suspect in itself, the Supreme Court has recognized that differential treatment of documented and undocumented immigrants *brought to the country as children* can be—particularly when the classification operates to withhold access to fundamental goods required for integration into American life.  Thus, in *Plyler v. Doe*, the Supreme Court asked whether a state law requiring undocumented children to pay for their public education "further[ed] some *substantial* goal of the state."  *Plyler v. Doe*, 457 U.S. 202, 224 (1982) (emphasis added); *see id.* at 238 (Powell, J., concurring) (recognizing that review of state law was "properly heightened").  As the Court explained, that searching review was warranted in part because undocumented status *is* immutable as far as children are concerned; they cannot affect their parents' conduct or their own status. *Plyer*, 457 U.S. at 220; *cf. Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) (applying intermediate scrutiny to a classification based on illegitimacy and invaliding classification because "visiting this condemnation on the head of an infant is illogical and unjust").  Furthermore, the Court stressed that the state law at issue did not withhold "merely some governmental 'benefit,'" but rather denied "the basic tools by which individuals might lead economically productive lives"

and integrate into "the fabric of our society." *Plyler*, 457 U.S. at 221. *Plyler*'s logic has significant force here: DACA beneficiaries, too, are undocumented immigrants brought to the United States through no fault of their own; and like the classification at issue in *Plyler*, DACA's rescission will deprive them of vital resources needed to lead economically productive lives—from the opportunity to earn a lawful living to the ability to access higher education.

This case also implicates a second and equally important equal protection principle: The Government must furnish a substantial justification when it claws back rights or recognition from a single, vulnerable group. *See Romer v. Evans*, 517 U.S. 620, 627 (1996) (invalidating a law that "withdr[ew] from homosexuals, but no others, specific legal protection[s]" that had been accorded by prior law). Plaintiffs thus do not contend that Defendants were constitutionally obligated to *establish* DACA. But, under the Equal Protection Clause, "it is no justification for taking something away to say that there was no need to provide it in the first place." *Perry v. Brown*, 671 F.3d 1052, 1088 (9th Cir. 2012) (citing *Romer*, 517 U.S. at 634), *vacated on other grounds by Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013). Because the Government has already extended DACA recipients the same opportunity to access critical benefits enjoyed by documented noncitizens, the Court must give "careful consideration" to the adequacy and "legitima[cy]" of the reasons the Government adduces for now taking those benefits away from undocumented young people alone. *Id.* at 1082 (quoting *Romer*, 517 U.S. at 633).

### 2. Defendants Have Advanced No Substantial Justification For Rescission.

To justify their discriminatory action, Defendants invoke only the same reasons they have advanced under the APA. *See* MTD Princeton 38 (asserting that the Equal Protection Clause is satisfied "for the reasons above"). But even if those arguments could satisfy APA review, they certainly do not meet the Equal Protection Clause's demand that Defendants advance a substantial justification for the discrimination that DACA's rescission effects.

For all of the reasons given in Plaintiffs' Motion for Summary Judgment, the Rescission Memorandum is incorrect in asserting that DACA is unlawful.  *See* Plaintiffs' Mot. Part III.A.1.b. Likewise, rescission is a "ludicrously ineffectual" method, *Plyler*, 457 U.S. at 228-29, of shielding DACA beneficiaries from litigation risk.  *See* Plaintiffs' Mot. Part III.A.1.c.  And the supposed purpose of leaving immigration decisions of some unspecified magnitude to Congress (MTD Princeton 31-32) makes no sense here:  Rescission does not enhance or limit Congress's authority to act in this area.  Moreover, it is the *Executive Branch's* action here that is very consequential and departs from the status quo.  *See* Plaintiffs' Mot. 17 n.6; *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015) (rejecting the state's interest in "await[ing] … political measures").  Because Defendants' proffered justifications for rescission do not withstand meaningful scrutiny, DACA rescission violates the Equal Protection Clause.

