**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION**<br><br>**MEMORANDUM IN SUPPORT** |
| Plaintiffs, | Civil Action No. 17-cv-1907 |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, KRISTJEN NIELSON, in her official capacity as Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and KRISTJEN NIELSON, in her official capacity as Secretary of the Department of Homeland Security, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

I.    Background ..............................................................................................................4

    A.  "Dreamers" ........................................................................................................4

    B.  The Creation of DACA ......................................................................................5

    C.  The Government's Defense of Deferred Action ................................................7

    D.  The Rescission of DACA ..................................................................................8

    E.  Administrative Record ......................................................................................9

II.   Standard of Review ..............................................................................................10

III.  Plaintiffs Are Entitled to Relief on Their APA Claims. ......................................11

    A.  Plaintiffs Are Entitled to Summary Judgment. ..............................................11

        1.  Defendants' Rescission of DACA Is Arbitrary and Capricious. .............11

            a.  The Legal Analysis Underlying Rescission Is Arbitrary and
                Capricious. ................................................................................... 12

                i.  Defendants did not rationally explain the basis for their
                     legal judgment. ................................................................... 13

                ii.  Defendants did not adequately explain their abrupt
                     reversal of position on DACA's legality. ........................... 15

            b.  The Legal Premise Underlying Rescission Is False. .................... 17

                i.  DACA is legal. .................................................................... 18

                     (a)  DACA is a lawful, responsible exercise of the
                          Secretary's broad statutory authority to administer
                           and enforce the INA. ..................................................... 18

                     (b)  Longstanding practice confirms that DACA is a
                          lawful exercise of the Secretary's authority under the
                            INA. ............................................................................... 20

                     (c)  DACA's individualized review accords with past
                            deferred action. ............................................................ 23

                ii.  The Fifth Circuit's DAPA ruling cannot justify
                     Defendants' claim that DACA is illegal. .......................... 24

            c.  Litigation Risk Cannot Justify Rescinding DACA. ..................... 28

                i.  Defendants' "litigation risk" argument is an
                     impermissible *post hoc* rationalization. ............................ 28

                  ii.  Even if litigation risk were Defendants' rationale for
                       rescinding DACA, it would be arbitrary and capricious. ........... 29

|   |   | (a) | Defendants' litigation-risk argument could be used to justify any legal conclusion. | 30 |
|   |   | (b) | Litigation risk necessarily has to be balanced against the benefits of a policy, but Defendants made no such assessment here. | 30 |
|   |   | (c) | Defendants did not assess the likelihood of different outcomes. | 32 |
|   | d. | | Defendants' Plan for "Winding Down" DACA Confirms the Arbitrariness of Their Rescission Policy as a Whole. | 36 |
|   | 2. | | Rescission Violates the APA Because It Is a Substantive Rule Imposed Without Notice and Comment. | 38 |
| B. | | | Plaintiffs Are Entitled to a Preliminary Injunction. | 41 |
|   | 1. | | Plaintiffs Possess a Strong Likelihood of Success. | 41 |
|   | 2. | | Plaintiffs Face Irreparable Harm. | 42 |
|   | 3. | | The Balance of Equities and Public Interest Weigh Overwhelmingly in Favor of an Injunction. | 45 |
| C. | | | Nationwide Relief Is Appropriate in this Case. | 47 |
| IV. | | | Plaintiffs Are Entitled to Provisional Relief on Their Information-Sharing Claim. | 48 |
| A. | | | Plaintiffs Are Likely to Succeed on the Merits of Their Information-Sharing Claim. | 48 |
| B. | | | Defendants' Asserted Authority to Revise the Information-Sharing Policy at Any Time Imposes Imminent and Irreparable Harm. | 51 |
| C. | | | The Balance of Equities and Public Interest Weigh Overwhelmingly in Favor of an Injunction. | 52 |
| CONCLUSION | | | | 53 |

# TABLE OF AUTHORITIES[*]

CASES

*Alaska v. United States Department of Transportation*, 868 F.2d 441 (D.C. Cir. 1989) ...................................................................................................................40

*Allied–Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993) ...............................................................................................35

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001)...................................10

*American Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015)..................................................................................41

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ...................................................................................................................11

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ...............................................50

*Arizona v. United States*, 567 U.S. 387 (2012)...................................................................18, 47

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ...............................................................7, 19, 25

*Association of Irrigated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007) ...............................41

*Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 4737280 (E.D.N.Y. Oct. 19, 2017) ...................................................................................................................3

*Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) .............................................................................................13, 28, 39, 52

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281 (1974)...................................................................................................................14

*Buckley v. Valeo*, 424 U.S. 1 (1976) .........................................................................................35

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 67 (D.D.C. 2001) ...................................................................................................45

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) ..................................................................43

*Chamber of Commerce of United States v. OSHA*, 636 F.2d 464 (D.C. Cir. 1980) .....................38

*Citizens for Responsibility & Ethics in Washington v. United States Department of Justice*, 846 F.3d 1235 (D.C. Cir. 2017)..................................................................................15

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017)..............................................12

*Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)....................40

*Consumer Energy Council v. FERC*, 673 F.2d 425 (D.C. Cir. 1982), *summarily aff'd*, 463 U.S. 1216 (1983) ........................................................................................41

*\*Cox v. Louisiana*, 379 U.S. 536 (1965)..............................................................48, 50

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ....................................................7, 25

*Doe 1 v. Trump*, Civ. A. No. 17-1597, __ F. Supp. 3d __, 2017 WL 4873042 (D.D.C. Oct. 30, 2017)....................................................................................45

*Doyle v. Brock*, 821 F.2d 778 (D.C. Cir. 1987) ........................................................13

*Dyer v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201 (D.C. Cir. 1988) ....................17

*\*Electronic Privacy Information Center v. United States Department of Homeland Security*, 653 F.3d 1 (D.C. Cir. 2011).................................................................35, 39

*\*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...............................14, 15

*Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983) ...........12

*\*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...........................11, 12, 16

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)......................................................12

*Friends of Animals v. United States Bureau of Land Management*, 232 F. Supp. 3d 53 (D.D.C. 2017) ..........................................................................................10

*Guardian Federal Savings & Loan Ass'n v. Federal Saving & Loan Insurance Corp.*, 589 F.2d 658 (D.C. Cir. 1978)................................................................40

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) .............................................47

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................18

*Heckler v. Mathews*, 465 U.S. 728 (1984).................................................................34

*Hispanic Affairs Project v. Acosta*, No. 15-CV-1562, 2017 WL 2951881 (D.D.C. July 7, 2017).................................................................................................15

*Inland Empire Immigrant Youth Collective v. Duke*, No. 17-cv-02048, 2017 WL 5900061 (C.D. Cal. Nov. 20, 2017)...............................................................44

*Intermountain Insurance Service of Vail v. Commissioner*, 650 F.3d 691 (D.C. Cir. 2011), *vacated on other grounds*, 566 U.S. 972 (2012) ........................................27

*Interstate Natural Gas Ass'n of America v. FERC*, 285 F.3d 18 (D.C. Cir. 2002) ......................41

*James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996) ............................11

*McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)................................40

*McVeigh v. Cohen*, 983 F. Supp. 215 (D.D.C. 1998) ....................................................................43

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ....................................30

*Morrissey v. Brewer*, 408 U.S. 471 (1972)....................................................................................50

*\*Motor Vehicle Manufactures Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................................................11, 31, 32, 37

*National Association of Government Employees v. City Public Service Board*, 40 F.3d 698 (5th Cir. 1994) ..........................................................................................................33

*National Association of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012)......................11

*National Mining Ass'n v. United States Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) .............................................................................................................47

*Natural Resources Defense Council v. United States Nuclear Regulatory Commission*, 680 F.2d 810 (D.C. Cir. 1982) ...........................................................................27

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).................................................................................................................................34

*Ohio ex rel. Eaton v. Price*, 364 U.S. 263 (1960).........................................................................14

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..............................................................................45, 51

*PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1 (D.D.C. 2004).......................................................3

*\*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) ...........................................15, 32, 41

*Petties v. District of Columbia*, 881 F. Supp. 63 (D.D.C. 1995) ............................................42, 52

*Plyler v. Doe*, 457 U.S. 202 (1982)...............................................................................................25

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ...............................................................47

*\*Raley v. Ohio*, 360 U.S. 423 (1959).............................................................................48, 49, 50

*Regents of the University of California v. United States Department of Homeland Security*, No. C 17-05211 WHA, 2017 WL 4642324 (N.D. Cal. Oct. 17, 2017), *stayed by In re United States*, No. 17A570, 2017 WL 5972687 (U.S. Dec. 8, 2017) ...............................................................................................................................3

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ..........................19

*Republic Airline Inc. v. United States Department of Transportation*, 669 F.3d 296
(D.C. Cir. 2012) .........................................................................................15

*Reynolds v. Sims*, 377 U.S. 533 (1964)............................................................35

*Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975) ...........................................35

*San Antonio ex rel. City Public Service Board v. United States*, 631 F.2d 831 (D.C.
Cir. 1980) .........................................................................................36-37

*Santobello v. New York*, 404 U.S. 257 (1971) .................................................51

*Saunders v. George Washington University*, 768 F. Supp. 843 (D.D.C. 1991)............................43

*Scenic America, Inc. v. United States Department of Transportation*, 836 F.3d 42
(D.C. Cir. 2016) .........................................................................................50

*Sebelius v. Auburn Regional Medical Center*, 568 U.S. 145 (2013) ...........................................23

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .....................................................30

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ....................................................11-12, 16, 17, 28

*Smoking Everywhere, Inc. v. United States FDA*, 680 F. Supp. 2d 62 (D.D.C. 2010),
*aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010)......................................44

*Teva Pharmaceuticals USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) ...........................17

*Texas Children's Hospital v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014) ...................52

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015)...............................................8, 25

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)............................................8, 25, 26, 27, 47

*Transcontinental Gas Pipe Line Corp. v. FERC*, 54 F.3d 893 (D.C. Cir. 1995)..........................13

*Trump v. United States District Court*, No. 17-72917, 2017 WL 5505730 (9th Cir.
Nov. 16, 2017) .........................................................................................9, 10

*United States ex rel. Parco v. Morris*, 426 F. Supp. 976 (E.D. Pa. 1977)...................................41

*United States v. Pennsylvania Industrial Corp.*, 411 U.S. 655 (1973)...................................49, 50

*United States v. Pink*, 315 U.S. 203 (1942) ...........................................................14, 18

*United States v. Texas*, 136 S. Ct. 2271 (2016) ...........................................................8

*United States v. Texas*, 137 S. Ct. 285 (2016) ............................................................8

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)...................................................51

*United States v. Wolff*, 127 F.3d 84 (D.C. Cir. 1997) ..................................................51

*Vargas v. Meese*, 682 F. Supp. 591 (D.D.C. 1987) ......................................................44

*Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984)................11, 27

*Water Quality Insurance Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016) ....................................................................................................................13

*WJG Telephone Co. v. FCC*, 675 F.2d 386 (D.C. Cir. 1982) ........................................37

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 4...........................................................................................47

5 U.S.C. § 553(b) ..........................................................................................................38

5 U.S.C. § 553(b)(A).....................................................................................................39

5 U.S.C. § 553(c) ..........................................................................................................38

5 U.S.C. § 706(2)(A)........................................................................................................2

6 U.S.C. § 202(5) .....................................................................................................18, 19

8 U.S.C. § 1103(a)(1).....................................................................................................18

8 U.S.C. § 1151(b)(2)(A)(i)...........................................................................................26

8 U.S.C. § 1182(a)(3)(D)(iv) .........................................................................................26

8 U.S.C. § 1182(a)(9)(B)(iii)(I) .....................................................................................25

8 U.S.C. § 1182(g)(1)(B) ...............................................................................................26

8 U.S.C. § 1182(h)(1)(B) ...............................................................................................26

8 U.S.C. § 1182(i)(1) .....................................................................................................26

8 U.S.C. § 1225(b) .........................................................................................................19

8 U.S.C. § 1226(c) .........................................................................................................19

8 U.S.C. § 1227(a)(1)(H)................................................................................................26

8 U.S.C. § 1229b(b)(1)(D)..............................................................................................26

8 U.S.C. § 1255(a) ...............................................................................................22

8 U.S.C. § 1255(b) ...............................................................................................22

8 U.S.C. § 1324a ..................................................................................................19

8 U.S.C. § 1324a(h)(3) ...................................................................................18, 22

8 U.S.C. § 1427(a) ................................................................................................22

8 U.S.C. § 1601 ....................................................................................................19

8 U.S.C. § 1611(b)(2) .............................................................................................5

8 U.S.C. § 1611(b)(3) .............................................................................................5

8 U.S.C. § 1621(d) .................................................................................................5

Immigration Act of 1990, Pub. L. No. 101-649, tit. III, § 301(g), 104 Stat. 4978,
     5030...............................................................................................................23

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ...................22

REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302 ...............................................22

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386,
     tit. V, § 1503(d)(2)(D)(i)(II) and (IV), 114 Stat. 1522 ............................................23

Violence Against Women Act of 1994, Pub. L. No. 103-322, tit. V, 108 Stat. 1092....................23

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 100-627 (1988)................................................................................20

**OTHER AUTHORITIES**

8 C.F.R. § 1.3(a)(4)(vi) ..........................................................................................5

8 C.F.R. § 212.5(f) .................................................................................................5

8 C.F.R. § 274a.12(c)(14) ..........................................................................5, 19, 22

42 C.F.R. § 417.422(h) ...........................................................................................5

42 C.F.R. § 422.50(a)(7) .........................................................................................5

44 Fed. Reg. 43,480 (July 25, 1979)......................................................................21

46 Fed. Reg. 25,079 (May 5, 1981) .......................................................................21

46 Fed. Reg. 55,920 (Nov. 13, 1981)...........................................................................21

52 Fed. Reg. 16,221 (May 1, 1987) .............................................................................21

Brief for Petitioners, *United States v. Texas*, No. 15-674 (U.S. 2016)........................18

Fed. R. Civ. P. 56(a) ....................................................................................................10

Order, *In re Duke*, No. 17-3345 (2d Cir. Oct. 24, 2017), ECF No. 41 ...........................3

Petition for Certiorari, *United States v. Texas*, No. 15-674 (U.S. 2016) .......................16

Petition for Rehearing, *United States v. Texas*, No. 15-674 (U.S. 2016) ...............16, 17

Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev.
    405 (1989).............................................................................................................31

## INTRODUCTION

This case concerns the Government's momentous decision to rescind the "Deferred Action for Childhood Arrivals" (DACA) policy.  That decision will devastate the lives of hundreds of thousands of "Dreamers"—young people who were brought to the United States as children and raised here as Americans.  Dreamers have studied hard, joined the workforce, served in the military, and contributed in myriad ways to their communities and to the Nation.  Defendants' attempt to rescind DACA does not comply with basic rules of procedural and substantive law and must therefore be enjoined.

