

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIALWORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **Declaration of Jill Dolan**<br><br>Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, Jill Dolan, declare:

1. I am the Dean of the College of Princeton University.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2. I have been the Dean of the College since July 2015.  Prior to my current position, I served as Director of the Program in Gender and Sexuality Studies and as a faculty member of the University.

3. I have taught on the faculty of three other universities, including the University of Wisconsin-Madison; the Graduate Center of the City University of New York; and the University of Texas at Austin.  I have been an administrator at all three universities, as well as at Princeton.  I am an award-winning scholar and teacher.

4. As Princeton's Dean of the College, I am responsible for the undergraduate academic experience, from recruitment to commencement and beyond.  I supervise fourteen different sub-units, including the residential colleges; programs for access and inclusion; the Writing Center and Program; the Office of International Programs and Experiential Learning; the Office of Undergraduate Research; the McGraw Center for Teaching and Learning; Admissions; the Office of Undergraduate Financial Aid; and the Registrar.

5. Princeton is a private, non-profit, educational institution dedicated to extraordinary scholarship, research, and instruction.  The University has long aspired to attract and support students, faculty, and staff with the broadest possible range of backgrounds, perspectives, and experiences.  By attracting talented students and faculty members from a variety of demographics, the University aims to create a vibrant learning environment, in

which members of the community engage in open-minded and thoughtful dialogue, and
learn from the vigorous expression of different ideas.

6. Since 2012, at least twenty-one recipients of DACA have enrolled at Princeton.  DACA
students currently enrolled at the University study in an array of fields, including computer
science, molecular biology, mechanical and aerospace engineering, psychology, and
politics.  They collaborate on important research, including through the University's
Computer Science Summer Programming Experience, and through the University's Keller
Center for Innovation.  They publish in campus publications and, as discussed below, serve
in several critical roles on campus.   In short, DACA students are among the most
accomplished and respected students studying at the University.

*Implementation of DACA has benefitted recipient students, other students, and the University*

7. DACA has enabled DACA beneficiary students to maximize the educational opportunities
available at Princeton.  For example, DACA has allowed beneficiary students to apply for
advance parole to obtain leave to travel overseas.   Advance parole allows DACA
beneficiaries to participate in the University's Bridge Year, a tuition-free program that
allows a number of incoming freshmen to begin their Princeton experience by engaging in
nine months of University-sponsored service at one of five international locations.   In
addition to supporting community-based initiatives at each site, Bridge Year aims to
provide participants with greater international perspective and intercultural skills, an
opportunity for growth and reflection, and a deeper appreciation of service in a local and
international context.

8. DACA has also allowed students to study abroad—which the University strongly
encourages all students to do, as it gives them an important opportunity to challenge and

3

expand their intellectual, social, and emotional boundaries.  It is no surprise, then, that 15 percent of Princeton students and 9.7 percent of DACA students study abroad.  An even greater percentage of DACA students wanted to study abroad, but could not do so due to problems obtaining advance parole in the past year.

9.   DACA beneficiary students have seized other opportunities at Princeton, too.  As noted above, they collaborate on important research, publish in campus publications, and have secured competitive internships.  They also serve in several critical roles on campus, helping to lead non-profits and volunteering to assist underprivileged students in surrounding communities through organizations like the Princeton University Preparatory Program and Community House.  Without DACA beneficiary students on campus, these roles would likely go unfilled.

10.  DACA beneficiary students' academic achievements are simply incredible.   DACA students earn a substantial number of academic honors, awards, and fellowships, including very selective and prestigious national and University fellowships.  These include the Pyne Prize, the Mellon Mays Fellowship, the Arthur Liman public interest fellowship, the Fred Fox grant for independent projects, the Labouisse post-graduation fellowship, and the Princeton Institute for International and Regional Studies undergraduate fellowship for summer thesis research.

11.  DACA status has also afforded DACA beneficiary students the ability to work.  Their work authorization allows them to satisfy the earnings expectation that is part of the financial aid package that they receive from Princeton.  This money is used to pay for students' books and personal expenses.  With work authorization, students can also secure summer jobs,

4

which allow them to gain critical skills, broaden their networks, and plan for life after graduation.

12. DACA also benefits non-DACA beneficiary Princeton students, faculty, and the University as a whole.  DACA students serve as mentors, peer advisors, and class representatives in student government.  They are campus leaders and community organizers who advocate powerfully for fellow students and for marginalized individuals and groups.  The work that DACA students do on behalf of their classmates and others is vital.  It reinforces values that are pivotal to Princeton, like community, empathy, and the pursuit of social justice, while demonstrating an important commitment to helping others thrive.

13. The value of having DACA beneficiaries as part of the University community continues after they leave campus.  A large part of the value that Princeton offers is its alumni network.  We have alumni on the Supreme Court, serving in the military, and writing critical journalism (among many other things).  Our alumni are emblematic of who we are as an institution; they draw new students to the University, and they help students find their way after they graduate.  To deplete this alumni network by removing DACA beneficiaries from Princeton works an enormous injury on the University, its students, and its alumni.

### *DACA Students and the University Have Made Significant Commitments in Reliance on the Program*

14. DACA students at Princeton report that they applied for relief under DACA in reliance on government representations that they would be eligible to renew their deferred status every two years.  Based on these representations, DACA students at Princeton have made life-altering decisions.  For example, they have incurred debt, structured their studies, and pursued specific internships or employment all in order to pursue specific job opportunities after graduation.

5

15. Princeton has also made substantial commitments in reliance on DACA.  Recognizing the invaluable contributions that DACA students make to campus life, the University has devoted substantial resources to recruiting and supporting recipients.  It made these investments—in the form of faculty time and attention; privately-funded financial aid for tuition, room, and board; and other resources—with the expectation that DACA students would be able to complete their Princeton education and apply it across a variety of fields after graduation.  Princeton also implemented programming designed specifically for DACA students.  My office (the Office of the Dean of the College) has collaborated with the Davis International Center and Career Services to host legal advising sessions, workshops on post-graduate professional opportunities available to undocumented/DACA students, counseling sessions focused on stress management and mental health, and networking opportunities with supportive alumni who can assist students in their postgraduate career searches.  This programming was designed to ensure that DACA students had the support, knowledge, and resources necessary to navigate a now-uncertain future in which many opportunities they wanted to pursue are now unavailable to them.

***Rescission of DACA will Impose Incalculable and Irreparable Harms on DACA Students, Other Students, and the University***

16. The rescission of DACA will impose incalculable costs on DACA recipients enrolled at Princeton, other students enrolled at Princeton, and the University.  First, and most important, the rescission of DACA will cause severe harm to recipient students.  Several of those harms are being felt now.  For example, several students have communicated to the Office of the Dean of the College that they are very worried about whether information that they provided in their applications for DACA may be used to facilitate the deportation of them and their families.  DACA students say they feel unsafe.  Many would not have

6

provided sensitive and identifying information absent government assurances about how it would be used.

17. Fear of removal is just one of many pressing concerns for recipient students.  Many are incredibly concerned about the loss of work authorization, which has a number of consequences.  On campus work allowed them to make important contributions to their financial packages and their families, while also allowing them to build a network and develop marketable skills.  Losing the ability to work on campus may make it more difficult to connect with campus administrators, professors, and peers.  The loss of off-campus work is also problematic.  Summer jobs enable students to secure valuable, important, and prestigious positions that can prove critical to advancing their post-Princeton plans.  In the past, DACA recipients have pursued competitive opportunities at organizations like the United Nations.  These opportunities are invaluable as learning experiences and for purposes of developing a professional network.

18. Losing eligibility for work authorization also has devastating and lasting implications for life after Princeton.  Students have structured their lives with particular professions in mind.  They have worked for their entire college career to develop the knowledge and credentials needed to pursue specific employment opportunities.  With the rescission of DACA, those opportunities have vanished.  And *any* lapse in eligibility to work could force students to forego unique employment opportunities.

19. DACA's rescission also deprives DACA beneficiaries of the opportunity to apply for advance parole.  The loss of advance parole means the loss of any opportunity to participate in the Bridge Year program.  It also means an inability to study abroad—an experience that students routinely describe as "life-changing."  DACA beneficiary students, by virtue of

7

their inability to secure advance parole, are denied the chance to engage in this opportunity for personal growth, to build their personal and professional networks, and to identify new opportunities to apply their talents in service of others.

20. All of these tremendous and immediate hardships take an emotional and psychological toll on DACA beneficiary students.  Several DACA students approached the Office of the Dean of the College to express anxiety about the renewed threat of deportation, the imminent loss of work authorization, and the termination of advance parole.  My office's mentors and advisors say that visits from DACA students have risen significantly since rescission, and that students are visibly apprehensive and overwhelmed because of the uncertainty created by the end of the DACA program.

21. Rescission also harms Princeton in an immediate and substantial way.  Princeton has devoted considerable resources to enrolling and supporting DACA students.  These investments, discussed above, were made with the expectation that DACA students would be able to apply their Princeton degree in a variety of important fields, making contributions to the country and the world.  Rescission of DACA will necessarily impede the ability of DACA students to obtain employment, and will therefore diminish the economic value of their education and Princeton's investment in it.

22. Since rescission was announced, Princeton has also invested additional resources to address and mitigate the immediate and imminent harm to its students.  For example, the Office of the Dean of the College has generated a slate of programming for DACA students to understand their needs; to strengthen relationships between administrators, faculty, and students; to share resources and information; and to brainstorm professional development opportunities and next life steps.  That Office has also partnered in particular with the Davis

International Center and Career Services to create a list of post-graduate opportunities that are available to former DACA beneficiary students who no longer have federal work authorization.  Finally, the University has produced an elaborate list of Frequently Asked Questions directing its DACA beneficiary students to appropriate resources.  Princeton reasonably expects to continue investing in services that will provide support for DACA students, whose mental health, studies, and economic prospects have been affected by rescission.

23. For Princeton, the rescission of DACA also imposes other substantial harms.  For example, the University will lose the opportunity to matriculate new DACA students, who may be deterred from study at Princeton for a variety of reasons, including difficulties presented by travel without government-issued identification and limited employment prospects after graduation.

24. Losing any DACA students would result in several severe injuries to the University.  As noted above, Princeton places enormous value on its alumni network, which enables current students to identify potential applications of their degree and to learn from experiences of graduates across a wide range of professions.  In addition to assisting matriculating students, alumni also assist the University, helping to fund important projects and to ensure that our curricular and extra-curricular activities are calibrated to provide skills that students will need to thrive after graduation.  As a result, loss of any DACA students would be a significant loss for Princeton.

25. Even more important, losing any DACA students would deprive Princeton and its student body of the immeasurable contributions that DACA students make on campus.  By virtue of their unique perspectives and experiences, DACA students offer insights that cannot be

replicated.   Their presence on campus better prepares all students to succeed after graduation and is an invaluable component of the diverse and inclusive learning environment that Princeton aspires to provide for all those who attend the University. Because the University has recently redoubled its commitment to diversity—not only by devoting resources to DACA beneficiary students, but also by supporting a transfer program to bring students from the military and community colleges—the injury to the University stemming from DACA's rescission is felt particularly strongly at this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 12, 2017 in Princeton, New Jersey.

Jill Dolan

11



# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIALWORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **Declaration of Khristina Gonzalez**<br><br>Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, Khristina Gonzalez, declare:

1. I am the Associate Dean of the College and Director of Programs for Access and Inclusion of Princeton University.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2. I have been the Associate Dean since March 31, 2015.  Prior to my current position, I served as the Associate Director of the Writing Center at Princeton University.

3. As Princeton's Associate Dean of the College, I am responsible for programs and initiatives within the Office of the Dean of the College that support and advance Princeton's commitment to an inclusive undergraduate student body.  I play a leading role in the creation, implementation, and management of strategic initiatives designed to enhance the experience of students from lower socioeconomic backgrounds and other historically underrepresented groups.

4. I also oversee the Freshman Scholars Institute (FSI), a seven-week summer program that allows a cohort of entering students the chance to experience the intellectual, co-curricular, and social life at Princeton prior to the beginning of the fall semester.  The FSI program is designed as a fellowship opportunity that you can attend without an additional financial burden.  FSI alumni are also invited to apply to join Princeton's four-year Scholars Institute Fellows Program (SIFP), designed for students from backgrounds historically underrepresented at Princeton, and for whom the university presents a new and different academic and social culture.

5. In addition, I co-coordinate the Mellon Mays Undergraduate Fellowship Program, an initiative to increase diversity in the faculty ranks of institutions of higher learning.

2

Fellows are selected as undergraduates, typically in their sophomore year, for their demonstrated academic ability and desire to pursue a doctoral degree in select humanities, social sciences or physical sciences.  The fellowship provides fellows with many forms of support, including regular, structured programming; faculty mentoring; term-time stipends for research activities; support for summer research; and repayment of undergraduate loans up to $10,000.  Many Mellon Mays scholars have benefitted from DACA, as it has allowed them to consider the pursuit of a graduate degree program; such programs generally require students to have work authorization.

