**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*, <br><br>       Plaintiffs, <br><br>       v. <br><br> DONALD TRUMP, *et al.*, <br><br>         Defendants. | No. 17-cv-1907 (JDB) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, <br><br>       Plaintiffs, <br><br>       v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br>         Defendants. | No. 17-cv-2325 (JDB) |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

   I.   THESE CASES ARE NOT JUSTICIABLE ..................................................... 2

      A.   The Rescission Policy Is Unreviewable Under the APA ...................................... 2

      B.   The INA Deprives District Courts of Jurisdiction over Challenges to
          Denials of Deferred Action .................................................................................. 9

      C.   The Non-Individual Plaintiffs Lack Standing ...................................................... 11

      D.   The Non-Individual Plaintiffs Cannot Assert APA and Regulatory
          Flexbility Act (RFA) Claims .............................................................................. 13

  II.   PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW. ........................... 15

      A.   The Then-Acting Secretary Rationally Explained Her Decision to Rescind
          DACA. .................................................................................................................. 15

      B.   The Rescission is a General Statement of Policy Not Subject to the
          Requirements of Notice-and-Comment Rulemaking Procedures. ........................ 27

      C.   The Rescission Does Not Violate Equal Protection Principles. ........................... 32

      D.   The Rescission Does Not Violate Procedural Due Process Norms. ..................... 34

      E.   The Information-Sharing Policy Does Not Violate Substantive Due
          Process Norms. ..................................................................................................... 36

      F.   The Rescission Policy Does Not Violate the Regulatory Flexibility Act. ............ 39

      G.   Declaratory Judgment Is Inappropriate in these Cases. ....................................... 39

 III.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION .............. 40

      A.   Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Could Be
          Remedied By The Injunction They Seek. ............................................................. 41

      B.   The Balance of the Equities and the Public Interest Disfavor Injunctive
          Relief. ................................................................................................................... 44

      C.   Any Injunctive Relief Should Be Narrowly Drawn. ............................................ 44

CONCLUSION ................................................................................................................ 45

i

# TABLE OF AUTHORITIES

## CASES

*3883 Connecticut LLC v. District of Columbia,*
    336 F.3d 1068 (D.C. Cir. 2003) ............................................................................ 35

*Aguilar v. ICE,*
    510 F.3d 1 (1st Cir. 2007) ..................................................................................... 11

*Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO,*
    498 U.S. 517 (1991) .............................................................................................. 13

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ............................................................................ 38

*Arizona v. United States,*
    567 U.S. 387 (2012) .............................................................................................. 44

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .......................................................................... 20, 30

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .............................................................................................. 14

*Batalla Vidal v. Duke,*
    No. 16-cv-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) ................... 2, 8, 9, 11

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
    239 U.S. 441 (1915) .............................................................................................. 36

*Brady v. FERC,*
    416 F.3d 1 (D.C. Cir. 2005) .................................................................................. 26

*C&E Servs., Inc. v. Dist. of Columbia Water and Sewer Auth.,*
    310 F.3d 197 (D.C. Cir. 2002) .............................................................................. 39

*Califano v. Sanders,*
    430 U.S. 99 (1977) ................................................................................................ 15

*Calloway v. Dist. of Columbia,*
    216 F.3d 1 (D.C. Cir. 2000) .................................................................................. 32

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 41, 42

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) .............................................................................................. 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................. 15

*Consumer Energy Council of Am. v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ................................................................ 32

*Convertino v. DOJ*,
    684 F.3d 93 (D.C. Cir. 2012) .................................................................. 38

*Cox v. Louisiana*,
    379 U.S. 559 (1965) ................................................................................. 38

*Crowley Caribbean Transp., Inc. v. Pena*,
    37 F.3d 671 (D.C. Cir. 1994) .......................................................... 4, 5, 6

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) .............................................................. 14

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ................................................................................. 38

*Davis v. Fed. Elec. Comm'n*,
    554 U.S. 724 (2008) ................................................................................. 11

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ............................................................... 6, 7

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ..................................................................................... 10

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ....................................................................... 18, 19

*Evangelical Lutheran Church in Am. v. INS*,
    288 F. Supp. 2d 32 (D.D.C. 2003) .......................................................... 10

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................... 16, 17

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017), *vacated on other grounds*,
    2017 WL 4782860 (U.S. Oct. 24, 2017) ................................................. 14

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................ *passim*

*Humane Soc'y of U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ............................................................ 12, 13

*ICC v. Brotherhood of Locomotive Engineers (BLE),
　482 U.S. 270 (1987) ................................................................... 6, 8, 9

Interstate Nat. Gas Ass'n of Am.. v. FERC,
　494 F.3d 1092 (D.C. Cir. 2007) ......................................................... 12

John Doe Co. v. CFPB,
　849 F.3d 1129 (D.C. Cir. 2017) ......................................................... 43

Kadrmas v. Dickinson Pub. Sch.,
　487 U.S. 450 (1988) ...................................................................... 32

Kaempe v. Myers,
　367 F.3d 958 (D.C. Cir. 2004) .......................................................... 37

Ky. Dep't of Corrs. v. Thompson,
　490 U.S. 454 (1989) ...................................................................... 35

L. Xia v. Tillerson,
　865 F.3d 643 (D.C. Cir. 2017) ........................................................... 7

Lane v. Dist. of Columbia,
　72 F. Supp. 3d 215 (D.D.C. 2014),
　appealed, No. 15-7023 (D.D.C. argued Oct. 6, 2017) ............................... 12

League of Women Voters of U.S. v. Newby,
　838 F.3d 1 (D.C. Cir. 2016) ............................................................. 41

Lewis v. Casey,
　518 U.S. 343 (1996) ...................................................................... 45

Lincoln v. Vigil,
　508 U.S. 182 (1993) ............................................................... 4, 5, 27

Linda R.S. v. Richard D.,
　410 U.S. 614 (1973) ...................................................................... 12

Local 186, Int'l Bhd. of Teamsters v. Brock,
　812 F.2d 1235 (9th Cir. 1987) .......................................................... 13

Lujan v. Defs. of Wildlife,
　504 U.S. 555 (1992) .................................................................. 12, 31

Lujan v. Nat'l Wildlife Fed'n,
　497 U.S. 871 (1990) ...................................................................... 13

*Mada- Luna v. Fitzpatrick,
　813 F.2d 1006 (9th Cir. 1987) ....................................................... 3, 28

iv

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................ 45

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) ............................................................................ 22

*Medina v. U.S. Dep't of Homeland Sec.*,
   No. C17-0218RSM, 2017 WL 5176720 (W.D. Wash. Nov. 8, 2017) ...................................... 35

*Meina Xie v. Kerry*,
   780 F.3d 405 (D.C. Cir. 2015) ............................................................... 7

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ............................................................... 23

*Miller v. Albright*,
   523 U.S. 420 (1998) ............................................................................ 11

*Moreno v. U.S. Dep't of Agriculture*,
   413 U.S. 528 (1973) ............................................................................ 33

*\*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ................................................................. 15, 25, 26

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988) ............................................................. 30

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................... 28

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988) ............................................................... 7

*New York v. Reilly*,
   969 F.2d 1147 (D.C. Cir. 1992) ......................................................... 26, 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................ 44

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975) ............................................................... 29

*Nw. Mining Ass'n v. Babbit*,
   5 F. Supp. 2d 9 (D.D.C. 1998) ............................................................. 14

*OSG Bulk Ships, Inc. v. United States*,
   132 F.3d 808 (D.C. Cir. 1998) ........................................................... 4, 6

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
  506 F.2d 33 (D.C. Cir. 1974) ........................................................ 28

*Perales v. Casillas*,
  903 F.2d 1043 (5th Cir. 1990) .................................................... 3, 5

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ............................................................ 27, 28

*\*Plyler v. Doe*,
  457 U.S 202 (1982) ..................................................................... 32

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*,
  463 U.S. 1216 (1983) ................................................................... 32

*Raley v. State of Ohio*,
  360 U.S. 423 (1959) ..................................................................... 38

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security*,
  No. C 17-5211, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018) ........................... *passim*

*\*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) ................................................................... *passim*

*\*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ..................................................................... 24

*Richardson v. Town of Eastover*,
  922 F.2d 1152 (4th Cir. 1991) ...................................................... 35

*\*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ......................................................... 4

*\*Romer v. Evans*,
  517 U.S. 620 (1996) ..................................................................... 33

*Rusu v. INS*,
  296 F.3d 316 (4th Cir. 2002) ........................................................ 34

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
  836 F.3d 42 (D.C. Cir. 2016), *cert. denied*, 138 S. Ct. 2 (2017) .................. 38

*Sec'y of Agric. v. Cent. Roig Ref. Co.*,
  338 U.S. 604 (1950) ..................................................................... 26

*\*Syracuse Peace Council v. FCC*,
  867 F.2d 654 (D.C. Cir. 1989) ....................................................... 21

vi

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ........................................................................ 8, 18, 22

Thunder Basin Coal Co. v. Reich,
  510 U.S. 200 (1994) ............................................................................................ 10

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005) ............................................................................................ 34

Town of Chester v. Laroe Estates, Inc.,
  137 S. Ct. 1645 (2017) ........................................................................................ 45

Troy Corp. v. Browner,
  120 F.3d 277 (D.C. Cir. 1997) ............................................................................ 15

U.S. Telecom Ass'n v. FCC,
  400 F.3d 29 (D.C. Cir. 2005) .............................................................................. 39

United States v. Brignoni-Ponce,
  422 U.S. 873 (1975) ............................................................................................ 34

United States v. Merkt,
  794 F.2d 950 (5th Cir. 1986) .............................................................................. 34

*Wayte v. United States,*
  470 U.S. 598 (1985) .............................................................................................. 5

*Webster v. Doe,*
  486 U.S. 592 (1988) .............................................................................................. 9

Wilimina Shipping A S v. U.S. Dep't of Homeland Sec.,
  934 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................ 35

