## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION** |
| Plaintiffs, | Civil Action No. 17-cv-1907 |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, KRISTJEN NIELSON, in her official capacity as Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA, | |
| Defendants. | |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ, | Civil Action No. 17-cv-2325 |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and KRISTJEN NIELSON, in her official capacity as Secretary of the Department of Homeland Security, | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

I.    The Rescission Is Subject to Judicial Review .................................................. 1

    A.    Judicial Review Is Not Precluded by *Heckler v. Chaney*. ........................... 1

    B.    Defendants Cannot Rebut the Strong Presumption of Reviewability .................... 4

    C.    The Non-Individual Plaintiffs Have Standing. ....................................... 7

    D.    The Non-Individual Plaintiffs Have a Cause of Action Under the APA. ............... 8

II.   The Rescission of DACA Is Arbitrary and Capricious ........................................ 9

    A.    Defendants' Explanation of the Rationale for Rescission Is Inadequate ............ 10

    B.    DACA Is Legal. .................................................................. 13

    C.    Defendants' "Litigation Risk" Defense Is Illegitimate and Wrong. ................. 17

III.  The Rescission of DACA Required Notice and Comment ....................................... 19

    A.    The Rescission Memorandum Is a Substantive Rule .................................. 19

    B.    If the Court Accepts Defendants' View of DACA, It Necessarily Follows That the Rescission Memorandum Required Notice and Comment .............................. 22

IV.   Plaintiffs Are Entitled to Relief on Their Information-Sharing Claim. ..................... 24

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES[*]

CASES

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) ....................................................9

*Amalgamated Transit Union Int'l v. Donovan*, 767 F.2d 939 (D.C. Cir. 1985) ......................... 5-6

*American Forest Resource Council v. Ashe*, 946 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015) ....................................................................23

*American Medical Ass'n v. Reno*, 57 F.3d 1129 (D.C. Cir. 1995) ...................................5

*American Medical Ass'n v. United HealthCare Corp.*, No. 00-cv-2800, 2007 WL 1771498 (S.D.N.Y. June 18, 2007) ....................................................................8

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) .......................................................................10, 23, 24

*Arpaio v. Obama*, 27 F. Supp. 3d 185 (D.D.C. 2014) ..........................................6, 16

*Batalla Vidal v. Duke*, No. 16-cv-4756, 2017 WL 5201116 (E.D.N.Y. Nov. 9, 2017) ..............................................................................1, 3, 4, 5, 17

*Capital Area Immigrant's Rights Coalition v. U.S. Dep't of Justice*, 264 F. Supp. 2d 14 (D.D.C. 2003) ..............................................................4, 5, 6, 7

*Center for Sustainable Economy v. Jewell,* 779 F.3d 588 (D.C. Cir. 2015) ...................................8

*Chiang v. Kempthorne*, 503 F. Supp. 2d 343 (D.D.C. 2007)............................................3

*Citizens for Responsibility & Ethics in Washington v. FEC*, 236 F. Supp. 3d 378 (D.D.C. 2017) ................................................................................6

*Citizens for Responsibility & Ethics in Washington v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ................................................................................7

*Coalition for Common Sense in Government Procurement v. United States*, 671 F. Supp. 2d 48 (D.D.C. 2009) ................................................................17

*Cody v. Cox*, 509 F.3d 606 (D.C. Cir. 2007) ...........................................................3, 4

*Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)................................19, 21

*Consumer Energy Council of America v. FERC*, 673 F.2d 425 (D.C. Cir. 1982)........................22

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994) ............................2, 3

*Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245 (D.D.C. 2011) ........... 22-23, 24

*Dyer v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201 (D.C. Cir. 1988) ....................................14

*Electric Privacy Information Center v. U.S. DHS*, 653 F.3d 1 (D.C. Cir. 2011) ......................23

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .....................................................12

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................................12

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ....................................................20

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...........................................................................1, 2, 4

*Humane Society of the United States v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988)...........................8, 9

*ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987)...............................................3

*International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) .........................................................................................13

*International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004) ........................................................................11, 12, 17

*International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock*, 783 F.2d 237 (D.C. Cir. 1986) ....................................................5

*Judulang v. Holder*, 565 U.S. 42 (2011)...................................................................................7

*Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) ...........................................................................................................9

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................................................4, 5

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) .........................................................................7

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...........................................................................14

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).............................................................................................................8, 9

*McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)..................19, 20, 21

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ....................................16

*Motor Vehicle Manufactures Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)........................................................................10

*National Treasury Employees Union v. Cornelius*, 617 F. Supp. 365 (D.D.C. 1985) ........................................................................................................................23

*National Wildlife Federation v. Watt*, 571 F. Supp. 1145 (D.D.C. 1983) ....................................24

*NTEU v. Horner*, 854 F.2d 490 (D.C. Cir. 1988) ........................................................................6

*\*OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808 (D.C. Cir. 1998)....................................1, 2

*Pickus v. United States Board of Parole*, 507 F.2d 1107 (D.C. Cir. 1974) ...........................19, 22

*\*Regents of University of California v. DHS*, No. 17-cv-05211, __ F. Supp. 3d __, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018) ....................................1, 3, 4, 5, 7, 8, 12, 16, 17, 18

*Regents of University of California v. DHS*, No. 17-cv-06211, 2018 WL 401177 (N.D. Cal. Jan. 12, 2018) ....................................................................................................25

*Roane v. Holder*, 607 F. Supp. 2d 216 (D.D.C. 2009)..................................................................3

*\*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985)..................................................................5, 6

*\*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ....................................................................10, 17

*Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) ........................................................................................................................................23

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015)................................................................18

*Young America's Foundation v. Gates*, 560 F. Supp. 2d 39 (D.D.C. 2008), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009) ......................................................................................5

**STATUTES**

8 U.S.C. § 1101(a)(15)(J) ............................................................................................................9

8 U.S.C. § 1324a(a)(1)................................................................................................................9

8 U.S.C. § 1324a(a)(1)(A) ..........................................................................................................8

8 U.S.C. § 1324a(h)(3)................................................................................................................8

**OTHER AUTHORITIES**

Citizenship and Immigration Services Ombudsman, *Annual Report 2007*, Department of Homeland Security (June 11, 2007), https://www.dhs.gov/xlibrary/assets/CISOMB_Annual _Report_2007.pdf ........................21

Petition for Certiorari, *U.S. DHS v. Regents of University of California*, No. 17-1003 (U.S. Jan. 18, 2018), 2018 WL 509822 ............................................................3

*President Trump's Full Exchange with Reporters*, CNN (Jan. 24, 2018),
    https://www.cnn.com/2018/01/24/politics/trump-white-house-interview-
    reporters/index.html ................................................................................................16

*Press Briefing with Press Secretary Sarah Sanders* (Feb. 6, 2018),
    https://www.upi.com/Top_News/US/2018/02/06/Watch-live-Sarah-Sanders-
    gives-White-House-briefing/5161517941994/ .........................................................1

To hear Defendants tell it in their briefs, this is a case about a discretionary change in immigration policy. The record tells an entirely different story. Defendants made no judgment about wise immigration policy. Rather, by proclaiming DACA a "circumvention of immigration laws" and "an unconstitutional exercise of authority," Defendants disclaimed political accountability for any discretionary decision to end this profoundly important program. AR 254. Having done so, they cannot now demand deference to the very policy judgment they eschewed. Rather, under core principles of administrative law, Defendants' conclusory legal determination and their recently unearthed "litigation risk" judgment must stand on their own two feet. Neither withstands meaningful review.