**C.   Plaintiffs State Due Process Claims Upon Which Relief Can Be Granted.**

**1.   Plaintiffs Have Adequately Pleaded That Rescission Violates Due Process.**

**a.   Plaintiffs Have Adequately Pleaded Protected Interests.**

Plaintiffs have adequately pleaded that the Rescission Memorandum violates the Due Process Clause and that DACA beneficiaries have protected liberty and property interests in their existing DACA status.  Defendants claim that DACA recipients do not possess a liberty interest in securing deferred status, MTD Princeton 39, but that is beside the point.  The question is not whether agency officials, *ex ante*, have discretion to grant or deny deferred action.  They obviously do.  Rather, the question is whether DACA recipients developed protected liberty and property interests *after* Defendants conferred deferred status.  Plaintiffs have adequately pleaded they did.

Courts have consistently held that once a discretionary benefit is granted, individuals may have a legitimate entitlement to the retention or renewal of that benefit.  *See, e.g.*, *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068 (D.C. Cir. 2003); *Wilmina Shipping AS v. U.S. Dep't of*

*Homeland Sec.*, 934 F. Supp. 2d 1, 17 (D.D.C. 2013); *Medina v. U.S. Dep't of Homeland Sec.*, No. 17-cv-0218, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017).  Once a discretionary benefit is conferred, the existence of a protected interest turns on whether the recipient has "more than a unilateral expectation" in its preservation.  *3883 Conn. LLC*, 336 F.3d at 1072.

DACA recipients plainly possess more than a unilateral expectation in maintaining their DACA status.  In order to entice individuals to seek deferred status in connection with DACA, the Government represented that deferred status would be subject to renewal.  Princeton Compl. ¶ 38.  The Government strongly encouraged DACA recipients to pursue renewal and to submit their requests well before their status might otherwise expire.  *Id.*  And although the Government retained ultimate discretion to decide whether renewal was appropriate for a given individual, it also provided eligibility guidelines to assist recipients in preserving their status.  *Id.*  These representations created a justifiable understanding that DACA recipients would have an opportunity to renew their deferred status, and thus created a legitimate claim of entitlement.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972); *see also Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) (holding that plaintiff had protected interest in renewal of businesses license even though municipality retained broad discretion to deny request for renewal on the basis of detriment to the "security, welfare, convenience, health, peace, or good government of the town").

Significantly, representations regarding the availability of renewal, as well as the procedural requirements for securing it, also induced DACA recipients to structure their lives in reliance on deferred status.  Princeton Compl. ¶¶ 40-41, 43.  In this respect, the Government's representations constitute, at the very least, an implicit promise that DACA recipients would be eligible for renewal, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), and belie any suggestion that

recipients had merely a unilateral expectation regarding the retention of their deferred status, *see 3883 Conn. LLC*, 336 F.3d 1068.

Defendants also ignore that deferred action provided recipients with several important benefits. For example, deferred status gave recipients the right to seek work authorization, *see* 8 C.F.R. § 274a.12(c)(14), to access federal benefits, *see* 42 C.F.R. § 417.422(h); 42 C.F.R. § 422.50(a)(7), and to obtain the identifying information required to access credit, purchase homes, and open businesses, *see* Princeton Compl. ¶ 100. Deferred status provided recipients with conditional liberty from detention and expulsion. *Id.* And it enabled recipients to pursue travel abroad through advance parole. *Id.* ¶ 42. These benefits, protected in their own right,[15] have been life-changing: they enable recipients to pursue an education, to earn a livelihood, and to form "the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. Having received deferred status, recipients relied on it,[16] thereby acquiring constitutionally protected interests in preserving these critical benefits.[17] *See, e.g., Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that drivers

---

[15] *E.g., Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (finding that due process applies to government benefits); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("[F]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause.") (citation omitted); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (finding that the "integrity of the family unit" is protected by the Due Process Clause); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (recognizing the right to travel abroad as a constitutionally protected liberty interest); *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995) (recognizing the "constitutionally protected 'right to follow a chosen trade or profession'").