Established by the Department of Homeland Security (DHS) in 2012, DACA is the latest in a long line of deferred-action programs the agency has used to accept the continued presence of certain classes of aliens whom the agency—and often the public at large—believes should not be removed or are very low priority for removal.  Applicants for DACA must meet stringent criteria. Those who are granted deferred action receive peace of mind and may seek work authorization and other benefits.  By all accounts, DACA has been highly successful, enabling nearly one million young people to pursue higher education and work legally in this country.  Five years in, however, DHS decided to terminate the program, returning all of these Dreamers to the shadows and threatening them with expulsion.

The agency's decision to rescind DACA violates basic tenets of the Administrative Procedure Act (APA).  In promulgating their rescission decision, Defendants did not analyze the harm rescinding DACA would cause to the country, its people (including DACA beneficiaries, such as Plaintiff Perales Sanchez), and its businesses, organizations, and institutions (including the organizational Plaintiffs).  Nor did they undertake any reasoned analysis of the legal arguments supporting DACA's validity, or of the prospects for vindicating them in court.  Instead, acting on

a conclusory opinion letter from Attorney General Sessions, Acting DHS Secretary Duke simply announced that she had no choice but to rescind DACA, because DACA is unlawful.

Because that decision was arbitrary, capricious, and not in accordance with law, this Court should set it aside. *See* 5 U.S.C. § 706(2)(A). First, Defendants rested DACA's rescission on a legal judgment, yet offered no legal analysis to support it. Second, Defendants compounded their error by failing to explain their departure from the Government's prior legal position that DACA was a lawful exercise of discretion, and by overlooking the immense reliance that prior position had engendered. Third, Defendants are simply wrong on the law: DACA is a lawful and traditional exercise of DHS's broad enforcement discretion.

Now that their decision is being litigated, Defendants offer a *post hoc* rationalization that appears nowhere in the administrative record. Even if they had the law all wrong, they say, their decision should be upheld based on an implicit estimate of "litigation risk"—a prediction that DACA would "in all likelihood" have been immediately enjoined, subjecting the program's beneficiaries to even greater "turmoil" than Defendants' rescission has imposed. Memorandum of Law in Support of Defs.' Mot. to Dismiss at 29-30, ECF 8-1, No. 17-cv-2325 ("MTD Princeton"). But, perhaps because Defendants did not actually act on this theory, they can point to nothing in the administrative record to support the rationality of their purported risk assessment. Defendants did not even weigh the purported risk of DACA's invalidation against the program's undisputed benefits—rendering any risk analysis they may have conducted irrational. And, far from being a considered measure to benefit DACA recipients, the unexplained "wind down" plan Defendants adopted only confirms the arbitrariness of their approach to deciding DACA's future.

In addition, DACA's rescission is independently invalid because Defendants failed to comply with the APA's procedural requirements. The APA requires substantive rules to undergo

notice-and-comment rulemaking before they become effective.  Even though rescinding DACA is a substantive rule that affects the interests of DACA recipients, Defendants ignored these notice-and-comment requirements.[1]

The Court should also enjoin Defendants from altering their policy of not using information provided by DACA beneficiaries for immigration enforcement purposes.  The Government used that policy to entice people to apply for DACA, and DACA applicants relied upon the policy in entrusting the Government with their information.  Yet, in connection with DACA's rescission, Defendants have altered the language they use to describe that policy and warned DACA beneficiaries to prepare to leave the country.  Moreover, Defendants insist that they may modify the information-sharing policy at any time.  Because due process prevents Defendants from changing this policy without notice and an opportunity for this Court to consider the legality of such a change, the Court should enjoin Defendants from departing from their prior policy without first affording that opportunity.

---

[1]  Plaintiffs believe the Court can and should resolve their challenge to the Rescission Memorandum by granting them summary judgment.  However, issues related to discovery and the scope of the administrative record are being litigated in related cases in other jurisdictions.  *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2017 WL 4642324 (N.D. Cal. Oct. 17, 2017) (authorizing discovery and completion of the administrative record), *stayed by In re United States*, No. 17A570, 2017 WL 5972687, at *1 (U.S. Dec. 8, 2017); *Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 4737280 (E.D.N.Y. Oct. 19, 2017) (authorizing discovery and directing completion of the administrative record); Order at 1, *In re Duke*, No. 17-3345 (2d Cir. Oct. 24, 2017), ECF No. 41 (staying the district court's orders pending adjudication of the Government's mandamus petition).  To the extent the Court wishes to see those issues litigated before granting final judgment to the Plaintiffs, the Court should enter a preliminary injunction.  *See, e.g.*, *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 5, 15 (D.D.C. 2004) (granting summary judgment in favor of plaintiffs and converting previously entered preliminary injunction against defendants into a permanent injunction).

## I.     Background

### A.   "Dreamers"

Prior to 2012, millions of young people raised in this country were compelled by circumstances beyond their control to live in the shadows.  Brought here as children, they attended American schools, contributed to their American communities, and strived to achieve American dreams.  AR 249.  But because they were not lawfully present, their lives did not resemble those of their American classmates in several respects:  They often could not secure government-issued identification and, accordingly, could not travel by plane to visit family or attend college far from home; they could not work in jobs or internships requiring work authorization; they generally could not open bank accounts, obtain credit cards, or engage in other commercial activity requiring access to credit; they could not access public benefits and, in many cases, health insurance; they could not enlist in the Armed Forces; and they lived in fear of law enforcement, with whom any interaction might mean deportation to a country that was often wholly foreign to them.  AR 187 *see generally* App. 2679-84.[2]

Despite these hardships, many of these young people triumphed.  They worked hard and excelled in school, developed talents and professional skills, and contributed to their families and communities.  Known as "Dreamers," they achieved these accomplishments while doing their best to stay under the radar and avoid the attention of immigration enforcement.

---

[2] Where several declarations lend support for a particular fact, Plaintiffs provide citation to a Topical Index of Plaintiffs' Declarations contained within the Appendix, *see* App. 2679-84, which identifies the relevant declarations as well as the relevant paragraphs therein.  Plaintiffs have also provided a separate, similar index that was submitted by litigants challenging the rescission of DACA in the Northern District of California, *see* App. 1825-34, and which catalogues third-party declarations, *see* App. 135-1824, of which this Court may take judicial notice.  *See* Plaintiffs' Request for Judicial Notice, filed simultaneously with this motion.

### B.  The Creation of DACA

On June 15, 2012, the then-Secretary of Homeland Security issued a memorandum establishing the DACA program ("DACA Memorandum").  AR 1-3.  DACA is a deferred-action program, consistent with a long national history of deferred-action programs.  AR 15-23; *see infra*, at 20-23.  Deferred action simply means that the Government decides in its discretion not to make the effort to remove an individual for a specified period of time.  AR 15.  Having so decided, the Government informs the affected individual of its decision so that she can plan accordingly and participate more fully in the life of the Nation.  AR 23-24.

In addition, by statute and regulation, all persons subject to deferred action—whether under DACA or any other program—may access certain benefits that accommodate the reality of their continued presence in the United States.  AR 24.  They may seek Social Security numbers and employment authorization, allowing them to work and access credit.  8 C.F.R. § 1.3(a)(4)(vi) (Social Security numbers); *id.* § 274a.12(c)(14) (work authorization).  They may seek advance parole, allowing them to apply to travel abroad and re-enter the United States.  *Id.* § 212.5(f).  And they may obtain driver's licenses, health insurance, and other public benefits.  8 U.S.C. § 1611(b)(2)-(3) (Social Security benefits and Medicare); *id.* § 1621(d) (state benefits); 42 C.F.R. §§ 417.422(h), 422.50(a)(7) (certain types of health insurance).

As the DACA Memorandum explained, DACA was rooted in a policy judgment about "how, in the exercise of our prosecutorial discretion, [DHS] should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home."  AR 1.  Because "these individuals lacked the intent to violate the law," and because our immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language," the DACA Memorandum concluded that "[p]rosecutorial discretion, which is used in so many other areas, is especially

justified here."  AR 1-2.  Under DACA, individuals who were brought to the United States as children and met certain stringent criteria could apply for renewable two-year grants of deferred action.  The DACA Memorandum stated that it "confer[red] no substantive right," but rather "set forth policy for the exercise of discretion within the framework of the existing law."  AR 3.

Eligibility for DACA is limited to persons who (1) came to this country when they were under the age of sixteen; (2) have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012; (3) are currently in school, have graduated from high school, have obtained a GED, or are an honorably discharged veteran; (4) do not have a significant criminal record or otherwise pose a threat to national security or public safety; and (5) are not above the age of thirty.  AR 1.  In addition to meeting these criteria, eligible individuals are required to provide the Government with sensitive personal information, submit to a thorough DHS background check, and pay a substantial fee.  Even with all these criteria fulfilled, DACA applications are evaluated "on a case by case basis."  AR 2.

DACA, by its terms, did not address the plight of all Dreamers.  Many were excluded, and many were understandably reluctant to hand over their personal information to government authorities.  AR 206.  But the Government encouraged them to apply and told DACA recipients they would be eligible to renew their status for the foreseeable future.  *See* AR 2-3.  In addition, the Government assured DACA applicants that their personal information would not be used for other immigration-related purposes, including to facilitate their removal.  AR 170.  The official instructions accompanying the U.S. Citizenship and Immigration Service (USCIS) DACA application form promised that "[i]nformation provided in this request is protected from disclosure to [U.S. Immigration and Customs Enforcement (ICE)] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings," unless certain narrow criteria are

met.   App. 1859.   As then-Secretary of Homeland Security Johnson later explained, DHS "consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes."  App. 1862.  He also acknowledged that "people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others." *Id.*

Since DACA's inception in 2012, nearly 800,000 individuals have enrolled in DACA.  AR 242.  Those individuals, including Plaintiff Perales Sanchez, declarants Sandoval and Torres, and the Doe declarants, have benefited directly from this "life-changing" program.  *See, e.g.*, App. 58 (Perales Sanchez Decl. ¶ 12); App. 118 (Sandoval Decl. ¶ 3); App. 131 (Torres Decl. ¶ 3).  The positive impact of that change has been shared with their families, their classmates, and their co-workers.  It has benefited their universities and employers as well.  *See generally* App. 2679-84.

### C.  The Government's Defense of Deferred Action

Several plaintiffs—including one State, a handful of immigration officers, and a local sheriff—challenged DACA in court.  *See Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015); *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015).  The Government vigorously defended DACA in those cases, explaining that the program fell "well within the government's broad discretion to 'establish national immigration enforcement policies and priorities.'"  App. 2374-2496 (Br. of Federal Appellees at 89, *Crane v. Johnson*, 783 F.3d 244 (5th Cir. July 9, 2014) (No. 14-10049), 2014 WL 10657553 (quoting 6 U.S.C. § 202(5) (alterations omitted))).  The cases were dismissed.  *Crane*, 783 F.3d at 255; *Arpaio*, 797 F.3d at 25.

Meanwhile, a separate coalition of States, led by Texas, challenged a later-established deferred-action program known as "Deferred Action for Parents of Americans and Lawful Permanent Residents" (DAPA).  AR 55.  These plaintiffs opted to challenge only DAPA (and

certain expansions of DACA proposed in connection with DAPA), and not to challenge DACA.
AR 239.  A district court in Texas preliminarily enjoined DAPA before it took effect.  AR 128-29.
Divided panels of the Fifth Circuit declined to stay that decision and then affirmed; between the
two decisions, two judges endorsed the challengers' legal theory and two rejected it.  *See Texas v.*
*United States*, 787 F.3d 733 (5th Cir. 2015) (AR 42-129); *Texas v. United States*, 809 F.3d 134
(5th Cir. 2015) (AR 130-219).   The Supreme Court divided evenly, with the result that the
preliminary injunction of DAPA was affirmed.  *See United States v. Texas*, 136 S. Ct. 2271 (2016)
(AR 227-28).   The Government sought rehearing, noting that the country lacked a "definitive
ruling" on DAPA's legality, App. 2498-2507 (Pet. for Reh'g at 5, *United States v. Texas*, No. 15-
674 (U.S. 2016)), but the Supreme Court denied that extraordinary relief.  137 S. Ct. 285 (2016).