6.   By virtue of my position at the University, I work particularly closely with our DACA beneficiary students.  I have seen first-hand the harm that these students have suffered and continue to suffer as a result of DACA's rescission.  I am also familiar with the injuries that Princeton has suffered and continues to suffer because of DACA's rescission.

***Implementation of DACA has benefitted recipient students, other students, and the University***

7.  Implementation of DACA has had a profound impact on DACA recipients studying at Princeton.  To begin, some recipients never would have pursued opportunities to study at the University if not for DACA—and even if they did study at Princeton, many would have been unable to see their families during their college years, as they would not have had the identification necessary to travel by public transportation.

8.  DACA's implementation is also important to recipient students because it has enabled them to pursue employment.  Because they now can work, they are able to generate income for themselves and their families.  The ability to secure employment has also delivered less tangible benefits:  DACA students report that they have more confidence, are more able to

3

develop skills, and value the ability to develop their network and their ability to make contributions to the economy.

9. DACA also enables recipient students to take advantage of all the educational opportunities available at Princeton.  Because DACA allows beneficiaries to obtain advance parole for travel outside the United States, DACA students have been able to study and do research abroad.  One DACA student has completed a full semester abroad and one has participated in the University's Bridge Year, a tuition-free program that allows select incoming freshmen to begin their Princeton education by spending nine months providing community service abroad.  One DACA beneficiary student has applied to the Princeton in Latin America post-graduate program, but may not be able to participate due to DACA's rescission.  Others have reported that they would like to study abroad but will be unable to do so because they can no longer obtain advance parole.

10. One of the most powerful effects of DACA is, for all intents and purposes, immeasurable.  No longer forced to live in fear of deportation, and no longer paralyzed by the possibility that pursuit of education or employment could result in removal, students report that they are happier, more confident, and better able to apply themselves.  Eliminating, or at the very least reducing, the anxiety associated with their immigration status has empowered them academically, professionally, and emotionally.

11. Of course, the implementation of DACA has also benefited other Princeton students and the University.  DACA students are friends, classmates, teammates, and colleagues.  They make important contributions to the Princeton community as scholars, mentors, campus leaders, and community organizers.  Many are highly effective and committed advocates for fellow students and for marginalized individuals and groups.

12. DACA students also possess unique viewpoints not otherwise represented in the University community.  As a result, DACA recipients make irreplaceable contributions to the learning environment at Princeton, sparking exactly the type of thoughtful and nuanced conversations that Princeton aspires to nurture.  The resulting dialogue generates innovative ideas, promotes cross-cultural understanding, and illuminates intellectual and experiential blind spots.

***Rescission of DACA will Impose Incalculable and Irreparable Harms on DACA Students, Other Students, and the University***

13. The rescission of DACA is causing and will continue to cause severe harm to recipient students.  Students have reported to me that, due to the stress stemming from DACA's rescission, they are unable to concentrate on important academic and professional matters.  Without betraying anyone's confidence, I can say that some have reported that this stress has manifested as sleeplessness, panic attacks, depression, and social isolation.  DACA students have also reported that, as a result of DACA's rescission, they have had to step away from co-curricular and service opportunities that they would have otherwise pursued in order to focus on their next professional steps and their families' security.

14. In reporting their concerns, several DACA students have emphasized that they would not have applied for DACA had they perceived any risk that the sensitive and identifying information furnished in their submission might be used to remove them or their families from the United States.  The government's assurances that it would not use students' information to effectuate their removal were essential to these students' decision to apply for the DACA program.

15. Students are also concerned about the loss of work authorization once their current DACA status lapses.  A lack of work authorization not only jeopardizes students' ability to support

themselves and contribute to their families' incomes, but also undermines the career plans to which they have dedicated themselves during their time at Princeton. To have invested so much time and energy to pursuing a specific goal and then to be unable to reap the benefits of those investments is devastating.

16. The effects of this devastation are felt by DACA beneficiary students' families as well as the students themselves. Several students have sought guidance from the Office of the Dean of the College about coping with the stark reality that their loss of income will have consequences for loved ones, who have sacrificed tremendously to help them secure admission to and thrive at Princeton, and who had been expecting some financial assistance upon the students' graduation. In light of these concerns, it is easy to understand why so many DACA students indicate they would not have applied to DACA absent government assertions that they would be able to renew their status, so long as they continued to abide the law.

17. These issues are already imposing severe hardship on DACA students, and that hardship will only be compounded as DACA beneficiary students approach the date on which their status will lapse. From my experience, it is clear that DACA students are suffering harm that is immediate and immeasurable.

18. Rescission also immediately harms Princeton. Since rescission was announced, Princeton has invested substantial resources to address and mitigate the immediate and imminent harm to its students. In addition to the Dean of the College's substantial formal programming to address DACA's rescission, faculty members, administrators, and non-DACA beneficiary students have devoted time and resources to providing informal support to DACA beneficiary students.

6

19. DACA's rescission also necessarily impedes the University's ability to bring the best and brightest students to study here.  In the absence of DACA, undocumented students would be much less likely to be able to attend Princeton without the documentation necessary to travel between their families' homes and school.  They likely could not even attend the upcoming Princeton Preview, which allows admitted students to visit the school to determine whether to attend the University.

20. Even more important, the loss of DACA students deprives Princeton and its student body of critical relationships.  As noted above, DACA beneficiaries on campus are friends, classmates, teammates, and colleagues.  DACA beneficiary students also play an essential role in helping Princeton fulfill its educational mission.  DACA beneficiary students bring unique perspectives and experiences to the classroom and to their extracurricular activities.  They are accordingly an invaluable component of the diverse and inclusive learning environment that Princeton aspires to provide for all those who attend the University.  Without DACA and the many students that DACA enables to study at Princeton, the University will be a poorer learning environment.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in Princeton, New Jersey.

Khristina Gonzalez

8



# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **Declaration of Janet Lavin Rapelye**  Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, Janet Lavin Rapelye, declare:

1. I am the Dean of Admission of Princeton University, a private, non-profit, educational institution dedicated to extraordinary scholarship, research, and instruction.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2.  I have been the Dean of Admission since July 1, 2003.  Prior to this position, I was the Dean and Director of Admission at Wellesley College in Wellesley, Massachusetts for 12 years.

3. I have been in college admissions for the past 35 years, including serving in admissions at Williams College in Williamstown, Massachusetts, Stanford University in Stanford, California, and Bowdoin College in Brunswick, Maine.

4. Because Princeton aspires to excellence, the admissions process serves a critical function: It ensures that Princeton identifies and attracts promising and talented students with a variety of backgrounds, perspectives, and experiences.

5. To that end, Princeton reviews applications for its undergraduate program on a yearly basis. Applications come from students who live in the United States and from students who live in other countries.  All have completed or will soon complete secondary education programs.  The admissions process is extremely competitive.  For example, the University received 31,056 applications for admission to the class of 2021.  Only 1,990 of those applicants were admitted, for an admissions rate of 6.4 percent.

6. In reviewing applications to Princeton, the admissions staff is cognizant of the important role we play in helping to build an optimal learning environment.  Based on personal experience, we know that matriculating students from across a range of demographic

2

groups delivers important benefits to our campus community.  For example, diverse and inclusive environments encourage intellectual and social growth.  This is corroborated by studies across a wide range of fields, including economics, psychology, and sociology.  The research demonstrates that experience in diverse settings promotes intellectual development, improves self-confidence, and helps individuals identify commonalities as well as cognitive biases.  Building a diverse and inclusive environment also increases awareness of inequalities, prejudices, and discrimination, while reducing the likelihood that individuals will engage in negative stereotyping.  For Princeton, the result of building a diverse and inclusive student body is a collaborative and creative space, characterized by vigorous debate in addition to nuanced and thoughtful conversation on countless issues.  Because of the effect of diversity on the educational environment, a diverse student body is essential to Princeton's educational mission.

7.  The University's commitment to diversity and inclusion also reflects its belief that students of all backgrounds should have an equal opportunity to seek and secure admission to Princeton.  For the University, this is a matter of fundamental fairness, access, and human dignity.  And the importance of equity extends beyond the admissions process.  The University's goal is to ensure that learners from all circumstances have the chance to participate in and contribute to the Princeton community, to succeed in their chosen professions, and to have a positive effect on the world around them.

8.  Building a diverse and inclusive learning environment is also critical to Princeton because diversity and inclusion advance an idea that is central to Princeton's educational mission: that students should live, learn, study, and engage each other in a setting that accurately reflects the breadth of experiences across the United States and especially the world.  By

3

broadening the range of perspectives that students encounter, Princeton ensures that learners acquire a deeper understanding of the world around them and that graduates are better equipped to lead and to serve others in their personal and professional endeavors.

9. When I first learned about the termination of DACA, I was deeply troubled. My immediate worry was about the calamitous effect that termination of DACA will have on our students who are DACA beneficiaries. I was concerned that the termination might render them unable to pursue their aspirations after graduation.

10. In addition to the direct effects on DACA beneficiaries themselves, rescission will severely and adversely affect the University's ability to deliver the powerful benefits associated with diversity and inclusion.

11. Since 2012, Princeton has admitted at least 21 students granted deferred action under DACA. Each student was admitted on the basis of personal merit and academic credentials commensurate with those of any other student on Princeton's campus. In reviewing their applications, the admissions committee noted that each DACA student had overcome substantial obstacles, demonstrating a strength of character and resilience that only bolstered the degree to which members of the admissions committee felt the students could contribute to Princeton's learning environment.

12. I have observed how DACA recipients who have enrolled at the University have made substantial contributions to the campus, including by excelling academically, engaging in careful examination of important issues with their classmates, and bringing their experience, intellect, and commitment to a variety of extra-curricular activities. It does not surprise me that DACA students have a tremendous positive impact on their peers and the broader Princeton community. DACA students who have enrolled at Princeton bring

App. 0026

unique perspectives and ideas to campus, which are shared in classrooms across varied fields of study and through involvement in a number of campus institutions and organizations.   In all of these respects, DACA students enrolled at Princeton are instrumental in helping the University realize the benefits associated with diversity and inclusion.

13. It is clear to me that the rescission of DACA will have a negative effect on the number of perspectives represented in Princeton's enrolling class.  And based on my experience with University admissions, the unique perspectives and experiences that DACA students bring to campus cannot be replaced or replicated.  For these reasons, the rescission of DACA is a substantial blow.   The decision to terminate the program will negatively affect Princeton's ability to create a diverse and inclusive learning environment and to deliver associated benefits to matriculating students, to faculty, and to other members of the University community.  This immeasurable loss only compounds the consequences of rescission, which fall squarely and most heavily on DACA recipients.

App. 0027

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 12, 2017 in Princeton, New Jersey.

Janet Lavin Rapelye



# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **Declaration of Rochelle Calhoun**<br><br>Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, |  |
| v. |  |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, |  |
| Defendants. |  |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, |  |
| v. |  |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, |  |
| Defendants. |  |

I, Rochelle Calhoun, declare:

1. I am the Vice President for Campus Life at Princeton University, a private, non-profit, educational institution that is committed to unsurpassed scholarship, research, and instruction.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2. I have been the Vice President for Campus Life at Princeton since September 2015.  Prior to my current position, I served as dean of students and vice president for student affairs at Skidmore College.  Before joining Skidmore, I was executive director of the Mount Holyoke College Alumnae Association and held a number of student affairs positions, including as acting dean of the college and associate dean of the college.

3. As Princeton's Vice President for Campus Life, I work to provide an enriching experience for Princeton's undergraduate and graduate students.  I collaborate closely with the Office of the Provost, the Office of the Executive Vice President, the Dean of the College, the Dean of the Faculty, and the Graduate School, and I advise the President on campus life issues.  I oversee a staff of more than 300 people in seven campus units, including Career Services, the Office of the Dean of Undergraduate Students, Office of Religious Life, University Health Services, and the Pace Center for Civic Engagement.  Together, we touch most, if not all, of the student population at Princeton through educational and social programming initiatives, support services, and outreach.

4. Princeton is committed to excellence in all facets of education.  To achieve excellence, Princeton must be accessible to talented students from all backgrounds.  This is because matriculating students with a broad range of experiences, perspectives, and interests

2

promotes the exchange of different ideas.  In this way, students and faculty are encouraged to challenge themselves, personally and intellectually.  The result is a dynamic learning environment, in which students develop a more nuanced understanding of the world and each other.

5.   There are currently students on campus who are DACA beneficiaries.  I understand that others are providing information about the immediate and substantial harm that termination of DACA has imposed on those students.  These harms are, of course, our principal concern.  From a campus life perspective, however, I know that the termination of DACA also has injured the broader Princeton community in several ways.

6.   During their time at Princeton, students form enduring friendships that can last a lifetime. The tight bonds that develop during the college experience mean that the entire campus community is aggrieved by the circumstances that now face DACA beneficiaries.  Students who are not DACA beneficiaries have expressed to me their sadness, frustration, and even anxiety about what DACA students now face.  The thought that their friends may now be unable to work, may be unable to support their families, and may be removed from the United States, is causing real emotional distress.  It is also eliciting an outpouring of support.  I regularly hear from students who are concerned about what the University is doing to assist DACA students in light of the termination.