**STATUTES**

5 U.S.C. § 553 .............................................................................................. 27, 28

5 U.S.C. § 601 .................................................................................................... 14

5 U.S.C. § 604 .................................................................................................... 39

5 U.S.C. § 611 .................................................................................................... 14

5 U.S.C. § 701 .................................................................................................. 1, 2

5 U.S.C. § 706 .................................................................................................... 15

6 U.S.C. § 202 ...................................................................................................... 8

8 U.S.C. § 1103 ......................................................................................................... 7

8 U.S.C. § 1252 ..................................................................................... 1, 9, 10, 30

15 U.S.C. § 1392 (repealed 1994) ......................................................................... 25

49 U.S.C. § 46101 ..................................................................................................... 7

## RULES

Fed. R. Civ. P. 56 .................................................................................................... 38

## REGULATIONS

8 C.F.R. § 274a.12 .................................................................................................. 43

## OTHER AUTHORITIES

1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 (5th ed. 2010) ................................... 28

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
    https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ......................................................................................................... 29

Dep't of Justice,
    Attorney General's Manual on the Administrative Procedure Act (1947) .............................. 27

DHS, USCIS, *Frequently Asked Questions: Rejected DACA Requests Q5*,
    (Dec. 7, 2017), https://www.uscis.gov/daca2017/mail-faqs ................................................ 36, 37

Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017),
    https://www.justice.gov/opa/press-release/file/965896/download ........................................... 31
Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ........................................................................................................ 16

The White House, *Remarks by President Obama on Immigration*,
    (June 15, 2012), http://go.usa.gov/xnXFY ............................................................................. 19

USCIS.gov, *Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*,
    https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and
    %20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA
    /daca_population_data.pdf ...................................................................................................... 33

## INTRODUCTION

The Rescission Policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals (DACA), an exercise of prosecutorial discretion that, from the start, has always conferred no substantive rights and been subject to change.  The Executive's discretionary enforcement decisions, especially in the immigration context, are presumptively unreviewable and, in these cases, the Immigration and Nationality Act (INA) specifically precludes judicial review.  5 U.S.C. § 701(a)(2); 8 U.S.C. § 1252(g).  Plaintiffs fail to show that this case falls within the jurisdiction of this Court.

Even if this Court had jurisdiction, Plaintiffs have not pleaded any colorable claims. The then-Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction abruptly ending deferred action for roughly 800,000 individuals.   Plaintiffs' constitutional claims fail because they have not identified any reason to apply heightened scrutiny, nor have they plausibly alleged a protected property or liberty interest in the continuation of DACA or in the maintenance of the Department of Homeland Security's (DHS) information-sharing policy.  Accordingly, the Court should dismiss these cases or, in the alternative, grant summary judgment to Defendants.

Plaintiffs have also failed to satisfy the requirements for the issuance of a preliminary injunction.   Moreover, Plaintiffs' motion for preliminary injunction on the Administrative Procedure Act (APA) Claims is brought in the alternative to their motion for summary judgment on the same.  Plaintiffs provide no reason to delay deciding these issues on the merits, and Defendants urge the Court to either grant or deny Plaintiffs' Motion for Summary Judgment without reaching their alternative request for preliminary injunctive relief.

## ARGUMENT

### I. THESE CASES ARE NOT JUSTICIABLE

#### A. The Rescission Policy Is Unreviewable Under the APA

Then-Acting Secretary Duke's decision to rescind DACA was an exercise of enforcement authority that is committed to agency discretion and, thus, unreviewable under the APA.  Defs.' Mot. to Dismiss Or, In The Alternative, for Summ. J. (Defs.' Motion or Mot.) 14-21, ECF No. 8;[1] 5 U.S.C. § 701; *Heckler v. Chaney*, 470 U.S. 821 (1985).   Plaintiffs' contrary claim is premised on a misunderstanding of the basis for and nature of the Policy itself.[2]  Pls.' Opp. to Defs.' Mot. (Pls.' Opp.) 5-10, ECF No. 23.

In an attempt to distinguish this case from *Chaney*, Plaintiffs argue that the Rescission Policy is unlike a presumptively unreviewable non-enforcement decision, claiming that the rescission "claws back the protection from coercive removal previously afforded to [DACA recipients], and it subjects them to *new* coercive requirements."  Pls.' Opp. 6 (citing *Batalla Vidal*, 2017 WL 520116, at *11).  To the contrary, the Rescission Policy—like any decision to abandon an existing non-enforcement policy—does not, in itself, exert the agency's coercive power over any individual.   Changes in policy as to criminal prosecutorial discretion, which regularly occur

---

[1] Because Defendants' motions in the above-captioned matters presented substantially identical arguments, for ease of reference, Defendants will generally cite only to the motion filed in *Trustees of Princeton University v. United States*, 17-cv-2325, except where addressing a unique argument raised only in their Motion to Dismiss Or, In The Alternative, for Summary Judgment filed in *NAACP v. Trump*, No. 17-cv-1907, ECF No. 15 (NAACP Mot.).

[2] Plaintiffs argue that this Court should follow the court in *Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 5201116, at *9-13 (E.D.N.Y. Nov. 9, 2017), which held that a similar case challenging the Rescission Policy was justiciable.  Since the filing of Plaintiffs' motion, a court in the United States District for the Northern District of California also denied Defendants' justiciability arguments. *See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.* (*Regents*), No. C 17-5211, 2018 WL 339144, at *11-14 (N.D. Cal. Jan. 9, 2018).  Defendants respectfully submit that those decisions were incorrect for the reasons discussed *infra*.

within the U.S. Department of Justice within and between presidential administrations, have never been considered amenable to judicial review.  There is no reason to treat changes in policy as to civil enforcement discretion any differently, especially in the immigration context.  *See Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 490 (1999) (concerns about judicial review of prosecutorial discretion "greatly magnified in the deportation context").  Likewise, the availability of work authorization and advance parole are merely discretionary *consequences* of receiving deferred action under the DACA policy, the rescission of which does not impose "coercive requirements" on current or former recipients.  Pls.' Opp. 6.  In any event, the Rescission Policy does not prevent DHS officials from later exercising their delegated discretion to confer deferred action on an individual former DACA recipient.  The Secretary remains free to establish (or revoke) other deferred action policies; to grant (or deny) deferred action under other policies or no policy at all; to revoke a grant of deferred action; and to pursue removal, all in her discretion.

Accordingly, there is nothing "misguided" about *Chaney*'s application to a decision, like the Rescission Policy, to wind down an existing non-enforcement policy and replace it with true case-by-case discretion, *id.*; and in fact, both the Fifth and Ninth Circuits have recognized *Chaney*'s application to denials of discretionary relief from enforcement proceedings.  *See Perales v. Casillas*, 903 F.2d 1043, 1048 (5th Cir. 1990) (rejecting the plaintiff's claim that *Chaney*'s "narrow exception" to judicial review was inapplicable and finding decision not to grant voluntary departure and work authorization nonjusticiable); *Mada- Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("Although a determination . . . not to grant deferred action status . . . is not precisely a 'decision not to take enforcement action,'" it requires the consideration of "many of the same factors" and, thus, "the same reasoning that supported the Supreme Court's decision in

*Chaney*" also supports the conclusion "that denials of deferred action status applications are not subject to judicial review.").

In a similar vein, Plaintiffs briefly invoke *Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985), to suggest that the Rescission Policy is reviewable because, rather than adopting a policy of non-enforcement, it rescinded one. Pls.' Opp. 6. But a decision whether to retain an enforcement policy implicates all of the same considerations about agency priorities and resources that inform the decision to adopt the policy in the first instance. In *Lincoln v. Vigil*, 508 U.S. 182 (1993), for example, the agency had operated a regional service for seven years, providing important medical treatment to disabled children on which the recipients had undoubtedly come to rely. *See id.* at 185-88. But notwithstanding that reliance, because nothing in the relevant statutes constrained the Service's discretion, the Supreme Court held that the Service's decision to discontinue the program was "committed to [its] discretion." *Id.* at 194. The same is true here. By contrast, in *Robbins*— which involved a challenge to the government's decision to close a federal building it had agreed to lease out and renovate for use as a homeless shelter—the D.C. Circuit distinguished the matter from "enforcement cases under *Chaney*," and held that the relevant statute "provides sufficient guidance." 780 F.2d at 48.

Plaintiffs also argue that, because the Rescission Policy is not presumptively immune from review because it is a "general enforcement policy," as opposed to a "single-shot" enforcement decision. Pls.' Opp. 7 (first quoting *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998); then quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994)). But agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are at least as susceptible to implementation through broad guidance as through case-by-case enforcement

decisions.  *See, e.g.*, *Wayte v. United States*, 470 U.S. 598, 601-03 (1985) (discussing passive enforcement policy under which government prosecuted only those who reported themselves as failing to register for the Selective Service).  Indeed, *Chaney* itself involved a broad enforcement policy, given that the FDA concluded that, as a matter of the agency's discretion, it would categorically not enforce a provision of the Federal Food, Drug, and Cosmetic Act (FDCA) against the use of certain drugs for capital punishment when those drugs had been approved by the FDA only for other medical purposes.  470 U.S. at 824-25.  The Supreme Court nonetheless held that the FDA's decision "[g]enerally" not to pursue enforcement actions in the "area" of "unapproved use of approved drugs for human execution," *id.* at 824, was a presumptively unreviewable exercise of discretion, *id.* at 833.  Although *Chaney* concerned individuals facing lethal injection in only two states, the relief sought would have affected a broad class of alleged law violators, including entire segments of the drug market, *id.* at 824, not to mention at least "several other[]" states that had adopted the same method of capital punishment, *id.* at 823.  Likewise, *Perales* addressed a broad enforcement policy; there, the Fifth Circuit held that a class action challenge to an Immigration and Naturalization Service (INS) district office's decision not to grant pre-hearing voluntary departure and work authorization to eligible aliens for a roughly three-year period was an unreviewable exercise of agency discretion.  903 F.2d at 1046; *see also Vigil*, 508 U.S. at 184, 188 (reallocation of funds from entire regional treatment program in the Southwest to other nationwide programs unreviewable).  For purposes of the APA, the question is whether the agency's decision is inherently discretionary in nature, not the number of people to whom it applies.