## I.    The Rescission Is Subject to Judicial Review.

### A.    Judicial Review Is Not Precluded by *Heckler v. Chaney*.

As two district courts have now held, D.C. Circuit precedent forecloses Defendants' main argument against judicial review. *See Regents of Univ. of Cal. v. DHS*, No. 17-cv-5211, 2018 WL 339144, at *12 (N.D. Cal. Jan. 9, 2018); *Batalla Vidal v. Duke*, Nos. 16-cv-4756 & 16-cv-5228, 2017 WL 5201116, at *11 (E.D.N.Y. Nov. 9, 2017). Defendants rely on *Heckler v. Chaney*, 470 U.S. 821 (1985), but *Chaney* reverses the presumption of reviewability only for "*single-shot*" decisions. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998). As the D.C. Circuit explained:

> *Heckler v. Chaney* and *Crowley Caribbean Transport v. Pena* establish that agencies' nonenforcement decisions are generally unreviewable under the Administrative Procedure Act ("APA"); **however, an agency's adoption of a general enforcement policy is subject to review**. Indeed, in *Crowley Caribbean Transport*, this court distinguished between "an agency's statement of a *general enforcement policy*" and a "*single-shot* nonenforcement decision," **the former being reviewable** even though the latter may not be. **Because [the defendant agency's] action was not such a single-shot non-enforcement decision, the district court had jurisdiction** to consider [the plaintiff's] complaint….

*Id.* (bolding added; citations omitted); *see Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994). Defendants do not claim rescinding DACA is a "single-shot" non-enforcement decision, nor dispute that the Rescission Memorandum adopted a "general enforcement policy." *See* Opp. 6[1]; *see also id.* at 27 (arguing the Rescission Memorandum is a "general statement of policy"). Those concessions dispose of Defendants' *Chaney* argument.

In an effort to undercut the *OSG*/*Crowley* rule, Defendants claim "*Chaney* itself involved a broad enforcement policy," and hence that *OSG* and *Crowley* could not have meant what they said. Opp. 5. But that premise is incorrect: *Chaney* involved a single FDA letter ruling that denied a one-off request for enforcement brought by a handful of petitioners. *See* 470 U.S. at 823-25. The "scope of [the Court's] decision" was therefore limited to "[i]ndividual, isolated nonenforcement decisions." *Id.* at 839 (Brennan, J., concurring).

Defendants next posit that *OSG* and *Crowley* allow review of general enforcement policies only if they "rest[] on an agency's interpretation of a statutory command." Opp. 6. But the D.C. Circuit found "ample reasons for distinguishing" between single-shot decisions and general policies. *Crowley*, 37 F.3d at 677. One reason, to be sure, was that general policies are more often rooted in legal judgments that fall in a court's core competence, *see id.*; as explained below, the Rescission Memorandum is a perfect example of such a policy. But *Crowley* also pointed to other considerations, stressing that "an agency will generally present a clearer (and more easily reviewable) statement of its reasons" when adopting a general policy, ensuring an adequate "focus for review." *Id.* This Court has thus applied *OSG* and *Crowley* (and rejected

---

[1] "Opp." refers to Defendants' Reply in Support of Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and/or Preliminary Injunction, ECF 55. "MSJ" refers to the Plaintiffs' Memorandum in Support of Summary Judgment and/or Preliminary Injunction, ECF 28-1. "Pl. MTD Opp." refers to Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF 23.

application of *Chaney*) to issues other than statutory interpretation. *See, e.g.*, *Roane v. Holder*, 607 F. Supp. 2d 216, 225-27 (D.D.C. 2009) (finding claim that defendants "arbitrarily and capriciously failed to exercise their authority to enforce the [Controlled Substances Act]" reviewable); *Chiang v. Kempthorne*, 503 F. Supp. 2d 343, 352-53 (D.D.C. 2007) (rejecting an enforcement policy not because it misinterpreted a statute, but because it "lack[ed] explanation" and did not consider "important aspects of the relevant problem").

In any event, *OSG* and *Crowley* would govern here even if they were applicable only when an agency's action is based on its interpretation of the law. Defendants rescinded DACA because, they claim, "continuing the DACA policy would itself have been unlawful." Pet. for Cert. 31, *DHS v. Regents of Univ. of Cal.*, No. 17-1003 (U.S. Jan. 18, 2018), 2018 WL 509822; *see id.* at 12. And even if they had conducted a serious assessment of the litigation risk posed by continuing DACA, the assessment would remain "abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings" and would bear no resemblance to the "mingled assessments of fact, policy, and law that drive an individual enforcement decision." *Crowley*, 37 F.3d at 677.

Defendants' invocation of *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987) (*BLE*), cannot save their *Chaney* argument. *See* Opp. 8-9. *Crowley* and *OSG* both post-date and fully account for *BLE*, including the very language that Defendants cite. *Compare Crowley*, 37 F.3d at 676-77, *with* Opp. 8-9. As two courts have now held, that language refers only to decisions that are presumptively or inherently unreviewable, like those at issue in *Chaney* and *BLE*. *See Regents*, 2018 WL 339144, at *12 n.7; *Batalla Vidal*, 2017 WL 5201116, at *10. There are only a few "narrow categories" of such matters, *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007), and per *Crowley*/*OSG*, a general enforcement policy is not one of them.

Finally, *Chaney* is inapposite here for the additional and independent reason that rescinding DACA is not a simple change in enforcement policy in the first place (much less a determination by the agency "*not to exercise* its enforcement authority," *Chaney*, 470 U.S. at 828 (emphasis in original)). Rather, DACA is a program in which individuals pay a fee and provide the Government with identity information to reduce the Government's enforcement burden and, in exchange, receive not only forbearance from removal, but also benefits like eligibility for work authorization and advance parole. *See* MSJ 19-20. As the *Regents* court explained, terminating such a program "bears no resemblance" to exercising non-enforcement discretion under *Chaney*. *Regents*, 2018 WL 339144, at \*12; *see Batalla Vidal*, 2017 WL 5201116, at \*10-11.[2]  For the same reason, Defendants' analogy to *criminal* prosecution policies (Opp. 2-3, 9) is unhelpful: None of the policies cited by Defendants go beyond a simple determination to bring or not bring certain kinds of cases.[3]

### B.   Defendants Cannot Rebut the Strong Presumption of Reviewability.

Because *Chaney* does not apply, DACA's rescission is subject to the APA's "strong presumption of judicial review." *Capital Area Immigrant's Rights Coal. v. U.S. Dep't of Justice*, 264 F. Supp. 2d 14, 25 (D.D.C. 2003) (*CAIR*).[4] And Defendants cannot adduce "'clear

---

[2] Defendants' argument that *Lincoln v. Vigil*, 508 U.S. 182 (1993), involved termination of a "program" (Opp. 4-5) does not alter the analysis. *Lincoln* merely added "[t]he allocation of funds from a lump-sum appropriation" to the short list of agency actions that are presumptively unreviewable. 508 U.S. at 191-92; *see Cody*, 509 F.3d at 610.