[16] *See* Princeton Compl. ¶¶ 41-42, 63 (right to work); *id.* ¶¶ 42, 63 (right to travel abroad); *id.* ¶¶ 41, 63 (right to public benefits); *id.* ¶ 64 (right to live with family); *id.* ¶¶ 33, 64 (freedom from government detention); Associations Compl. ¶¶ 36-41.

[17] Institutions, organizations, and businesses, including the organizational Plaintiffs here, likewise have protected interests. For example, Defendants do not meaningfully contend that the interests of Princeton and Microsoft, including tangible property interests like the money invested in DACA students and employees, are unprotected. Princeton Compl. ¶¶ 5, 14-15, 20, 61-62, 98-99. Instead Defendants simply assert that if DACA recipients do not have protected interests, Microsoft and Princeton cannot either. Because Defendants fail to show that DACA recipients lack protected interests, this argument necessarily fails.

licenses could not be suspended without due process because they may be "essential in the pursuit of a livelihood").

Defendants respond that the DACA Memorandum, by its own terms, "'confers no substantive right, immigration status[,] or pathway to citizenship.'" MTD Princeton 40. This is accurate, but irrelevant.[18] The *promulgation* of a program under which individuals could be considered for an individualized exercise of prosecutorial discretion does not confer substantive rights.[19] But, crucially, once an individual *receives* and relies upon the exercise of that discretion, an act that significantly forecloses the likelihood that discretion will be similarly exercised in the future does implicate the substantive rights discussed above.[20] *See Medina*, 2017 WL 5176720, at *8-9 (holding that DACA recipient had protected interest in deferred-action status).

Similarly misguided is Defendants' argument that DACA recipients cannot have protected interests because the agency said, in a single document, that deferred status was terminable at any time and without notice. MTD Princeton 40. Plaintiffs' allegations, which must be taken as true, establish that this is not how DACA operated under agency standard procedures. Princeton Compl.

---

[18] To the extent Defendants contend that this language was directed to interests developed after the case-by-case exercise of prosecutorial discretion, not to the DACA memorandum, the argument still fails. The D.C. Circuit has repeatedly held that rights and interests are determined by the legal effect of an agency's action, not by the words used to describe it. *Scenic Am., Inc.*, *v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

[19] The agency provided no assurance that relief would be granted in all circumstances where the criteria were met. AR 2.

[20] For this reason, *Velasco-Gutierrez v. Crossland* and *Romeiro de Silva v. Smith* are inapposite. Both cases concern whether constitutionally protected interests exist when applicants seek or are denied deferred status. *See Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 797 (10th Cir. 1984); *Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985). They have nothing to say about whether protected interests may arise where, as here, the government has already exercised its discretion to confer a benefit. *See 3883 Conn. LLC*, 336 F.3d at 1072 (emphasizing "critical distinction" between applicants and recipients of government permits).

¶ 39.  As Plaintiffs allege, absent a disqualifying criminal offense, national security concern, or other extraordinary circumstance, the agency did not terminate a recipient's status before providing a notice of intent to terminate that "'thoroughly explained' the grounds for termination."  *Id.*

In fact, the procedures further provide that upon receipt of a notice to terminate, recipients "should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of deferred action.  Princeton Compl. ¶ 39; *see also Medina*, 2017 WL 5176720, at *1 (observing that notice stating individual had been approved for DACA indicated that deferred status could be terminated if recipient engaged in "[s]ubsequent criminal activity").  These facts are certainly sufficient to allege that recipients of deferred status had more than a unilateral expectation of the preservation of their status.  *See, e.g.*, *3883 Conn. LLC*, 336 F.3d 1068 (D.C. Cir. 2003) (holding that entity had protected interest in construction permit where it had already been conferred and could be revoked for several reasons, including violation of construction codes and failure to abide stop work orders); *cf. Wilmina Shipping AS*, 934 F. Supp. 2d at 17 (holding that entity had protected interest in boating certificate where it had already been granted and could be revoked for failure to comply with conditions of issuance).[21]