### D.   The Rescission of DACA

When President Trump first took office, his Administration opted not to alter DACA.  In
February 2017, then-Secretary of Homeland Security Kelly repealed a broad array of immigration
directives but specifically exempted DACA.  AR 230.  As he later explained, he viewed "DACA
status" as a "commitment … by the government towards the DACA person."  App. 1922.  In June
2017, Secretary Kelly rescinded DAPA, but again left DACA in place.  App. 1925-27.  Likewise,
the President said the "dreamers should rest easy" and agreed that the "policy of [his]
administration [is] to allow the dreamers to stay."  App. 1938-39.

In June 2017, around the time that Secretary Kelly made his second decision to leave
DACA in place, Attorney General Sessions and other political appointees in the Justice
Department were communicating with attorneys general from several of the States that had
challenged DAPA in the *Texas* case (and for whom then-Senator Sessions had served as an
*amicus*).   App. 1951-52.   Although Defendants have not disclosed the contents of those
conversations, they culminated in a letter from the state attorneys general to Attorney General

Sessions on June 29, 2017.  AR 238.  The letter asserted that DACA was unlawful and asked Defendants to "phase out the DACA program"; if Defendants did not do so, the States said, they would amend their years-old complaint to challenge DACA for the first time.  AR 239.

On September 4, 2017, Attorney General Sessions announced, in a one-page letter, that DACA was "unconstitutional" and lacked "statutory authority."  AR 251.  The Attorney General's letter did not provide any substantive legal analysis.  Instead, it referenced the *Texas* DAPA litigation and the "potentially imminent litigation" over DACA.  *Id.*  The next day, Acting Secretary of Homeland Security Duke issued a memorandum formally rescinding DACA (the "Rescission Memorandum").  AR 252.  The Rescission Memorandum added little to the Attorney General's conclusory letter.  After describing the course of the *Texas* litigation and reciting the Attorney General's conclusion that DACA was unlawful, Acting Secretary Duke simply announced that it was "clear" that DACA should be terminated.  AR 254-55.

The Rescission Memorandum instructed DHS immediately to stop accepting new initial DACA applications and approving new applications for advance parole; to accept renewal applications only from individuals whose current deferred action would expire by March 5, 2018; and to accept such renewals only until October 5, 2017.  AR 255.

### E.  Administrative Record

The administrative record contains very little explanation of Defendants' decision to rescind DACA.  "[T]he government submitted as 'the' administrative record fourteen documents comprising a mere 256 pages, all of which are publicly available on the internet," and 192 of which consist of the Supreme Court, Fifth Circuit, and District Court opinions in the *Texas* litigation related to DAPA.  *Trump v. U.S. District Court*, No. 17-72917, 2017 WL 5505730, at *2 (9th Cir. Nov. 16, 2017); *see id.* ("The notion that the head of a United States agency would decide to

terminate a program giving legal protections to roughly 800,000 people based solely on 256 pages of publicly available documents is not credible.").

Among other things, the record lacks any sign that Defendants conducted any substantive legal analysis, weighed any of DACA's benefits, or considered any of the myriad issues that might be relevant to the "wind-down" period adopted by the Rescission Memorandum. Likewise, as the Ninth Circuit observed, "the proffered record contains no materials addressing the change of position between February 2017—when then-Secretary Kelly affirmatively decided *not* to end DACA—and Acting Secretary Duke's September 2017 decision to do the exact opposite." *Id.* at *3. Furthermore, there is no evidence of how Defendants evaluated what they now claim was the basis for their decision: the risk that a loss in future litigation could bring DACA to an abrupt end. For instance, there are no communications between Defendants and the Texas Attorney General, beyond the initial letter threatening to sue if DACA is not rescinded, and no evidence that Defendants considered any alternatives to the method of rescission they chose.

## II.      Standard of Review

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a challenge under the APA, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases).

Motions for a preliminary injunction are evaluated under a four-factor test. Plaintiffs must show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 60 (D.D.C. 2017).

III.    **Plaintiffs Are Entitled to Relief on Their APA Claims.**

    A.  **Plaintiffs Are Entitled to Summary Judgment.**

        1.  **Defendants' Rescission of DACA Is Arbitrary and Capricious.**

The APA is the principal safeguard against irrational, incoherent, or unexplained agency decision making.  A court reviewing agency action must undertake "a thorough, probing, in-depth review" of the agency's reasoning. *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1098 (D.C. Cir. 1996) (quotation marks omitted).  If the action is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" the court "must set [it] aside." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 922-23 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)).  Under this familiar standard of review, the ultimate choice of policy is largely up to the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  But the court is responsible for ensuring that the agency "examine[d] all relevant factors," *Am. Wild Horse*, 873 F.3d at 923; weighed "reasonably obvious alternative[s]" to its chosen course, *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984); and furnished "a satisfactory explanation for its action"—one that draws a "rational connection between the facts found and the choice made," and that supplies "a reasoned analysis for the change" the agency elected to make, *State Farm*, 463 U.S. at 43 (citation omitted).

The APA does not bar an agency from "rely[ing] on the incumbent administration's views of wise policy," or from reversing course on that basis after due deliberation. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (quotation marks omitted).  But the APA *does* demand that when an agency reappraises its approach, it must candidly weigh the relevant factors, including the "facts and circumstances that underlay or were engendered by the prior policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and "set forth with such clarity as to be understandable" why it is changing course, *SEC v. Chenery Corp.*, 332 U.S.

194, 196 (1947) (*Chenery II*).[3]   Judicial review under the APA thus ensures both that there are "good reasons for the [agency's] new policy," *Fox Television,* 556 U.S. at 515, and that the agency is "accountable to the public" for its discretionary policy choice, *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

Because Defendants did not satisfy any of these requirements when they rescinded DACA, their action must be set aside.

### a.   The Legal Analysis Underlying Rescission Is Arbitrary and Capricious.

Defendants do not articulate a policy rationale for rescinding DACA.  Indeed, Defendants claim not to favor removing DACA recipients from the country as a matter of policy, and President Trump has professed a "great love" for the young people protected by DACA.  His Administration has insisted that "DACA kids add value to the country" and that "the President … wants to give them legal status."[4]   That position aligns with a sweeping popular consensus in favor of shielding DACA recipients from removal.  App. 2085-87; 2089-92; 2359-61.  Rightly so.  As the DACA Memorandum explained, and as Defendants have never disputed, "these young people have already contributed to our country in significant ways"; they "lacked the intent to violate the law"; and it makes no sense to "remove [them] to countries where they may not have lived or even speak the language."  AR 1-2.

In the absence of any policy arguments against DACA, Defendants' decision to rescind the program rested entirely on an assertion that a policy choice to retain DACA would not be lawful.

---

[3] Courts regularly insist that even when the White House changes hands, agencies must give a reasoned explanation of the neutral principles warranting a policy change.  *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 8-9 (D.C. Cir. 2017); *Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 817 (D.C. Cir. 1983); *see also Fox Television*, 556 U.S. at 537-38 (Kennedy, J., concurring in the judgment) (discussing the agency's unexplained reversal after "a change in Presidential administration" in *State Farm*).

[4] *See* App. 1963; *see also* App. 2003 (exchange between Sen. Lindsey Graham and Michael Dougherty, Ass't Secretary of DHS).

Attorney General Sessions took that stance in his September 4, 2017 letter, declaring DACA "an unconstitutional exercise of authority by the Executive Branch." AR 251. The Rescission Memorandum, issued the next day, described the course of the *Texas* litigation, quoted the Attorney General's conclusions that DACA was "unconstitutional" and lacked "statutory authority," and said it was therefore "clear" that DACA should be terminated. AR 254-55. In short, Defendants terminated DACA because, under their view of the applicable legal principles and precedents, the program—however laudable from a policy perspective—was against the law. *See Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 5201116, at *10 (E.D.N.Y. Nov. 9, 2017) ("In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court.").

Because the Rescission Memorandum's rationale is purely legal, it must be set aside if Defendants "failed to provide a rational explanation" for their resolution of this determinative "legal question," including an explanation of "why [they] departed from [their] prior practice." *Doyle v. Brock*, 821 F.2d 778, 782-83 & n.2, 786 (D.C. Cir. 1987); *see, e.g.*, *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 71-72 (D.D.C. 2016) (vacating an agency decision "due to the insufficiency of its legal analysis").

### i. Defendants did not rationally explain the basis for their legal judgment.

To meet the demands of the APA, Defendants had to articulate their *reasons* for concluding that DACA is unlawful. *See, e.g.*, *Transcon. Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995) (an agency "must, of course, reveal the reasoning that underlies its conclusion"). The Sessions and Duke memoranda, however, are devoid of legal reasoning.

To the extent the Attorney General's one-page letter explains his view of DACA's legality at all, the letter rests on an assertion that DACA suffers from "the same legal and constitutional defects that the courts recognized as to DAPA." AR 251. But no court has identified *any*

"constitutional defect[]" in DAPA—so the Attorney General's statement that DACA has those "same" defects is unintelligible. *Id.* As for other purported "legal … defects," the Attorney General said nothing about *why* he agrees with the Fifth Circuit majority that DAPA exceeded DHS's broad statutory authority. Nor did the Attorney General discuss a single similarity or difference between DAPA and DACA, even though his conclusion depended on their purported equivalence. In short, the Sessions letter provides no discussion from which Defendants' analytical "path may reasonably be discerned"; it just announces the Attorney General's chosen destination. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The Rescission Memorandum likewise failed to supply the required legal analysis. The Memorandum recited the history of the DAPA litigation and then asserted that "the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," together with the "letter from the Attorney General," made it "clear that [DACA] should be terminated." AR 255. For the most part, this statement merely repackaged the unsupported conclusions of the Sessions letter. And the Rescission Memorandum's reference to the Supreme Court's "ruling" in the DAPA litigation only compounded the irrationality of Defendants' legal analysis: It is blackletter law that "nothing is settled" by a 4-4 affirmance, which is "without force as precedent." *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 264 (1960) (opinion of Brennan, J.); *see, e.g.*, *United States v. Pink*, 315 U.S. 203, 216 (1942). The Supreme Court's nonprecedential affirmance in *Texas* would carry no weight in potential future litigation over DACA.

In short, because Defendants rested DACA's rescission on purported legal constraints rather than a policy judgment, they were required to rationally explain the grounds of their legal assessment. But "[w]hatever potential reasons [Defendants] might have given, [they] in fact gave almost no reasons at all." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

ii.  Defendants did not adequately explain their abrupt reversal of position on DACA's legality.

Defendants likewise failed to discharge their specific "duty to explain why [they] deemed it necessary to overrule [their] previous position" on the question of DACA's legality.  *Encino Motorcars*, 136 S. Ct. at 2126.  That duty is particularly weighty when an agency's position "has engendered serious reliance interests."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (quoting *Fox Television*, 556 U.S. at 515).  As the Supreme Court recently reaffirmed, "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."  *Encino Motorcars*, 136 S. Ct. at 2126 (quotation marks omitted); *see Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) ("One of the core tenets of reasoned decision-making is that an agency when changing its course is obligated to supply a reasoned analysis for the change." (quotation marks and alterations omitted)).  Defendants did not engage, or even mention, the legal arguments on which they previously relied.  Their decision to "simply disregard" the Government's prior position—expressed in both a published Office of Legal Counsel (OLC) opinion and numerous court filings—confirms that they did not undertake a reasoned analysis of the complex issues at stake.  *Fox Television*, 556 U.S. at 515.

Defendants' disregard of the 2014 OLC opinion on the legality of deferred action is particularly damning.  These "memoranda are akin to legal authority for an agency," and an agency therefore may not "toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices."  *Hispanic Affairs Project v. Acosta*, No. 15-CV-1562, 2017 WL 2951881, at *9 (D.D.C. July 7, 2017); *see id.* (explaining that OLC opinions "necessarily become the executive branch interpretation of the law" (citation omitted)); *see generally Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017).

Over thirty-three single-spaced pages, the relevant OLC opinion explains four "general principles" that govern the Executive Branch's assessment of the legality of deferred-action programs, AR 27, and articulates why DACA and DAPA satisfied those requirements, AR 18 n.8, 23-28.   Until recently, DHS relied on and scrupulously observed this legal analysis.  *See* AR 35-36.

In arriving at their new view that DACA is unlawful, however, Defendants did not even acknowledge the *existence* of the four previously controlling principles, much less explain why those standards were either unsatisfied or misguided.  Instead, Defendants "depart[ed] from [that] prior policy *sub silentio*"—without even noting that the OLC opinion was "still on the books." *Fox Television*, 556 U.S. at 517.[5]

Defendants also appear to have switched sides on the many legal arguments the Government previously advanced at every level of the federal judiciary.  In 2016, for example, DHS and the Justice Department suggested that the Fifth Circuit "fundamentally erred" in the *Texas* case, "strip[ping] DHS of authority it has long exercised to provide deferred action to categories of aliens."  Pet. for Cert. at 12-13, *United States v. Texas*, No. 15-674 (U.S. 2016).  And even *after* the Supreme Court's nonprecedential affirmance, the Government continued to urge that the lower court's ruling was wrong and should not be "le[ft]" in place."  Pet. for Reh'g at 5, *United States v. Texas*, No. 15-674 (U.S. 2016).  DHS has not explained why the Fifth Circuit's opinion is any more persuasive today than it was in October 2016, when the agency's effort to undo it came up short.  As the Government put it then, the country lacks a "definitive ruling" on

---

[5] Defendants' discussion of the OLC opinion in their briefing here, MTD Princeton 32-33, cannot supply the analysis that is missing from the administrative record.  *See Chenery II*, 332 U.S. at 196.  But in any event, that discussion is misleading.  The opinion did not merely reiterate a "preliminary" judgment that DACA would be lawful under certain conditions.  Rather, it explained that under DACA—which had then been up-and-running for more than two years—applicants' "eligibility" was assessed on a "case-by-case basis" in the sense required by OLC's detailed legal framework.  AR 20-21; *see id.* at 25-26; *see also infra*, at 23-24.