7.   Although the distress caused by DACA's rescission is hard to quantify, it is becoming more acute.  As more time passes, more and more DACA beneficiary students will have their status lapse.  The rescission of DACA will accordingly affect an ever-growing part of the Princeton community, including the friends, professors, and classmates of each DACA beneficiary student.  The stress created by DACA's rescission accordingly builds on itself.

Indeed, because of the expansive nature of the harm that DACA's rescission has caused the University community, DACA's rescission has made non-DACA beneficiary students feel anxious about their own futures, too.  This anxiety is antithetical to the University's goal of creating a flourishing educational environment where students from all backgrounds can explore their chosen fields of study.

8.  In short, the termination of DACA is harming and will continue to harm Princeton in an enduring way.  As discussed above, access is critical to Princeton's educational mission.  Terminating DACA will impede Princeton's ability to attract brilliant, creative, and thoughtful students.  This will negatively affect campus life and hinder Princeton's ability to develop and disseminate knowledge.  These effects will be long-term and lasting.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 3, 2017 in Princeton, New Jersey.

Rochelle Calhoun

5



# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, AND UNITED FOOD
AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

   Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

   Defendants.

---

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Declaration of Jacqueline Leighton**

Civil Action No. 17-cv-1907 (CRC)

Civil Action No. 17-cv-2325 (CRC)

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

   Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

   Defendants.

App. 0036

I, Jacqueline Leighton, declare:

1.  I am the Director of the Davis International Center of Princeton University.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2.  I have been the Director of the Davis International Center since August 18, 2010.  Before I took my current position, I served as Director of International Services at Montclair State University in Montclair, New Jersey and as coordinator of international affairs at Hunter College of the City University of New York in New York, New York.  I have more than thirty years' experience providing U.S. immigration regulatory advising services to students at U.S. universities.

3.  As Princeton's Director of the Davis International Center, I am responsible for managing immigration-related services and cultural adjustment programs that promote the success and well-being of Princeton's international students and its DACA beneficiary students. These services and programs are discussed in greater detail below.

4.  Princeton has long been committed to being a leading research and teaching university.  In order to fulfill this mission, it must be able to identify, attract, and retain the most promising individuals from all backgrounds.  The DACA program has allowed Princeton to do exactly that by not only facilitating the presence of many wonderful students on campus but also by allowing those students to engage more fully and visibly in the Princeton community.

5.  Since 2012, at least twenty-one recipients of DACA have enrolled at Princeton.  Each DACA student was admitted to the University based on his or her individual merit.  Five of our DACA students have graduated and fifteen are currently matriculating; an additional undergraduate student recently received her green card, and thus is no longer a DACA

2

beneficiary.  The University also has one DACA beneficiary graduate student; another graduate student entered as a DACA beneficiary but has also recently received his green card.

6. DACA students currently enrolled at or recently graduated from the University have studied in a wide variety of fields, including ecology and evolutionary biology, comparative literature, policy at the Woodrow Wilson School, geosciences, computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.  They have been recognized for excellence in their fields, receiving the Henry Richardson Labouisse Prize Fellowship (which provides $30,000 to a graduating senior who wishes to work or study abroad on matters related to on-the-ground policy development), the R.W. Van De Velde Award (the Woodrow Wilson School's principal academic award for juniors), election to the Society of Sigma Xi (a scientific research honor society), the M. Taylor Pyne Honor Prize (the University's highest honor for an undergraduate), and the Mellon Mays Undergraduate Fellowship (which provides repayment of undergraduate loans up to $10,000 if the student pursues doctoral study in an eligible field).

7. Several DACA beneficiaries who have graduated from Princeton have gone on to work in fields sorely in need of additional help.  For example, one graduate is working in an independent school district in the United States as a college success advisor; another has been accepted into a PhD program to study civil and environmental engineering; another is working with a family services organization, teaching after-school arts and literacy classes; and, finally, one graduate is currently enrolled in medical school.

3

8. DACA has had a profound effect on recipients studying at Princeton.  Before the program was implemented, undocumented students were without government-issued identification and accordingly were often unable to travel to and from campus.  Those who did come to Princeton largely lived in the shadows; they rarely reached out to me for help, and they were less engaged in their classrooms and in campus activities for fear of being too visible.

9. DACA's implementation is also important to recipient students because it allows them to pursue employment.  Our students have expressed that, because they can now work, they are able to generate income for themselves and contribute to the income of their families. The ability to secure employment has allowed them to develop skills and a network to draw on after graduation.

10. Of course, the implementation of DACA has also benefited other Princeton students and the University.  Among other things, DACA students have filled critical roles on campus. Many are part of the Dream Team, an on-campus organization that mentors migrant students, hosts activism workshops and lectures, and advocates on and off campus for immigrants' rights.  They also tutor underprivileged students in the local community through an organization called Community House.  Without DACA beneficiaries on campus, these roles might well go unfilled.

*11.* DACA students also have unique viewpoints not otherwise represented in the University community.  As a result, DACA recipients make irreplaceable contributions to the learning environment at Princeton.  Sharing their perspectives across several fields of study and through extracurricular activities, DACA students spark the thoughtful and nuanced conversations that Princeton aspires to nurture.  These conversations promote understanding and help eliminate blind spots.  Consequently, Princeton students leave the

4

University better equipped to make contributions in the "nation's service and in service of humanity," a phrase that encapsulates the school's mission and serves as its informal motto.

*12.* Princeton has made substantial investments in reliance on the government's promises relating to DACA. Specifically, the Davis Center—in collaboration with the Office of the Dean of the College—has provided monthly DACA support meetings focused on DACA benefits and obligations, fellowships and jobs available to DACA recipients, stress management techniques, and community building. It has also provided services and funds to help students apply for DACA relief for the first time or for renewal of their DACA status, as well as for advance parole. In addition, once a semester since 2014, the Davis Center has brought a DACA attorney to campus to provide accurate information about the responsibilities and benefits of the DACA program. The University has also provided "DACA Ally Training" aimed at providing information about the needs and concerns of DACA students to University advisors and administrators. Finally, the University has assembled a host of online resources for DACA students, including a long "Frequently Asked Questions" document.

13. In my view, the rescission of DACA works immeasurable harm on DACA recipients enrolled at Princeton, other students enrolled at Princeton, and the University. First, and most important, the rescission of DACA is causing and will continue to cause severe harm to recipient students. Several students have reported that they are very worried about whether information that they provided in their DACA applications be used to facilitate the deportation of them and their families. Additionally, many students are incredibly concerned about the loss of work authorization, which deprives them of the ability to support themselves and their families and limits their ability to build a network and develop

5

marketable skills.  Losing the ability to work on campus also makes it more difficult to connect with campus administrators, professors, and students.

14. Losing eligibility for work authorization has devastating and lasting implications for life after Princeton, too.  Students have worked for their entire college career to develop the knowledge and credentials needed to pursue specific employment opportunities.  With the rescission of DACA, those opportunities have vanished.

15. Even if a student were in a position to abandon his or her family, friends, and home upon graduation to pursue opportunities overseas, it is by no means clear that employment opportunities would exist outside the United States.  For DACA students, personal and professional networks are here, not abroad.  The students have worked hard to position themselves to secure post-graduate opportunities in the United States, the only country that most have meaningfully known.

16. I also understand that, as part of rescission, DACA recipients are now ineligible to apply for advance parole.  This is a significant loss.  The University strongly encourages it students to study abroad because study abroad programs allow students to understand the international dimensions of problems, develop their language skills, experience personal growth, and build their networks.  In the past, DACA recipient students have seized this opportunity, studying at venerable institutions like Oxford University.

17. The loss of advance parole means the loss of this important opportunity to challenge and expand boundaries and to build personal and professional networks.  Two or three DACA beneficiary students who were planning to study abroad have had to cancel those plans because of an inability to obtain advance parole.  As a result, these students are unlikely to *ever* have the opportunity to study abroad.

6

18. All of these concerns pose an immediate and tremendous psychological, emotional, and financial hardship on DACA beneficiary students.  One DACA student has reported being so angry about DACA's rescission that the student is unable to focus on coursework.  Another student has communicated that the time she has had to devote to managing the effects of DACA's rescission on her and her family has compromised her ability to engage fully with her academics.

19. In short, DACA's rescission is already imposing severe hardship on DACA students, and that hardship will be compounded as they approach the date on which their status will lapse.

20. Rescission also imposes immediate harms on Princeton.  Since rescission was announced, Princeton has invested additional resources to address and mitigate the immediate and imminent harm to its students.  For example, the University has paid for a consultation and (if warranted) follow-up legal assistance from immigration counsel for all DACA students.  The Office of Career Services has also assembled guidance for DACA students on which internships, employment, and fellowships that can pursue without DACA status.  Princeton reasonably expects to continue investing in services that will provide support for DACA students, whose mental health, studies, and economic prospects have been affected by rescission.

21. The rescission of DACA injures Princeton in other ways, too.  By forcing students back into the shadows, rescission will deprive Princeton and its students of the immeasurable contributions that DACA students make on campus, including by bringing their unique perspectives and experiences to bear in the classroom and in extracurricular activities.  The University will also lose the opportunity to matriculate new DACA students, who are likely to be deterred from study at Princeton for a variety of reasons, including difficulties

App. 0042

presented by travel without a U.S. government-issued photo identification, and limited employment prospects post-graduation.

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 12, 2017 in Princeton, New Jersey.

Jacqueline Leighton

9



# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, AND UNITED FOOD
AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

Defendants.

**Declaration of Julia Elyachar**

Civil Action No. 17-cv-1907 (CRC)

---

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

Civil Action No. 17-cv-2325 (CRC)

**App. 0046**

I, Julia Elyachar, declare:

1. I am an Associate Professor in the Department of Anthropology at Princeton University. I am over the age of 18 and make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently to the facts in this declaration.

2. I have been a professor at Princeton since July 2016. My research focuses on problems at the intersection of political economy, social theory, and anthropology, primarily in the Middle East and former Yugoslavia. I teach several courses at Princeton, including a required theory class for first-year graduate students in anthropology; an undergraduate class called "Debt," which gives a historical and cultural perspective on debt crises; and an undergraduate class called "Revolt," which examines the Arab Spring and other political revolts and places them in a historical perspective. I also advise roughly eight PhD students, four undergraduates writing senior theses, three undergraduates writing junior papers, and eight undergraduates developing senior thesis proposals.

3. Before coming to Princeton, I was a member of the faculty at the University of California, Irvine starting in 2007; while there, I served as (among other things) an associate professor of Anthropology and Economics and as the Director of the Center for Global Peace and Conflict Studies. I have also taught at the Hagop Kevorkian Center for Near Eastern Studies at the International Center for Advances Studies at New York University, and I have done post-doctoral work at the Academy of Sciences and Arts in Ljubljana, Slovenia.

4. I met Maria De La Cruz Perales Sanchez in December 2016 in my capacity as Director of the Princeton Institute for International and Regional Studies Undergraduate Fellows Program (PIIRS). PIIRS is Princeton University's international and regional studies center. It promotes research, learning and dialogue on world cultures and issues of global

App. 0047

importance.  Providing students with the opportunity to combine the theories they learn in the classroom about the world with on-the-ground knowledge is integral to the mission of the program—and to the mission of the University as a whole.

5. The PIIRS program is a highly competitive fellowship program that offers motivated juniors at Princeton a chance to develop a proposal for summer senior thesis research outside of the United States.  Because of the competitive nature of the program, Maria's cohort was quite small; there were fewer than ten students in the group in majors ranging from Civil Engineering to Slavic Studies, Economics, and History.

6. PIIRS is designed for students who are highly independent learners and workers and who are able to work together collaboratively as part of a cohort.  After being selected for the program, fellows attend ten group sessions over the course of the semester, as well as individual meetings with me and the Institutional Review Board (IRB) on campus.  These meetings are completed for the purpose of developing the thesis proposal and research plan, getting IRB approval for their research if necessary, and constructing a detailed budget.

7. I selected Maria for the PIIRS cohort in consultation with Dr. Mark R. Beissinger, then the Director of the program.  She had an extremely strong academic record and proposed a research project that seemed both doable and meaningful to the community she planned to study and for knowledge in her field.  She proposed studying children who were fleeing violence in Central America and waiting in Mexico for an opportunity to apply to enter the United States.  Her project had a strong policy orientation; she wanted to know whether, and to what extent, changes in policy regarding children fleeing violence in Central America changed the planned courses of action among these children.