The D.C. Circuit's discussion of "general enforcement polic[ies]" in cases such as *Crowley* and *OSG Bulk Ships* implicate a different legal issue.  As *Crowley* observed, general policy

5

statements are "*more likely* to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that [are] . . . peculiarly within the agency's expertise and discretion."   37 F.3d at 677 (emphasis added).   But as the previous discussion shows, that does not mean that *every* general enforcement policy rests on an agency's interpretation of a statutory command.   Accordingly, *OSG Bulk Ships* and other cases following *Crowley* have emphasized that their review was limited to the question of whether or not the agency's express statement of enforcement policy unlawfully construed a statute.   *See, e.g.*, *OSG Bulk Ships*, 132 F.3d at 812 (reviewing the agency's interpretation of section 506 of the Merchant Marine Act of 1936).   Therefore, if the agency's interpretation of a statute is embedded in a non-reviewable enforcement policy, the former may be reviewable as such.   *See, e.g.*, *Crowley*, 37 F.3d at 676–77.   It does not follow, however, that the enforcement policy itself is reviewable.   *See ICC v. Brotherhood of Locomotive Engineers* (*BLE*), 482 U.S. 270, 283 (1987).   For present purposes, the Rescission Policy does not contain an embedded interpretation of the INA (or any other statute) that would be otherwise reviewable.   Rather, it merely contains a non-reviewable decision about how DHS intends to exercise its enforcement discretion on a prospective basis.

Next, Plaintiffs, invoking *Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002), concede that the Rescission Policy was an exercise of the then-Acting Secretary's discretion, but contend that such discretion is reviewable.   Pls.' Opp. 8.   Plaintiffs, however, overstate *Drake*'s holding, which merely was that "*Chaney*'s presumption against judicial review may be rebutted . . . only if the operative statute provides clear guidelines by which to do so, or otherwise evinces an intent to constrain the [agency's] discretion."   291 F.3d at 71.   Although the D.C. Circuit found that, in light of the relevant statutory authority, the agency decision at issue was not amenable to judicial review whether *Chaney*'s presumption applied or not, *id.* at 72, it did not hold that such statutory language

set the minimum standard for determining there is no "law to apply." *Id.* at 72 (finding that statutory provision gave the FAA Administrator unfettered discretion to dismiss an administrative complaint without a hearing when she "*is of the opinion*" that it does not warrant an investigation (quoting 49 U.S.C. § 46101(a)(3))). Here, by contrast, the INA "fairly exudes deference," *id.* (citation omitted), to the Secretary of Homeland Security to, *inter alia*, enforce the INA and "all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1). Because the INA provides no standards constraining in any way the Secretary's exercise of discretion to rescind the DACA policy, there is no "law to apply" here. *See Drake*, 291 F.3d at 72.

Plaintiffs' argument also ignores the strong presumption of non-reviewability of the Executive's discretionary *enforcement* decisions. *See Chaney*, 470 U.S. at 824. In fact, the cases they cite do not involve enforcement decisions at all.[3] This suit, by contrast, involves a challenge "outside the streamlined process that Congress has designed" to the Executive's broad discretion to enforce the nation's immigration laws, the invasion of which raises "greatly magnified" concerns. *AADC*, 525 U.S. at 485, 490. Those concerns are not dispelled by the preemptive nature of this challenge: Plaintiffs seek not merely to delay the effects of DHS's enforcement decision, but to enjoin its implementation altogether. In the immigration context, however, judicial management of the Executive's enforcement discretion would prolong ongoing violations of the

---

[3] *See* Pls.' Opp. 7 (citing *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988) (involving challenge to issuance of OPM decision, through rulemaking, to except certain government jobs from the competitive civil service)); *id.* 9 n.5 (citing *L. Xia v. Tillerson*, 865 F.3d 643, 646 (D.C. Cir. 2017) (involving challenge to the administrative processes by which DHS canceled the plaintiffs' certificates of naturalization and the State Department revoked their passports); *Meina Xie v. Kerry*, 780 F.3d 405, 405 (D.C. Cir. 2015) (involving challenge to State Department's alleged delay in processing visa applications filed by Chinese nationals)).

INA in just the way that the Supreme Court has condemned.  *See id.* at 490.  And because Congress specifically entrusted the Secretary with broad discretion and authority to enforce the INA, Plaintiffs' suggestion that the then-Acting Secretary acted outside her congressionally delegated authority and that the presumption of reviewability is thus somehow higher here lacks merit.  Pls.' Opp. 9; *see* 6 U.S.C. § 202(5) (providing that the Secretary of Homeland Security "shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities").

Plaintiffs' attempt to show that there is "law to apply" to the Rescission Policy misunderstands the reasons underlying the Policy.  Plaintiffs' claim is premised on the argument that the "only asserted reason" for the Rescission Policy was "a purely legal judgment" that can be assessed by this Court.  *Id.*  However, the Policy itself makes clear that the former Acting Secretary, applying her "authority in establishing national immigration policies and priorities," relied on considerations other than DACA's legality in the abstract, such as the history of the *Texas v. United States* litigation, 809 F.3d 134 (5th Cir. 2015), her reasonable predictive judgment about the significant risk of an immediate injunction enjoining DACA, and the complexities of ending such a large-scale policy.  *See* Rescission Policy 2-4 (AR 253-55), ECF No. 8-3.  The balancing of those considerations is not amenable to review in light of the sources cited by Plaintiffs, such as statutory text, the history of the use of deferred action, and an Office of Legal Counsel (OLC) opinion.  Pls.' Opp. 9 (citing *Batalla Vidal*, 2017 WL 5201116, at *10).

Furthermore, Supreme Court precedent blocks Plaintiffs' attempt to make an end-run around the discretionary nature of the rescission decision.  *BLE* rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."  482 U.S. at 283.  Plaintiffs' only answer is their assertion that "the decision to rescind [DACA] was *not* inherently [an unreviewable] decision."  Pls.' Opp. 10 n.6 (quoting *Batalla Vidal*,

8

2017 WL 5201116, at *10).   But that is the critical issue over which the parties disagree.

Accordingly, if this Court concludes that the Rescission Policy is an unreviewable discretionary

decision to abandon a non-enforcement policy, the substantive legal reasons Plaintiffs dwell on

become irrelevant.   As the Supreme Court explained, prosecutors commonly decline to prosecute

alleged criminal violations based on substantive legal reasons, but it is "entirely clear" that the

refusal to prosecute is committed to agency discretion and not subject to judicial review, even

though courts are "well qualified to consider," for example, whether a conviction was likely or the

evidence was sufficient.   *BLE*, 482 U.S. at 283.   Likewise, the FDA's decision not to enforce the

FDCA prohibition in *Chaney* did not become reviewable even though it was based, in part, on the

agency's understanding of its authority to initiate such proceedings.   470 U.S. at 824.   In short, "it

is the [agency's] formal action, rather than its discussion, that is dispositive."   *BLE*, 482 U.S. at

281.

**B.**     **The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action**

Not only are Plaintiffs' APA claims unreviewable, but this Court independently lacks

jurisdiction over all of Plaintiffs' claims under 8 U.S.C. § 1252(g).[4]   Plaintiffs do not dispute that

Section 1252(g) eliminates federal court jurisdiction over denials of deferred action, as *AADC*

confirms.   Instead, they claim that this provision is inapplicable because they filed these challenges

to a denial of deferred action *before* the government had "commence[d] proceedings, adjudicate[d]

---

[4] Plaintiffs erroneously contend that, even if review of their APA claims is precluded, review of their constitutional claims is not foreclosed.   Pls.' Opp. 10.   Although decisions "committed to agency discretion" under the APA may nonetheless be reviewed for alleged constitutional violations, *see Webster v. Doe*, 486 U.S. 592, 602 (1988), the breadth of 8 U.S.C. § 1252(g) makes clear Congress's intent to deprive district courts of jurisdiction to review certain of DHS's enforcement decisions.   8 U.S.C. § 1252(g) (barring review "notwithstanding *any* other provision of law (statutory or *nonstatutory*)" of "*any* cause or claim" (emphasis added)).

cases, or execute[d] removal orders."  8 U.S.C. § 1252(g); *see* Pls.' Opp. 10-12.[5]

That is irrelevant.  The denial of deferred action is a step toward the commencement of removal proceedings against an alien.  And Plaintiffs cannot escape the INA's careful scheme for such proceedings simply by filing suit before the agency has initiated an enforcement proceeding against them.  Even in instances where the statutory text less clearly precludes review, the Supreme Court has held that, where it is fairly discernible that Congress intends a particular review scheme to be exclusive, a plaintiff may not circumvent that exclusive scheme by filing a preemptive district-court action, but must instead present its claims or defenses through the review scheme established by Congress.  *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 8-10 (2012); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994).  Accordingly, Plaintiffs' claims, "if they are reviewable at all," must be litigated in removal proceedings, not through "separate rounds of judicial intervention" in federal district court.  *AADC*, 525 U.S. at 485.

As a fallback, Plaintiffs contend that Microsoft and Princeton are not suing "on behalf of any alien," 8 U.S.C. § 1252(g), but to protect their own purported interests.  Pls.' Opp. 12.  But this argument only underscores why these two litigants lack standing.  *See infra* Part I.C.  If the incidental effects from the denial of deferred action to employees or students were sufficient to confer an independent, constitutionally cognizable injury on their employers or schools, Section 1252(g) would practically become a dead letter:  All an alien would need to circumvent Congress's carefully wrought review scheme would be a sympathetic school or employer to run into court.