[3] Defendants' criminal analogy fails as a counterexample to the *OSG/Crowley* rule, too. The D.C. Circuit has never addressed whether that rule applies in the unique context of criminal charging policies. But even if general enforcement policies were not reviewable in that special setting, that would be no basis for refusing to follow the *OSG/Crowley* rule with respect to administrative agencies' enforcement policies—the context in which the rule originated, and so plainly applies.

[4] Defendants suggest that the immigration context weakens that presumption. Opp. 3, 7. But "the Supreme Court has applied the 'strong presumption in favor of judicial review of administration

and convincing evidence'" of a congressional intent to preclude review. *Id.*

Defendants' argument that the Rescission Memorandum implicates "considerations about agency priorities," for which there is no "law to apply" (Opp. 4, 7-8), does not meet this burden. "The question of whether there exists law to apply focuses on the *particular allegations* of the plaintiff." *Robbins v. Reagan*, 780 F.2d 37, 47 (D.C. Cir. 1985) (emphasis added). Unless a court "lacks manageable standards to deal with the issues raised," judicial review proceeds. *Id.* Here, resolution of Plaintiffs' claims is eminently "manageable." *Id.* Those claims simply seek to hold the agency to the basic standards of procedural rationality that Congress imposed in the APA.[5] Thus, "familiar APA concepts" themselves "provide the core standards for judicial review." *CAIR*, 264 F. Supp. 2d at 23. And multiple sources of law aid the Court in applying those standards.

With respect to the question whether DACA is lawful, the "law to apply" includes the INA, DHS's own priority memos, an OLC opinion, the DACA Memorandum, and decades of regulatory practice. *See Batalla Vidal*, 2017 WL 5201116, at *10; *Regents*, 2018 WL 339144, at *12; MTD Opp. 9.[6] Defendants cannot seriously argue otherwise, *see* Opp. 8, as it would be "almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*." *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Brock*, 783 F.2d 237, 246 (D.C. Cir. 1986); *see Amalgamated Transit Union*

---

action' in the immigration context." *Regents*, 2018 WL 339144, at *12 (citing *INS v. St. Cyr*, 533 U.S. 289, 298–99 (2001)). This Court has, too. *See CAIR*, 264 F. Supp. 2d at 22, 24.

[5] Defendants' reviewability arguments have no bearing on Plaintiffs' notice-and-comment claim. *E.g.*, *Lincoln*, 508 U.S. at 195-96; *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995).

[6] "[J]udicially manageable standards may be found in formal or informal policy statements and regulations as well as in statutes." *Young Am.'s Found. v. Gates*, 560 F. Supp. 2d 39, 44 n.1 (D.D.C. 2008) (quotation marks omitted), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009).

*Int'l v. Donovan*, 767 F.2d 939, 944 n.7 (D.C. Cir. 1985). Indeed, Chief Judge Howell had no difficulty assessing DACA's legality with reference to the INA in refusing to enjoin the program. *See Arpaio v. Obama*, 27 F. Supp. 3d 185, 209 (D.D.C. 2014) (concluding, at preliminary injunction stage, that "deferred action programs are consistent with, rather than contrary to, congressional policy"). The same materials more than suffice to assess whether the agency rationally *explained* its reversal of position and its rejection of obvious alternatives. *See* MSJ 13-17; *see also Robbins*, 780 F.2d at 45-46 ("[T]he agency itself can often provide a basis for judicial review through the … announcement of policies.").

That same body of law, together with the cases surrounding DACA and DAPA, also equips the Court to assess Defendants' purported "predictive judgment" that a disruptive ruling against DACA was so "certain[]" that further analysis was unnecessary. Opp. 8, 15. Indeed, courts in this district routinely review agencies' assessments of their litigation prospects. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. FEC*, 236 F. Supp. 3d 378, 396 (D.D.C. 2017) (concluding the FEC made a rational "litigation risk" judgment not to pursue a case). Such judgments are, if anything, *more* naturally suited to judicial review than many of the policy- or cost-based judgments the D.C. Circuit has held reviewable. *See, e.g.*, *NTEU v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988) (holding reviewable an agency's "cost justification" for excepting certain jobs from the civil service). Moreover, "[c]ourts often have invalidated agency action because it simply did not comport with standards of rational decisionmaking given the agency's uncontested goal." *CAIR*, 264 F. Supp. 2d at 23 n.8 (citation omitted); *see Robbins*, 780 F.2d at 46 ("[E]ven without specific statutory guidelines controlling the exercise of discretion, courts have a meaningful role to play in reviewing agency action"). Here, Plaintiffs argue that, even assuming the agency's goal was managing

"litigation risk," Defendants did not pursue that goal in a rational way. *See* MSJ 29-36; *infra* 17-19. Defendants have not explained why this Court is incapable of evaluating those claims.

Finally, *Judulang v. Holder*, 565 U.S. 42 (2011), confirms that judicial review here is "manageable." In *Judulang*, the Court unanimously rejected the Government's policy for determining eligibility for discretionary immigration relief as arbitrary and capricious, explaining that the agency's chosen approach was not "tied, even … loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Id.* at 55. Because the agency did not "exercise its discretion in a reasoned manner," its policy could not "pass muster under ordinary principles of administrative law." *Id.* at 53, 64. The Court had no difficulty making that judgment, even without a statutory definition of the "appropriate operation of the immigration system," because the agency's rationale failed on its own terms. The same is true of Defendants' "litigation risk" theory here.

In sum, Defendants have not carried their "heavy burden" to show that Congress meant to preclude judicial review, *CAIR*, 264 F. Supp. 2d at 22, and this Court is fully competent to evaluate Plaintiffs' APA claims.

### C.  The Non-Individual Plaintiffs Have Standing.

Plaintiffs Princeton and Microsoft have standing to challenge DACA's rescission. *See* MTD Opp. 12-17. Unlike the plaintiff in *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), *see* Opp. 12, Princeton and Microsoft have shown that they *themselves* have judicially cognizable interests (including avoiding pecuniary harm) that would be redressed by the reversal of Defendants' actions.[7] *See Regents*, 2018 WL 339144, at *16 (rejecting government's *Linda R.S.* argument).