### b.  Defendants Did Not Employ Adequate Procedures When Depriving Plaintiffs Of Their Protected Interests.

Plaintiffs adequately pleaded that Defendants took away the protected liberty and property interests of DACA recipients without due process.  DACA recipients may not be deprived of their

---

[21] Defendants' reliance on the agency's single assertion of unfettered discretion is also misplaced because boilerplate language is not sufficient to defeat due process.  As has been discussed, at length, granting deferred status is an agency action from which legal consequences flow.  Under such circumstances, the perfunctory reservation of rights will not preclude agency action from creating substantive rights.  *Cf. Scenic Am., Inc.*, 836 F.3d at 56; *Appalachian Power Co.*, 208 F.3d at 1023.  All the more so when action creates substantial reliance interests.  *See Bell*, 402 U.S. at 539; *Medina*, 2017 WL 5176720, at *9.

constitutionally protected interest in maintaining deferred status, or in maintaining access to its attendant benefits, without due process.  *See Mathews v. Eldridge*, 424 U.S. 319, 331 (1976). Rescission effects just such a deprivation, obviating the recipients' legitimate claim of entitlement to seek renewal without notice or any opportunity to be heard.

Defendants acknowledge that they did not afford DACA recipients any process in connection with rescission, but assert that none was due because individualized process is impractical and unnecessary where a rule "applies across-the-board to a large number of people." MTD NAACP 42.  But even when individualized process may be unnecessary because an agency adopts a legislative rule that applies uniformly and to a substantial number of people, procedural due process requires the agency to afford an opportunity for notice and comment.  *See Pickus v. U.S. Bd. of Parole*, 543 F.2d 240, 245 (D.C. Cir. 1976) ("The general principle that notice and comment rulemaking is constitutionally sufficient for policy decisions is applicable, at least in the absence of extraordinary circumstances."); *see also 2910 Georgia Ave., LLC v. District of Columbia*, 234 F. Supp. 3d 281 (D.D.C. 2017) (holding that the "requirements of procedural due process" were satisfied by the "notice and comment process").  In other words, procedural due process must be satisfied by the type of notice-and-comment procedures afforded by § 553 of the APA, but was denied to Plaintiffs here.

### 2. Plaintiffs Have Adequately Pleaded That Defendants' Revised Information-Sharing Policy Violates Due Process.

Plaintiffs have also adequately pleaded that DACA Rescission violates the Due Process Clause with respect to Defendants' use of information collected from DACA applicants.  In their Motion for Summary Judgment, Plaintiffs demonstrate that due process forbids the Government

from making and then breaking promises about the legal consequences of a specific action.[22]  *See*

Plaintiffs' Mot. Part IV.A.  Specifically, Plaintiffs allege: (1) Defendants made specific and

affirmative representations that identifying information provided in DACA applications would not

be shared with immigration officials, absent certain limited and enumerated circumstances,

Princeton Compl. ¶¶ 34-36; Associations Compl. ¶¶ 32-33; (2) Defendants encouraged and

induced applicants to rely on these representations regarding information sharing, Princeton

Compl. ¶ 37; Associations Compl. ¶¶ 32-35; and, (3) Defendants have now modified the language

of the information-sharing policy and threatened to modify the policy further without prior

notice.[23]  Princeton Compl. ¶ 51; *see* Associations Compl. ¶¶ 56-57.

As Plaintiffs allege, Defendants' new information-sharing policy provides that, upon

expiration of deferred status, information "will not be *proactively* provided" to immigration

officials for purposes of enforcement.  Defendants assert that the revision "is entirely consistent"

with their previous policy.  MTD Princeton 41; *accord* USCIS, *Frequently Asked Questions:*

*Rejected DACA Requests*, https://www.uscis.gov/daca2017/mail-faqs (last updated Dec. 7, 2017)

---

[22] In this respect, Defendants' reliance on *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997), and *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003), is misplaced.  Defendants cite those cases for the proposition that Plaintiffs have not identified a "fundamental right."  *See* MTD Princeton 42.  However, the Government itself acknowledges that a "'denial of fundamental fairness' may rise to the level of a substantive due process violation."  *Id.*  And expanding the use of applicant information for purposes of immigration enforcement also implicates a substantial number of additional rights cognizable under the Due Process Clause.  *See supra* n.15.