DAPA's legality, and a question so important should not be left to a single court of appeals that "divided twice, with two judges voting for [DHS] and two for [the plaintiff] States." *Id*. Without acknowledgment or explanation, Defendants now repudiate these prior positions.

In sum, because Defendants rested rescission on their unsupported and unexplained premise that DACA is unlawful, and because they reversed course without meaningful explanation, their decision is necessarily arbitrary and capricious. Accordingly, the Court can set it aside without even reaching the question of whether, in the final analysis, DACA *is* lawful.[6]

### b.   The Legal Premise Underlying Rescission Is False.

If the Court concludes that Defendants have met their threshold burden of explaining their changed legal position, it nonetheless must set aside the rescission of DACA for the simple reason that Defendants' new legal position is wrong. When an agency "mistakenly thought itself bound by [the law]" to reach a certain result, "[t]his error renders its decision arbitrary and capricious." *Teva Pharm. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006). And in determining whether the agency mistakenly thought itself so bound, the agency's view of the law is due no deference. *See Dyer v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 206 (D.C. Cir. 1988) ("[D]eference is appropriate only when an agency has exercised its *own* judgment. When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand." (quotation marks

---

[6] Defendants make a passing suggestion that, even if their legal analysis would be arbitrary if taken on its own terms, DACA rescission should be upheld because the "same concerns" that underlie their legal position could "equally support a policy judgment"—namely, a judgment that important immigration decisions "should be left to Congress." MTD Princeton 31-32. But Defendants did not rest their decision on a self-imposed policy of executive passivity in immigration matters— much less "clearly invoke[]" such a policy—and so cannot rely on it here. *Chenery II*, 332 U.S. at 196. In any case, rescinding DACA based on a bare policy preference for legislative action— without weighing that preference against any of DACA's policy benefits or the reliance interests it engendered (*see infra*, at 42-47)—would be arbitrary and capricious in its own right, as such a justification could be used to summarily rescind any agency action at the Executive's whim.

omitted)).  DACA is a lawful exercise of the Secretary's broad statutory authority, and that fact provides an entirely independent basis for vacating the rescission.

i.   DACA is legal.[7]

In asserting that DACA is illegal, Defendants misconstrued immigration law, upending more than 50 years of settled practice and stripping the Secretary of frequently exercised discretion to provide deferred action to categories of noncitizens already living in our country.

(a)   *DACA is a lawful, responsible exercise of the Secretary's broad statutory authority to administer and enforce the INA.*

DACA is a lawful exercise of the Secretary's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1), including through work authorization, 8 U.S.C. § 1324a(h)(3).  The Secretary cannot properly exercise this authority without discretion to consider "whether agency resources are best spent on this violation or another," whether a particular action "best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action at all."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Indeed, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona v. United States*, 567 U.S. 387, 396 (2012).

Congressional appropriations only allow DHS to remove about 4% of the total undocumented population annually.  App. 2113-14.  As a result, millions of undocumented individuals who have lived and worked in this country for years will continue living and working

---

[7] The arguments here tightly track positions the Government itself advanced in the Supreme Court in *United States v. Texas* in 2016.  *See* Br. for Pet'rs at 42-64, *United States v. Texas*, No. 15-674 (U.S. 2016).  From a legal standpoint, all that has changed since then is the announcement of the Court's 4-to-4 deadlock, which carries no precedential weight.  *See Pink*, 315 U.S. at 216.

here for the foreseeable future.  Rather than ignoring this reality, DACA addresses it forthrightly by using deferred action for a category of immigrants with particularly strong ties to this country: people who were brought here as children, many of whom have never known another home.

Consistent with Congress's direction, DHS has prioritized removing serious criminals, terrorists, persons who have recently crossed the border, and persons who have significantly abused the immigration system.  *See* 6 U.S.C. § 202(5); 8 U.S.C. §§ 1225(b), 1226(c).  DACA complements those priorities by according deferred action to some non-priority immigrants, so that scarce enforcement resources can be targeted elsewhere.  *See Arpaio*, 797 F.3d at 24.

DACA does not confer lawful status or create a pathway to citizenship.  Rather, it is "an act of administrative convenience to the government which gives some cases lower priority," 8 C.F.R. § 274a.12(c)(14), in a "'commendable exercise [of] administrative discretion,'" *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999).  Under DACA, an eligible person can come forward, pay a fee, pass a background check, and potentially receive deferred action.  If law-enforcement officers later encounter her, ICE can quickly confirm her identity through a biometric match and conclude that she does not warrant the commitment of resources for removal.  Without DACA, ICE has to check that individual's background and immigration history every time—and ICE would foot the bill, eating up resources and time that could be better spent on higher-priority candidates for removal and securing the border.  App. 2155.

DACA also promotes self-sufficiency through deferred action's longstanding tie to work authorization for undocumented immigrants who demonstrate economic need.  *See* 8 U.S.C. §§ 1324a, 1601; 8 C.F.R. § 274a.12(c)(14).  Without DACA, many covered individuals would remain in the United States but would work off-the-books, exposing themselves to exploitation while putting American workers and scrupulous employers at a competitive disadvantage.

Deferred action has encouraged DACA recipients to come out of the shadows, work with authorization at higher wages, and pay federal and state taxes on those higher wages.

In sum, DACA facilitates the responsible exercise of enforcement discretion, under the INA, to address a difficult problem.  DHS eminently had the authority to adopt this program.

> *(b)  Longstanding practice confirms that DACA is a lawful exercise of the Secretary's authority under the INA.*

DACA's lawfulness is underscored by its deep historical roots.  DHS and its predecessor (INS) have adopted more than 20 policies in the last 50 years that accord deferred action or similar forms of discretion to large defined groups of undocumented immigrants.  At least since the early 1970s, every one of those policies has made aliens eligible for work authorization, a practice that was codified in formal regulations in 1981.  Fully aware of those practices, Congress has repeatedly ratified the Secretary's authority with respect to both enforcement discretion and work authorization, while at the same time directing DHS to focus its limited resources on securing the border and removing serious criminals.  This history confirms that deferred-action programs, devised to provide relief to defined classes of immigrants, fully comport with the INA.

**Past policies for exercising enforcement discretion.**   Since 1960, INS and DHS have established more than 20 deferred-action (or functionally similar) policies for immigrants in defined categories.  *See generally* H.R. Rep. No. 100-627, at 4-6 (1988) (collecting examples).  As the Government itself recited in its *Texas* brief, *see* App. 2159-60, among these policies are:

- a 1960 policy for Cuban nationals;
- a 1975 policy for Vietnamese;
- a 1975 policy for Cambodians;
- a 1975 policy for Laotians;
- a 1977 policy for about 250,000 foreign nationals from across the Western Hemisphere;
- a 1987 policy for at least 150,000 Nicaraguans;

- 1987 and 1990 Family Fairness policies for as many as 1.5 million spouses and children of aliens granted lawful status (about 40% of the total undocumented population at the time);
- 1989 and 1990 policies for about 80,000 Chinese nationals;
- a 1992 policy for about 190,000 Salvadorans;
- a 1997 policy for about 40,000 Haitians;
- 1997 and 2000 policies for battered spouses and victims of human trafficking;
- 1999, 2007, 2011, and 2014 policies for Liberians;
- a 2001 policy for victims of human trafficking and other crimes;
- a 2005 policy for foreign students displaced by Hurricane Katrina; and
- a 2009 policy for widows and widowers of U.S. citizens.

*Id*.  As this list demonstrates, such programs have been established for populations larger than the DACA population and for immigrants who have never had legal status.  In many cases, the recipients of deferred action—like DACA recipients—never set out to violate the law and were simply waiting for Congress to enact appropriate legislation.  In some cases, the programs lasted many years—the program for Cuban nationals, for example, lasted about 13 years and covered more than 600,000 people.  App. 2365.

  **Work authorization.**  The agencies have long interpreted their broad statutory authority to administer the immigration laws to encompass the ability to authorize aliens to work.  *See* App. 2160-63 (Government's own recitation of this history in its *Texas* brief).

  In 1981, relying on its general authority to administer the INA under Section 1103(a), INS promulgated formal regulations codifying its existing practices.  46 Fed. Reg. 25,079, 25,080-81 (May 5, 1981); *see* 44 Fed. Reg. 43,480 (July 25, 1979).  From the start, those regulations enabled aliens with deferred action to work, notwithstanding that they lacked lawful status, 46 Fed. Reg. at 25,081; aliens with extended voluntary departure were added soon thereafter, 46 Fed. Reg. 55,920-21 (Nov. 13, 1981).  In 1987, INS re-promulgated its work-authorization regulations, including for aliens with deferred action.  *See* 52 Fed. Reg. 16,221, 16,228 (May 1, 1987).

These regulations thus embody Defendants' longstanding interpretation that, as a component of the exercise of discretion, they are empowered by the INA to authorize lawful work by aliens who lack lawful status. *See* 8 C.F.R. § 274a.12(c)(14) (allowing work authorization for "[a]n alien who has been granted deferred action, … if the alien establishes an economic necessity for employment"). And, consistent with this position, INS and DHS have authorized lawful work by aliens under *every* one of the deferral policies adopted since at least the early 1970s.

***Congressional ratification.*** Congress has repeatedly ratified the agency's practice by enacting legislation that takes as a given the agency's power to accord deferred action—including by establishing programmatic criteria for large classes of aliens. *See* App. 2158-70. Several of those statutes expressly presuppose the existence of "deferred action," as traditionally practiced, and attach particular consequences to that status. *See, e.g.*, REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, 119 Stat. 302, 49 U.S.C. § 30301 (permitting States to issue driver's licenses to aliens with "approved deferred action status"); *see also* App. 2168-69 (collecting examples).

In other situations, Congress has specifically approved class-based deferred action. For example, in the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, Congress granted lawful status to millions of undocumented aliens, but pointedly did *not* extend this benefit to their families. *See* 8 U.S.C. §§ 1255(a)-(b), 1427(a).[8] INS responded with the "Family Fairness" policy, which provided indefinite voluntary departure (effectively deferred action) to any spouse or child of a legalizing alien who met certain class-wide criteria, such as continuous residence and lack of a felony conviction. App. 2188-90. As many as one and

---

[8] In a separate provision, IRCA ratified the INS's existing regulation authorizing aliens with deferred action status to obtain work authorization. *See* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" for work purposes as an alien not "authorized to be so employed by th[e INA] *or by the Attorney General*" (emphasis added)); *see also* App. 2163-65.

a half million people were eligible for this benefit.  App. 2166.  Three years after INS announced

its policy, Congress specifically ratified the Family Fairness program, granting lawful status to an

even larger class of family members, effective one year in the future, and instructing that the one-

year delay "shall not be construed as reflecting a Congressional belief that the existing family

fairness program should be modified in any way before such date."  Immigration Act of 1990, Pub.

L. No. 101-649, tit. III, § 301(g), 104 Stat. 4978, 5030.[9]  Congress's "failure to revise or repeal the

agency's interpretation" of its statutory authority to accord deferred action for categories of aliens

"is persuasive evidence that the interpretation is the one intended by Congress," *Sebelius v. Auburn*

*Reg'l Med. Ctr.*, 568 U.S. 145 (2013), and hence that DACA, like its forerunners, is lawful.

### (c)  *DACA's individualized review accords with past deferred action.*

Defendants' principal argument against DACA's legality in their Motions to Dismiss is

that the program does not award deferred action on a strictly "case-by-case" basis.  MTD Princeton

32.  But given the long history recounted above, there is nothing remarkable about DACA's use

of programmatic criteria to channel the exercise of enforcement discretion.  And just like its

predecessors, DACA requires a "case by case" review that may result in the denial of deferred

action for appropriate case-specific reasons.  AR 2.  For example, each applicant must be assessed

individually to ascertain whether he or she poses a national-security threat, and the agency

considers whether an applicant has committed fraud or falsely claimed U.S. citizenship in the past.

App. 2225-26, 2229.  In fact, in the *Texas* litigation, DHS officials specifically testified that DACA

---

[9] Many similar examples are collected in the Government's *Texas* brief.  *See* App. 2162-70; *see,
e.g.*, Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, Tit. V,
§ 1503(d)(2)(D)(i)(II) and (IV), 114 Stat. 1464, 1522 (directing the Secretary to consider
exercising his preexisting authority to make two additional categories of aliens eligible for deferred
action); Violence Against Women Act of 1994, Pub. L. No. 103-322, tit. IV, 108 Stat. 1902
(specifying that certain aliens who self-petition for relief are eligible to request "deferred action").

applications were refused based on exercises of case-specific discretion.  *Id*.  Defendants have not disputed that testimony.