3

8. Throughout the PIIRS program, Maria was a full and active member of her cohort. She also added a valuable perspective that no other student had. Her observations and comments were critical to group discussions and deepened everyone's understanding of the issues. I teach two other courses; neither of them has a DACA beneficiary student among its ranks. The absence of that perspective from the classroom is particularly glaring in my other classes when they discuss problems such as the student debt crisis, economic inequality, or theories of culture and politics in the Social Sciences. Maria's unique perspective is reflected in her research; she was the only student in her PIIRS cohort who planned to study a group to which she had a personal connection. Summer thesis research must, by definition, be completed over a short period of time. Maria had the unique ability in her group to quickly and effectively establish the rapport necessary to get vulnerable populations to speak. Although other students planned to study at-risk disenfranchised populations, their perspectives on these problems were abstract and their ability to get access to meaningful data was less assured. No other student conceptualized a project that was directly linked to public policy, utilized fine-grained research methodologies, and had implications for a matter of such enormous public interest.

9. Although Maria was a full and active member of the cohort, I noticed that she sometimes seemed a bit shy. I came to realize that her uncertainty about whether she would be able to conduct her research led her to be less active in full group discussions than she might otherwise have been. Although Maria was a vocal and strong advocate when speaking for others—whether in class or in co-curricular activities—I sensed that an element of stigma associated with her immigration status limited her inclination to speak openly about her own research plans. When she did speak, her classmates were routinely struck by the

4

gravity of her research; as noted, she planned to study children who were fleeing violence in their home countries.

10. Because of the intensive nature of work with undergrads in PIIRS, I came to know Maria reasonably well over the course of the program.  As I came to understand more of the burdens Maria carried, I made a point of reaching out to her from time to time.  We remained in contact throughout the spring of her junior year and during the following summer.  While on summer break, Maria had to assemble documentation for her interview for advance parole, which she required to conduct the thesis research that she had long been planning for through PIIRS.  She was increasingly anxious as the time for her interview approached.  She told me that she worried—as she had throughout the PIIRS program—about whether she could secure advance parole to conduct her research, whether she would be able to graduate from Princeton without completing research overseas, whether PIIRS would withhold funding if she were denied advance parole, and many other weighty issues.  Although Maria always remained composed in the classroom, the strain on Maria was apparent in our personal interactions.

11. Maria filed her application for advance parole in early June.  When she had not heard from the government regarding her application by the end of July, she decided to apply for emergency advance parole to ensure that she would be able to travel to Mexico during her summer break as planned.  As the date of Maria's interview for her emergency advance parole interview drew near, we were in touch more and more often.  I wrote a letter in support of her application, explaining why her overseas research was crucial for her studies and completion of her degree.  Ultimately, however, Maria was denied emergency advance parole.  And because DACA was rescinded, her application for regular advance parole was

5

not granted.  Maria was incredibly upset and asked me a number of times if she would be able to graduate on time.

12. I had several conversations with other professors and administrators about how best to support Maria's research and to confirm that she remained on track to graduate.  I devoted time to pursuing potential solutions for Maria and to reaching out to my contacts to see if they could help her with her research.  Ultimately, Maria had to develop a new United States-based research project for her senior thesis; this project will analyze differences in the effect of DACA's rescission on students at private universities versus public universities and community colleges.  Although this project promises to be excellent (like all of Maria's work), the need to develop a new thesis project after investing so much in her initial research project was an enormous burden on Maria.  It also, of course, limited her ability to explore her research questions through international research.

13. Without research of the type that Maria planned to conduct in Mexico, we lack knowledge of the crucial terrain between the on-the-ground experience of migrants and the high level theories put forward by sociologists, economists, and policy makers.  Maria is at the forefront of a young generation of future policy makers and intellectuals who can bridge that gap between theoretical and empirical knowledge.  Research conducted in situ overseas is crucial to being able to serve as such a bridge.  Maria has the capacity to bring together knowledge gathered from the field with the models she studied in the classroom. But because of DACA's rescission, she cannot pursue this work.  Maria of course suffers gravely as a result of the rescission, in part because she can no longer conduct research abroad as planned.  The University, her classmates, and her field of study are also the

poorer for DACA's rescission, as they cannot benefit from the work that Maria would have done.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December <u>13</u>, 2017 in Princeton, New Jersey.

Julia Elyachar

8



# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIALWORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **Declaration of Maria De La Cruz Perales Sanchez** Civil Action No. 17-cv-1907 (CRC) |

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, AND UNITED FOOD
AND COMMERCIALWORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

          Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

          Defendants.

**Declaration of Maria De La Cruz Perales
Sanchez**

Civil Action No. 17-cv-1907 (CRC)

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

          Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

          Defendants.

Civil Action No. 17-cv-2325 (CRC)

I, Maria De La Cruz Perales Sanchez, declare:

1. I am a recipient of DACA and a plaintiff in the above-captioned action.  I am over the age of 18 and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2. I was born September 10, 1995, in Mexico.  In January 2004, at the age of eight, I was brought to the United States.  There I joined my parents, who had already immigrated to the United States in search of opportunities for themselves and their children.  I grew up in the United States as an undocumented immigrant.

3. In the United States, my family shared a small two-bedroom apartment.  My father worked for his brother doing construction.  My mother took care of him and their nine children, including me.

4. Being able to grow up in the United States made an enormous difference in my family's life.  In particular, those of us who came to the United States at a young age were able to pursue our education in a way that older members of our family could not.

5. I have been fortunate to be a DACA beneficiary since graduating high school.  But, until DACA, the fear and possibility of deportation were more of a reality.  We could not drive very far, and were afraid to travel south of San Antonio.  We avoided the police, and would not have contacted them unless it was a life or death situation.  We were reluctant to seek out medical treatment, and in several instances decided to forego healthcare.  And I, for one, was also scared in some circumstances to socialize.  For example, when my friends in Texas crossed the border into Mexico, I was too nervous and had to explain why I could not join them.

2

6. When I began school, I did not speak English and was enrolled in English as a Second Language (ESL) courses.  The ESL classes, unlike the regular and advanced classrooms, were more often held behind at recesses.  This experience was stigmatizing.

7. Within two full years of beginning school in the United States, I was removed from the ESL program and placed in courses for advanced and gifted students.  In high school, however, this also led to experiences that left me feeling marginalized and vulnerable. Instructors frequently asked whether I had entered the correct classroom and also failed to learn my name until after I had performed well on the first exam.  In class discussion, classmates regularly disregarded my point of view.  Some even use the word "illegal." This continued after I raised concerns about the dehumanizing nature of that word.  Few if any of my peers spoke up for me inside the classroom.

8. Notwithstanding these dehumanizing experiences, and the fact that other students were dismissive of my ideas, I pressed on.  In between attending school, participating in extra-curricular activities, and completing homework, I researched academic summer camps and scholarships for undocumented students.   I also researched opportunities to continue pursuing my education.

9. As a result of my research, I resolved to attend a four-year university.  I had always loved learning, and my mother had encouraged this love throughout my life.  She had only been able to attend school through the second or third grade; then she had to work in the fields because her family needed money.  She told me that we came to the United States to succeed, and that education is the key to success.  I knew I had opportunities here that I would not have had in Mexico, and I was inspired to take advantage of them by my mother,

3

who passed away in 2011.  Her memory, her sacrifices, and her resilience continue to give me strength.

10. I learned about DACA through the news, and then I researched it on the United States Citizenship and Immigration Services website.  Although some members of my family thought DACA was a scam to collect our information and deport us, I trusted the government's promise not to provide our information to immigration enforcement authorities.

11. The decision to apply for DACA was not, however, an easy one.  The application required that I provide personal and identifying information, including my mailing address, my contact information, and other sensitive materials.  Ultimately, I decided to provide all of this information because I wanted to have a legal status that would allow me to live a more normal life.  This included being able to pursue my education without being scared every day about little things, like travelling to and from campus.

12. DACA has had a profound effect on my life.  But for DACA, I would not have been able to travel freely to and from Princeton.  Moreover, I would not have been able to work or open a bank account.  DACA has also enabled me to enjoy a more normal, less anxious life: In addition to traveling without fear, I have been able to socialize more freely, including in simple ways like going to movies that require identification.

13. Since arriving on campus, I have applied myself academically.  Through hard work, I have also secured several fellowships and grants.  Following a competitive selection process, I received the Arthur Liman Public Interest Fellowship, through which I did legal work with labor migrants in Mexico.  This was the first time I visited Mexico since I left as a child.  I have also been awarded the Fred Fox Grant for independent projects, which allowed me to

4

work with an organization that provides legal services to women seeking asylum in Texas. And I have been chosen for the Princeton Institute for International and Regional Studies Undergraduate Fellowship for summer thesis research. (At Princeton, conducting an independent research project and documenting it through a written senior thesis is a requirement for graduation.) With that fellowship, I planned to do my thesis research outside of the United States. Unfortunately, I did not get advance parole approved prior to DACA's rescission, and now there is no mechanism by which I can obtain advance parole.

14. My inability to conduct research abroad was immediately problematic. I had been working hard to design a research plan and develop my thesis for a very long time. And I had designed my undergraduate studies to prepare me for the project. Because the international research was essential to my thesis, learning I could not obtain advance parole forced me to revise my project completely. While attending to all of my other academic and co-curricular obligations, I had to develop and execute an entirely new research plan. I also had to do that on a tighter budget because I was unable to recover some of the grant money that I had already committed to travel and lodging for my previous project. All of these modifications needed to be completed within six to eight weeks, an incredibly abbreviated timeline that also coincided with the termination of DACA. The process of reworking my thesis project was incredibly stressful, not to mention disappointing, but I worked through it. I am using my remaining fellowship money to conduct research on the institutional response to DACA's rescission within the United States.

15. At Princeton, I have also identified and dedicated myself to a number of extracurricular activities. I have served as a peer-academic advisor for fellow students and as an elected member of the Woodrow Wilson School's advisory council. In the latter role, I advocate

5

for students who are studying in the Woodrow Wilson department, including by providing feedback on curricular issues, on the sufficiency of student resources, and about other critical issues.

16. Community engagement is also very important to me.  When I arrived at Princeton, the summer before my freshman year, the Director of the University's Pace Center for Civic Engagement told me about Community House, a tutoring organization for underserved students.  I have served as a volunteer and leader of Community House since that time, and in this role I have developed meaningful relationships with the local Princeton community and my students.  Additionally, I serve as the co-director of the Princeton Dream team, an immigrants' rights organization.  My work with this organization has given me a community of allies and has allowed me to develop my interest in immigrants' rights.

17. At Princeton, DACA has enabled me to pursue other opportunities that I believe are incredibly valuable.  For example, DACA enabled me to obtain advance parole for international travel.  As a result, I was able to do a fellowship assisting labor migrants in Mexico and to participate in a study-abroad program at the University of Oxford in England.  DACA has also made me less feel less afraid and more like I am a part of the country.

18. DACA has also enabled me to obtain work authorization.  That work authorization has allowed me to be financially independent and to help my father pay the modest mortgage on my family's house.  It has also allowed me to work as a research assistant for a professor at Princeton and as an associate at the Pace Center for Civic Engagement.  In the first role, I have researched whether certain practices at home, and prior to preschool, influence a child's educational attainment.  This research has taught me how to think about education

6

policy from a scholarly perspective and how to abide by best research practices.  At the Pace Center, I have handled logistics for events and volunteer activities.  These positions have had a substantial impact on my personal, academic, and professional development, and allowed me to form meaningful relationships with several mentors.

19. In addition to holding these positions, I have also worked in other capacities on campus, including in the campus dining hall and as an office assistant.

20. When I applied for DACA, based on the Government's representations, I expected that I would have an opportunity to continue renewing my deferred status.

21. I am very worried about the termination of DACA, for a number of reasons.  In addition to disrupting my thesis research plans, the rescission of the DACA program disrupts my post-graduation plans.  After graduation, I had wanted to do a one-year fellowship, called the Labouisse Fellowship, to conduct research in Mexico.  Because of DACA's rescission, that is no longer feasible because I cannot obtain advance parole.  I will also be ineligible for another fellowship of interest: the Sachs Fellowship, which has an international component for which I am now ineligible.

22. The termination of DACA will also make it harder to fulfill my dream of attending law school.  Even if I were able to attend law school without being able to work or to access loans or other financial aid, the termination of DACA means that I will be unable to work legally in the United States.  Currently, because of the DACA rescission, the possibility to carry out my dream and practice immigration law is non-existent.

23. As noted above, I have held several jobs during my time at Princeton to provide my family and me with additional income.  However, never before has my need to work been as pressing as it is right now.  Because my DACA status expires immediately after I graduate

7

from Princeton, I have been working as many hours as possible given my academic and extracurricular load.  This situation is far from ideal, as I am also writing a thesis, doing school work, and figuring out my post-graduation plans.  I had to drop a core requirement course earlier this semester because I had more responsibilities—including my jobs—than I could manage.

24. I am also very concerned about whether the information I provided in my DACA application will be used to initiate proceedings to deport me or my family members.  This is something that I have been worrying about a lot, despite my best effort to put it out of my head.

25. As a result of the rescission of DACA, I have at times felt depressed or anxious.  The stress generated by the uncertainty of my future causes me to be frequently tired, and I sometimes feel debilitated when I think about the negative impact DACA's rescission will have on my life.  I have focused on my studies and worked even harder in every endeavor to try to distract myself from thinking about the fact that I have to reconfigure my life plan.  And I feel very privileged to have the support that Princeton provides.  Because of that, it is incredibly important to me to advocate for others who have even fewer resources to address the consequences of losing deferred status under DACA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in Princeton, New Jersey.