---

[5] In pursuing this argument, Plaintiffs rely on *Evangelical Lutheran Church in America v. Immigration & Naturalization Service*, 288 F. Supp. 2d 32, 43 (D.D.C. 2003), *appeal dismissed*, No. 03-5376, 2004 WL 434067 (D.C. Cir. 2004).  Pls.' Opp. 11.  But that case involved the substantive review of INS's decision to deny an application for an extension of the plaintiff's stay on an H–1B nonimmigrant visa, 288 F. Supp. 2d at 34, not a discretionary decision to deny deferred action.

And even if Microsoft and Princeton have standing, it would elevate form over substance to conclude that their participation in this litigation—like that of the American-Arab Anti-Discrimination Committee in *AADC*—is not "on behalf" of their alien employees or students. To the extent Microsoft and Princeton would benefit from the relief sought by Plaintiffs, that benefit would be only an indirect and incidental effect of the relief for their employees or students who happen to be DACA recipients. *Cf. Aguilar v. ICE*, 510 F.3d 1, 16–17 (1st Cir. 2007) (concluding that "we must look through such easy evasions as creative labeling and consider the fundamental nature of the claims asserted," and "cannot allow collective end runs around congressional directives" such as "the INA's channeling requirements").

### C.      The Non-Individual Plaintiffs Lack Standing

Plaintiffs contend that Defendants' challenge to the non-individual Plaintiffs' standing is "irrelevant" because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Pls.' Opp. 12-13 (citation omitted). District courts routinely evaluate whether each party has standing to pursue their particular claims, as they have in other challenges to the Rescission Policy. *See, e.g.*, *Miller v. Albright*, 523 U.S. 420, 426-27 (1998) (noting petitioner's father had been a co-plaintiff raising the same claim, but that the district court dismissed him for lack of standing); *Regents*, 2018 WL 339144, at *14-17 (assessing standing for each plaintiff and claim); *Batalla Vidal*, 2017 WL 5201116, at *14-20 (same). After all, standing must be assessed on a claim-by-claim basis, *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008), and here, Defendants have moved to dismiss the particular claims and actions brought by the non-individual Plaintiffs for lack of standing. Especially given that Plaintiffs have filed two suits identifying overlapping (but not identical) claims, a claim-by-claim analysis that is appropriate here. The cases that Plaintiffs cite regarding standing generally are therefore

irrelevant.  *See* Pls.' Opp. 12.

Plaintiffs additionally fail to provide an adequate answer to either the point that the injuries suffered by the non-individual Plaintiffs merely reflect the indirect effects of federal enforcement policies or the fact that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  To the extent the rescission affects the non-individual Plaintiffs, it only does so through its potential future impact on individual DACA recipients.  Any such "regulation . . . of someone else" imposes a "substantially more difficult" jurisdictional bar which the non-individual Plaintiffs cannot meet here.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (emphasis omitted) (citations omitted).

Furthermore, the *NAACP* Plaintiffs' attempt to rehabilitate their associational standing claims fail, as these organizations have not shown that the interests they seek to protect are germane to their purpose.[6]  *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007).  The germaneness requirement mandates "that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together."  *See Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988).

Here, the *NAACP* Plaintiffs have submitted declarations describing their organizational missions of "eliminat[ing] race-based discrimination," NAACP Decl. ¶ 4 (App. 2618), Pls.' Mot. Ex. V, ECF No. 28-17, "championing fairness and economic opportunity for our members," AFT Decl. ¶ 3 (App. 2595), Pls.' Mot. Ex. R, ECF No. 28-17, and "elevat[ing] [workers] . . . by

---

[6] Plaintiffs' opposition clarifies that the *NAACP* Plaintiffs assert only associational standing, Pls.' Opp. 18. Plaintiffs do not contest (and thus concede) Defendants' point that these entities lack organizational standing.  *See Lane v. Dist. of Columbia*, 72 F. Supp. 3d 215, 219 (D.D.C. 2014) (plaintiff conceded defendants' argument in summary judgment motion by not addressing it), *appealed*, No. 15-7023 (D.D.C. argued Oct. 6, 2017).

improving their wages, hours, benefits, and working conditions," UCFW Decl. ¶ 5 (App. 2640),

Pls.' Mot. Ex. Y, ECF No. 28-17.  Despite these additional submissions, however, Plaintiffs fail

to show the relation between these organizational purposes and the subject of this suit—*i.e.*, the

Executive's exercise of prosecutorial discretion in enforcing the immigration laws.  *See Local 186,*

*Int'l Bhd. of Teamsters v. Brock,* 812 F.2d 1235 (9th Cir. 1987) (labor union's challenge to a

racketeering act disqualifying persons convicted of certain crimes from seeking employment in a

labor organization was not germane to the union's purpose).  Nor do the *NAACP* Plaintiffs identify

a "critical mass" of members whom are allegedly harmed by the Rescission Policy, a further

indication that the germaneness requirements had not been met.  *See Humane Soc'y*, 840 F.2d at

57, 58 n.21; NAACP Decl. ¶ 6 (App. 2619) (failing to identify number of members who are current

or former DACA recipients); AFT Decl. ¶ 5 (App. 2596) (same); UFCW Decl. ¶ 6 (App. 2640)

(stating "several hundred" of its 1.3 million members are DACA recipients).

### D.   The Non-Individual Plaintiffs Cannot Assert APA and Regulatory Flexibility Act (RFA) Claims

Because none of the non-individual Plaintiffs have identified interests that are arguably

protected or regulated by the INA, these entities lack a cause of action under the APA.  Claims

that their students or employees have been affected by the Rescission Policy are insufficient, as a

plaintiff cannot meet the zone-of-interests test merely by alleging that an agency has acted against

someone else's interests in a way that might indirectly affect his own.  *See Air Courier Conference*

*of Am. v. Am. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 522-31 (1991); *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  Instead, a plaintiff must show that "the [actions] in

question are *designed* to protect [or regulate] some . . . concrete interest of *his* that is the ultimate

basis of his standing." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citation omitted).  The non-individual Plaintiffs fail to meet that standard here.[7]

The *NAACP* Plaintiffs also fail to establish that they have standing to bring their RFA claims.  "[T]he language of the RFA extends standing to seek judicial review only to a 'small entity,'" as defined by the statute.  *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998). None of the *NAACP* Plaintiffs allege facts showing that they themselves are "small entit[ies]."  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id*. § 611(a)(1) (restricting judicial review to "a small entity that is adversely affected or aggrieved").  Their amended complaint contains only a single conclusory allegation that Plaintiffs fall within the statutory definition, Pls.' First Am. Compl. ¶ 79, *NAACP v. Trump*, 17-cv-1907, ECF No. 10 (*NAACP* Am. Compl.), and any factual support for that claim is missing from (and arguably contradicted by) the declarations submitted in support of their motion for summary judgment.  *See* NAACP Decl. ¶ 4 (App. 2618) ("The NAACP is the nation's largest . . . civil rights organization."); AFT Decl. ¶ 3 (App. 2595) ("The AFT is a national labor union representing approximately 1.7 million members."); UFCW Decl. ¶ 5 (App. 2639-40) ("[UFCW] is a labor organization" representing "1.3 million members ."). Plaintiffs' conclusory assertions on this score should not be assumed true on a motion to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009), nor do they support preliminary injunctive relief.

---

[7] Plaintiffs' reliance on *Hawaii v. Trump* as well as other cases and INA provisions pertaining to the issuance of visas is unpersuasive.  Pls.' Opp. 21-22 & n.13.  In *Hawaii*, the Court held that "the State's interests in student- and employment- based visa petitions for its students and faculty are related to the basic purposes of the INA" because the INA specifically provides a mechanism for such visas.  859 F.3d 741, 766 (9th Cir. 2017), *vacated on other grounds,* No. 16-1540 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017).  Because the INA does not regulate entities with respect to discretionary enforcement decisions.  Plaintiffs' interest in admitting, hiring, and retaining DACA recipients does not fall within the zone of interests protected by that statute.

## II.   PLAINTIFFS' CLAIMS FAIL AS A MATTER OF LAW.

### A.   The Then-Acting Secretary Rationally Explained Her Decision to Rescind DACA

Even if the decision to rescind DACA was subject to judicial review, it was not arbitrary and capricious.  Agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible.  Here, the then-Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling Fifth Circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A)-(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citation omitted), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency." *Id.*

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the pending *Texas* lawsuit.  Then-Acting Secretary Duke explained that, "[t]aking into consideration

the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The then-Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The former Acting Secretary was thus "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.* Contrary to Plaintiffs' assertion, there was nothing irrational about that decision or the explanation for it.

**1.** Plaintiffs first argue that Defendants "did not adequately explain their abrupt reversal of position on DACA's legality." Pls.' Mot. for Summ. J. and/or Prelim. Inj. (Pls.' Mot.) 15, ECF No. 28. But in the Rescission Policy, the then-Acting Secretary not only expressly "rescind[ed] the June 15, 2012 [DACA] memorandum," Rescission Policy 1 (AR 252), but fully explained why that policy shift was preferable. That is all the APA requires, as the Supreme Court held in *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of fleeting expletives. *Id.* at 505. The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance. *Id.* at 514. The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id.* On the contrary, the Court explained, when an agency changes course it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Here, the then-Acting Secretary's explanation was more than adequate. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id.* The former Acting Secretary fully explained that there are "good reasons" for it, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *Fox*, 556 U.S. at 515, because the then-Acting Secretary expressly "rescind[ed]" the 2012 DACA Memo. Rescission Policy 1 (AR 252). The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But here, the then-Acting Secretary's justification for the policy change was

that *controlling legal precedent* had changed:  after the DACA policy was implemented, DAPA

*and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an

equally divided Supreme Court and that necessarily applied to DACA itself.  *See infra* Part I.B.5.

It is difficult to think of a more compelling basis for a change in agency position.