---

[7] In any event, this Court need not decide the standing of Princeton and Microsoft to ensure that their case falls within the purview of Article III. *See* Pl. MTD Opp. 12-13; *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 225-26 (D.D.C. 2009).

The *NAACP* Plaintiffs also have standing to challenge the rescission, as the interests they seek to protect are germane to their purpose. In challenging this germaneness requirement, Defendants rely on *Humane Society v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988), which clarified that an organization meets the requirement if its litigation goals are "pertinent to its special expertise and the grounds that bring its membership together." *Id.* at 56. Defendants rely on a hypothetical scenario posed by the D.C. Circuit to illustrate how an organization might fail the "germaneness" test.[8] But the D.C. Circuit was aware of *only two cases* "in which a federal court denied standing on germaneness grounds." *Id.* at 58. Because the *NAACP* Plaintiffs have demonstrated that reversing the rescission is pertinent to their missions, they each satisfy the "germaneness" test and have associational standing. *See* App. 2618 (Johnson Decl. ¶¶ 4-5); App. 2595-96 (Weingarten Decl. ¶¶ 3, 5-6); App. 2639-40 (Lopez Decl. ¶¶ 5-6).

### D. The Non-Individual Plaintiffs Have a Cause of Action Under the APA.

Because the non-individual Plaintiffs' interests are, at the least, "arguably within the zone of interests … regulated by" the INA, they have a cause of action under the APA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation marks omitted). Defendants do not dispute that deferred-action policies are linked to work authorization. *See* 8 U.S.C. § 1324a(a)(1), (h)(3); *Regents*, 2018 WL 339144, at *16. Nor do they dispute that the agency's decisions about programs like DACA implicate the interests of

---

[8] Defendants contend that the *NAACP* Plaintiffs must show that a "critical mass" of members are harmed by the rescission. Opp. 13. But this is not the standard for determining germaneness. *See, e.g.*, *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) ("The germaneness requirement mandates 'pertinence between litigation subject and organizational purpose.'" (quoting *Humane Soc'y*, 840 F.2d 45 at 58)). "[N]o federal court has applied the 'critical mass' test here urged by Defendants." *Am. Med. Ass'n v. United HealthCare Corp.*, 2007 WL 1771498, at *20 (S.D.N.Y. June 18, 2007) (rejecting a critical mass test for germaneness).

universities as educators. Because Princeton and Microsoft both employ DACA beneficiaries,[9] and Princeton also educates them, their interests are far from "'marginally related to … the purposes implicit in the statute.'" *Patchak*, 567 U.S. at 228.

Defendants object that the INA is not "*designed*" to regulate these interests. Opp. 13. But the INA regulates employment on *both* sides of the relationship, *see* 8 U.S.C. § 1324a(a)(1), and it deals pervasively with universities' interests in admitting and otherwise engaging with immigrants and foreigners. *See* 8 U.S.C. § 1101(a)(15)(J); *Abourezk v. Reagan*, 785 F.2d 1043, 1050-51 (D.C. Cir. 1986); MTD Opp. 21-22. Thus, when the agency implements the INA—and particularly with respect programs like DACA—it does so "with at least one eye directed toward" the costs and opportunities for employers and universities. *Patchak*, 567 U.S. at 226. Princeton and Microsoft thus satisfy the APA's "lenient" standard for objecting when such decisions are made unlawfully. *Lexmark Int'l v. Static Control Components*, 134 S. Ct. 1377, 1389 (2014). Princeton and the Association Plaintiffs also satisfy the zone-of-interests test because they represent the interests of their DACA-beneficiary students and members; Defendants do not dispute that those interests suffice. *See, e.g.*, *Humane Soc'y of the U.S.*, 840 F.2d at 61.

## II.    The Rescission of DACA Is Arbitrary and Capricious.

Defendants' rescission of DACA violates the APA's bar on arbitrary or capricious agency action three times over. First, quite apart from the merits of the agency's decision, the agency's *explanation* of its decision is too opaque and conclusory to withstand APA review—including because it fails to give coherent reasons for reversing course and for rejecting reasonable, obvious alternatives. Second, the Rescission Memorandum's bottom-line—that continuing DACA would

---

[9] App. 96-100 (Radu Decl.); App. 124-128 (Preciado Decl.); App. 2685 (Supp. Leighton Decl.). Plaintiffs submit the supplemental Leighton Declaration to address one issue raised by the intervening decision from the Northern District of California.

be unlawful—is incorrect as a matter of law. And third, any "litigation risk" assessment that might be extracted from (or read into) that Memorandum is irrational. Defendants' arguments on all three issues only confirm these deficiencies.

### A.  Defendants' Explanation of the Rationale for Rescission Is Inadequate.

DACA's rescission is unlawful because Defendants' explanation fails the APA's baseline requirement that an agency "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); MSJ 13-17. "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable"; a reviewing court cannot be left to "chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). Here, the agency's conclusory proclamation of DACA's illegality has become an empty vessel for a host of arguments that the Acting Secretary may never have considered in deciding to rescind DACA. Upholding the rescission based on those arguments would reward the agency for the obscurity of its original rationale and flout core principles of administrative law. *See id.*

Indeed, on each key issue, the Rescission Memorandum itself says either practically nothing or, in some cases, literally nothing at all—thereby "'cross[ing] the line from the tolerably terse to the intolerably mute.'" *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017). *First*, the Memorandum does not explain what legal argument against DACA Defendants found compelling or why (and the Attorney General's one-page letter does not either). *Second*, the Memorandum does not explain why the Government's prior view of the same question was faulty. *Third*, the Memorandum does not explain how Defendants weighed the extensive reliance on that prior position. *Fourth*, the Memorandum does not mention a single alternative course of action that the agency considered. *Fifth*, assuming that the Memorandum embodies a

predictive judgment that DACA was "near-certain" (Opp. 19) to be enjoined (*but see infra* 17), the Memorandum does not explain the grounds for that purportedly pivotal assessment. And *sixth*, the Memorandum nowhere explains the reasoning underlying the agency's idiosyncratic and haphazard "wind-down" process. Any one of these lapses would suffice to set the rescission aside.