[23] Citing *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), Defendants argue that breaking their promises regarding information sharing does not amount to a denial of fundamental fairness, notwithstanding that Defendants specifically invited reliance on their assurances.  But allowing the Government to expand its use of applicant information for purposes of immigration enforcement would "be to sanction an indefensible sort of entrapment" by the Government.  *Cox v. Louisiana*, 379 U.S. 536, 571 (1965) (quotation marks omitted).  Action so arbitrary, and taken under circumstances when deliberation is practical, bears no resemblance to the conduct at issue in *County of Sacramento*, where law enforcement officers were engaged in an active and high-speed pursuit that ultimately led inadvertently to the death of a suspect.

(asserting that, despite the decision to reformulate the policy, the policy "has not changed"). However, Defendants do not explain why the modified language is necessary if it has no effect on implementation of the information-sharing policy.[24]   And drawing all reasonable inferences in favor of the Plaintiffs, it is at the very least plausible that USCIS is, under the new information-sharing policy, required to provide information should ICE and CBP ask for it.   It is likewise plausible that USCIS is now storing information in a location made jointly accessible to other components of DHS.   These allegations are plainly sufficient to plead a Due Process violation.[25] *See* Plaintiffs' Mot. Part IV.

Moreover, in their Motion to Dismiss, Defendants insist that they retain the right to further amend their information-sharing practice at any moment.   MTD Princeton 41.   In other words, even if Defendants have not already expanded their use of applicant information for purposes of enforcement under the revised information-sharing policy, they asserts the ability to make such changes at any time.   Plaintiffs plausibly fear that, if Defendants are not already expanding the universe of applicant information they shares with enforcement officials, they will do so imminently.   Princeton Compl. ¶ 51.   Indeed, the Rescission Memorandum offers no assurances on this issue, Defendants have already revised the information-sharing policy once, and DHS has

---

[24] Defendants do not supply evidentiary support for their assertion that these revisions do not alter the information-sharing policy in practice.   They have not provided a sworn affidavit from any government actor with knowledge of the information-sharing policy.   Even if it had, considering such evidence at this stage in the proceedings would be improper.   Although Defendants style their motion as one to dismiss or for summary judgment, and although the distinction does not bear on Plaintiffs' APA claims, there is, at a minimum, discovery that is necessary to properly adjudicate Plaintiffs' information-sharing claim.   Absent any opportunity to take discovery on how the information-sharing policy is being implemented, and will be implemented going forward, a motion for summary judgment on Plaintiffs' information-sharing claim is premature.

[25] Factual disputes about what the policy is and how it has changed likewise preclude resolving at this stage Plaintiffs' claim that the alleged changes to the policy do not comport with the APA.   *See* Princeton Compl. ¶¶ 76, 82.

already "'urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States.'" *Id.* Given Defendants' unexplained about-face on DACA itself, there is no reason to believe that the Government will not share applicant information in order to facilitate immigration enforcement against DACA recipients once they lose status. *Batalla Vidal*, 2017 WL 5201116, at *15-16.[26]

### D.   Plaintiffs State a Claim Under the Regulatory Flexibility Act.

Because the Rescission Memorandum is a substantive rule subject to APA notice-and-comment requirements, *see supra* at 24, the Association Plaintiffs have also alleged a valid claim under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq*. Defendants do not dispute that an RFA analysis is an essential element of an agency's explanation for a substantive rule, *see Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009), and do not dispute that none was provided here. *See* Associations Compl. ¶¶ 75-82. Accordingly, if the Court concludes that the Rescission Memorandum is a substantive rule, the Association Plaintiffs will be entitled to relief on their RFA claim as well.