It is not surprising that DACA denials for non-programmatic reasons are infrequent:  The essence of DACA is a policy judgment that someone who meets its programmatic criteria is, on that account alone, a very strong candidate for deferred action.  In this respect, too, DACA is just like prior deferred-action programs that have occasioned no controversy.  For example, when the INS Commissioner established a deferred-action program for certain aliens who suffered abuse by U.S. citizen spouses, he explained that "by their nature, [these] cases generally possess factors that warrant consideration for deferred action."  App. 2194.  The "case-by-case" review therefore involved confirming for each individual application the absence of "unusual … factors" that would block that inference in a specific case.  *Id.*  So, too, with the young people who grew up in this country and satisfy DACA's other threshold criteria:  If they can meet the onerous requirements to qualify, they almost certainly warrant deferred action, subject only to review for special factors. That is all the case-by-case discretion the law could possibly require.

      ii.  <u>The Fifth Circuit's DAPA ruling cannot justify Defendants' claim that DACA is illegal.</u>

Not only is DACA legal, but it is also materially distinguishable from the DAPA program that the Fifth Circuit addressed in the *Texas* litigation.  Indeed, the Fifth Circuit's decision itself underscored that "DACA and DAPA are not identical" and expressly warned against sloppy extrapolation between the two.  AR at 170; *see id.* at 169 ("[A]ny extrapolation from DACA must be done carefully.").  As noted above, the Attorney General's letter and the Rescission Memorandum are guilty of just that—conflating a ruling on DAPA with a hypothesized challenge to DACA, without accounting for the two programs' substantial differences.  The lack of analysis

is particularly striking because when faced with the same legal decisions and factual issues just months earlier, then-Secretary Kelly determined to rescind DAPA *but not* DACA.[10]

As a legal matter, DAPA and DACA are different in several respects.  *First*, DACA applies to individuals who were brought to the United States as children, many of them as infants or toddlers or (as in the case of Plaintiff Perales Sanchez) eight-year-olds.   "[F]undamental conceptions of justice" confirm that people who came here as children are not similarly situated to adults.  *Plyler v. Doe*, 457 U.S. 202, 220 (1982).  Unlike parents whose arrival in the United States was "the product of conscious, indeed unlawful, action," *id.*, children could "affect neither their parents' conduct nor their own status," *id.* (citation omitted).   As Judges King and Higginson explained in the *Texas* litigation, "DACA is materially distinguishable from DAPA because the former applies only to a subset of undocumented immigrants who are particularly inculpable as they were brought to this country as children and, thus, lacked the intent to violate the law." *Texas*, 809 F.3d at 210 n.43 (King, J., dissenting) (quotation marks omitted) (AR 206); *see Texas v. United States*, 787 F.3d 733, 781 (5th Cir. 2015) (Higginson, J., dissenting).   The INA itself recognizes the critical distinction between adults and children by excluding the time an alien was a minor when calculating periods of "unlawful presence."  8 U.S.C. § 1182(a)(9)(B)(iii)(I).[11]

---

[10] Whereas the Fifth Circuit held that the plaintiff States were "likely" to prevail against DAPA, no court has ever found DACA to be unlawful.  To the contrary, every challenge has been dismissed.  *See Crane*, 783 F.3d at 247; *Arpaio*, 797 F.3d at 15.  And while DACA has been on the books for half a decade, DAPA—announced almost 30 months after DACA—was preliminarily enjoined before it could even take effect.  Presumably the State of Texas and its co-plaintiffs opted to challenge DAPA within weeks of its announcement, while leaving DACA unchallenged for years, in part because they viewed DAPA as significantly more vulnerable than DACA—and perhaps they had no interest in litigating such a case against an administration that would mount a serious defense.

[11] The special status of children may also explain why there is such broad support for allowing Dreamers to remain in the country—a consensus that means DACA effectively serves as a stopgap measure until their permanent legal status is resolved.  *See, e.g.*, App. 2209 (Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM) (urging Congress to "legalize DACA")).

*Second*, the Fifth Circuit concluded that DAPA was inconsistent with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." *Texas*, 809 F.3d at 179 (AR 175); *see id.* at 186 (AR 182). Specifically, under the INA, parents of U.S. citizens qualify for "immediate relative" visas as soon as their child turns twenty-one. 8 U.S.C. § 1151(b)(2)(A)(i). An immigration judge also may grant lawful permanent residence through cancellation of removal, under certain circumstances, because of the impact of removing an immigrant parent on a child who is a U.S. citizen or lawful permanent resident.[12] In other words, Congress not only had considered the need for immigration forbearance for the undocumented parents of lawfully present children—the very population DAPA addressed—but had taken specific steps in that regard, going a certain distance but no further. By contrast, the INA contains no comparable (and hence arguably exclusive) pathway for individuals brought to the United States as children. So, even if DAPA was "foreclosed by Congress's careful plan," DACA is not. *Texas*, 809 F.3d at 186 (AR at 182).[13]

*Third*, the scope of relief afforded by DAPA and DACA is substantially different. In the *Texas* litigation, a central argument for the plaintiffs was that the potentially eligible population for DAPA was too large to be covered by a DHS deferred-action policy. The Fifth Circuit agreed, citing—no less than seven times—the fact that 4.3 million individuals were potentially eligible under DAPA, by far the largest class to which any deferred-action or similar policy had ever been

---

[12] 8 U.S.C. § 1229b(b)(1)(D); *see id.* §§ 1182(a)(3)(D)(iv), 1182(g)(1)(B), 1182(h)(1)(B), 1182(i)(1), 1227(a)(1)(H).

[13] Although the Fifth Circuit enjoined certain expansions of DACA alongside DAPA—which were announced together in a single 2014 memorandum—the Fifth Circuit did not consider separately whether the DACA expansion conformed to the INA, and relied on arguments specific to DAPA in concluding that DAPA did not. *See, e.g.*, *Texas*, 809 F.3d at 180 (emphasizing that the INA does not "grant[] lawful presence, on the basis of a child's immigration status, to the class of aliens that would be eligible for DAPA") (AR 176); *see generally id.* at 178-86 (AR 174-82).

applied.  *See Texas*, 809 F.3d at 148, 174 n.138, 179, 181, 185 n.197, 186 & n.202 (AR 144, 170, 175, 177, 181, 182).  But the Fifth Circuit also noted that the potentially eligible population for DACA was barely a quarter that size.  *See id.* at 147, 174 & n.138.  Indeed, as noted above, DACA recipients are by no means the largest population to have benefited from deferred-action policies. *See supra*, at 20-21.

*Fourth*, unlike DAPA, DACA effectively includes an automatic sunset provision.  DACA may be granted initially only to persons "not above the age of thirty" who have been in the United States continuously since at least 2007.  AR 1.  DAPA had no age limit.  So, had DAPA not been enjoined and then rescinded, new DAPA applications might have continued arriving at USCIS for decades to come.  By contrast, the flow of new DACA applications will dry up completely when the youngest potentially-eligible individuals reach their thirty-first birthday.  Defendants therefore were wrong in describing DACA as an "open-ended" policy "with no established end-date."  AR 251; *accord* AR 254.

For all these reasons, even if this Court were to agree with the Fifth Circuit's conclusions as to DAPA, it should uphold DACA as a lawful exercise of DHS's authority.[14]

---

[14] There is another ground for the Fifth Circuit's decision:  its conclusion that DAPA required notice and comment.  *See Texas*, 809 F.3d at 170-78 (AR 170-74).  But this provides no support for the rejection of DACA.  For one thing, the Attorney General made no mention of this issue in finding DACA unlawful.  *See supra*, at 13-14.  And for another, even if the Attorney General erroneously believed that DACA required notice and comment, the rational response to such a concern would have been to reissue the DACA Memorandum as a proposed rule and undergo notice and comment—not to abandon the program preemptively.  Objections raised in this curative comment period could surely be evaluated with an "open mind."  *Intermountain Ins. Serv. of Vail v. Commissioner*, 650 F.3d 691, 709 (D.C. Cir. 2011), *vacated on other grounds*, 566 U.S. 972 (2012); *see, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 813-14, 817 (D.C. Cir. 1982).  At a minimum, this was a "reasonably obvious" alternative warranting consideration and discussion.  *Walter O. Boswell Mem'l Hosp*, 749 F.2d at 797.

### c.   Litigation Risk Cannot Justify Rescinding DACA.

Relying on a rationale that it never invoked below, Defendants now argue that, regardless of DACA's actual legality, the "litigation risk" of DACA's eventually being subjected to a highly disruptive nationwide injunction was too great and therefore Defendants were justified in preemptively rescinding the program.  MTD Princeton 1-2, 19, 26, 29-31, 44.  This rationale fails both because it is a *post hoc* invention and because, even if it were accepted as the basis for the Rescission Memorandum, it fails to satisfy the APA.

#### i.   Defendants' "litigation risk" argument is an impermissible *post hoc* rationalization.

Defendants' "litigation risk" argument is foreclosed by a "simple but fundamental rule of administrative law":  A "reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency" at the time of the action.  *Chenery II*, 332 U.S. at 196.  The Rescission Memorandum rested on DACA's purported illegality, not the risk of a disruptive injunction.  It does not appear that Defendants even intended to adopt the latter rationale; but if they did, they "failed to express [themselves] with sufficient clarity and precision to be so understood."  *Id.* at 198; *see id.* (limiting APA review to grounds "clearly invoked" by the agency).  The Court should therefore reject outright Defendants' attempt to recast their legal analysis as a "predictive judgment" meriting deference.  MTD Princeton 31; MTD Associations 30.

The text of the relevant documents shows as much.  As another District Court explained in rejecting Defendants' same argument:  "While Defendants attempt to recast the decision to rescind the DACA program as the product of a discretionary 'balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil,' that argument is unsupported by the text of the Sessions Letter and the DACA Rescission Memo."  *Batalla Vidal*, 2017 WL 5201116, at *10.  That is because

both Attorney General Sessions's letter and the Rescission Memorandum are framed in purely legal terms. *See supra*, at 13-14. Indeed, after declaring DACA "unconstitutional" and lacking in "proper statutory authority," Attorney General Sessions invoked his own "duty to defend the Constitution and faithfully execute the laws passed by Congress" and touted the "restoration of the rule of law" that DACA's rescission would bring about. AR 251. In this context, the Attorney General's passing assertion that a court would "likely" agree with him about DACA, *id.*, cannot plausibly be viewed as a freestanding assessment of litigation risk. And, as noted above, the Rescission Memorandum that followed the next day added nothing of substance to the Attorney General's analysis, and certainly nothing resembling a litigation-risk assessment. *See supra*, at 13-14, 30-32. In particular, the Rescission Memorandum never articulates the theory Defendants now advance—that they ended DACA themselves to ensure an "orderly" wind-down rather than an abrupt court-ordered shutdown. The Memorandum does not so much as mention Defendants' purported fear of disruption following an adverse court ruling, instead linking the choice to "wind [DACA] down in an efficient and orderly fashion" to the "administrative complexities" inherent in ending the program. AR 254.

   ii. <u>Even if litigation risk were Defendants' rationale for rescinding DACA, it would be arbitrary and capricious.</u>

  Even if DACA had actually been rescinded based on concerns about litigation risk, this supposed basis for rescinding a policy on which nearly a million people have justifiably relied is unprecedented, unsupportable, and worthy of zero deference. Indeed, even the senior DHS official who drafted the Rescission Memorandum testified in a related case regarding the rescission of DACA that taking government action based on "litigation risk" would be "the craziest policy you could ever have." App. 2214. He is right, for at least three reasons.

              (a)  *Defendants' litigation-risk argument could be used to justify any*
                      *legal conclusion.*

To begin, Defendants' "litigation risk" argument here proves far too much.  Agencies often must make purely legal judgments in deciding which policy options to rule into or out of consideration.  For generations, those judgments have been reviewed on their merits under the APA.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").  Under Defendants' theory, however, every agency has a ready means of circumventing that rigorous review:  The agency can just assert that someone will take its favored view of the law in litigation, and that (given the correctness of that view) a specific court will "likely" side with that party.  (The agency can even coordinate with a plaintiff to line up a threatened case for good measure.)  This formula for converting legal positions into "reasonable predictive judgment[s]" (MTD Princeton 31) cannot possibly be the law.  *Cf. Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("If an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter.").  For this reason, even if genuine "litigation risk" may sometimes figure properly in an agency's decisionmaking calculus, a reviewing court should take particular care to ensure that the agency has seriously evaluated and addressed the balance of risks, rather than asserting a legal position and dubbing it a risk assessment.  As explained below, however, Defendants' purported assessment of litigation risk cannot withstand even cursory scrutiny.

              (b)  *Litigation risk necessarily has to be balanced against the benefits of*
                      *a policy, but Defendants made no such assessment here.*

Litigation risk is just that:  a risk.  All government policies face some measure of litigation risk, and the Government routinely accepts such risks to advance important policies or avoid significant harms.  To make rational decisions under such uncertainty, the Government has to weigh the net costs and benefits of various scenarios.  Here, that means Defendants had to balance

the costs of deciding not to rescind DACA and then having it later invalidated in court, on the one hand, against the costs of rescinding DACA if it would *not* have been invalidated in court, on the other.  *See State Farm*, 463 U.S. at 52, 54 (explaining that "reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of their actions); *see also* Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 493 (1989) ("A rational system of regulation looks not at the magnitude of the risk alone, but assesses the risk in comparison to the costs.").  It was thus impossible for Defendants to rationally decide to terminate DACA based on "litigation risk" without first assessing the program's value as a matter of policy: If DACA was valuable enough, it would be worth defending even though (according to Defendants) there was a material risk of defeat, and even though a court-ordered shutdown could impose its own burdens.  There is no evidence that Defendants ever engaged in such an inquiry.