Maria De La Cruz Perales Sanchez



# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, AND UNITED FOOD
AND COMMERCIALWORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

Defendants.

**Declaration of Bryan Ramirez**

Civil Action No. 17-cv-1907 (CRC)

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

Civil Action No. 17-cv-2325 (CRC)

App. 0065

I, Bryan Ramirez, declare:

1. I am a senior at Princeton University, where I study politics.  I am over 18 years old and make this declaration based on my personal knowledge.  If called as a witness, I could and would testify competently to the facts in this declaration.

2. I first met Maria De La Cruz Perales Sanchez during Princeton Preview, an event that helps admitted students decide whether to attend Princeton by giving them an opportunity to spend time on campus.  We had further opportunity to get to know each other the following summer, at the Princeton Freshman Scholars Institute.  The Freshman Scholars Institute is a program that allows students to spend seven or eight weeks on campus prior to the beginning of the school year, meet future classmates, take extra courses, and immerse themselves in campus activates.  Although Maria was very reserved when we met at Princeton Preview, she became more outspoken over the summer and eventually told me about her undocumented immigration status.

3. From the moment that we began to become friends, it was obvious to me that Maria had a passion for assisting others.  When the two of us discussed our goals and aspirations, Maria talked about wanting to obtain an engineering degree, so that she could work on building physical infrastructure in countries where it was lacking.  To me, it was also clear that Maria cared deeply about issues relating to immigration.  Because of Maria's dedication to advocacy and service, I was not surprised when she decided to pursue a degree in public policy, where her work could benefit a substantial number of people.

4. Over four years, Maria and I have come to know each other very well.  In addition to being an incredible friend and classmate, she is one of the most reliable, tireless, and hard-working people I know.  She is dedicated to her studies and to improving the lives of her

2

classmates.  In all of these ways, Maria is an incredible role model for everyone in the Princeton community.

5.  Maria and other DACA recipients have an enormous impact on academic dialogue at Princeton.  Conversations that might otherwise be theoretical are more concrete, more thorough, and more nuanced because of the perspectives that DACA recipients bring to discussion.  For example, Maria often draws on her incredible intellect and her personal experience to identify gaps in classroom conversation.  It is clear that her unique insight has a meaningful effect on others:  She is often able to engage students who might not otherwise consider certain ideas.

6.  Because of Maria's influence, I have become more receptive to listening to others and more compassionate.  I have also come to appreciate the importance of assessing how abstract ideas operate in practice.  Sometimes, the human consequences of concepts that we discuss in class can be lost during discussion.  This occurred in a course I took on the ethics of migration.  As far as I know, no one in the class was a DACA beneficiary.  As a result, perspectives on the circumstances driving migration, as well as the uncertainty associated with emigrating, were sorely lacking.  I often consulted Maria about what we were studying in the class and she regularly raised novel points that challenged my understanding of the material.  Our conversations helped me appreciate the subject matter in new ways.

7.  For all of these reasons, learning alongside Maria has been and remains very important to me.  Maria has had a substantial effect on my college experience in other positive ways, too.  For instance, from Maria, I learned about and joined the Dream Team, a Princeton organization that advocates on behalf of undocumented individuals brought to the United States as children, and also advocates on a number of other immigration issues.  Through

3

the Dream Team, I met several students who are DACA recipients, as well as other students motivated to work on important immigration issues.  I have been inspired by these students, who dedicate their time to improving the lives of others.  I think that this commitment to working on issues that affect people outside of the Princeton community is incredibly impressive, especially because there is so much going on—academically and in many activities—on campus.

8. Because of my interactions with members of the Dream Team, and particularly with DACA recipients like Maria, I have been inspired to do work in service of others.  For example, I have worked on a number of service projects with local government institutions, such as the Princeton Public Library.  I have also assisted the legal department of Centro Legal de la Raza with immigration work, including by translating for Spanish speakers who are vindicating tenants' rights or challenging wage theft.

9. When I first heard about the termination of DACA, I was immediately concerned for Maria, and for all of the other DACA students on campus.  Having spoken and interacted with Maria over the past several months, I know that the elimination of DACA has been incredibly hard on her.  For example, last spring, Maria began working on her thesis.  She worked very hard to develop an outline, to plan her research, and to secure funding.  She had planned to go abroad to do that research but, when DACA was terminated, she became ineligible to travel internationally.  As a result, she lost all of her substantial work.  She had structured her entire academic career for this project and then could not do it, which was devastating.

10. The termination of DACA has been hard for Maria in other ways, too.  Although she is extremely resilient, Maria is obviously anxious about her future.  I am trying to be

4

supportive, but I cannot imagine what she must be feeling.  I have never had to worry about my future in the way that Maria does.  If I study hard and work hard, then the privilege of having U.S. citizenship will ensure I have an array of attractive post-graduate options.  I think it is unfair that Maria will not have the same options.

11. While my primary concern about the termination of DACA is for recipients and their families, I think it is also important to mention collateral consequences.  For example, while nothing compared to what Maria is going through, I have been deeply saddened by the decision to end DACA because it means that I will have fewer opportunities to work, and perhaps to study, with Maria and with other DACA recipients.  The termination of DACA has had an impact on everyone who cares about DACA recipients.  Emotionally, it has been difficult to stay positive and to help affected students and friends maintain hope.  I find it hard to avoid sharing some of the stress and anxiety created by the decision to end DACA.

12. It also important to remember that the termination of DACA will have consequences for broader communities.  On campus, if DACA recipients are less represented or less vocal, it will harm students in the classroom, where DACA students' unique insights promote thoughtful discussion.  The absence of DACA recipients will also be felt in the many campus organizations and institutions in which these students have been involved; these organizations promote awareness of important issues, help students interface with the administration, and benefit the Princeton community in other important ways.

13. The termination of DACA will have negative consequences off campus as well.  Maria, for instance, is an incredibly powerful advocate for others.  If she loses her work authorization, it will deprive people of a tireless ally.  Other DACA recipients that I have met at Princeton

are also incredibly dedicated to assisting the broader community.  It appears to me that this outward focus is a result of their own experience, including the obstacles that they have overcome and their belief that everyone should have an opportunity to provide for themselves and their families.

App. 0070

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in Princeton, New Jersey.

Bryan Ramirez

7

App. 0071



# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF JANE DOE #1** |
|  | Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, |  |
| v. |  |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, |  |
| Defendants. |  |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, |  |
| v. |  |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, |  |
| Defendants. |  |

I, Jane Doe, proceeding under a pseudonym, state as follows:

1. I am 33 years old. I have personal knowledge of the facts in this declaration and, if called as a witness, could competently testify to the facts herein.

2. I work for Microsoft Corporation ("Microsoft") as a finance manager. I support our business partners and distributors by structuring financing solutions, driving ad hoc projects, and coordinating teams with post Go-Live activities. This is a rotational position in which I move between teams in Worldwide Payment Solutions ("WPS") every nine to twelve months for three years. I have been employed in this capacity since July 5th, 2017.

3. I was brought into the United States when I was six years old. I have been in the United States since that time and remain in the country as a DACA beneficiary.

4. I graduated from high school in 2002. I was not able to apply to a four-year university because of my undocumented status, so I took one to two classes per quarter at a community college for thirteen years until I earned my Associates Degree.

5. After I obtained my Associates Degree, I transferred to Seattle University. While there, I saw a need for Latino students in the world of finance, so I became the founding president of the student chapter for Association of Latino Professionals for America ("ALPFA") at the university. In this role, I provided Latino students on campus with the tools they needed to achieve their future goals, such as learning new skills and networking with professional ALPFA members. Through connections I made with this association, I was able to obtain an internship at a Microsoft vendor. I was also awarded the ALPFA Student of the Year award in 2014 and the Microsoft/ALPFA Seattle Scholarship for outstanding achievements. I continue to mentor the Seattle University

Student ALPFA Chapter, which has grown to over 15 active members in its third year as an active chapter.

6. When I became a DACA beneficiary, I was ecstatic about the opportunity to come out of the shadows and be recognized as an individual in the United States. I was able to push forward my studies and finish them more quickly. With DACA securing my ability to obtain a work permit, I knew that I would be able to find gainful employment at the end of my schooling and develop a productive career.

7. I graduated from Seattle University in 2015 with a degree in business administration and a double major in finance and international business. Because of the work authorization I obtained as a result of DACA, I was able to accept a full-time position with Microsoft following my graduation.

8. My skill set includes a Microsoft Office Excel Level 1 Certification, Bloomberg Terminal, Custodian On-line Systems/Aladdin Applications, PowerBI, and Windows OS applications. I use these skills daily, as they are the systems the financial sector relies on in assisting customers.

9. The income that my employment generates has allowed me to purchase a home, open a line of credit, and purchase a car.

10. During my time at Microsoft, I have been involved in various pillars of Finance Latinos at Microsoft ("FinLat"). The mission of FinLat is to foster an inclusive community for Latino finance employees and provide opportunities for career development and networking to foster professional growth and retention for Latinos at Microsoft. I have been involved in all three leadership pillars of the group; the communications pillar, the external partnership pillar, and the internal events pillar. I lead the quarterly newsletters

and updated our SharePoint site so that members can be aware of upcoming events and career opportunities, and build a sense of community. I managed networking and career development events, recruiting events, and the relationship with the ALPFA National Chapter and regional chapters throughout the United States.

11. Because my position at Microsoft is part of a rotation program involving myself and one other employee, as we transfer positions we spend time passing on the knowledge we gained in the last rotation. If DACA is terminated and I can no longer work, I will not be able to support and contribute to my growing team, specifically the rotation employee who follows me into roles.

12. In my role at Microsoft, I partner with various business groups within WPS, credit, sales, operations, and our various banking partners to structure financing solutions that help them grow and sell through our products and services. I assist on the post Go-Live activities in cooperation with Microsoft Credit Services, operations, and other partners to ensure smooth funding, recording of transactions, and reporting.  I also integrated the Structured Finance operational tasks to our WPS operations team, helping to streamline the process and to provide the Structured Finance managers with more time to structure financing cases.

13. My DACA work permit is valid until April of 2019. If my work authorization expires at that time, I will be two years into a three-year program with no way to pass the knowledge I have obtained on to a new employee. Those two years of practical knowledge will be lost to the company.

14. Because of the termination of DACA, I also fear that I will lose the opportunity to give back to my community, in both my personal life and my professional life. I am currently

mentoring young high school students to pursue higher education and teaching them how to maneuver through college. Similarly, I am mentoring recent college graduates on the transition from school into a full-time career. In the professional setting, I am also helping Microsoft further its mission of Diversity and Inclusion by recruiting the best minority talent, and helping Microsoft's Latino retention by mentoring new employees as they grow their own careers. These commitments are important to me. My career goal within Microsoft is to become a people manager. I enjoy seeing people grow in their career and find personal fulfilment in helping those that, like me, are first time generation professionals and immigrants.

15. The termination of DACA has caused me to put part of my life on hold. I want to start a family of my own and have children, but because my future is so uncertain, I have not been able to start the family I desire. I also spend a great deal of my time creating contingency plans for all of the circumstances I may face because of the decision to end DACA. I have to make sure my parents and siblings will be taken care of and establish power of attorney so that my home and car will be managed. I work all day at a job I love, but must handle all the stress created by the termination of DACA.

16. When my work authorization expires, I will lose my job, which is my sole source of income. I will no longer be able to pay for my home or my car and will likely become homeless. My siblings are all DACA beneficiaries and I provide financial assistance to my parents and siblings. Losing DACA would affect the entire financial ecosystem of our family.

17. It is important to me that this declaration be anonymous. As stated, I have undocumented family members and the thought of them being affected by my participating in these legal

proceedings, including the possibility of detention or deportation, causes me extreme mental stress. My partner is also undocumented and I do not wish to put him at risk. The constant vigilance that is required when one is undocumented is exhausting. There are mental restrictions, such as never getting too comfortable where you live. There are community and local travel restrictions, like not shopping at the Latino grocery store out of fear of being identified as undocumented. I do not want to put any more burden on myself and my loved ones than already exists.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 12th, 2017 in Woodinville, WA

Jane Doe #1



# EXHIBIT J

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, and UNITED FOOD
AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

Defendants.

**DECLARATION OF TARU RINTAMÄKI**

Civil Action No. 17-cv-1907 (CRC)

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

Defendants.

Civil Action No. 17-cv-2325 (CRC)

I, Taru Rintamäki, hereby declare as follows:

1. I am over the age of eighteen. I have personal knowledge of the facts in this declaration and, if called as a witness, could competently testify to the facts herein.