Moreover, OLC's preliminary view that the proposed version of DACA would be lawful

and the arguments that the Government advanced in the *Texas* litigation do not undermine the

Government's position in this case.  The Fifth Circuit firmly rejected those views in an opinion

that was affirmed by an equally divided Supreme Court, and the Government, having exhausted

its appeal options, was bound to respect that decision given the absence of any plausible prospect

of a different result in the pending litigation.  In any case, OLC's "preliminary" conclusion was

conditioned on the proviso that "it was critical that . . . the DACA program require immigration

officials to evaluate each application for deferred action on a case-by-case basis."  OLC Op. 18

n.8 (AR 21).   Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such

discretion in practice.  *Texas*, 809 F.3d at 176.[8]

This case bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117

(2016), cited by Plaintiffs to support requiring an explanation for change in the interpretation of a

program's legality. Pls.' Mot. 14-15.  In *Encino*, the Department of Labor had long interpreted the

---

[8] The *Regents* court questioned the Fifth Circuit's conclusion that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory.  2018 WL 339144, at *20.  In particular, it pointed to a declaration submitted by DHS in *Texas* asserting that DACA was, in fact, a case-specific process under which there were "several instances of discretionary denials," *id*. (citing *Texas*, 809 F.3d at 175 (citing Decl. of Donald Neufeld)), an argument that persuaded a dissenting judge, *id*. (citing *Texas*, 809 F.3d at 210 (King, J., dissenting)).  But the Fifth Circuit majority squarely rejected the argument, concluding that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria."  809 F.3d at 175 n.140; *see also id.* at 172 n.130.  It is that holding, not the views of the dissenting panelist, to which the agency (and the district court in Texas) is now bound.

Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors."  136 S. Ct. at 2122-24.  The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift.  *Id*. at 2127.  The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved."  *Id*. at 2126.  In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended.  *Id*.

*Encino* is inapposite in every material respect.  To begin, no similarly "longstanding" reliance interests are present here.  *Encino*, 136 S. Ct. at 2126.  By its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion."  DAPA Memo 2 (AR 38).  And when he announced DACA in 2012, President Obama explained that it was "not a permanent fix" but a "temporary stopgap measure," and he urged Congress to act "because these kids deserve to plan their lives in more than two-year increments."  The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY.  Even assuming that DACA was lawful, a prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests—and certainly not beyond the stated duration (generally two years) of deferred action grants, which were not truncated by the Rescission Policy.  *See* Defs.' Mot. 38-41 (explaining why Plaintiffs fail to state a procedural due process claim).  More fundamentally, the then-Acting Secretary did not make a policy change heedless of any reliance interests, but was impelled to act by the near-certain invalidation of DACA by the courts, such that

19

her orderly wind-down process reasonably took into account any interests DACA recipients had under the circumstances.[9]

**2.**    Plaintiffs also contend that the Rescission Policy should be set aside because "Defendants' new legal position is wrong."  Pls.' Mot. 17.  This argument is mistaken for several independent reasons.

To begin, the then-Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, the assessment that it was "likely" that a legal challenge to DACA "would yield similar results" as the successful challenge to DAPA in view of the resulting Fifth Circuit precedent.   Rescission Policy 3 (AR 254) (citation omitted).   That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to sustain the agency's decision.  In particular, the Fifth Circuit affirmed the invalidation of not just DAPA, but expanded DACA, and the differences between expanded DACA and original DACA— the length of the deferred-action period and modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal rationale.

Moreover, to the extent the then-Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.   If an agency's constitutional analysis and policy judgment overlap, courts should presume an

---

[9] Equally unpersuasive is Plaintiffs' argument that the wind-down plan was inadequately explained.  Pls.' Mot. 36-38.  Given that DACA was an exercise of prosecutorial discretion, revocable at any time, that the agency could well have ended immediately, *see Arpaio*, 797 F.3d at 17, there was certainly nothing arbitrary about deciding to wind it down gradually over a two-and-a-half-year period.  If Plaintiffs were correct that it is arbitrary to allow individuals to request renewal if their DACA "expires on March 5, 2018," "while a recipient whose grant expires the next day . . . receives nothing," Pls.' Mot. 37, then the government could never set deadlines for anything; that sort of alleged "arbitrariness" is an unavoidable consequence of any deadline.

independent policy judgment, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–58 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").   Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected.   Sessions Letter (AR 251).   But those same concerns equally support a policy judgment by the then-Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits" that "Congress had not otherwise acted to provide by law."   Rescission Policy 2 (AR 253).   This Court could, therefore, sustain the Acting Secretary's decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

In any event, while this Court need not decide the issue to resolve this case in favor of the Government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*. Plaintiffs, like the court in *Regents*, argue that "DACA is a lawful exercise of the Secretary's broad statutory authority," Pls.' Mot. 18; *Regents*, 2018 WL 339144, at *17-22, repeating many of the arguments that the government pressed in the *Texas* case, *see* Pls.' Mot. 18-24.   But for better or worse, those arguments were rejected by the Fifth Circuit, whose decision was affirmed by an equally divided Supreme Court.   Thus, while Plaintiffs believe that "DHS eminently had the authority to adopt this program," Pls.' Mot. 20, the Fifth Circuit did not.

Plaintiffs offer a handful of reasons why this Court should disagree with the Fifth Circuit's decision in *Texas* and make an independent assessment of DACA's legality.   None are persuasive.

First, although *Texas* invalidated DAPA, not DACA, the Fifth Circuit also upheld the injunction of an *expanded version of DACA* itself, and there is no principled legal distinction between original DACA and expanded DACA.[10]   And as for the possibility of drawing a distinction between *DAPA* and DACA, the Fifth Circuit's decision was based on the "important similarities" between the policies.  *Texas*, 809 F.3d at 174.  As the court explained:  "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171-72; nevertheless, "there was evidence from *DACA's* implementation that [this] discretionary language was pretextual," *id.* at 173 (emphasis added).  While that finding had to be "extrapolat[ed]" to invalidate DAPA, *id.*, it *directly* dooms DACA itself—a point that the *Regents* court failed to appreciate in straining to distinguish the policies.  2018 WL 339144, at *21.  At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos.

Moreover, that eligibility for DACA, unlike DAPA, is not dependent on the immigration status of family members hardly points in favor of its legality, as Plaintiffs suggest.  Pls.' Mot. 16; *see Regents*, 2018 WL 339144, at *22 (attempting a similar distinction).  To be sure, the Fifth Circuit found DAPA unlawful in part because it was inconsistent with the INA, which already "prescribes how parents may derive an immigration classification on the basis of their child's status."  *Texas*, 809 F.3d at 186.  But if DACA has "no such analogue in the INA," *Regents*, 2018 WL 339144, at *22, then it is on even shakier—not firmer—ground than DAPA.  *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[W]here a statute expressly provides a

---

[10] Plaintiffs' suggestion that the Fifth Circuit's decision should be distinguished based on the number of DAPA and DACA recipients is not rooted in legal doctrine. *See* Pls.' Mot. 26-27.  In any event, there can be no dispute that DACA, like DAPA and expanded DACA, is a policy of "vast 'economic and political significance,'" to which the Fifth Circuit's reasoning would apply. *Texas*, 809 F.3d at 183 (citations omitted).

particular remedy or remedies, a court must be chary of reading others into it"—a "presumption that . . . is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." (citations omitted)).  In any event, the basis of the Fifth Circuit's decision was not the existence of a particular statutory pathway to lawful presence, but the "specific and intricate provisions" of the INA as a whole addressing discretionary relief.  Those provisions no more include DACA recipients than those of DAPA (or expanded DACA).

**3.**  Plaintiffs incorrectly assert that the Rescission Policy was based on a "purely legal" determination that DACA was unlawful, Pls.' Mot. 13, and falsely claim that "litigation risk" is simply a *"post*[-]*hoc* rationalization."  *Id.* at 28.  The notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is refuted by the record, and the court in *Regents* erred in concluding otherwise.  The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the then-Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA.  Rescission Policy 3-4 (AR 254-55) (quoting Sessions Letter (AR 251)).  Thus, the *Regents* court was simply wrong to assert that "[n]owhere in the administrative record did the Attorney General or the agency consider . . . litigation risk."  2018 WL 339144, at *23.

Plaintiffs' contention that it is arbitrary and capricious for litigation risk to inform an agency's decisionmaking is equally mistaken. These cases do not present a situation in which a "litigation risk argument could be used to justify any legal conclusion."  Pls.' Mot. 30.  Unlike in

23

*Mexichem Specialty Resins, Inc. v. Environmental Protection Agency*, 787 F.3d 544 (D.C. Cir. 2015), the then-Acting Secretary did not attempt to "circumvent the rulemaking process"—which was not required in any event—"through litigation concessions." *Id*. at 557.  On the contrary, DHS vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court. Having lost that battle, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate.  Far from end-running the APA, DHS has declined to frontally assault the courts.  That is commendable, not irrational.

The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison.  There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants.  *Id*. at 562. The city faced potential litigation either way:  If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit.  *Id*. at 562-63.  Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so.  *Id*. at 585.  If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone.  And here, there was far more than a "strong basis" for the then-Acting Secretary to believe that

continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point. [11]

Plaintiffs' suggestion that *State Farm* requires agencies considering litigation risk to conduct a formal cost benefit analysis is based on a misreading of the case. *State Farm* does not require a cost benefit analysis irrespective of the statutory text. Rather, in that case, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994)). Accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id*. at 54.