Defendants' efforts to clarify the Rescission Memorandum in response to these charges have made it only more enigmatic. Defendants identify the "justification for the policy change" as a change in "*controlling legal precedent*" (Opp. 17-18)—but they do not explain why the agency would treat a nonprecedential, 4-to-4 affirmance of a preliminary injunction as "controlling precedent" for anything at all, much less for the invalidity of a different program. *Infra* 18-19. They reiterate the Attorney General's belief that DACA "'has the same legal and constitutional defects that the courts recognized as to DAPA'" (Opp. 16)—but they do not explain *which* defects were persuasive with respect to DACA, an especially egregious omission because the district court and Fifth Circuit had different rationales, and *neither* held DAPA unconstitutional. *Infra* 14-17. And they place immense weight on the notion that rescinding DACA was "the least disruptive option" to manage an inevitable end to the program—but they implicitly concede that this explanation is found nowhere in the administrative record, meaning that it is outside this Court's review. *See* Opp. 16 (quoting a press release outside the administrative record to support this theory); *id.* at 17 (asserting without citation that rescission was based on the "potential for massive disruption were the policy immediately enjoined"). What reasoning the Rescission Memorandum does contain fails to explain, much less justify, the agency's choice. *See Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (rejecting agency rationale that "there was a 'change in agency priorities'" as "not informative in the least" because "it is merely a reiteration of the decision to withdraw the proposed rule").

The conclusory nature of the Rescission Memorandum is particularly problematic because, when agencies reverse positions, they have specific obligations to address the basis for their prior policy and any reliance it engendered. MSJ 15-17. Defendants claim that Plaintiffs possessed no "legally cognizable" reliance interests because a person's DACA status was good only for two years and renewal was not guaranteed. Opp. 17-19. But the cases on which Defendants rely do not demand that a party possess longstanding or "legally cognizable" reliance interests before an agency must explain how it considered the effects of a policy reversal. Rather, the agency must consider "facts and circumstances that … were engendered by the prior policy," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and explain why the change is justified notwithstanding those factors, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016). Thus, when deciding whether to rescind DACA, Defendants had to take the world as they found it then, in 2017, rather than as it had stood in 2012, before DACA was adopted. And in 2017, hundreds of thousands of DACA beneficiaries were attending college, working with authorization, serving in the military, and making significant life choices based on the existence of DACA. *See* MSJ 42-46; *Regents*, 2018 WL 339144, at *24-26. Those arrangements added greatly to the cost of rescinding DACA and made rescission a materially different decision than whether to adopt DACA in the first place.

Defendants respond that they did consider changed circumstances, namely intervening Fifth Circuit precedent regarding the DAPA program. But citing that decision without evaluating or even acknowledging the differences between DAPA and DACA does not satisfy the APA. *See Int'l Union*, 358 F.3d at 44 (rejecting withdrawal of rule based on intervening Eleventh Circuit precedent because the agency "did not explain why it came to deem the Eleventh Circuit decision fatal" to that rule). Nor did Defendants explain why the Fifth Circuit furnished the relevant

benchmark for a legal question that would surely have been decided by the Supreme Court. And Defendants offered no explanation why, when faced with the same supposedly controlling cases just months earlier, then-Secretary Kelly opted to rescind DAPA, but not DACA. MSJ 24-25.

Finally, another critical element of the agency's explanatory burden was wholly neglected: The Rescission Memorandum nowhere weighs or even mentions any number of obvious and compelling alternatives to Defendants' chosen approach. For example, if Defendants believed DACA was being implemented with insufficient case-by-case discretion (Opp. 18), they could have provided new instructions for administering the program that would, in their view, more faithfully implement DACA's express commitment to "case by case" review. AR 2; *see Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983) (explaining that an agency decision must be vacated when "the agency's explanation could not justify its drastic decision to rescind rather than modify [a] standard"). Or if Defendants believed DACA should have gone through notice and comment, they could have reissued the DACA Memorandum as a proposed rule. *See infra* 23-24. Yet Defendants entertained only one possibility: rescission. "[S]uch an artificial narrowing of options is antithetical to reasoned decisionmaking and cannot be upheld." *Donovan*, 722 F.2d at 817 (internal quotation marks omitted).

These myriad explanatory deficits are reason enough to vacate. Doing so would ensure that those whose lives are affected by DACA's rescission will receive the reasoned decisionmaking process the APA requires, and that any future judicial review will be trained on a fixed, comprehensible rationale for which Defendants may be held accountable.

## B.  DACA Is Legal.

Even if Defendants had provided an adequate explanation, their rescission of DACA still could not stand. Defendants' decision was driven by their faulty conclusion that DACA was unlawful. *See* MSJ 12-13, 28-29. That is a pure error of law that is entitled to no deference. *See*

*Dyer v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 206 (D.C. Cir. 1988); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (setting aside agency action premised on legal error). As Plaintiffs have demonstrated, DACA does not violate the INA, is consistent with decades of agency interpretations of the relevant statutes, and is lawful. *See* MSJ 18-27.

      To this day, Defendants have not articulated a coherent legal argument against DACA's validity. To justify their assertion that DACA is "indistinguishable" from DAPA, Defendants place great weight on the fact that the 2014 memo establishing DAPA also would have made three limited revisions to the 2012 DACA policy. Opp. 18, 20, 22 & n.10, 23-24; *see* AR 39-40. But as the district court explained when enjoining the 2014 memo, with those "three minor exceptions, *this case does not involve ... 'DACA*.'" AR 57 (emphasis added); *see* AR 147 n.11. Notwithstanding Defendants' semantic trick of repeatedly referring to a purported 2014 "expanded DACA" policy, it is indisputable that DACA commenced in 2012, remained in effect for more than half a decade, and has never been invalidated by the Fifth Circuit or any other court. Because the same DACA policy that DHS implemented continuously from 2012 to 2017 was never challenged in *Texas*, the fact that the 2014 memo enjoined in *Texas* also included minor changes to DACA should carry no weight here.

      Furthermore, although the Fifth Circuit warned against careless extrapolation between DACA and DAPA, and Plaintiffs identified key distinctions (MSJ 24-27), Defendants barely address these differences. *First*, Defendants have no response to the point (MSJ 27) that DAPA, unlike DACA, was an "open-ended" policy "with no established end-date." AR 251; *accord* AR 254. *Second*, despite the Fifth Circuit's emphasis on the size and scope of the DAPA program (AR 170, 177, 180), Defendants do not contest the Fifth Circuit's data showing that there were almost four persons eligible for DAPA for each person eligible for DACA. *See* Opp. 22 n.10. *Third*,

Defendants do not address the crucial distinction that DACA has survived for more than half a decade without a successful challenge, while DAPA was enjoined before it was implemented. MSJ 25 n.10. Thus, in any proceeding to enjoin DACA, the balance of equities would be dramatically different from what it was in the *Texas* litigation. MSJ 33-34. *Fourth*, Defendants have no response to the distinguishing facts that DACA recipients were brought to this country as children; often have no ties to and do not even remember their birth country; have grown up as Americans; and are (in the words of two Fifth Circuit judges) "particularly inculpable" (MSJ 25). The Fifth Circuit acknowledged these facts in proclaiming "DACA and DAPA are not identical." AR 170.