### E.   Nationwide Declaratory and Injunctive Relief Is Permissible and Warranted.

A nationwide injunction is proper because Plaintiffs bring a facial challenge, maintaining that the rescission of DACA is invalid under the APA and the Constitution. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (recognizing that a party brings a facial challenge when alleging that agency action violated APA procedures in taking action). If Plaintiffs are correct, this Court will hold that DACA was unlawfully rescinded.

---

[26] Defendants also claim Plaintiffs have no judicially-enforceable right to seek relief from changes in the information policy because DHS stated that the policy might be modified, superseded, or rescinded at any time. This is incorrect. *See* Plaintiffs' Mot. Part IV.A.

The Supreme Court has held that "the scope of injunctive relief is dictated by the extent of the violation established." *Lewis v. Casey*, 518 U.S. 343, 360 & n.7 (1996). Accordingly, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989). If the rescission of DACA is unlawful, there is no justification for DACA to be available in some parts of the country but not available elsewhere. Defendants have attempted to rescind DACA nationwide, and thus the only remedy that would adequately ameliorate the harm of this act is an injunction precluding Defendants from making it effective anywhere.

Anything short of a nationwide injunction would also violate the long-held understanding that immigration law requires uniform, nationwide application. The Constitution requires "an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and the Supreme Court has described immigration policy as "a comprehensive and unified system," *Arizona v. United States*, 567 U.S. 387, 401-02 (2012). Thus, not only would anything short of a nationwide injunction fail to fully remedy the Government's unlawful act, but it would create an incoherent patchwork of immigration law in which some individuals are able to retain the protection of DACA, while others are not. There is no basis for such an outcome. Indeed, it is for these very reasons that in *Texas v. United States*, 809 F.3d 134, 187, 188 (5th Cir. 2015)—the principal case upon which Defendants rely to justify their rescission of DACA—the Fifth Circuit affirmed a nationwide injunction after concluding that DAPA was not promulgated in compliance with the APA.

Finally, Defendants are simply wrong in claiming that declaratory relief would be merely "academic." MTD Princeton at 44. For one, Defendants cannot credibly argue that there is no "actual controversy" concerning the lawfulness of DACA. *Id.* (quoting 28 U.S.C. § 2201(a)).

Indeed, Defendants, in their Motion to Dismiss, and Plaintiffs, in their Motion for Summary Judgment, have both briefed whether DACA is lawful.  *See* MTD Princeton 31-33; Plaintiffs' Mot. Part III.A.1.b.i.  Thus, Defendants' own briefing in this case refutes their claim that the question of DACA's lawfulness has "no bearing" on the validity of the rescission of DACA.  MTD Princeton at 44.  There is, therefore, "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941).

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied.

Dated: December 15, 2017

Respectfully submitted,

By: /s/ Joseph M. Sellers
Joseph M. Sellers
    D.C. Bar No. 318410
Julie S. Selesnick
    D.C. Bar No. 485558
Julia A. Horwitz
    D.C. Bar No. 1018561
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
T: (202) 408-4600
F: (202) 408-4699
jsellers@cohenmilstein.com
jselesnick@cohenmilstein.com
jhorwitz@cohenmilstein.com

*Attorney for Plaintiffs NAACP; American Federation of Teachers, AFL-CIO; United Food and Commercial International Union, AFL-CIO, CLC*

By:  /s/ Thomas J. Perrelli
Thomas J. Perrelli
    D.C. Bar No. 438929
Lindsay C. Harrison
    D.C. Bar No. 977407

Sam Hirsch
     D.C. Bar No. 455688
Ishan Bhabha
     D.C. Bar No. 101567
Ben Eidelson
     D.C. Bar No. 1031574
Alex Trepp
     D.C. Bar No. 1031036*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
tperrelli@jenner.com
lharrison@jenner.com
shirsch@jenner.com
ibhabha@jenner.com
beidelson@jenner.com
atrepp@jenner.com

*Attorneys for The Trustees of
Princeton University, Microsoft
Corporation, and Maria De La Cruz
Perales Sanchez*

*\*Application for Admission to District Court
for District of Columbia Pending*

38