In particular, the Rescission Memorandum failed to mention (much less weigh) any of DACA's many benefits, or the commensurate costs of rescinding it.  For one, DACA's rescission has sweeping, negative implications for the U.S. economy.  According to industry experts, "a repeal of DACA would cost the federal government $60 billion in lost revenue and the economy as a whole $215 billion in lost GDP."  App. 218 (Brannon Decl. ¶ 11).  (That means that, on GDP grounds alone, a mere one-in-five chance of successfully defending the program in court was worth $43 billion.)  DACA and its beneficiaries have also significantly enhanced U.S. national security, with approximately 900 individuals serving in the military under a program for persons who possess skills "vital to the national interest."  App. 2235; *see also* App. 2567.  In addition, DACA has greatly enhanced public safety and facilitated essential community policing efforts.  *See generally* Br. Amici Curiae of Current and Former Law Enforcement Leaders ("Law Enforcement Br.") 2-14.  And, of course, nearly 800,000 young people, including Plaintiff Perales Sanchez,

have benefited immensely from and come to rely on DACA since 2012. DACA has enabled them to live openly, make educational plans, pursue livelihoods, and invest in careers in the United States. App. 2679-80 Topics 1, 2, 5, 6. Rescinding DACA would end all that, and penalize beneficiaries like Plaintiff Perales Sanchez for their reasonable reliance on the program in the process. *Cf. Perez*, 135 S. Ct. at 1209 (underscoring the Government's heightened explanatory burden "when its prior policy has engendered serious reliance interests that must be taken into account" (citation omitted)).

Because the Rescission Memorandum did not even begin to assess these considerations, it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. After all, it is entirely implausible that DACA's eventual invalidation in court was so certain, and the ensuing costs of an abrupt termination so great, that it was worth *guaranteeing* the harms listed above would occur, just to hedge against that risk. But in any event, it is indisputable that DHS did not conduct any analysis that could warrant that conclusion. In effect, Defendants' "litigation risk" defense treats the "risk" of a complete defeat on all issues of liability and remedy as a 100% certainty. It then jumps to the conclusion that an immediate, but "orderly," wind-down process surely must be preferable to a later, but perhaps not so "orderly," one. MTD Princeton 1-2; MTD Associations 1-2, 33. Such an assessment of "litigation risk" is plainly irrational and does not suffice under the APA.

*(c)   Defendants did not assess the likelihood of different outcomes.*

Finally, in resting their defense of rescission on the "litigation risk" not only that DACA will be invalidated, but also that its operation will be abruptly suspended, *see* MTD Princeton 1-2, Defendants assume that a court in the hypothetical challenge to DACA would impose an immediate and complete injunction. There is no reason given for this assumption—and indeed, there are powerful reasons to believe it is incorrect.

*Unavailability of a Preliminary Injunction.*   Had Texas and its co-plaintiffs made good on their threat to sue over DACA, they likely would have faced insuperable obstacles to obtaining preliminary relief.  As discussed above, the distinctions between DACA and DAPA are sufficiently material that a court could have—and should have—ruled differently on the likelihood of success on the merits.  *See supra*, at 24-27.  Moreover, while DAPA was challenged before it took effect, DACA would have been in effect for *more than five years* by the time the States sought to amend their complaint to challenge it.  This means, first, the plaintiff States would have to overcome serious laches defenses to their claims for equitable relief.  *See Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd.*, 40 F.3d 698, 708 (5th Cir. 1994) ("[E]quity aids the vigilant and not those who slumber on their rights." (citation omitted)).  Second, even if they could overcome laches, the States would be forced to argue that an injunction was necessary to prevent irreparable harm even though they had been willing to live with that very harm for half a decade before bringing suit.

The balance of harms, too, would be completely different; the reliance interests of nearly 800,000 DACA recipients and their families, universities, and employers would have to be weighed against the States' comparatively weak assertions of harm.  The district court in *Texas* made these differences crystal clear, explaining that a preliminary injunction against DAPA was necessary because "without a preliminary injunction, any subsequent ruling that finds DAPA unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits or licenses already provided to DAPA beneficiaries." AR 124.  This "genie would be impossible to put back into the bottle." *Id.* (stating that DAPA implementation would be "virtually irreversible," and it would be "difficult or even impossible for anyone to 'unscramble the egg'").  Likewise, in balancing the harms of an injunction, the court explained, a "delay of DAPA's implementation pose[d] no threat of immediate harm to

33

Defendants," as they were not yet enjoying any concrete benefits under DAPA.  AR 125.  For each of these considerations, the opposite would be true in a challenge to DACA.

Because obtaining preliminary relief would have been unlikely, if not impossible, litigation over DACA would have continued.  Defendants' claimed urgency was of their own making.

***Orderly Injunctive Relief or Remand.***   Defendants' premise that a court would immediately have enjoined DACA in full also wholly ignores the equitable powers of Article III courts.  Defendants assume that although *they* could execute an orderly wind-down of DACA despite their apparent belief that DACA was illegal, a federal judge would or could not.  But the same district judge who immediately enjoined DAPA explained that he was doing so only because DAPA had not yet taken effect.  *See supra*, at 33-34.  It is hardly likely that he or another federal judge would ignore the drastic consequences of abruptly enjoining DACA, which had been in place for more than five years; indeed, the state attorneys general do not appear to even have been seeking such an abrupt end to the program.  AR 239 (requesting a "phase out" of DACA).

Nor would the law require a federal judge to enjoin DACA immediately.  Courts have broad equitable powers to avoid the serious consequences of such action.  *See, e.g.*, *Heckler v. Mathews*, 465 U.S. 728, 746 (1984) ("We have recognized, in a number of contexts, the legitimacy of protecting reasonable reliance on prior law even when that requires allowing an unconstitutional statute to remain in effect for a limited period of time." (footnote omitted)); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 88 (1982) (plurality opinion) (holding an Act of Congress invalid, but applying the decision "only prospectively" to avoid producing "'substantial

inequitable results,'" and also staying the decision, to afford Congress an opportunity to legislate a cure (citation omitted)).[15]

Indeed, if a court were to invalidate DACA on procedural APA grounds—which largely drove the lower court decisions in *Texas*, see AR 98-124, 166-74—the district court would not have to suspend DACA at all. The standard remedy for a notice-and-comment violation when a program has already taken effect and suspending it would be "disruptive" is simply to remand without vacatur so that process can take place. *E.g.*, *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 8 (D.C. Cir. 2011) ("*EPIC*") (where agency failed to conduct a notice-and-comment rulemaking, refusing to vacate the rule because doing so would be disruptive, and instead remanding the rule so the agency could promptly "cure the defect in its promulgation"); *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Rodway v. USDA*, 514 F.2d 809, 817 (D.C. Cir. 1975). Defendants' assumption that a court would invalidate DACA without crafting its own sensible "wind-down" policy or simply remanding for notice and comment is unexplained and irrational.

Defendants' failure to reckon with these complications underscores a simple fact: The Rescission Memorandum undertook no serious analysis of litigation risk. Defendants never estimated their chances of success or failure in defending DACA in the district courts, the courts of appeals, and the Supreme Court. They never considered the differences between the preliminary-injunction phase and final judgment. And they never considered the possibility that they could lose on the merits of DACA's legality but prevail on remedial issues, thus ensuring a

---

[15] *See also Buckley v. Valeo*, 424 U.S. 1, 142-43 (1976) (per curiam) (invalidating the composition of the Federal Election Commission, but treating its past acts as de facto valid, and staying the judgment so that the Commission could continue exercising certain powers); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (explaining that "equitable considerations might justify a court in withholding the granting of immediately effective relief").

relatively orderly and deliberate wind-down process without abandoning DACA preemptively. Nor did Defendants consider whether DACA's policy merits were sufficient to make whatever "litigation risk" was involved worth running.  For all these reasons, "litigation risk" could not have justified Defendants' rescission of DACA even if Defendants had rested the Rescission Memorandum on that rationale.

> ### d. Defendants' Plan for "Winding Down" DACA Confirms the Arbitrariness of Their Rescission Policy as a Whole.

The Rescission Memorandum announced that, rather than continuing DACA, DHS would phase it out.  *See* AR 255.  But Defendants did not justify any of the features of this so-called "wind-down," a failure that underscores the breakdown in Defendants' policymaking process and the arbitrariness of their decision.

Defendants' plan for phasing out DACA has three salient features.  First, new DACA awards could still be made, but only to applicants who had *already* completed the paperwork by the date of the rescission.  Second, existing DACA recipients were eligible for full two-year renewals, but only if their current grant was set to expire within six months, *and* they applied for the renewal within one month.  Third, new and continuing DACA recipients would no longer be eligible for advance parole (*i.e.*, permission to travel abroad and return).

Apart from Defendants' claims about DACA's illegality, *see supra*, at 13-14, they justified this three-part rescission plan based only on unidentified "costs and burdens that will be imposed on DHS" in ending DACA and alleged "complexities" attending that process.  AR 251, 254-55. To mitigate those "costs" and "complexities," they opted for what they called "an efficient and orderly" phase-out of the program.  AR 254.  That is *all* they said:  Not a word about the nature of the supposed costs and complexities, nor about how the three program changes would achieve efficiency and "orderliness."  That cannot pass for reasoned decisionmaking.  *See San Antonio ex*

*rel. City Pub. Serv. Bd. v. United States*, 631 F.2d 831, 852 (D.C. Cir. 1980) (explaining that an agency may not rest on "general allusion[s]" to interests that are "so broad as to be meaningless as a standard").

Although deadlines can seem stark or even arbitrary to those who must abide by them, here the reasoning behind Defendants' wind-down plan is extraordinarily opaque:

- **The September 5, 2017 Deadline.**  Why were potential new DACA recipients given no grace period to file or complete their applications after rescission was announced, even though Defendants were willing to make new DACA grants to others?

- **The October 5, 2017 Deadline.**  Why was the grace period for new renewal applications limited to one month?  Given that DACA would continue to exist into 2020 regardless, what was the urgency?

- **The March 5, 2018 Cutoff.**  Why was the renewal opportunity limited to those whose grants expired within six months?  That is, why should a DACA recipient whose grant expires on March 5, 2018, be eligible for a two-year extension—carrying her through March 5, 2020—while a recipient whose grant expires the next day, on March 6, 2018, receives nothing?

- **Advance Parole.**  Why was advance parole, previously authorized for DACA recipients, now unwarranted?

By all appearances, Defendants set the three deadlines above by "pluck[ing] number[s] out of thin air," *WJG Tel. Co. v. FCC*, 675 F.2d 386, 388-89 (D.C. Cir. 1982), and they canceled advance parole for no reason at all.  Because the Rescission Memorandum gives no indication that the terms of the rescission "reflect[] [Defendants'] informed discretion"—rather than their "unbridled whim"—the Memorandum should be vacated.  *Id.*

Defendants' decision not to explain their rationale is intertwined with another flaw:  their failure to consider "relevant factors" and "important aspect[s] of the problem" before them.  *State Farm*, 463 U.S. at 42-43.  In particular, Defendants credited only the "costs and burdens that will be *imposed on DHS*" in rescinding DACA.  AR 251 (emphasis added); *see* AR 254 (citing "administrative" complexities).  The Rescission Memorandum never even mentioned the interests

of current DACA recipients like Plaintiff Perales Sanchez and new applicants with respect to whether and how DACA might be rescinded.  For example, before setting a one-month deadline for renewal applications, Defendants should have weighed the hardship that their choice would impose on DACA recipients who could not marshal the $495 renewal fee so quickly.

And given the transitional program's idiosyncratic design, some students will be unable to graduate, employees will be unable to finish key projects, and service-members' military commitments may be cut short—all while DACA remains in effect for others.  According to Defendants' testimony before Congress, they were willing to make wholly new DACA grants where necessary to spare themselves the hassle of refunding application fees.[16]  But, remarkably, they were not willing to make new DACA grants to spare potential DACA beneficiaries, who could have applied within days, the fear and uncertainty that DACA was designed to abate.  A rational accounting of the relevant policy considerations would have required Defendants to grapple with these anomalous results.[17]  For this reason, too, the Rescission Memorandum must be set aside.

### 2.   Rescission Violates the APA Because It Is a Substantive Rule Imposed Without Notice and Comment.

DACA's rescission is also invalid because it does not comply with the APA's procedural requirements.   Under the APA, "substantive" rules must go through notice-and-comment rulemaking before they become effective.  *See* 5 U.S.C. § 553(b), (c); *Chamber of Commerce of U.S. v. OSHA*, 636 F.2d 464, 470-71 (D.C. Cir. 1980).   By contrast, notice-and-comment

---

[16] *See* App. 2041 (testimony of Michael Dougherty, Ass't Secretary of DHS) (explaining that existing applications were processed because "sending everyone back their application and their money was an administratively difficult thing for us to do").

[17] Defendants cannot claim that their transitional plan was compelled by the demands of the *Texas* plaintiffs, because their plan does not meet those demands in the first place.  *Compare* AR 239 (threatening litigation unless the Government agreed "not to renew or issue any new DACA … Permits"), *with* AR 255 (providing for renewals and new issuances).

rulemaking requirements do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).