2. I am a Director of Structured Finance at Microsoft Corporation ("Microsoft"). Our team arranges bank financing to support Microsoft sales and arranges access to financing for Microsoft partners. In addition, Structured Finance supports Microsoft procurement to get longer terms while offering suppliers access to working capital financing at attractive rates. As a Director, I lead this activity with a team of five to six people. I also develop offering and engage with internal and external stakeholders. I have been employed in this capacity since January 2015.

3. In my role as Director, I work with an employee rotation program that is approximately three years long. Employees in the rotation spend time in three to four teams over the length of the program. One employee in our rotation is a DACA beneficiary.

4. As employees move through this rotation program, they are afforded the opportunity to learn a great deal about specific work groups at Microsoft. They bring the knowledge they gain into both their next rotation and the future roles they hold at Microsoft. This is a profound growth opportunity and Microsoft invests a substantial amount of time and resources into these rotation employees. When an employee moves to a new rotation, it takes about 45 days to get them to a point where they are fully productive. At the conclusion of the program, the rotation employees are in a unique position to lead cross-subject team projects because they have a complete and intimate understanding of what each group does and how they work. Losing an employee in this program due to DACA

termination would be a loss of this recurring time investment and a loss of a specially developed employee.

5. As the rotation employees shift between groups, they spend time with the employee that is stepping into their role and pass on parts of the knowledge they gained in the role. This is not just a summary of what they learned, but a continual reference point for the incoming employee that could not be encapsulated in any other format. This collective wisdom builds over the entire length of the program and cannot be replicated without starting over with a new set of employees. If an employee that is part of the rotation is removed because of the termination of DACA, it would leave a gap in the work unit that could not be addressed.

6. The DACA employee in our rotation has been driving a project that involves developing processes and operations and moving those tasks to a new team. This project was started in August 2017 and the DACA employee has been handling it from its inception. This project is currently not complete. If this person is removed prior to the completion of this project, it would create disruption in the transfer that would be detrimental to Microsoft and our customers. We would have to spend around two months getting a new employee up to date on the project, and they would never have the institutional knowledge that comes from owning a project from the start. Our customer financing cases would be negatively impacted, as their ability to implement their projects would be delayed.

7. The DACA employee involved in this project has been getting a great deal of positive feedback during the time with Microsoft. This person has demonstrated a high level of motivation, has a positive attitude, and seems to be constantly looking for new ways to make an impact with Microsoft. The employee has developed a reporting system

surrounding bad debts that we are required to keep for auditing purposes, developed a

Bloomberg dashboard for our internal activities, and conducted all the feedback

collection work for an offsite program we were involved in. This person is already a role

model for other incoming employees. If this person is forced to leave our company due to

a DACA repeal, Microsoft would be losing a valuable employee that could not be

replaced for around two to three months.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December _13_, 2017 in _Espoo, Finland_

_Taru Rintamäki_



# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF JOHN DOE #2** |
| Plaintiffs, | Civil Action No. 17-cv-1907 (CRC) |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, John Doe, proceeding under a pseudonym, state as follows:

1. I am 24 years old. I have personal knowledge of the facts in this declaration and, if called as a witness, could competently testify to the facts herein.

2. I work for Microsoft Corporation ("Microsoft") as a software engineer in the Dynamics AX Team. My team works on developing the Azure cloud services that deploy Dynamics AX in Azure. This includes creating and configuring the cloud infrastructure so that customers can log into their various portals to access the many services that Dynamics AX has to offer. I have been employed in this capacity since April 2017.

3. I was only one year old when I was brought to the United States. I have been here ever since and have received deferred status through DACA.

4. Prior to becoming a DACA beneficiary, I was awarded two scholarships to help me attend community college near my home in Southern California. Because of my undocumented status and my lack of a social security number, I could not deposit my scholarship award into a bank account to use for courses. I was forced to deposit that scholarship money into an account at the school bookstore, where it all had to be used before a certain amount of time. After buying my books, I was left with around $700 that had to be used on less productive items like bookstore snacks and clothing. This was extremely frustrating.

5. I found out about DACA one year into my time at community college. I had been living my entire life in a state of perpetual fear of deportation. I was taking three buses and commuting for three to four hours a day to get to school because I could not get a driver's license. I had to wait two weeks to apply in order to save money for the application fee, but the benefits of becoming a DACA beneficiary outweighed the risks associated with

providing the government my personal information. I had already heavily invested my

time and resources into my education and had done my absolute best in school. DACA

was a way to receive the benefits that came from my hard work and effort in school and

to validate all I had done. I saw it as a bridge to a successful career and a productive life

in the United States.

6.  Becoming a DACA beneficiary allowed me to open a bank account and work as a tutor

while I was in school, helping my fellow students with their math studies while making

money so I could pay for my own books and other educational expenses. It allowed me to

integrate more easily with my peers. I was no longer the only person showing my

consulate card as proof of my age when we went to the movies. I was no longer the odd

man out.

7.  I graduated from community college with five associates degrees, a 4.0 grade point

average, and was a valedictorian candidate. I have degrees in Mathematics, Physics, and

Computer Science and took courses in Differential Equations and Linear Algebra,

Electromagnetism, Modern Physics, and Computer Organization.

8.  I transferred to the University of California at Berkeley. DACA allowed me to make this

move to Northern California. I no longer feared deportation and felt safe enough to move

away from my family. I knew that this was a major opportunity to amass all the education

and work experience I could find. I was no longer hesitant to dream of a full career that

would not be stifled by my inability to work. I knew that my employment eligibility

would provide me with the ability to work and to pay for my continued education. I was

awarded more scholarships, which I was able to utilize in a productive manner, and also

got a job as a computer science instructor for incoming transfer students while I

continued my own education. DACA gave me the safety net I needed to move away to college.

9.  I graduated from Berkeley as an Etta Kappa Nu Honor Society member with a degree in Electrical Engineering and Computer Science. My course studies included Data Structures, Computer Architecture, Discrete Math and Probability Theory, Artificial Intelligence, Database Systems, Efficient Algorithms and Intractable Problems, Operating Systems and Systems Programming, Software Engineering, Signals and Systems, Microelectronic Circuits, and Linear Integrated Circuits.

10. My knowledge of various computer programming languages allows me to create the cloud infrastructure that customers rely on to access their portals. My computer language skill set includes Java, Python, C, C#, C++, Powershell, Scheme, MIPS, MATLAB, and Ruby.

11. In my role at Microsoft, I work on the Azure cloud services that are responsible for the deployment of Dynamics AX into Azure for each of our customers. This includes setting up the infrastructure, such as deploying and configuring the Virtual Machines, so that customers can log into the Dynamics AX portal and access the many services it offers. I have also had a role in working on our On-Premise offering, which allows customers to deploy Dynamics AX in their own infrastructure by using Service Fabric.

12. If I am allowed to continue working, I plan to continue learning and growing at Microsoft. I have just begun my career this year and would like to see myself develop professionally and personally in the Pacific Northwest community that has become my new home. In time, I would also consider buying my own house. I am excited to be

putting my education to use in order to contribute to society, and hope that I have my whole future ahead of me to continue giving back to the country in which I was raised.

13. The termination of DACA has forced me to put several areas of my life on hold. I have not been taking advantage of Microsoft's 401K matching program because I need to keep all the money I earn liquid, in case of a legal or residential emergency. The lease on my apartment is almost up for renewal, but I cannot renew for another year as expiration of my deferred status would force me to pay early termination and cancellation fees. I have refrained from buying a car because I am not sure if I would be able to pay for it after losing deferred status.

14. The termination of DACA also creates a great deal of anxiety in my life. I try not to think about it too much because the number of contingencies I have to plan for is overwhelming. The nature of my job, computer programming, requires long stretches of time where I am silent and alone in my work. During those times, my mind is particularly vulnerable to thinking about all the possible outcomes and I notice that this impacts my performance at work.

15. If I lose my work authorization, I will lose my job. Without an income, I could no longer afford my rent and would be forced to move away from my current work community. I would have to return to my parents' home in southern California, a two-bedroom apartment that is currently shared by my two parents and five U.S. citizen brothers and sisters. I would no longer be able to send money home to help support my family, who currently live off of my contributions and the money my father makes painting apartments. I would go back to the mental space of feeling like I have a great deal of potential but no way to put it to use.

16. I have no family in my birth country, so if I were forced to leave I would be alone in a country that I have not lived in since my infancy and in which I have no support system.

17. I would like to provide this declaration anonymously. I have undocumented family members and I am fearful that identifying myself would lead to immigration problems for them. The mental harm that would come to myself and my entire family if that occurred is immense.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 14, 2017 in Bellevue, WA .

John Doe #2
_____
John Doe #2



**EXHIBIT L**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF COSTEL RADU** |
|  | Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, Costel Radu, hereby declare as follows:

1. I am over the age of eighteen. I have personal knowledge of the facts in this declaration and, if called as a witness, could competently testify to the facts herein.

2. I am a Principal Engineering Manager in Consumer and Device Sales at the Microsoft Corporation ("Microsoft"). Our group develops the ERP application *Dynamics 365 for Finance and Operations* as part of the larger business suite *Dynamics 365*. In my role as a Principal Engineering Manager, I lead the team responsible for building the online services for deployment and configuration of the ERP application on the Microsoft Azure infrastructure (Azure is a Microsoft developed cloud service.) I have been employed in this capacity since 2014 and I have been working for Microsoft since 1996.

3. There is an employee on my team who is a recipient of Deferred Action for Childhood Arrivals (DACA). The team that this employee is a part of is a small team of five employees. Any movement in this group creates a big impact on our work product. Prior losses of employees in this group have taken upwards of six months to address. If we were to lose an employee in this group because of the termination of DACA, it is reasonable to say it would take this group around six months to return to maximum efficiency and productivity. That setback would affect not just our team, but the customers we serve, creating a ripple effect of declining productivity.

4. My team is currently working on the initial deployment and configuration for Dynamics 365 Financials and Operations ("D365FO"), a functionality that has a substantial impact on our customers' perception of the ability to manage our Dynamics 365 system. This has a major influence on customers' willingness to agree to business deals for D365FO. If our DACA employee no longer works for Microsoft, our ability to maintain the quality

and to address requests for change would immediately diminish and would also be
delayed until a replacement was found. As mentioned above, this process would take
several months.

5. My team has also started working on the next deployment service based on a new Azure
technology. If the DACA employee could no longer work for Microsoft, we would have
to delay our timelines for delivering this project.

6. Microsoft has made a substantial investment in training this employee. This employee
has completed boot camps with Azure, security training, and on the job training
experiences that would be difficult to recreate for future employees. The Azure boot
camp was a two-day, intense lab experience that helps employees prepare to work with
Azure services. The security training ("STRIKE") was a two-day event where high
profile Microsoft engineers and executives from software security participate in case
studies and laboratory classes. If this employee is unable to continue working, Microsoft
would lose out on the return that is set to come from its investment.

7. This DACA employee brings a unique point of view to our team. Because of the
relatively young age of this employee and the mindset that comes with that age
demographic, the employee is able to provide a generational point of view as to a certain
customer base that is not found elsewhere in the group. Moreover, the employee is
bringing new problem-solving ideas to the team and a consumer point of view that is not
otherwise represented on the team. The Azure/Cloud space that this employee works in is
highly competitive, both in terms of market competition in the cloud computing space
and in the market for highly skilled employees, so our group needs this input to stay
relevant and helpful to customers. How we architect and engineer products depends upon

youth oriented and consumer driven points of view, so to lose this employee would be damaging to our work product.

8. Age aside, this employee brings unique life experience that provides strength to the team by increasing the diversity of ideas and opinions. This makes our team more dynamic and better able to address the diversity in the marketplace. Our DACA employee's background also helps us improve our understanding of user behavior in utilizing our product and the experiences that we build within the product. This employee brings a strong desire to succeed when facing adversity, a spirit of empathy directed towards our customers, and a strong desire to give back to the community that offered the employee a path to success. These points of view strengthen our team by inspiring others and making employees reflect on why and how we do our work.

9. There is currently a lack of engineers at Microsoft that know our system well. This impacts our ability to ship features and maintain our systems at the level expected by our customers. The customers we serve are setting up their business processes using our solutions, they trust us with their data and the execution of these processes, and expect our product to offer a high degree of reliability, manageability, and security. There are only two people that really know the system, so we have been training the DACA employee to become the third with a deep understanding of the system. To lose this person from the team would be detrimental to our ability to meet current customer expectations and deliver on the promises.

10. Our DACA employee has expressed extreme passion for the team's work and pride in being the only member of her or his family to work for a large corporation. This employee's commitment to the work we do comes out in every discussion we have and

every project the employee completes. This commitment, no doubt, comes from the

employee's background and the challenges necessarily overcome to get to this point in

life. I am confident that the significant investment we made in this individual will pay off

for the company in the long run if they are given the chance to continue their employment

at Microsoft.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 12, 2017 in Redmond, WA

_____

Costel Rada



**EXHIBIT M**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF JOHN DOE #1**<br><br>Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, John Doe, proceeding under a pseudonym, state as follows:

1. I am 25 years old. I have personal knowledge of the facts in this declaration and, if called upon as a witness, could competently testify to the facts herein.