**4.** Finally, Plaintiffs contend that, in adopting the Rescission Policy, the then-Acting Secretary "fail[ed] to consider [all] relevant factors" to the decision—specifically, the economic effects of rescission and its consequences for DACA recipients. Pls.' Mot. 37-38 (quoting *State Farm*, 463 U.S. at 42-43) . For starters, this argument fails to reckon with the reality—referenced in the former Acting Secretary's memo—that continued litigation would, in all likelihood, have led to an abrupt, complete, and court-ordered end to DACA. Indeed, the then-Acting Secretary's decision to opt instead for an orderly wind-down of the policy likely ameliorated, rather than exacerbated, the effects about which Plaintiffs complain, as she was fully aware. Thus, the then-Acting Secretary cannot fairly be said to have inadequately weighed other "programmatic objectives . . . [or] reliance interests" against the obvious litigation risk, *Regents*, 2018 WL 339144, at *24, as the APA did not require her to ponder how to prevent the unavoidable, *see State Farm*,

---

[11] Plaintiffs also incorrectly second-guess the then-Acting Secretary's conclusion that the threatened litigation would not have resulted in an immediate and complete injunction. Pls.' Mot. 33-34. That Plaintiffs disagree with her predictive assessment of the outcome of an impending challenge to DACA does not render her judgment arbitrary and capricious as a matter of law.

463 U.S. at 43 (an agency must simply "examine the relevant data and articulate a satisfactory explanation for its action").

Moreover, the Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to request employment authorization" documents, enabling them to work lawfully in the United States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy, *id.* at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a half years. It was such considerations—*i.e.*, the "complexities associated with winding down the program," *id.*—that influenced her to allow DACA to sunset over a number of years, rather than abruptly end the policy herself or under court order. That these factors did not upend her ultimate decision to rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in the face of the *Texas* litigation would have been quixotic rather than rational.

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, the [agency] is free to exercise [its] discretion in this area." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611-12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's recognition that they involve "wide areas of judgment and therefore of discretion"). Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831. Indeed, the original DACA memorandum providing for the granting of deferred action expressly stated that it "confer[red] no

26

substantive rights." DACA Memo 3 (AR 3).  Thus, Congress has not instructed the agency to give

the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all.  That

they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no

reason to disturb the agency's decision, especially given their futility in this context.  *See, e.g.*,

*Reilly*, 969 F.2d at 1150.

> **B.     The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures**

Plaintiffs cannot succeed in arguing that DHS was required to engage in full notice-and-

comment rulemaking procedures before rescinding the DACA policy.  The APA generally requires

an agency to follow notice-and-comment procedures before promulgating rules.  5 U.S.C. §

553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015), but exempts "general

statements of policy" from that requirement unless another statute provides otherwise, 5 U.S.C. §

553(b)(3)(A), and none does here.  The Rescission Policy is exempt from the APA's notice-and-

comment requirements because it is a general statement of policy regarding how DHS will exercise

its enforcement discretion under the INA.  In attempting to recast the Rescission Policy as a

substantive rule, as opposed to policy guidance, Plaintiffs mischaracterize both the nature of the

rescission and its effect on the availability of deferred action.  Indeed, the court in *Regents* recently

dismissed identical notice-and-comment (and RFA) claims on this ground.  *See* Order Granting in

Part Defs.' Mot. to Dismiss 3, *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, No. 17-cv-5211

(N.D. Cal. Jan. 12, 2018), ECF No. 239 (*Regents* Jan. 12, 2018 Order) ("[T]he rescission

memorandum is a general statement of policy.").

General statements of policy "advise the public prospectively of the manner in which the

agency proposes to exercise a discretionary power."  *Vigil*, 508 U.S. at 197 (quoting Dep't of

Justice, Attorney General's Manual on the APA 30 n.3 (1947)).  They "serve a dual purpose": both

to "inform[] the public concerning the agency's future plans and priorities for exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in the field, who are required to implement . . . policies and exercise . . . discretionary power in specific cases." *Mada-Luna*, 813 F.2d at 1013.  And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979).  In other words, an "agency action that . . . would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).  The APA generally leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b).  If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion.  Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831.  Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties.  And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

Applying these principles, the Rescission Policy can only be viewed as a general statement of policy.  Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures.  *See* Andorra Bruno et al., Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13, 2012),   https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf.  Plaintiffs offer no good reason for treating the Rescission Policy differently.

The text of the Rescission Policy reinforces the point again and again.  It is a "memorandum."  Rescission Policy 1 (AR 252).  The then-Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities."  *Id*. at 4 (AR 255).  It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis.  *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [*i.e.*, legislative rules] are directed primarily at the public in an effort to impose obligations on them." (emphasis added and internal citation omitted)).  The Policy does not act to immediately deprive any current DACA recipients of their deferred action, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis."  Rescission Policy 4 (AR 255).  It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement . . . prerogatives," *id.* at 5 (AR 256).  It "does not . . . create

any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* And no alien

has an enforceable right to obtain deferred action under DACA or any other policy regardless. *See*

8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 485. Deferred action "remains discretionary and

reversible," *Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted

without "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory*

*Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).

Plaintiffs' attempt to portray the Rescission Policy as a substantive rule is unpersuasive.

They first argue that deferred action is no longer available to DACA recipients, Pls.' Mot. 39-40,

but this mischaracterizes the nature of DACA rescission and the availability of deferred action

generally. Deferred action was available on a discretionary basis before the DACA policy (albeit

on a more limited and case-specific basis), and it remains available today. DACA is not the only

manner by which individuals obtain deferred action, as the long history of similar policies evinces.

That a particular policy permitting a class of individuals to seek deferred action based on certain

criteria is being rescinded does not mean that DHS officials are prohibited from later extending

that deferred action on an individualized basis to persons regardless of if they are former DACA

recipients, and nothing in the Rescission Policy indicates otherwise.

Plaintiffs also assert that, officials are prohibited from granting deferred action "based on

DACA's threshold criteria," *id.* at 40, but that is untrue. In fact, nothing in the Rescission Policy

prevents DHS officials from exercising their pre-existing (and still-existing) discretion to confer

deferred action on an individual former DACA recipient, or even upon groups of former DACA

recipients, under any particular criteria. In short, the Rescission Policy does not bind regulated

parties or the courts in any way; it is an announcement of the manner in which DHS currently

intends to exercise its prosecutorial discretion on a prospective basis. It does not even "bind" DHS

in any meaningful sense; the Rescission Policy reflects nothing more than DHS's return to true case-by-case adjudication of requests for deferred action.[12]

Moreover, it is common for senior prosecutors to set bright-line policies directing the exercise of discretion by individual prosecutors.  For example, the "passive enforcement policy" adopted by the Attorney General and approved in *Wayte*, limited the discretion of prosecutors to pursue charges against those who had not self-reported their violation of the law.  And earlier this year the Attorney General issued a memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more lenient policies.  *See* Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download.  If enforcement policies lacking an *additional* layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.

Plaintiffs' argument is nonsensical for the additional reason that, if winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  But because the DACA Memo itself was not adopted through notice and comment, on Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without any remedy.  Plaintiffs essentially ask this Court to strike down the rescission of DACA on a legal theory that would immediately thereafter *compel* the rescission of DACA.  As explained in Defendants' motions to dismiss, that is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" (citation omitted)).[13]

---

[12] For the same reasons, DACA's rescission does not have the "present binding effect" of barring DACA recipients from requesting deferred action in the future. Pls.' Mot. 40.

[13] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were

### C.        The Rescission Does Not Violate Equal Protection Principles

Plaintiffs fail to state an equal protection claim.  Plaintiffs have neither alleged a suspect class or facts implicating a fundamental right, nor explained how the Rescission Policy fails to meet the deferential standard for rational basis review.  Instead, Plaintiffs conjure up their own heightened scrutiny standard at "the intersection of two equal protection principles."  Pls.' Opp. 25.  Although it is unclear what the implications of this alleged "intersection" are, according to Plaintiffs, these principles "require[] Defendants to advance a robust justification" for the Rescission Policy.  *Id.*  Plaintiffs' arguments for heightened scrutiny are unavailing, and the Rescission Policy easily survives rational basis review.

*Plyler v. Doe* thus explicitly addressed the unique context of public education—a subject about which the Rescission Policy is silent.  *See* 457 U.S. 202, 221-23 (1982) (discussing the "pivotal role" of public education).  Plaintiffs' argument that *Plyler* should be read more broadly to include any situation that impacts the ability to seek employment or access higher education is directly controverted by subsequent Supreme Court and D.C. Circuit rulings making clear that "the Supreme Court limited *Plyler* to its facts."  *Calloway v. Dist. of Columbia*, 216 F.3d 1, 7 (D.C. Cir. 2000); *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 459 (1988) ("We have not extended [the holding of *Plyler*] beyond the 'unique circumstances,' *id.*, at 239 (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales,' *id.*, at 243 (Burger, C.J., dissenting).") (quoting *Plyler* 457 U.S at 239, 243).  Before and after the creation and rescission of DACA,

---

defective in some respect."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).  That holding, however, concerned the rescission of a rule, promulgated after notice and comment, which was allegedly defective on other grounds—not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445-46.  If an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

minors without lawful immigration status (including but not limited to DACA recipients) may seek a public education, and states that deny them that right may run afoul of *Plyler*.  But there is simply nothing in *Plyler* that has anything to say about the actual enforcement (or lack thereof) of the federal immigration laws, or about how DHS exercises prosecutorial discretion.[14]

Second, Plaintiffs argue that *Romer v. Evans*, 517 U.S. 620 (1996), mandates heightened scrutiny in this case.  As a threshold matter, even if the facts of the cases were analogous, *Romer* cannot possibly mandate the application of heightened scrutiny here because it was, itself, a rational basis review case.  *See id.* at 631-32 (holding that the law at issue "fails . . . even this conventional inquiry" of whether the law "bears a rational relation to some legitimate end."). Instead, *Romer* stands for the unremarkable proposition that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."  517 U.S. at 634-35 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).  But that principle has no applicability here, as applied to a government action that is neutral on its face, and as applied to governmental action that is warranted by (at an absolute minimum) "legitimate public policies which justify the incidental disadvantages they impose on certain persons," *id*. at 635—such as DHS's rational desire to avoid massive litigation risk and an immediate nationwide injunction shutting down DACA entirely.