If, as Defendants suggest (Opp. 20), some specific facet of "the Fifth Circuit's legal rationale" would inevitably trigger DACA's downfall, the agency should have expressly identified this facet. *See supra* 10-11. But nothing in the administrative record, or even in Defendants' briefing, identifies the linchpin to the agency's legal conclusion. Defendants do not appear to be arguing that DACA required notice and comment—the sole basis for the Texas district court's injunction of DAPA. *See* Opp. 29 (noting with approval that DHS and INS have adopted "deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures"). And in any event, this type of procedural APA violation would not "*compel* the rescission of DACA" (Opp. 31), as it could be cured by reissuing DACA as a proposed rule and requesting public comment. *See infra* 23-24; MSJ 27 n.14, 35, 41 n.18.

Defendants also fail to identify what facet of the Fifth Circuit's secondary legal rationale— that DAPA is contrary to the INA—would inevitably doom DACA. Is DACA invalid because deferred action is always contrary to the INA? No, Defendants concede that DHS officials may grant deferred action on an individualized basis. Opp. 30. Is DACA invalid because deferred action cannot be granted based on DACA's threshold criteria? No, Defendants concede that doing so is

lawful. *Id.* Is DACA invalid because deferred action cannot be granted to groups of these individuals? No, Defendants concede that DHS officials may "confer deferred action … even upon *groups* of former DACA recipients, under any particular criteria." *Id.* (emphasis added); *see also Regents*, 2018 WL 339144, at *19-20.[10]

So why is DACA unlawful in Defendants' view? Is it the supposed lack of individualized review? The 2012 DACA Memorandum mandates individualized review: "[R]equests for relief pursuant to this memorandum are to be decided on a case by case basis." AR 2; *see Arpaio*, 27 F. Supp. 3d at 209. If Defendants are not instructing DHS officials to review applications individually, that is a choice they have made, not something mandated by DACA. *See Regents*, 2018 WL 339144, at *20, 22. Defendants cannot violate their own policy and then claim their violations require the policy's rescission.[11] *Cf. Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("If an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter.").

Articulating no real legal argument, Defendants fall back on a "presume[d] … independent policy judgment … that immigration decisions of this magnitude should be left to Congress." Opp. 20-21 (citing *Syracuse Peace Council v. FCC*, 867 F.2d 654, 657-58 (D.C. Cir. 1989)). But unlike

---

[10] Nor can Defendants identify any legal flaw in DACA based on the Supreme Court's 4-to-4 affirmance in *Texas*. There is no way to know what the four Justices who voted to affirm believed, including whether some adopted a notice-and-comment theory and others a substantive theory.

[11] Even now, it is unclear whether the Administration actually believes DACA is illegal. When asked this afternoon if the President was considering extending DACA after the March 5 rescission deadline, the White House Press Secretary stated, "He certainly has the right to do so." *See Press Briefing with Press Secretary Sarah Sanders*, at -17:53 (Feb. 6, 2018), https://www.upi.com/Top_News/US/2018/02/06/Watch-live-Sarah-Sanders-gives-White-House-briefing/5161517941994/. This statement followed comments by the President himself that he might extend the DACA deadline if Congress cannot reach a deal by March. *See President Trump's Full Exchange with Reporters*, CNN (Jan. 24, 2018), https://www.cnn.com/2018/01/24/politics/trump-white-house-interview-reporters/index.html.

in *Syracuse Peace Council*, here the Acting Secretary did not actually articulate the purported "independent policy judgment" at the time of her decision—much less "clearly invoke[]" such a rationale, *Chenery*, 332 U.S. at 198. Her Rescission Memorandum nowhere states that, even if she has legal authority to set deferred-action policies for hundreds of thousands of immigrants, she has opted, as a matter of policy, not to do so. *See* MSJ 17 n.6; *Regents*, 2018 WL 339144, at *22 n.16. Thus, "we do not know—nor are we free to guess—what the agency would have done had it realized that" its legal analysis was faulty. *Int'l Union*, 358 F.3d at 44-45.

### C.  Defendants' "Litigation Risk" Defense Is Illegitimate and Wrong.

Defendants try to reframe their unexplained (and wrong) legal conclusion as "a reasonable predictive judgment about litigation risk." Opp. 20. This pivot from the rationale stated in the record is barred both by *Chenery* and by Defendants' failure to respond to the litany of reasons this supposed "predictive judgment" is wrong. *Compare* MSJ 32-36 *with* Opp. 25 n.11.

Initially, Defendants' "litigation risk" rationale is barred because, as two courts have found, it is a *post hoc* rationalization. *See Regents*, 2018 WL 339144, at *23, 26; *Batalla Vidal*, 2017 WL 5201116, at *10. The Rescission Memorandum did not articulate Defendants' current theory that they ended DACA to ensure an orderly administrative wind-down rather than an abrupt court-imposed shutdown.[12] *See* MSJ 28-29. "[E]xplanations the [agency] offers in its briefing" cannot substitute for "'the grounds upon which the [agency] … based its action.'" *Coal. for Common Sense in Gov't Procurement v. United States*, 671 F. Supp. 2d 48, 55-56 (D.D.C. 2009).

---

[12] Defendants also fail to rebut the claim that their wind-down plan was itself arbitrary and capricious. *See* MSJ 36-38. While they note (Opp. 20 n.9), as did Plaintiffs (MSJ 37), that many deadlines can seem arbitrary, they ignore the thrust of this argument—that they did not justify the structure of the wind-down, and that they referred only to the administrators' interests (AR 251, 254) while ignoring beneficiaries' interests.

Second, even if the agency had considered "litigation risk," Defendants have no adequate explanation for their failure to assess DACA's benefits—an essential step in any rational risk analysis. Without evaluating DACA's benefits, it is impossible to weigh the costs of deciding not to rescind DACA if it were later invalidated in court against the costs of rescinding DACA if it were *not* invalidated in court. MSJ 30-32; *see Regents*, 2018 WL 339144, at *24 (noting the agency's failure to "ask whether the program was worth fighting for"). Rather than respond to this point, Defendants now argue for the first time that there was effectively *zero* chance that DACA would be upheld. *See* Opp. 25-27 (arguing the agency need not "ponder how to prevent the unavoidable"). But that argument eviscerates the notion of a separate "litigation risk" rationale for rescission; it proves Defendants rescinded DACA because of an erroneous legal judgment.

Because of their unexplained confidence, Defendants entirely fail to reckon with the range of different litigation outcomes—just as they did when deciding to rescind DACA. Plaintiffs demonstrated in detail that: (1) DACA's challengers would likely *not* have won a preliminary injunction (MSJ 33-34); and (2) any relief, preliminary or permanent, could have been crafted to promote an orderly wind-down, and indeed could have involved a simple remand without vacatur (MSJ 34-36). As for the first point, Defendants just assert by *ipse dixit* that a preliminary injunction would have issued and plead for deference to that "predictive assessment." Opp. 25 n.11. Yet Defendants offer no evidence or argument to *support* the agency's judgment, forfeiting any response. As for the fact that a court could have triggered an orderly wind-down or simply ordered DHS to complete notice-and-comment, Defendants say nothing at all. That is particularly remarkable because, in *Texas*, the Fifth Circuit went out of its way to note that remand without vacatur would be warranted if, among other things, "vacatur would be seriously disruptive." *Texas v. United States*, 787 F.3d 733, 768 n.128 (5th Cir. 2015).