The D.C. Circuit has explained that an agency action is a substantive rule if it (1) "alter[s] the rights or interests of parties," (2) makes a "substantive change" to the statutory or regulatory regime, and (3) has a "present binding effect."  *EPIC*, 653 F.3d at 5-7.  Under this standard, the Government's rescission of DACA is a substantive rule that did not go through the required notice-and-comment procedures.

To begin, revoking DACA clearly affects recipients' interests.  Rescission immediately eliminated the ability of DACA beneficiaries like Plaintiff Perales Sanchez to receive advance parole to travel outside the United States.  AR 255.  And as soon as their DACA status expires, beneficiaries cannot legally work in the United States, nor can they lawfully receive the other benefits for which their DACA status made them eligible.  *See Batalla Vidal*, 2017 WL 5201116, at *15.  The end of DACA also means that former beneficiaries are at much greater risk of being removed.  DHS has "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States."  App. 2239.  As a Director of ICE recently stated: "If you're in this country illegally … you should be uncomfortable.  You should look over your shoulder."  App. 2311; *see Batalla Vidal*, 2017 WL 5201116, at *15 ("[I]f they were to lose their deferred action, the individual [p]laintiffs would be subject to removal from the United States," and there is "nothing 'speculative' about the possibility that they would actually be removed.").

DACA's rescission also makes a substantive change to the regulatory regime.  Under the DACA Memorandum, DHS officials may grant deferred action to someone who meets DACA's eligibility criteria (so long as no special facts warrant a discretionary denial).  *See supra*, at 23-24.

An official's authority under the Rescission Memorandum is markedly different. First, deferred action is not available to Dreamers under the Rescission Memorandum at all. *See* AR 255 (directing officials to "reject all DACA initial requests" and to "reject all DACA renewal requests" filed outside the wind-down parameters). Second, even if officials possess authority to grant deferred action under the new regime, the Rescission Memorandum prohibits them from doing so based on DACA's threshold criteria. *Id.* Put otherwise, it is no longer permissible for an official to grant deferred action simply because the DACA criteria are satisfied and no special factors counsel against doing so. That withdrawal of authority shows that DACA's rescission substantively changed the regime. *See, e.g.*, *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 447 (D.C. Cir. 1989) (holding that agency order was substantive in part due to "mandatory language cabining [the agency's] enforcement discretion"); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948-49 (D.C. Cir. 1987) (concluding that FDA action was substantive because "this type of cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule"); *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978) (a "so-called policy statement" that "narrowly limits administrative discretion … will be taken for what it is—a binding rule of substantive law").

Finally, DACA's rescission has a present binding effect. The rescission *presently* bars DACA beneficiaries from obtaining advance parole or applying to renew DACA relief. It also *presently* bars DHS officials from exercising their prior discretion in reviewing DACA applications or advance-parole applications. Just as that constriction of agency discretion shows that the rescission makes a substantive change to the regulatory regime, so too it establishes that the new policy "is a rule of present binding effect." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988); *see id.* at 1322 (holding that a rule that "substantially curtails

EPA's discretion in delisting decisions and accordingly has present binding effect" was a legislative rule).

A record developed through the proper procedures would have ensured that the consequences of rescinding DACA, including the "serious reliance interests" that DACA engendered, *Perez*, 135 S. Ct. at 1209, were fully aired and evaluated. Indeed, had DHS considered the evidence that would have been presented, including the dramatic costs of rescission, *see infra*, at 42-47, rescission could not reasonably have been adopted. The failure to undergo notice and comment renders DACA's rescission invalid.[18]

### B. Plaintiffs Are Entitled to a Preliminary Injunction.

#### 1. Plaintiffs Possess a Strong Likelihood of Success.

For all of the reasons that Plaintiffs are entitled to summary judgment on their APA claims, Plaintiffs are likely to succeed on the merits of those claims.[19]  *Supra* Part III.A.

---

[18] Unlike rescission, DACA itself did not require notice-and-comment rulemaking. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 980-81 (E.D. Pa. 1977) (holding that blanket rescission of a deferred-action program required notice-and-comment rulemaking even though the initial program did not); *see also Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1034 (D.C. Cir. 2007); *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 60 (D.C. Cir. 2002). Moreover, even if DACA required notice and comment, it could not be rescinded without notice and comment. *See, e.g.*, *Consumer Energy Council v. FERC*, 673 F.2d 425, 445-47 & n.79 (D.C. Cir. 1982) (where agency revoked a procedurally deficient rule without notice and comment, court set aside the revocation, holding that notice and comment were necessary for the repeal), *summarily aff'd*, 463 U.S. 1216 (1983); *Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013) (explaining that even defective agency rules cannot ordinarily be repealed without notice and comment), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015).

[19] Although Plaintiffs include only their APA claims and information-sharing claims in this Motion, Plaintiffs also possess a strong likelihood of success on the merits of their other claims, including the Constitutional claims discussed in their opposition to Defendants' Motions to Dismiss. *See* Plaintiffs' MTD Opp. 24-35.

## 2.    Plaintiffs Face Irreparable Harm.

Because Plaintiffs are entitled to summary judgment as a matter of law, there is no requirement that they demonstrate irreparable harm.  However, should the Court prefer to issue a preliminary injunction, Plaintiffs satisfy all the requisite equitable elements.

*First*, rescission is inflicting severe, continuing emotional harm on DACA beneficiaries, including Plaintiff Perales Sanchez and others who are Princeton students, Microsoft employees, and members of the Association Plaintiffs (*i.e.*, the NAACP, American Federation of Teachers (AFT), and United Food and Commercial Workers (UFCW)).  App. 2683 Topic 12.  These DACA recipients have been thrust abruptly back into an existence defined by uncertainty.  Many are now experiencing fear, anxiety, and feelings of depression, conditions that negatively affect their work and their studies.  App. 2683 Topic 12.  These harms are irreparable.  *See Petties v. District of Columbia*, 881 F. Supp. 63, 68 (D.D.C. 1995) (stress, anxiety, and deteriorating scholastic performance caused by uncertainty about government's action constitutes irreparable harm).

*Second*, DACA students at Princeton are being forced to make decisions that have life-altering personal and professional consequences.  At least one DACA student at Princeton, Plaintiff Perales Sanchez, has already modified her plans for employment after graduation, declining to apply for fellowships that have an international component because she can no longer obtain advance parole.  App. 61 (Perales Sanchez Decl. ¶ 21).  And because she could not travel abroad, Perales Sanchez was forced to scrap her senior thesis project, which she had invested months of time and effort to develop, and to which she had already committed a portion of her research grant.  She was forced to develop a different project on short notice and with less funding that could not possibly replace the original.  App. 59 (Perales Sanchez Decl. ¶ 14).

Likewise, Jane Doe No. 5 is currently attending CUNY and had planned to go to law school upon graduation; with DACA's rescission, she must now come up with a new plan.  App. 2634-

35.  (Jane Doe No. 5 Decl. ¶¶ 11, 18).  Jane Doe No. 2 is a special education teacher who may have to abandon her job as well as her aspiration to obtain a doctorate in audiology and become a school audiologist.  App. 2604 (Jane Doe No. 2 Decl. ¶¶ 11, 14).  Jane Doe No. 6 will likewise be forced to abandon her dream of becoming a paralegal, returning to her difficult life before DACA, when she worked two part-time, low-paying jobs without benefits, all while trying to provide a home for her young twins.  App. 2650-51 (Jane Doe No. 6 Decl. ¶¶ 7, 10-11); *see also* App. 2615 (John Doe No. 3 Decl. ¶ 16); App. 2628 (Jane Doe No. 4 Decl. ¶¶ 16-17); App. 2671 (Jane Doe No. 9 Decl. ¶ 25).

These harms are irreparable.  *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (finding irreparable harm where plaintiff stood to "lose his job, income, pension, health and life insurance" and faced "stigma" from government termination of his employment); *Saunders v. George Washington Univ.*, 768 F. Supp. 843, 845 (D.D.C. 1991) (finding irreparable injury from potential interruption of college professor's employment); *cf. Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 n.16 (1981) (explaining that the denial of "specific job opportunities and the training and competitive advantages that would come with those opportunities" constitutes "serious or irreparable harm").

*Third*, in a matter of months, DACA recipients will begin to lose status on a rolling basis. Recipients of deferred action will then lose their work authorization.  Some will no longer be able to support themselves or their families.  App. 2681-82 Topics 9, 10.  Some will have to forgo pursuing professions around which they have structured their entire lives.  App. 2681-82 Topic 9. Plaintiff Microsoft and its subsidiary LinkedIn would forfeit all they have invested to recruit, hire, and train their DACA recipients, and will also bear costs and disruptions imposed by the need to identify, recruit, hire, train, and integrate new employees.  App. 96-98 (Radu Decl. at ¶¶ 3-4, 6, 9);

App. 111-14 (Bozeman Decl. ¶¶ 6, 9-10, 12); App. 126 (Preciado Decl. at ¶¶ 8-10).  Princeton will forfeit its own investments to prepare DACA recipients for lives "in the nation's service and the service of humanity."   App. 2683 Topic 13.   Plaintiff NAACP will lose the value of the comprehensive training it has provided to DACA recipient members to address issues regarding the African Diaspora through an advocacy platform, in addition to the many other contributions DACA recipients currently make to the association.   App. 2623 (Johnson Decl. ¶¶  22-24). Plaintiff AFT will lose members who are forced to leave their jobs if they lose their work authorization, and the unique and diverse perspectives they contribute which helps the AFT better respond to the needs of immigrant communities.   The AFT will also lose leaders who champion the direct interests of the members.  App. 2599 (Weingarten Decl. ¶ 20).  Plaintiff UFCW will lose volunteers and activists who make important contributions to UFCW and their communities, including sharing their knowledge of collective bargaining, health and safety requirements, and grievance procedures.  App. 2646-47 (Lopez Decl. ¶¶ 23-24).

These harms are irreparable.  *See, e.g.*, *Inland Empire Immigrant Youth Collective v. Duke*, No. 17 -02048, 2017 WL 5900061, at *9-10 (C.D. Cal. Nov. 20, 2017) (deprivation of ability to work and support family constitutes irreparable harm); *Vargas v. Meese*, 682 F. Supp. 591, 595 (D.D.C. 1987) (denial of "the benefits of protection from deportation and work authorization, as well as the right to travel outside this country without forfeiting these benefits" causes irreparable harm); *see also Smoking Everywhere, Inc. v. U.S. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (where agency has sovereign immunity, monetary damages are not recoverable and constitute irreparable harm), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

Worse yet, when recipients like Perales Sanchez lose their deferred status, they will be at immediate risk of deportation, which would separate them from family, friends, professional

networks, and the only country they have ever known.  App. 2682 Topic 10.  This injury is, again, severe and irreparable.  *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (describing "[t]he severity of deportation" as "the equivalent of banishment or exile" (citation omitted)).

Rescinding DACA is imposing or will impose irreparable harms on Perales Sanchez and the other Plaintiffs, as well as their students, employees, and members, as detailed in their declarations.  *See* App. 2679-84.  A preliminary injunction would eliminate or mitigate these harms by restoring the pre-rescission status quo pending a final decision on the merits.  *See Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 67, 76 (D.D.C. 2001).

### 3. The Balance of Equities and Public Interest Weigh Overwhelmingly in Favor of an Injunction.

The balance of hardships and the public interest strongly favor injunctive relief.[20]  DACA is critical to nearly every aspect of its beneficiaries' lives:  their education, ability to work, secure health care, travel, secure credit, and more.  But the harms will not be suffered by them alone. Without DACA, individuals will be less able to support themselves and their families.  App. 1829 Topic 10; App. 2682 Topic 10.  They may be forced to abandon their jobs, worsening labor shortages in high-skilled job markets.  App. 1829 Topic 10; App. 1834 Topic 22; App. 2681-82 Topic 9; *see also* Br. Amici Curiae of 112 Companies at 6-8.  They will be unable to complete important research and business projects, hurting productivity.  App. 1834 Topic 22; App. 2684 Topic 17.  And they will become less able and less likely to buy homes, cars, consumer goods, and investments.  App. 1829 Topic 10; App. 1832 Topic 17; App. 1833 Topic 20; App. 2684 Topic 16.  The overall loss to the economy will be staggering:  approximately $215 billion in the next ten years.  App. 218 (Brannon Decl. ¶ 11).

---

[20] These factors merge when the Government is the opposing party.  *Doe 1 v. Trump*, No. 17-1597, __ F. Supp. 3d __, 2017 WL 4873042, at *33 (D.D.C. Oct. 30, 2017).

Universities, including Princeton, will suffer significant losses from DACA's rescission. Students at some colleges may be forced to withdraw without completing their degrees.  App. 1828 Topic 9; App. 1831 Topic 14.  Their classmates will be deprived of their valuable, critical insights; and institutions will lose talented, promising students and future alumni.  The country as a whole will lose the opportunity to employ these skilled, highly educated workers in many fields where they would contribute to the public interest—including health care, education, and other public services.  App. 1829 Topic 10; App. 1831 Topic 14; App. 1834 Topic 22; App. 2681-82 Topic 9; App. 2684 Topic 17.