2. I work for Microsoft Corporation ("Microsoft") as an Associate Consultant in the Business Productivity domain within Microsoft Services. I have been employed in this capacity since March of 2017.

3. I was brought to the United States at the age of twelve, have been here since then, and received deferred status as a result of DACA.

4. My father is a United States citizen. My mother and younger siblings are permanent residents. My older brother and I are the only DACA beneficiaries in my family.

5. During my years as a high school student in Florida, I volunteered with various non-profits and small businesses in my community. I worked closely with churches doing design work and other marketing projects as a way to build my skill set while giving back to the communities in which I was raised. Because of my spirit of volunteerism, my community contributions, and my high grades, I was awarded a KML Foundation Scholarship that provided full college tuition, allowing me the opportunity to attend the University of South Florida.

6. When I learned about DACA, I was filled with excitement and relief. I felt like I could finally start my life. I had full faith in the administration's promises and so I enthusiastically applied for deferred status, notwithstanding the sensitive personal information that I had to provide in the application. I believed that this was a way to provide me with a better life, not a trick to get me to hand over my information and trap me.

7. After DACA was put in place, I started applying for jobs immediately. I was able to get various paid internships and continue to gain invaluable work experience at places like Wilson Human Capital Group in Tampa, Florida and Raymond James Financial, Inc. in St. Petersburg, Florida. Specifically, I developed customized SharePoint applications for clients and used SharePoint Designer, InfoPath, Visual Studio, and front-end scripting languages to implement client solutions.

8. While I was working at Raymond James, my DACA expired. I had recently been assigned a new project to work on, so I had to explain to my manager that I was in the United States as a DACA beneficiary and that I would no longer be able to work until my renewal came through. Prior to that moment, I had never felt like an outsider or an immigrant, but this experience made me realize how uncertain my situation was without DACA.

9. During the weeks that passed as I waited for my DACA renewal to arrive, my life came to a standstill. The project I was working on had to be delayed and I was terrified I would lose my job. I felt completely isolated because no one I worked with could fully understand what it was like to live as a DACA beneficiary. I was never embarrassed, but it was difficult to explain to others the significance of what was going on in those weeks of waiting. I was living in uncertainty about my future, wondering if I would end up losing my job, unable to drive anywhere, and struggling to make ends meet financially. My mother spent a lot of her time trying to calm me down. Once my DACA renewal arrived, I was back at work the very next day.

10. I have a Bachelor of Science degree in Management Information Systems and was awarded honors in Mathematics, Science, and Computer Programming while in school. I

took courses in Engineering Calculus, Systems Analysis and Design, Business

Application Development, Database Design, Business Intelligence, and Business

Statistics.

11. I have a wide variety of computer based skills that allow me to help Microsoft customers

solve their problems in creative ways. My skill set includes JavaScript, Rails, Bootstrap,

LESS, JSON, Objective C, REST, HTML5, CSS3, C#, SASS, jQuery, Backbone.js,

AngularJS, React, SQL Server, MySQL, Microsoft Access, A/B Testing, and User

Centered Design.

12. After I graduated from college, I was hired by Microsoft as part of the Microsoft

Academy of College Hires ("MACH") program, a customized, two-year learning

experience for university hires. I was hired with a class of 38 individuals and we have

spent the first nine months of our time together working as a team and learning from each

other. Our class has become very close and I view them as another family. The amount of

resources Microsoft has invested in me as part of this program is astounding. I have

attended conferences to develop my professional skills and have been provided the

opportunity to network with senior figures in the company. This demonstrates to me how

important this program is to building the future leaders of the company.

13. As an Associate Consultant at Microsoft, I am a strategist who works closely with IT

decision makers as well as business owners who come to me for specific and unique

solutions to their business problems. I work primarily on development and coding based

solutions that revolve around SharePoint/Business Productivity tools. I evaluate, design,

and implement enterprise infrastructures and IT business solutions, often working on site

to help customers deploy the solutions I created.

14. My DACA status came at a transitional period of my life, where I was moving from my parents' home and care and becoming more self-sufficient. It allowed me to get my driver's license, become employed, and pay my own bills and taxes. I purchased a car on the expectation that I would be able to renew my DACA status. DACA allowed this transition to occur in a very natural and fluid manner. Faced with the possibility of this program being terminated, I now realize the importance of DACA in a way I had not fully comprehended before. I am just starting to find my independence and footing away from my family and now I am at risk of losing both my financial and emotional support systems.

15. Since learning of the termination of the DACA program, I have put some life choices on hold. I was going to purchase a home with another MACH program employee, but because I could not be certain that the DACA program would remain I was forced to pass on the opportunity.

16. If I am able to remain a DACA beneficiary, I see myself continuing my journey to ultimately what is my American Dream. I see a future where I continue to grow as an individual, excelling in my career, and contributing to my community. I see myself teaching our young ones the basics of computer code, so that they can see the benefits of technology at an early age, and gain an interest in how to use technology for good. I see myself excelling at Microsoft, and playing my part in making this wonderful company a cornerstone in America's economy. I hope to build on the fundamental principles that got me to where I am today: hard-work, dedication, perseverance, humility, and compassion. I hope to stay in this beautiful country. I hope to continue to call the United States home.

17. If DACA is terminated, I will lose a significant portion of my life that I have worked so hard to obtain. The work I have done over the course of years will be lost. I may have to move to a country I did not grow up in, and may be forced to leave my entire family and my place of employment. While I am trying to remain optimistic and excited about my future in the United States, and about my work team and managers, losing deferred status will make all of this disappear.

18. I wish to proceed with this declaration anonymously because I am concerned about my information becoming public and affecting my family in a negative way. They have done nothing wrong and to have them exposed to risk or publicity because of my participation in this lawsuit would be unfair. My brother is a DACA beneficiary as well and I do not want him thrust into the limelight just because I am choosing to provide a declaration. It is extremely stressful and frightening to think about the possibility of placing this burden on my family members.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13 , 2017 in Dallas, Texas .

John Doe #1



# EXHIBIT N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, and UNITED FOOD
AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,

       Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,

       Defendants.

</td><td>

**DECLARATION OF MICHELLE BOZEMAN**

Civil Action No. 17-cv-1907 (CRC)

</td></tr>
<tr><td>

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,

       Plaintiffs,

v.

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,

       Defendants.

</td><td>

Civil Action No. 17-cv-2325 (CRC)

</td></tr>
</table>

I, Michelle Bozeman, hereby declares as follows:

1. I am over the age of eighteen. I have personal knowledge of the facts in this declaration and, if called as a witness, could competently testify to the facts herein.

2. I am a Director of Technical Delivery and Business Productivity at Microsoft Corporation ("Microsoft"). I have been employed in this capacity since 2012.

3. Employees in Technical Delivery and Business Productivity provide technical support and consulting services to Enterprise customers using Microsoft technology and cloud services.

4. Part of my role involves working with university hires that are brought on as part of the Microsoft Academy of College Hires ("MACH") program. The MACH program recruits students from universities across the globe to work as employees at Microsoft. These hires have no substantial work experience and are hired based on their potential, drive, and ability to collaborate and absorb information.

5. Currently, there is one DACA beneficiary in our MACH program. This individual's MACH class has a total of 38 employees.

6. Once accepted into the MACH program, employees are trained on technology, presentation, and professional skills. They receive standard Microsoft On Board training followed by 60 additional days of specialized training. During this time, MACH employees are not producing any quantifiable results for the company. After this two-month training period, they are expected to shadow more senior Microsoft employees for two weeks to gain practical experience. This is also a use of Microsoft resources, as the productivity of our senior employees typically decreases when they are training MACH

employees. Finally, MACH employees are assigned a mentor from the current Microsoft staff who coaches them weekly for the first year of employment. The amount of resources Microsoft expends on these MACH employees is unlike any other program at the company.

7.  With the MACH program, Microsoft is trying to grow leaders, not just employees. Because they are impressively credentialed, and because Microsoft makes substantial investments in them, the recruits that come out of this program are highly valued by the company. They are quickly hired into to a wide variety of position within Services, the product groups and other business groups. The experience of being customer facing from the start of employment is an invaluable skill that MACH recruits take with them to their roles across Microsoft.

8.  MACH hires have a diversity of perspectives, which is important to Microsoft. These hires are made directly from the university level where job experience is not the guiding factor. This results in a much more diverse applicant pool than one that comes from industry hires, where various industry influences tend to eliminate certain perspectives from the applicant group. This diversity increases our ability to reach and meet the needs of the global customer base that we serve.

9.  Microsoft makes a substantial investment of time and resources in the MACH hires. Each hire requires a great deal of training before they can begin to produce a benefit to Microsoft. A typical industry hire can hit the ground running because of their past work experience, so the company starts seeing returns on industry hires quite quickly. With MACH hires, Microsoft expends a great deal of resources from the outset and, because we see these employees as long-term leaders of the future, the return comes later in their

careers. To have an employee removed from the MACH program because of DACA termination would result in an unrecoverable loss of both past and future resource allocation.

10. Since MACH hires are brought into Microsoft as a class, they work and learn as a collective unit once they start. These classes form a tight network and tend to rely on each other a great deal. They are akin to a freshman class at a very small school. To have one of these employees pulled from their class because of DACA termination would create a great disruption to the dynamic of the entire class. This disruption would lead to a decrease in productivity of the remaining class members as they struggle to recover from a loss of such an integral part of their team. Replacing a member of an established class of only 38 is not possible as their bond comes from the timing of their collective start with Microsoft.

11. The caliber of employee that comes through the MACH program is exceptional and, as expected, they are an in-demand segment of the technology industry. Microsoft assumes that a certain, small number of MACH employees will leave the company to pursue other opportunities and we plan for that small loss in advance. To take away an additional MACH employee because of a DACA termination would result in a loss above and beyond the planned amount.

12. MACH hires make valuable contributions to both their MACH class and to Microsoft as a whole. To lose such an employee to a DACA termination would be a substantial loss of our investment. We would be forced to incur the cost, disruption, and delays associated with their departure and, because of the unique nature of the group, we would not be able

to find a replacement. We would be deprived the unique skills, knowledge, and perspectives that make Microsoft such a useful resource for our clients.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in Charlotte, NC

Michelle Bozeman



# EXHIBIT O

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF JOSE SANDOVAL** |
| | Civil Action No. 17-cv-1907 (CRC) |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 (CRC) |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

I, Jose Sandoval, declare as follows:

1.      I am over the age of 18. I have worked at LinkedIn since January 2016, first as a Global Sales Associate through LinkedIn's Business Leadership Program, and since August 2016 as a Senior Sales Development Representative. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.

2.      I left Mexico for the United States when I was eight years old. I moved here with my mother, who came here because my aunt, who already lived in the United States, had terminal cancer, and needed someone to care for her and her children. I have a B.A. in Business Administration from the University of California, Berkeley, Haas School of Business. I received legal authorization to live and work in the United States through the Deferred Action for Childhood Arrivals (DACA) program in 2012.

3.      For me, receiving deferred status through DACA has been life-changing. When I first learned about DACA, I was ecstatic. I did have some fear about the possibility of being deported in the future, since applying for deferred status required giving the government my information.  But because DACA was renewable, and because it would solve many of my immediate problems, including how to support myself and apply my skills, I knew it was something I wanted to pursue. I had already managed to get into college with a Dreamers scholarship, but, without DACA, I knew I was getting a degree from an amazing university without any opportunity to apply the skills I was learning to my career.  Even with the scholarship, paying rent and other non-educational expenses was extremely challenging and stressful.  Having work authorization under DACA lifted that stress. And to be able to use the skills I was learning in school and apply for jobs was incredibly rewarding. The first position I held while in school was as a Wealth Management Summer Analyst at Morgan Stanley. This was so exciting for me.  It was an amazing opportunity that I would not have had without DACA.

4.      Because I was able to apply for and obtain work authorization through DACA, I have been able to apply my skills to benefit a number of different companies. For example, in my current role at LinkedIn, I bring in new business for the company by qualifying potential business

opportunities for the sales team. This means I am a first point of contact with many potential customers. When our marketing team generates demand for our products, and potential business prospects request that we contact them, I am the first representative of LinkedIn that makes contact. During this first conversation, I determine whether to connect the prospect with one of our Sales Executives for further conversation and to close new business. Since I began working at LinkedIn, I have brought in close to $2 million in revenue for the company.

5.      In addition to my contributions to LinkedIn's financial success, I work very hard to nurture a team environment where everyone feels included. My team at LinkedIn includes some of my best friends, and we regularly plan events together. I am also active in recruiting and hiring, focusing on bringing in more people from underrepresented minority groups. Creating a universal sense of belonging is very important to me, and I am a part of two of LinkedIn employee resource groups – Hispanics of LinkedIn Alliance (HOLA) and Out@In. Both groups play an important role at LinkedIn, encouraging employees across offices to share their experiences, engage in dialogue, and, ultimately, develop a deeper appreciation of diversity. Each group sponsors events and activities that involve conversations about a number of important issues, such as issues related to race or ethnicity.  In doing so, HOLA and Out@In help create a space for employees with different experiences and backgrounds to engage in discussion, share ideas, and learn from one another. These forums and activities increase a feeling of belonging and collaboration among employees, and when you feel more included in your team, you are likely to work harder and be more productive.