---

[14] In all events, *Plyler* would be inapplicable to DACA recipients who are *not* children—which includes the vast majority of DACA recipients.  As of September 4, 2017, approximately 0.3% of DACA recipients were under the age of 16; 28.5% were between the ages of 16 and 20; 36.7% were between 21 and 25; 23.7% were between 26 and 30; and 10.9% were between 31 and 36. The median age was 23, and the interquartile range was 20 to 27 years old.  USCIS.gov, *Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat ion%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.  And the fact that all DACA recipients *used to be* children cannot justify any special constitutional treatment; all of us *used to be* children.

Plaintiffs' reliance on these inapposite cases evidence their understanding that rational basis review is appropriate.  For the reasons stated above, *supra* II.A, the Rescission Policy is rationally related to a legitimate state interest.  In any case, even if some form of heightened scrutiny did apply, the orderly and lawful enforcement of the immigration laws is a compelling state interest. *See, e.g.*, *United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975) (public interest demands effective measures to prevent illegal entry of aliens); *Rusu v. INS*, 296 F.3d 316, 321 (4th Cir. 2002) (recognizing that, "[b]ecause of the Government's compelling interest in controlling immigration," due process requirements may be relaxed in immigration context).

### D.     The Rescission Does Not Violate Procedural Due Process Norms.

Plaintiffs' procedural due process claim fails because Plaintiffs still have not identified a protected liberty or property interest. [15]  Plaintiffs admit that individuals without DACA do not have a protected interest in applying for DACA, but argue that individuals who have been granted DACA have a protected interest in renewing their DACA.  Pls.' Opp. 27-28.  The ability to renew DACA is not a protected entitlement because "government officials may grant or deny it in their discretion."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted).  For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v.*

---

[15] To the extent Plaintiffs argue that DACA recipients have a protected interest in the continued effect of their DACA during the time period for which it was conferred, Defendants maintain that such a protected interest does not exist, as deferred action under DACA may be terminated at any time for any reason, *see* Defs.' Mot. 38-41.  However, Defendants need not address this argument as no Plaintiff had their DACA terminated during the time period for which it was conferred, and thus, Plaintiffs do not have standing to pursue this claim.

*Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted).   Plaintiffs have identified no such

"explicitly mandatory language" controlling the renewal of DACA.   *Id.*; *see also Regents* Jan. 12,

2018 Order at 5 (noting that there is no "protected interest in the *renewal* of DACA and its

associated benefits").   Moreover, *Richardson v. Town of Eastover*, 922 F.2d 1152 (4th Cir. 1991),

the single case identified by Plaintiffs where a court found a protected interest in the renewal of a

benefit, is inapposite.[16]   The court in that case based its holding on the fact that there were mutual

expectations between the parties, a statutory requirement of cause, and a history of renewal at least

six times, none of which are circumstances that exist with respect to the renewal of DACA.   *See*

*id.* at 1157; *see also Regents* Jan. 12, 2018 Order at 6 (finding that there was no mutually held

belief of entitlement to DACA renewal between DACA recipients and the Government).

For the same reasons that DACA recipients do not have protected constitutional interests

in their DACA, *see* Defs.' Mot. 38-41, the indirect and ancillary consequences that Plaintiffs

identify as flowing from DACA are not protected liberty and property interests.   That DACA

recipients may enjoy work authorization and access to certain federal benefits as a result of their

DACA—under separate and pre-existing regulations that are generally not at issue in this case—

does not change the fact that the grant of DACA is a discretionary decision and does not confer

any constitutionally protected entitlement.   Moreover, as DACA recipients have no protected

---

[16] The other cases that Plaintiffs rely on to support its position that DACA recipients have a protected interest in renewal of their DACA are also inapposite, as they concern the revocation of benefits during the time period for which they were conferred. *3883 Connecticut LLC v. Dist. of Columbia*, 336 F.3d 1068, 1072-73 (D.C. Cir. 2003) (concerning revocation of building permit already granted); *Wilimina Shipping A S v. U.S. Dep't of Homeland Sec.*, 934 F. Supp. 2d 1, 17 (D.D.C. 2013) (concerning revocation of shipping compliance certificated during two year period while it was in effect); *Medina v. U.S. Dep't of Homeland Sec.*, No. C17-0218RSM, 2017 WL 5176720, at *9 (W.D. Wash. Nov. 8, 2017) (concerning revocation of DACA during the period of deferred action).

interest in their DACA or the ability to renew DACA, it is inconceivable that the non-individual Plaintiffs could have such interests.

In any event, even accepting the flawed premise that DACA (or any related downstream benefits that might accrue to DACA recipients) creates some constitutionally protected interest, Plaintiffs do not contest that individualized process is not required for the kind of broad agency action exemplified by the Rescission Policy. *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915); Pls.' Opp. 32. Instead, Plaintiffs contend only that Defendants should have provided an opportunity for notice and comment. For the reasons set forth *supra* II.B, the Rescission Policy is not a substantive rule that requires notice and comment. Thus, Plaintiffs have failed to identify any process that Defendants were constitutionally required to provide.

### E.   The Information-Sharing Policy Does Not Violate Substantive Due Process Norms

Plaintiffs have failed to state a due process claim relating to DHS's information-sharing policy and thus have failed to show a substantial likelihood of success on the merits regarding the same. This claim fails, among other reasons, for the simple reason that DHS's information-sharing policy has not changed. Plaintiffs' attempt to characterize the policy differently is unpersuasive. The Rescission Policy says nothing about, and makes no changes to, DHS's information-sharing policy. Rescission Policy (AR 252-56). And DHS recently and publicly confirmed that "[t]his information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." DHS, USCIS, *Frequently Asked Questions: Rejected DACA Requests* Q5 (Dec. 7, 2017), https://www.uscis.gov/daca2017/mail-faqs (Dec. 7, 2017 FAQs).

Plaintiffs quote selected portions of older FAQs that were issued with the rescission of DACA, which confirm that, unless certain exceptions are satisfied, DACA information "will not

be *proactively* provided to ICE and CPB for the purpose of immigration enforcement proceedings." Compl. ¶ 51, *Trs. of Princeton v. United States*, No. 17-cv-2325, ECF No. 1 (*Princeton* Compl.) (quoting DHS, *Frequently Asked Questions: Rescission of DACA* (Sept. 5, 2017) (hereinafter Rescission FAQs)).   But that was true when the DACA policy was first announced in 2012, and it remains true today, notwithstanding Plaintiffs' unwarranted alarm about the adverb "proactively."   In any event, to the extent that prior FAQs created any confusion, more recent FAQs unequivocally confirm that the policy "has not changed in any way since it was first announced." Dec. 7, 2017 FAQs No. 5.   Plaintiffs' allegations to the contrary are not entitled to the presumption of truth in the face of judicially noticeable documents that confirm their falsity. *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (noting that the court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice" (citation omitted)).

Moreover, even if DHS *had* modified that policy, the policy has always explicitly noted that it "may be modified, superseded, or rescinded at any time" and that it creates no legal rights. DHS, *FAQ: Rescission of DACA* Q19.   Plaintiffs attempt to skate around this language by characterizing it as a "reservation" intended to "obviate substantive legal rights conferred by [DHS's] initial representations." Pls.' Mot. 50 n. 22. But Plaintiff fails to identify these "initial representations." *Id.* DHS has always advised that the information-sharing policy may be changed at any time, including in the instructions for completing the form used by individuals seeking DACA status, which is referenced in Plaintiffs' complaints.   *See NAACP* Am. Compl. ¶ 27; *Princeton* Compl. ¶ 33 n. 25.   Those instructions state, right under the statement of USCIS's information-sharing policy, that the policy "may be *modified, superseded, or rescinded at any time without notice*, [and] is not intended to, does not, and may not be relied upon to create any right or

benefit, substantive or procedural." USCIS Form I-821D at 13 (emphasis added), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf. Because DACA recipients were notified from the very start that the information-sharing policy was subject to change, a subsequent change would not be "so egregious" and "outrageous" as "to shock the contemporary conscience," and thus does not rise to the level of a substantive due process violation.[17] *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). Plaintiffs' reliance on *Cox v. Louisiana*, 379 U.S. 559 (1965) and *Raley v. State of Ohio*, 360 U.S. 423 (1959) is misguided.[18]

Plaintiffs attempt to paint this disclaimer as boilerplate language should be disregarded by the Court. But the cases that Plaintiffs rely on arose in different circumstances, when the agencies were avoiding notice and comment on a substantive rule by warning that further guidance may be issued in the future. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000); *Scenic Am., Inc. v. U. S. Dep't of Transp.*, 836 F.3d 42 (D.C. Cir. 2016), *cert. denied*, 138 S. Ct. 2 (2017). Were this Court to extend the holdings of those cases to apply when an agency provides notice that it may change its policy in the future, an agency could never change its policy without violating

---

[17] Plaintiffs include a passing allegation, in a footnote, that "discovery … is necessary to properly adjudicate Plaintiffs' information-sharing claim" and thus "summary judgment on [that] claim is premature." Pls.' Opp. 34 n.24. Plaintiffs, however, make no attempt to explain *why* such discovery is necessary and to meet the stringent requirements of Rule 56(d), which alone warrants rejection of this argument. *See* Fed. R. Civ. P. 56 (d) ("nonmovant [must] show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Discovery on how DHS has or will "implement" the information-sharing policy would, in fact, be pointless to opposing the threshold *legal* arguments raised in Defendants' dispositive motions. As explained above, Plaintiffs' due process claims with respect to information-sharing fail *as a matter of law*. *See Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012) (A party seeking additional discovery must "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation.").

[18] In those cases, the Court overturned the criminal convictions of individuals who relied on express representations from law enforcement officers that their conduct was lawful when it was actually prohibited by criminal statute. *See Cox*, 379 U.S. at 571; *Raley*, 360 U.S. at 426. Even if DHS were to change its information-sharing policy, there is no legal consequence, such as a criminal conviction, that would necessarily flow to a DACA recipient.

the substantive due process rights of an individual.  Surely that is not the law.  The information-sharing policy at issue in this case has not changed, and Plaintiffs' unsupported speculation about future conduct is insufficient to state a claim for violation of substantive due process.