Finally, Defendants take the outcome of litigation over DACA in the Supreme Court entirely for granted. After acknowledging that the Fifth Circuit's DAPA judgment was affirmed by an equally divided Court (*e.g.*, Opp. 18, 21), Defendants assume, without even making their assumption express, that a nine-member Court would refuse to stay, and would affirm, an injunction of DACA, even though it had already been in place for more than five years, and even though four Justices voted to reverse the Fifth Circuit even with respect to DAPA. Those assumptions are unexplained and unwarranted. The APA requires more.

III.    **The Rescission of DACA Required Notice and Comment.**

    A.  **The Rescission Memorandum Is a Substantive Rule.**

The Rescission Memorandum should be set aside for the additional, independent reason that it is a substantive rule promulgated without notice and comment. *See* MSJ 38-41; *supra* 5 n.5.

Defendants' efforts to deny that the Rescission Memorandum is a substantive rule fail. Initially, the suggestion that a substantive rule must be "directed primarily at the public" and "create legally-enforceable rights or obligations in regulated parties" misstates the law. Opp. 28-29 (quotation marks omitted). An agency policy that creates or modifies "'rights and obligations'" is always a substantive rule. *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). But an agency's policy statement can also rank as a substantive rule if, either on its face or as implemented, it "constrains the agency's [own] discretion." *Id.*; *see Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987); *see also Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112-13 (D.C. Cir. 1974) (holding that parole criteria amounted to a substantive rule because they "narrow[ed] [the decisionmaker's] field of vision").

The Rescission Memorandum plainly circumscribes the agency's discretion. The Memorandum is not a "'musing[] about what the [agency] might do in the future,'" *McLouth*, 838 F.2d at 1321. Rather, it expressly instructs agency officials how to dispose of specific matters that

come before them: Officials "*will*" immediately reject all pending advance-parole requests by DACA recipients; "*will not* approve" any such requests based on DACA going forward; "*will* reject all DACA initial requests*"; and "*will* reject" all renewal requests after the applicable deadline. AR 255 (emphasis added). That kind of "'mandatory, definitive language'" is a "'powerful, even potentially dispositive, factor'" in identifying a substantive rule. *McLouth*, 838 F.2d at 1321; *see id.* ("The use of the word 'will' suggests the rigor of a rule, not the pliancy of a policy."); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding … [if it] appears on its face to be binding").[13]

Defendants' principal response is that although the Rescission Memorandum eliminates the existing discretion to grant *DACA* status, it nonetheless permits officials to "exercis[e] their pre-existing (and still-existing) discretion to confer *deferred action* on … groups of former DACA recipients," and permits them to do so "under any particular criteria" they choose. Opp. 30 (emphasis added). This argument is untenable for two reasons.

First, the idea that ending "DACA" does not substantially constrict the discretion to award deferred action to Dreamers is not plausible. As noted above, the Memorandum mandates the rejection of "*all* DACA initial requests" and, now that the October 5 deadline has passed, "*all* DACA renewal requests." AR 255 (emphasis added). Defendants cannot seriously contend that, under that policy, agency personnel remain free to take incoming DACA application forms (or their substantive equivalents), construe them as plain-vanilla "deferred action" applications, and then grant them based on the criteria DACA announced. Since the Memorandum orders personnel

---

[13] Defendants' lead example (Opp. 31) of a policy statement that should not require notice and comment—the Attorney General's 2017 charging memorandum—offers an instructive contrast. That memorandum sets out a general principle and repeatedly emphasizes prosecutorial discretion to depart from it. In any event, as noted above, criminal charging policies and decisions may not be subject to ordinary APA review in the first place. *See supra* 4 n.3.

to reject all such applications, it is common sense that it does not "*genuinely* leave[] the agency and its decisionmakers free to exercise discretion" in the manner Defendants hypothesize. *Cmty. Nutrition Inst.*, 818 F.2d at 946 (emphasis added). Nor have Defendants adduced any evidence to support their unrealistic gloss on the Rescission Memorandum. They have neither (a) explained why *that* result is lawful but DACA is not, nor (b) pointed to a significant number of cases in which DHS actually *has* granted deferred action, based on a person's satisfying DACA's programmatic criteria, during the several months the Rescission Memorandum has been in effect.

To be sure, the Rescission Memorandum presumably permits ad hoc grants of deferred action in line with DHS's pre-DACA policies allowing for this form of relief in exceptional cases (typically involving acute medical concerns).[14] But the return to that regime—one in which Defendants agree deferred action was available only on far "more limited" terms (Opp. 30)—represents a dramatic change in the scope of agency discretion relative to the pre-rescission status quo, and hence amounts to a substantive rule. *Cf. McLouth*, 838 F.2d at 1321 (explaining that while "a provision for exceptions obviously qualifies a rule" by making it less than "ironclad," it still "does not push [the rule] much in the direction of a policy statement"). Indeed, it is hard to see how it could be otherwise: Whatever the Attorney General and the Acting Secretary decided in rescinding DACA, they undoubtedly concluded that awarding deferred action through DACA was legally off-limits. That means that something the agency previously considered within its discretion would be no longer, and hence, necessarily, that the agency cabined its own discretion in a manner having a direct and profound impact on hundreds of thousands of young people who have grown up and made their lives in this country and consider it their home.

---

[14] *See* Citizenship and Immigration Services Ombudsman, *Annual Report 2007*, Department of Homeland Security, at 88 (June 11, 2007) (majority of ad hoc grants involved medical grounds), *available at* https://www.dhs.gov/xlibrary/assets/CISOMB_Annual _Report_2007.pdf.

Second, even if agency personnel were free to award the kind of quasi-DACA status Defendants now posit, the elimination of DACA's programmatic elements would still amount to a substantive change. Most important, whatever residual authority exists to award deferred action appears to come without any promise that information shared by applicants will be protected from use for purposes of enforcement. This materially changes the terms of the agency's relationship with potential applicants, and it will dramatically reduce, if not eliminate entirely, the inflow of applications. That is the kind of substantive change on which affected parties must be permitted to comment. *See Pickus*, 507 F.2d at 1112 (explaining Congress's purpose to ensure public comment before agencies make changes of "substantial impact"). Likewise, and in contrast to DACA, there does not appear to be any formal process for appealing the denial of ad hoc deferred action. This change, too, directly affects DACA applicants' interests and goes beyond a general announcement of agency priorities.

### B. If the Court Accepts Defendants' View of DACA, It Necessarily Follows That the Rescission Memorandum Required Notice and Comment.