Likewise, our military and national defense will suffer as DACA recipients will no longer be able to enlist for service, and those who have enrolled through the Military Accessions Vital to the National Interest (MAVNI) program may lose the ability to see out their military service.  App. 2235; *see also* App. 2567.

Furthermore, the prospect of being deported to a foreign country and being separated from their families and friends will drive many DACA recipients back into the shadows.  They will be significantly less likely to start businesses and make long-term investments that help the economy grow.  *See, e.g.*, App. 2658 (Jane Doe No. 7 Decl. ¶¶ 17-18); App. 91 (John Doe No. 2 Decl. ¶ 13); App. 424, 426 (D. Garcia Decl. ¶¶ 54, 68); App. 1796 (Yaffe Decl. ¶ 8); App. 1546 (Sati Decl. ¶ 45).  They will become less likely to interact with law enforcement even if they are victimized or witness crimes.  App. 1832 Topic 16; *see* Law Enforcement Br. 4-8.  The loss of work authorization will also likely result in the loss of health insurance.  And an increased uninsured population will burden emergency healthcare services and reduce overall public health as people become unable or reluctant to seek preventative medical care.  App. 1832 Topic 16.

By contrast, the Government will face little or no harm if a preliminary injunction is granted.  Tellingly, the Rescission Memorandum itself did not cite a single public interest served by rescission.  And, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

### C.   Nationwide Relief Is Appropriate in this Case.

Defendants should be enjoined from implementing the Rescission Memorandum nationwide.

*First*, a nationwide injunction is proper because Plaintiffs bring a facial challenge under the APA.  *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).  "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).  Defendants have attempted to rescind DACA nationwide, and the only remedy that would adequately ameliorate the harm from that act is an injunction precluding Defendants from implementing the unlawful rescission anywhere.

*Second*, anything short of a nationwide injunction would violate the long-held understanding that immigration law requires uniform, nationwide application.  The Constitution requires "an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and the Supreme Court has described immigration policy as "a comprehensive and unified system," *Arizona*, 567 U.S. at 401.  Thus, not only would anything short of a nationwide injunction fail to fully remedy the Government's unlawful act, but it would create an incoherent patchwork of immigration law in which DACA is available to individuals in only certain areas of the country.  Indeed, it is for these very reasons that in *Texas*, 809 F.3d at 188 (AR 184), the Fifth Circuit affirmed a nationwide injunction after holding that DAPA was not promulgated in compliance with the APA.

IV.    **Plaintiffs Are Entitled to Provisional Relief on Their Information-Sharing Claim.**

Plaintiffs also seek to enjoin Defendants from modifying existing policy regarding the use of information furnished by DACA applicants.  If the Government chooses to modify its policy, it must first provide Plaintiffs notice of and an opportunity to challenge any changes in this Court.

A.  **Plaintiffs Are Likely to Succeed on the Merits of Their Information-Sharing Claim.**

Plaintiffs are highly likely to succeed on their claim that Defendants would violate the Due Process Clause by revising their policy of not using the identifying information supplied by DACA applicants for the purpose of immigration enforcement.  This information was provided by DACA applicants at the Government's invitation, to facilitate an assessment of eligibility for deferred status, and based on assurances that it would be protected.  Having made affirmative representations about the legal consequences of supplying information through DACA, and having induced reliance on those representations, Defendants cannot reverse course.

Due process forbids the Government from making and then breaking promises about the legal consequences of a specific action. *Cox v. Louisiana*, 379 U.S. 536 (1965); *Raley v. Ohio*, 360 U.S. 423 (1959).  For example, in *Cox v. Louisiana*, officials directed a group of individuals to protest in a particular location, which was in the vicinity of a local courthouse.  379 U.S. at 571.  One of the participants was subsequently prosecuted and convicted for violating a statute that prohibited protesting "near" a courthouse.  *Id.*  Citing due-process concerns, the Supreme Court overturned the conviction.  *See id.* at 572.  It reasoned that the Government was bound by the permissive representations it made to the protestors, and that a contrary result "would be to sanction an indefensible sort of entrapment by the State."  *Id.* at 571.

Likewise, in *Raley v. Ohio*, state officials assured several individuals that they were permitted to invoke the privilege against self-incrimination in hearings before a state commission.

360 U.S. at 438.  After invoking the privilege during testimony, each individual was convicted of an offense for refusing to answer.  *See id.*  The Supreme Court vacated the convictions.  Although Ohio law operated to invalidate the privilege, the Court held that due process bound the State to its affirmative representations about availability of the privilege, precluding the prosecutions.  *See id.* at 425-26, 438; *cf. United States v. Pa. Ind. Chem. Corp. (PICCO)*, 411 U.S. 655, 674 (1973) (holding that due process required overturning criminal conviction because lower court prohibited defendant from presenting evidence that agency affirmatively misled defendant into believing that specific action was permissible).

In this case, as in *Cox* and *Raley*, the Government made specific representations about the legal consequences of an action:  here, providing identifying information to immigration officials.  Time and again, the Government emphasized that information provided in DACA applications would not be shared for enforcement purposes, absent a handful of enumerated circumstances.  These representations were made in instructions provided with the DACA application form, in a DACA toolkit for community providers, on the USCIS website, and in other informational materials.  App. 1838; App. 1872, 1878; App. 1862; App. 1859.  The Government also stated that its information policy was consistent with longstanding practice.  App. 1862.

Defendants do not dispute that they made these affirmative representations, that individuals relied on the representations, or that this reliance benefited the nation.  App. 1862.  Recognizing that eligible individuals were undocumented, and thus hesitant to identify themselves to the Government, officials offered protection along with the possibility of securing deferred status and its attendant benefits.  App. 1838; App. 1905-06.  This approach was effective.  Individuals who were otherwise reluctant to step forward and identify themselves determined on the basis of the

Government's representations that information provided in their DACA application would not be used for enforcement absent articulated conditions.  App. 2684 Topic 19.

Defendants now assert that this *remains* their policy, despite ambiguity in their public statements on this subject.  *See* MTD Opp. 33-35.  Their conflicting public statements, at a minimum, raise significant concern and a factual question about whether the policy has indeed changed.  For present purposes, whether there has been a change in policy is irrelevant:  Defendants insist that they may further modify the information-sharing policy at any time, without notice.[21] MTD Princeton 41; MTD Associations 39.  Defendants are incorrect.  Having made affirmative representations regarding the legal consequences of supplying information through DACA, Defendants may not modify their information-sharing policy to expand the use of such information for immigration enforcement—and certainly may not do so without providing notice and an opportunity for this Court to rule on Plaintiffs' information-sharing claims.[22]  *See PICCO*, 411 U.S. at 674; *Cox*, 379 U.S. at 568-69; *Raley*, 360 U.S. at 425-26.

The requirement that the Government deal fairly with parties to whom it makes affirmative representations has been recognized in a number of contexts.  *See Morrissey v. Brewer*, 408 U.S. 471, 486 (1972) (where parolee is promised liberty under certain conditions, government is bound

---

[21] Before seeking provisional relief on this issue, Plaintiffs asked Defendants to stipulate that it would not depart from the information-sharing policy expressed in the DACA application materials without first affording notice to Plaintiffs, so that they could raise their due-process claim before this Court at that time.  Defendants declined to make such a stipulation.  *See* Declaration of Lindsay C. Harrison ¶¶ 145-46, filed concurrently with this Motion.

[22] While DHS stated that the policy might be modified, superseded, or rescinded at any time, that reservation cannot obviate substantive legal rights conferred by its initial representations.  *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).  Indeed, in *Cox*, law enforcement officials plainly retained discretion to revise their directions with respect to permissible protest.  And in *Raley*, the Government's representations were *already* contradicted by law criminalizing the condoned behavior.  Nevertheless, in both cases, the Court recognized that the Government's affirmative representation regarding the legal consequences of specific conduct were binding.  So too, here.

by promise absent reasonable cause to believe conditions of parole have been violated); *Santobello v. New York*, 404 U.S. 257 (1971) (where plea turns on government promise regarding future conduct, promise must be fulfilled); *United States v. Wolff*, 127 F.3d 84, 86 (D.C. Cir. 1997) (same); *cf. United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996) (where government promises to assume the risk of subsequent changes in law, government is held to the benefit of its bargain). Deportation is no exception.  *See Padilla*, 559 U.S. at 365 (recognizing that deportation is severe sanction analogous and "intimately related to" the criminal process).

A change in Defendants' information-sharing policy would expose individuals like Plaintiff Perales Sanchez and other DACA recipients enrolled at Princeton or employed by Microsoft to the immediate threat of deportation.  The Constitution requires that any such change be preceded by notice and an opportunity to be heard so that this Court can rule *before* irreparable harm is imposed.

### B.   Defendants' Asserted Authority to Revise the Information-Sharing Policy at Any Time Imposes Imminent and Irreparable Harm.

Defendants assert the right to amend their information-sharing policy at any time and without notice.  MTD Princeton 41.  This asserted discretion leaves Plaintiffs Perales Sanchez, as well as other DACA recipients enrolled at Princeton or employed or represented by the other Plaintiffs (collectively, the "Represented Recipients"), vulnerable to irreparable harm.

The Represented Recipients are already experiencing severe stress and anxiety as a result of the uncertainty about whether, without notice, the Government will begin using information obtained through DACA for purposes of immigration enforcement.  App. 2684 Topic 19.  This psychic harm is cognizable and irreparable.  *See supra*, at 42.  Of course, the Government's asserted right to revise the information policy carries an even greater risk:  that the Government

will indeed revise its policy and begin providing information to enforcement officials, facilitating the removal of Represented Recipients and their families.

In light of DACA's rescission, this risk is imminent.  Represented Recipients will begin losing deferred status in August 2018, and perhaps earlier.  App. 2604 (Jane Doe No. 2 Decl. at ¶ 2).  The Government has moved to enforce immigration law against at least one former DACA recipient who lapsed in status, App. 2203-07; App. 2591-92, and suggests that it intends to enforce immigration laws against undocumented individuals.  App. 2279.  Indeed, there is little reason to believe the Government will not seek to enforce immigration laws against DACA recipients, once their deferred status expires.  *See Batalla Vidal*, 2017 WL 5201116, at *16.  Because the Government asserts that it may revise its information-sharing policy at any time and has warned the Represented Recipients to prepare for deportation, the Represented Recipients face imminent and irreparable harm.  *See Petties*, 881 F. Supp. at 68-70 (finding that "uncertainty" over whether students could stay in school as a result of government action "is exacting a psychological, emotional and physical toll" on the student plaintiffs which "clearly and dramatically" demonstrated irreparable harm).  There is no obligation for them to delay in seeking a remedy. *See, e.g.*, *id.* at 69; *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243 (D.D.C. 2014); *cf. Batalla Vidal*, 2017 WL 5201116, at *16.

### C.  The Balance of Equities and Public Interest Weigh Overwhelmingly in Favor of an Injunction.

The balance of hardships and public interest strongly warrant injunctive relief on Plaintiffs' information-sharing claim.  Providing Plaintiffs with an opportunity to contest any change in the information policy does no harm to the Government, which has no interest in implementing an unlawful practice.  *See supra*, at 47.  Moreover, the Government's existing information-sharing

policy already enables it to share information for specifically enumerated purposes that relate to law enforcement and national security.  App. 1905.

By contrast, allowing the Represented Recipients to challenge any modification in the information-sharing policy will advance substantial public interests.  *See supra*, at 45-47.  As a result, the balance of equities and public interest weigh in favor of granting them an opportunity to contest any expansion in the use of their information for immigration enforcement, which might otherwise result in their detention or removal.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs summary judgment on their APA claims and permanently enjoin the implementation of the DACA Rescission Memorandum or, alternatively, grant Plaintiffs a preliminary injunction enjoining Defendants from terminating or rescinding the DACA program and from enforcing or implementing the DACA Rescission Memorandum.  Additionally, the Court should grant Plaintiffs a preliminary injunction enjoining Defendants from modifying, in policy or practice, the use of information furnished pursuant to the DACA program in ways that could result in the detention or removal of current or former DACA applicants, without first providing Plaintiffs reasonable notice of and an opportunity to contest any such modification in this Court.

Dated: December 15, 2017

Respectfully submitted,

By: /s/ Joseph M. Sellers
Joseph M. Sellers
    D.C. Bar No. 318410
Julie S. Selesnick
    D.C. Bar No. 485558
Julia A. Horwitz
    D.C. Bar No. 1018561
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
T: (202) 408-4600

F: (202) 408-4699
jsellers@cohenmilstein.com
jselesnick@cohenmilstein.com
jhorwitz@cohenmilstein.com

*Attorney for Plaintiffs NAACP; American
Federation of Teachers, AFL-CIO; United
Food and Commercial International Union,
AFL-CIO, CLC*


By:   /s/ Thomas J. Perrelli
Thomas J. Perrelli
      D.C. Bar No. 438929
Lindsay C. Harrison
      D.C. Bar No. 977407
Sam Hirsch
      D.C. Bar No. 455688
Ishan Bhabha
      D.C. Bar No. 101567
Ben Eidelson
      D.C. Bar No. 1031574
Alex Trepp
      D.C. Bar No. 1031036*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
tperrelli@jenner.com
lharrison@jenner.com
shirsch@jenner.com
ibhabha@jenner.com
beidelson@jenner.com
atrepp@jenner.com

*Attorneys for The Trustees of
Princeton University, Microsoft
Corporation, and Maria De La Cruz
Perales Sanchez*

*\*Application for Admission to District Court
for District of Columbia Pending*