6.      DACA has also made it easier to assist my family and contribute to my broader community. My job has enabled me to help my mother financially, which is very important to me because of how much she sacrificed to give me opportunities growing up. I also do volunteer work with an LGBT center and the San Francisco Food Bank. While at Berkeley, I started the school's first suicide prevention program. I am passionate about being an advocate for mental health issues and raising awareness, particularly in low income areas where many people do not have easy access to mental health care, or knowledge about what resources are available.

7.      The termination of DACA has been incredibly hard for me, in a number of ways. First, as a result of termination I will be unable to work and will lose my job at LinkedIn. This uncertainty is very difficult to deal with. Every day I live with the knowledge that I may lose the supportive work community I have helped foster at LinkedIn. I do not know if I will be working here this time next year, and neither does my manager at LinkedIn, which I know creates challenges with respect to planning.  In addition, knowing that I may not be able to continue helping my mother financially if I am unable to work is also quite stressful — not only for me, but also for her.

8.      I am also aware that as a result of the termination of DACA, I may have to leave the United States at some point. It is extremely difficult to contemplate having to leave the United States after spending so many years building my life and community here. The only way I was able to get where I am today is through the incredible amount of support from my community and family. Knowing I could lose all of that, and that one day all of my friends and support could be gone, makes me very sad and worried about the future. The United States is my home and I cannot picture living anywhere else. There is no one in Mexico for me even to visit, so at this point it is just one of many foreign countries to me. As an advocate for mental health issues, and speaking from my own personal experience as well, this fear and uncertainty has had an enormous emotional impact on me and on my friends, family, and community.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in San Franciso, CA

Jose Sandoval



# EXHIBIT P

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **DECLARATION OF HECTOR JAVIER PRECIADO** Civil Action No. 17-cv-1907 (CRC) |

THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP), AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, AND UNITED FOOD
AND COMMERCIAL WORKERS
INTERNATIONAL UNION, AFL-CIO, CLC,     )

        Plaintiffs,     )

v.     )

DONALD TRUMP, in his official capacity as
President of the United States, JEFFERSON
BEAUREGARD SESSIONS, III, in his official
capacity as Attorney General of the United
States, ELAINE C. DUKE, in her official
capacity as acting Secretary of Homeland
Security, U.S. CITIZENSHIP AND
IMMIGRATION SERVICES, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF
HOMELAND SECURITY, UNITED STATES
OF AMERICA,     )

        Defendants.     )

---

THE TRUSTEES OF PRINCETON
UNIVERSITY, MICROSOFT
CORPORATION, and
MARIA DE LA CRUZ PERALES SANCHEZ,     )

        Plaintiffs,     )

v.     )

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE C. DUKE, in her
official capacity as Acting Secretary of the
Department of Homeland Security,     )

        Defendants.     )

Civil Action No. 17-cv-2325 (CRC)

**DECLARATION OF HECTOR JAVIER PRECIADO**

Civil Action No. 17-cv-1907 (CRC)

I, Hector Javier Preciado, declare as follows:

1.      I am over the age of 18.  I have worked at LinkedIn as a Sales Development Manager since September 2016, and have been employed at LinkedIn since June 2013. I lead an Inbound Sales Development team of eight people, focusing on lead qualification for three of LinkedIn's lines of business (Hire, Sell, Learn). I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.

2.      Jose Sandoval is a Senior Sales Development Representative on my team. He has worked in this role at LinkedIn since August 2016. He qualifies potential business opportunities for the sales team, which means he is a first point of contact with many potential customers. As our marketing team generates demand for our products and potential business prospects reach out to us, the first conversations they have are with Jose and his peers. During this first conversation we determine whether to connect the potential customer with one of our Sales Executives for further conversation, in order to close new business. It is my understanding, based on conversations with Jose, that he came to the United States from Mexico as a child, and that he currently has authorization to live and work in the United States through the Deferred Action for Childhood Arrivals (DACA) program.

3.      LinkedIn takes great pride in its culture, which we believe sets us apart, defines who we are, and shapes what we aspire to be. There are five pillars we strive to uphold that underscore what we do and how we do it: transformation, integrity, collaboration, humor and results. LinkedIn also defines itself through our values, which include: Members first. Relationships matter. Be open, honest and constructive. Demand excellence. Take intelligent risks. Act like an owner.

4.      Jose has always exceeded productivity expectations in his role, and has consistently been one of the top performers on my team. He has a work ethic that few can rival. He approaches his work with a sense of urgency, appreciation and joy. Personally, I associate this with his background. Jose does not take the opportunities he has been able to pursue for granted. In addition, Jose is very talented.  His intellectual curiosity is among the most impressive I have ever

encountered and his skills are not limited to those necessary to succeed in just his current role. He is a self-starter, entrepreneurial, a problem solver, and a creative thinker. If all of my representatives were like Jose, we would have no trouble setting records for goal attainment in our line of business.

5.       Jose's contributions to my team and to LinkedIn go well beyond his strong performance. Jose espouses and lives LinkedIn's culture and values. He has a positive attitude, is very active in sharing ideas, and goes out of his way to create a collaborative and inclusive environment among his peers on my team and beyond. This benefits LinkedIn because cohesive teams perform better and have lower attrition.

6.       Jose also adds significant value to LinkedIn through his unique perspective. As an openly gay Latino man, he is active in two of LinkedIn's employee resource groups – Hispanics of LinkedIn Alliance (HOLA) and Out@In. These groups are instrumental in engaging employees around the world in open, honest, and constructive conversations to help build understanding among colleagues. They regularly host events covering a range of issues touching on race relations and government policy issues, thus creating an indispensable forum where people of different perspectives and experiences can share, ask questions, and learn from each other. In our business, encouraging employees to share their diversity of experience is helpful. As an example, one of our other Latino sales reps has leveraged his heritage and background in conversation with potential customers who are bilingual and has had conversations with them in Spanish. I've also shadowed calls where business prospects have shared their appreciation for LinkedIn's culture. From these experiences and others, I know that employing sales representatives with a range of backgrounds allows us to employ a "social selling" approach to building rapport with our clients.

7.       Jose has combined his commitment to inclusiveness and helping others advance their careers with his own personal path of career transformation. Sales development representatives typically move on to sales roles, but Jose is interested in a different type of role in the future, so he has taken the initiative to teach himself SQL (Structured Query Language, the standard language for relational database management systems).  For the same reason, he has also

taken the initiative to work on a mentor-matching project with HOLA. This involves using data analytics to match appropriate mentors with mentees, thereby helping other Latino workers advance their careers and find their "next play." This experience has created a body of work for Jose to point to that will allow him to compete for roles in other teams that perform much of LinkedIn's data driven analyses at a more macro level for the company.

8.      I am aware that the termination of DACA will cause Jose to lose his work authorization and may result in his deportation. Although my first concern is for Jose, the uncertainty of his situation presents difficulties for me as a manager, particularly in planning for the delegation of responsibilities on my team, since I do not know whether Jose will be able to continue working here or not. If Jose were not permitted to continue working, I would need to divert time from coaching, mentoring and developing my current team to recruiting individuals to replace Jose. I spend about fifty percent of my time on the former set of activities; adding the latter to my plate would pose a challenge for me and my team.

9.      Not having Jose employed at LinkedIn would be a major loss to the company. First, it would be difficult and time consuming to replace someone as productive as he is. Finding and recruiting the right talent and then training and bringing the new hire up to speed would set me back at least six months and would reduce productivity. To fill Jose's role, I would need to spend at least ten percent of my time building a pipeline of potential hires and another ten percent interviewing them. In addition, it would take us approximately two months to on-board the new hire, knowing that it would be another few months before they might be able to perform at the same level as Jose. Of course, that level of performance would not be guaranteed, given Jose's historic performance and the high bar he has set.

10.     Second, beyond his skills and performance, Jose's unique personality and voice for diverse and underrepresented minorities, as described above in paragraphs five and six, would be nearly impossible to replace at LinkedIn. And, company-wide, our Latino employee population has decreased by one percent year over year, and Jose's departure from LinkedIn would further impair our efforts to recruit and retain high potential, high performing diverse talent.

[Signature On Following Page]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December _13_, 2017 in _San Francisco, CA_.

_____
Hector Javier Preciado



# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE C. DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | ) ) ) ) ) ) |
| Defendants. | ) ) |

**DECLARATION OF LUIS TORRES**

Civil Action No. 17-cv-1907 (CRC)

Civil Action No. 17-cv-2325 (CRC)

I, Luis Torres, declare as follows:

1.    I am over the age of 18.  I have worked at LinkedIn as a Senior Software Engineer since July 2017. Prior to this I was an engineer at Amazon. I work on the Flagship Application Infrastructure team. The Flagship Application Infrastructure team is responsible for maintaining the code for the LinkedIn.com website. Without this team, the LinkedIn website would not exist in its current form, as the website's infrastructure is the foundation upon which the "house" – the LinkedIn website – is built. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.

2.    I immigrated to the United States from Mexico as a child, in 2002.  I have a B.A. in Mathematics and an M.S. in Computer Science from California State University – Fullerton. In 2012, I applied for and secured deferred status through the Deferred Action for Childhood Arrivals (DACA) program. Through DACA, I received authorization to live and work in the United States. I learned about DACA right when it was announced, by watching the news. It is hard to explain my reaction when I first heard about the program, but I remember imagining that it was the same feeling I must have had when I first opened my eyes when I was born. I felt like now I had an entire life ahead of me, with many doors open that used to be closed.

3.    It is difficult to overemphasize the positive impact that DACA has had on my life. I am the first person in my family to go to college. Before DACA, I knew that I likely was going to school for no reason, because I was not going to be able to work legally in the United States. Getting work authorization under DACA created many opportunities for me. I had the freedom to express myself more openly, to truly consider what careers I might find appealing, and to pursue the career of my choice.

4.    My work authorization under DACA has also allowed me to contribute to the companies where I have been employed, including LinkedIn. I have a very different background from most software engineers. When I started in this profession, there were very few Hispanic people, and Hispanics are still very underrepresented in my field.  By working successfully at a tech company like LinkedIn, I am demonstrating that Hispanic people can make it in this

environment and be successful. As an undocumented person, I always had to take risks but also anticipate possible outcomes, so that I would have a plan for how to respond. At work, this mindset allows me to take risks and anticipate possible future issues that may arise related to the software we write and technical decisions we make. These decisions are important because if the LinkedIn website went down for even a minute, it would have a substantial impact on many users and also on the business itself. In addition, my educational background, which includes training in both mathematics and art, allows me to analyze and solve problems with both a mathematical and artistic perspective. Accordingly, I bring both diversity and a different way of thinking to the table in my daily work.

5.      I am extroverted and really like to encourage team bonding and collaboration. This collaborative spirit is missing at times in the engineering field and people tend to work independently. I believe I have made the team work environment friendlier, more family like, and more supportive of talking through problems.

6.      In engineering, we are taught to solve problems, but at times solving the immediate or obvious problem is not the right approach. Instead the right thing to do is to understand deeper underlying issues and implement a larger solution that will address those underlying issues. It might seem like a waste of time or too much work at the beginning, but in the long run it saves a lot effort and engineering time. This is one of the most important contributions that I bring to my team, and is something that has stuck with me from my undocumented life. When I was undocumented, I always had to understand everything about my situation and consider the implications that taking a specific action could have for my future. This has been a useful skill in my field, Front End Engineering, where we have no control over internet browsers, which shape the environment in which we work. For example, at any time Google can release a new version of its internet browser, or a user might try to access the LinkedIn website using an outdated version of a browser. In order to stay afloat, my team has to always anticipate these possible problems.

7.      It is important to me to give back to my community. While in college I decided that I wanted to mentor other students in the computer science field to share my excitement about this

field and to help other students achieve their goals. While in graduate school and once I started working, I taught a computer science class at Fullerton College, a local community college near my university. It was gratifying to help and see the students succeeding in this field. I have watched some of them start small companies, and others secure jobs at places like NASA, Raytheon, Google, and Amazon.

8.     I know that, as a result of the termination of DACA, I will be unable to continue working at LinkedIn. I believe it will be difficult for LinkedIn to find someone who could replace the value I bring to the company, both because it is difficult to find engineers with a mindset for the type of engineering infrastructure work that I do, and because there are few Hispanic engineers with my type of background.

9.     I also know that it is possible that, in addition to losing my work status, I may be deported. It is hard to imagine being removed from the United States after spending so many years here. My life is here. My community is here. Everything I have worked for, is here. I cannot control what happens with DACA, but I am using my voice to advocate for what I believe is right: allowing DACA recipients to continue working and living in the communities they call home. I also hope to encourage people in similar situations to engage in similar advocacy.

[Signature to Follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 13, 2017 in Mountain View, CA

_____
Luis Torres