### F.     The Rescission Policy Does Not Violate the Regulatory Flexibility Act

Plaintiffs' RFA claims fail for the same reasons as their notice-and-comment claims.  *See supra*, II.B.  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "[w]hen an agency promulgates a final rule under section 553 of . . . title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required.  Because those procedures were not required here, the RFA is inapplicable.

### G.     Declaratory Judgment Is Inappropriate in these Cases

Plaintiffs are not entitled to a declaratory judgment that DACA is "lawful." In arguing that an actual and substantial controversy over the lawfulness of the policy exists, *see* Pls.' Opp. 36–37, Plaintiffs ignore black-letter law holding that the Declaratory Judgment Act provides only a remedy—not a source of rights independent of substantive federal law. *C&E Servs., Inc. v. D.C. Water and Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Comm. on Judiciary, U.S. House of Representatives*, 558 F. Supp. 2d 53, 83-84 (D.D.C. 2008) ("[Plaintiff] must . . . identify a judicially remediable right that may be enforced through the DJA.").  Plaintiffs fail to identify any *remediable* right.  Plaintiffs seek declaratory judgment that DACA is lawful as a corollary to their APA claim that the rescission of DACA was arbitrary and capricious.  As explained *supra* Part I.A-B, however, the Rescission Policy is an unreviewable exercise of discretionary enforcement and is barred by the INA.  Because Plaintiffs' APA claim is not reviewable by this court, Plaintiffs

have also failed to identify the predicate remediable right in their claim for declaratory judgment. Moreover, Plaintiffs' failure to identify any cause of action underlying their request for a declaratory judgment is thus fatal. And any determination by this Court that DACA were, in fact, lawful, would have little effect given that the decision to rescind DACA was based on the litigation risk that DHS was then confronting. In other words, any declaratory judgment that this Court might issue would provide no actual benefit to Plaintiffs because the controversy in this lawsuit concerns whether the then-Acting Secretary's decision to rescind DACA was arbitrary and capricious.

## III.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

Plaintiffs concede that at least their APA claims can and should be resolved now on the merits, and each party has filed a dispositive motion encompassing those issues.  Nonetheless, Plaintiffs seek a preliminary injunction "in the alternative" "to the extent the Court wishes to see" how discovery and record supplementation issues in DACA-rescission cases pending in other jurisdictions are resolved.  Pls.' Mot. 3 n.1.  Yet, Plaintiffs have not challenged the completeness of the record in these matters and, in any event, the discovery and administrative record issues in other DACA-rescission cases have largely been stayed by the courts, or all parties have agreed to stay their obligations, in light of Defendants' pending requests for appellate review by the Second Circuit, Ninth Circuit, and Supreme Court.  Plaintiffs have, thus, provided no reason to delay deciding these cases on the merits, and the Court need not address their alternative request for preliminary injunctive relief.

Even if the Court were to entertain their request, Plaintiffs have not demonstrated any reason for the Court to invoke its emergency powers here.  For the reasons explained above, Plaintiffs cannot establish a likelihood of success on the merits of their APA claims because those claims are not justiciable, *see supra* Part I, and fail to state a claim upon which relief can be granted, *see supra* Part II. Moreover, Plaintiffs cannot prevail on their information-sharing claim because

the Government has not changed its policy and because there is no due-process right to prevent the Government from changing a policy that always has been subject to change, *see supra* Part II.E. But even putting aside these hurdles, the other preliminary injunction factors also weigh against temporary injunctive relief—especially now that the United States District Court for the Northern District of California has ordered DHS to provide nearly all the relief that Plaintiffs here request. This Court need not and should not enter a legally unwarranted and factually unnecessary preliminary injunction.

### A. Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Could Be Remedied By The Injunction They Seek

A preliminary injunction is "an extraordinary remedy" that requires a movant to meet "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To make this showing, Plaintiffs must demonstrate actual harm that is "so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (internal citation and alteration omitted). The harm must also be "*beyond remediation*." *Id.* (quoting *Chaplaincy*, 454 F.3d at 297). "Bare allegations of what is likely to occur are of no value since … [t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Plaintiffs have not met their burden to establish irreparable harm that could possibly be remedied by preliminary relief. Plaintiffs first point to alleged emotional harms stemming from "an existence defined by uncertainty." Pls.' Mot. 42. But the uncertainty faced by DACA recipients cannot be remedied by a *temporary* injunction, which would dissolve upon the conclusion of these lawsuits. Only Congress can provide the certainty and stability that Plaintiffs seek, in the form of

a permanent lawful immigration status. For the same reason, the fact that DACA recipients may be "forced to make decisions that have life-altering personal and professional consequences," such as choices related to graduate school and career options, *see id.* at 42–43, will not be resolved by provisional relief, given that such relief will remain in place only during the pendency of this litigation.

And under current circumstances, the harms identified are neither certain nor imminent: Although Plaintiffs point to seven individuals whom, they contend, face uncertain futures should they lose work authorization, they fail to point to any individual recipient who faces *imminent* expiration of their DACA status. *See* App. 59–61 (no expiration given for Perales Sanchez's DACA); App. 2634–35 (same for Jane Doe No. 5); App. 2604 (Jane Doe No. 2's DACA expires August 2018); App. 2650–51 (Jane Doe No. 6's DACA expires April 2019); App. 2615 (no expiration given for John Doe No. 3); App. 2628 (same); App. 2671 (Jane Doe No. 9's DACA expires April 2019). None of the individuals Plaintiffs point to are likely to lose their DACA or work authorization while a preliminary injunction would be in place. Plaintiffs likewise cannot demonstrate irreparable harm justifying their request for an injunction prohibiting future changes to the Government's information-sharing policy. "Such an injury is far too speculative to warrant preliminary injunctive relief," *Chaplaincy*, 454 F.3d at 298. And Plaintiffs themselves recognize that the "[r]epresented recipients" will not begin to lose their DACA until August 2018, meaning that these cases may very well have been fully litigated to final judgment before any alleged harms come to pass (even ignoring the fact that the preliminary injunction already entered in the Northern District of California allows all of these individuals to seek another two-year renewal of their DACA).

Plaintiffs also cite a variety of alleged harms related to the potential loss of work authorization for DACA recipients. For example, Plaintiffs reference alleged harms to Microsoft stemming from the "costs and disruptions imposed by the need to identify, recruit, hire, train, and integrate new employees," Pls.' Mot. 43; Princeton University's loss of "its own investments to prepare DACA recipients for lives 'in the nation's service and the service of humanity,'" *id.* at 44; the loss to NAACP of the value of the training it has provided to its DACA members, *id.*; and the loss of DACA-recipient union members to Plaintiffs AFT and UFCW, *id.*

These allegations ignore the fact that "economic loss does not, in and of itself, constitute irreparable harm," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). But even accepting all of these facts as true and that all of those harms truly are irreparable, none of these alleged harms are imminent, or even likely, given the preliminary injunction recently issued in the Northern District of California litigation.[19] That order requires DHS to permit individuals who previously have been granted DACA to submit new renewal requests, and to process those requests. If DHS determines that the requestor qualifies for a renewal, those individuals also may receive new work authorizations, *see* 8 C.F.R. § 274a.12(c)(14), and the harms about which Plaintiffs are concerned simply would not come to pass. As noted above, the Government is already fully complying with the injunction entered in *Regents*.  Because Plaintiffs' alleged harms *already* have been prevented by another court, they provide no basis for granting the request for injunctive relief here.

---

[19] Although the Government believes that the *Regents* order (No. C 17-5211, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018)) is erroneous, it is not seeking a stay of that order pending appeal.

### B.  The Balance of the Equities and the Public Interest Disfavor Injunctive Relief

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion. These factors merge when the Government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this country. *Arizona v. United States*, 567 U.S. 387, 394 (2012). This includes significant discretion as to whether, and under what circumstances, to exercise prosecutorial discretion with respect to individuals without a lawful immigration status, including through a grant of deferred action. The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief from the harms identified by Plaintiffs for the reasons discussed above—especially now that DHS is already subject to a similar preliminary injunction. Indeed, in arguing that the public interest favors injunctive relief, Plaintiffs point to alleged long-term harms to the nation's economy, national defense, health-care markets, and law-enforcement interests—all macro policy concerns which fall within the province of the Executive Branch, not this Court. Accordingly, this factor weighs against granting these Plaintiffs an additional injunction.

### C.  Any Injunctive Relief Should Be Narrowly Drawn

This Court should deny Plaintiffs' request for injunctive relief (both preliminary and permanent) in its entirety. If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' request to enjoin the rescission of DACA nationwide. Pls.' Mot. 47. Such relief clearly would be overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not addressed in Plaintiffs' motion. Constitutional and equitable

principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). The remedy sought must therefore "be limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Accordingly, any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction. At a minimum, this would require that any injunction sweep no broader than the one already ordered by the District Court in the Northern District of California, which, although overbroad itself, recognized some important limitations: that "new applications from applicants who have never before received deferred action need not be processed," that "the advance parole feature need not be continued for the time being for anyone," and that "defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Regents*, 2018 WL 339144, at *27.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motions to Dismiss or, in the Alternative, Summary Judgment, and deny Plaintiffs' Motion for Summary Judgment and/or Preliminary Injunction.

Dated: January 22, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Principal Deputy Assistant Attorney General

                                           JESSIE K. LIU
                                           United States Attorney for the District of Columbia

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           */s/   Rachael L. Westmoreland*
                                           RACHAEL L. WESTMORELAND (GA Bar. No.
                                           539498)
                                           KATE BAILEY
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue NW
                                           Washington, DC 20530
                                           Phone: (202) 514-1280
                                           Fax: (202) 616-8470
                                           Email: rachael.westmoreland@usdoj.gov

                                           *Counsel for Defendants*