Even setting aside the arguments above, Defendants' divergent and inconsistent positions on the arbitrary-and-capricious and notice-and-comment issues place them in an intractable dilemma. If "any discretion afforded to DHS officials [under DACA] was illusory" (Opp. 18 n.8)—something Plaintiffs certainly dispute (MSJ 23-24)—it necessarily follows that rescinding DACA was a substantive change requiring notice and comment. After all, if DACA created a practically nondiscretionary entitlement to deferred action for those meeting the program's criteria, then rescinding DACA eliminated that entitlement—repealing a substantive rule, and necessitating notice and comment. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982) ("[T]he APA expressly contemplates that notice and an opportunity to comment will be provided prior to agency decisions to repeal a rule."); *Douglas Timber Operators, Inc. v. Salazar*,

774 F. Supp. 2d 245, 259 (D.D.C. 2011) (noting that even minor changes to substantive rules must undergo notice and comment). Thus, if the Court *accepts* Defendants' defense to the arbitrary-and-capricious claim, it should necessarily *reject* their defense to the notice-and-comment claim.

Faced with this double-bind, Defendants assert that if DACA itself should have gone through notice and comment (but did not), then it was "void *ab initio*," such that Defendants could rescind it without following the APA. *See* Opp. 31 & n.12. But failure to undergo notice and comment does *not* render a rule legally "void." *See Am. Wild Horse*, 873 F.3d at 928 (holding that an earlier "failure to comply with the [APA] … would not render [a policy] void from its inception"); MSJ 41 n.18. If Defendants' "void *ab initio*" theory were sound, an agency could never continue to enforce a rule while undergoing court-mandated, corrective notice-and-comment procedures (for there would be no "rule" to enforce during that period). But agencies routinely do just that—and courts often remand without vacatur in notice-and-comment cases to facilitate that fix. *See, e.g.*, *Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 8 (D.C. Cir. 2011); *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002); MSJ 35. Thus, if DACA were a substantive rule adopted without notice and comment, that defect would not bar the rule from taking legal effect. And once it took effect, as DACA did almost six years ago, the agency could eliminate it only through notice and comment. *See Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 26 (D.D.C. 2013) ("[O]rdinarily an agency rule may not be repealed unless certain procedures, including public notice and comment, are followed, and … this is true even where the rule at issue may be defective."), *aff'd*, 601 F. App'x 1 (D.C. Cir. 2015); *Nat'l Treas. Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985) (agency could not rescind regulation without notice and comment based on belief that the regulation exceeded its authority).

Defendants' attempt to portray any notice-and-comment process that DHS could have undertaken here as an empty formality (Opp. 31) is both irrelevant and mistaken. First, "courts often enforce procedural mandates even when an agency may reach the same decision after the required process is completed." *Douglas Timber*, 774 F. Supp. 2d at 245. Second, the result of the agency's notice-and-comment process would hardly be foreordained here. For one thing, the agency could include *retaining* DACA (once ratified by notice and comment) among the proposed paths forward. *See* MSJ 27 n.14; *National Wildlife Fed'n v. Watt*, 571 F. Supp. 1145, 1156-58 (D.D.C. 1983) (explaining the value of notice-and-comment process even for purely legal decisions). But even if the agency were intent on ending DACA, there would be many significant issues for interested parties to address with regard to the means of phasing out the program (as the agency's own convoluted "wind-down" plan makes clear, *see* MSJ 36-38). Defendants cannot explain why, if they indeed inherited a procedurally defective substantive rule, the proper response was to privately negotiate a resolution with Texas and its DAPA co-plaintiffs rather than to afford the opportunity for public comment that the APA demands. "In administrative law, as elsewhere, two wrongs do not make a right." *Am. Wild Horse*, 873 F.3d at 928.

## IV.    Plaintiffs Are Entitled to Relief on Their Information-Sharing Claim.

Defendants do not dispute that due process binds the Government to its affirmative representations about the legal consequences of conduct. Opp. 36. Nor do they dispute that the Executive will enforce immigration laws against at least some DACA recipients upon expiration of status. *Compare* MSJ 52, *with* Opp. 36-39. Instead, they argue that their information-sharing policy has not changed. But whether the policy has changed need not be resolved to grant Plaintiffs' motion for provisional relief. MSJ 50-51.[15] Taking Defendants' assertion as true,

---

[15] Although Defendants assert that the policy has not changed despite materially different statements made at the time of rescission (Opp. 36), counsel's assertions are not evidence, and

Plaintiffs' Motion seeks to require Defendants to provide notice only should it decide to change that policy during this litigation. Such a request is reasonable and imposes no undue burden on the Government. DACA recipients like Perales Sanchez, who reasonably relied on the policy in handing over their sensitive, personal information, deserve at least that much.

In response, Defendants argue that due process is not implicated because DACA recipients will not *necessarily* be removed if Defendants expand the circumstances under which DACA recipients' information is shared for enforcement purposes. Opp. 38 n.18. But as Plaintiffs demonstrated, due process is violated when the government transforms material solicited with a promise to shield applicants from enforcement into evidence that exposes them and their families to the threat of removal, causing irreparable harm. *See* MSJ 51-52. It likewise does not aid Defendants that DACA applicants were on notice about the potential for modifications to the policy from the outset. The perfunctory reservation of rights upon which Defendants rely is ambiguous, and thus ineffective. *Regents*, 2018 WL 401177, at *5. In any event, Defendants cannot simultaneously invite and disclaim reliance. *See* MSJ 50 n.22.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion.

Dated: February 6, 2018                                        Respectfully submitted,

By: /s/ Joseph M. Sellers                            By: /s/ Thomas J. Perrelli
Joseph M. Sellers (DC Bar No. 318410)         Thomas J. Perrelli (DC Bar No. 438929)
Julie S. Selesnick (DC Bar No. 485558)          Lindsay C. Harrison (DC Bar No. 977407)
Julia A. Horwitz (DC Bar No. 1018561)          Sam Hirsch (DC Bar No. 455688)
Cohen Milstein Sellers & Toll PLLC               Ishan Bhabha (DC Bar No. 101567)
1100 New York Ave. NW, Fifth Floor             Benjamin M. Eidelson (DC Bar No. 1031574)
Washington, DC 20005                               Alex Trepp (DC Bar No. 1031036)
T: (202) 408-4600                                    Kendall Turner (DC Bar No. 144701*)
F: (202) 408-4699                                    JENNER & BLOCK LLP

---

Plaintiffs have alleged otherwise. *See Regents of the Univ. of Cal. v. DHS*, No. 17-cv-06211, 2018 WL 401177, at *4-5 (N.D. Cal. Jan. 12, 2018).

jsellers@cohenmilstein.com

*Attorneys for Plaintiffs NAACP; American Federation of Teachers, AFL-CIO; United Food and Commercial International Union, AFL-CIO, CLC*

1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
tperrelli@jenner.com

*Attorneys for The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez*

*\*Application for Admission to District Court for District of Columbia Pending*