# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DONALD J. TRUMP, et al.,**<br><br>    **Defendants.** | **Civil Action No. 17-1907 (JDB)** |
| **TRUSTEES OF PRINCETON UNIVERSITY, et al.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**UNITED STATES OF AMERICA, et al.,**<br><br>    **Defendants.** | **Civil Action No. 17-2325 (JDB)** |

## MEMORANDUM OPINION

These cases present an array of administrative and constitutional challenges to the Department of Homeland Security's ("DHS") rescission of the Deferred Action for Childhood Arrivals ("DACA") program. Though the government disputes these challenges on the merits, its primary defenses concern the Court's authority to hear the cases: the government contends that most plaintiffs lack standing, that the Immigration and Nationality Act ("INA") deprives the Court of subject-matter jurisdiction, and that the Department's decision to rescind DACA is not subject to review under the Administrative Procedure Act ("APA") because it was committed to agency discretion by law. The government has moved to dismiss the complaint in its entirety, and plaintiffs have moved for summary judgment only on their APA claims.

These are just two of a series of challenges to the September 2017 rescission of DACA that have already been before several district courts, two circuit courts of appeals, and the Supreme Court on two occasions. At this time, two preliminary injunctions are in place that require DHS to accept applications for the renewal of DACA benefits, but not to accept new DACA applications. Here, through their pending motions, plaintiffs seek permanent injunctive relief, although only on their APA claims. And the relief they seek would reach new as well as renewal DACA applications.

For the reasons that follow, the Court concludes that it has both jurisdiction and statutory authority to hear plaintiffs' APA and constitutional claims. The Court further concludes that, under the APA, DACA's rescission was arbitrary and capricious because the Department failed adequately to explain its conclusion that the program was unlawful. Neither the meager legal reasoning nor the assessment of litigation risk provided by DHS to support its rescission decision is sufficient to sustain termination of the DACA program. Thus, plaintiffs' motion for summary judgment will be granted in part, and the decision to rescind DACA will be vacated and remanded to DHS. Vacatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications. The Court will stay its order of vacatur for ninety days, however, to allow the agency an opportunity to better explain its rescission decision.

# BACKGROUND

## I.    THE IMPLEMENTATION AND RESCISSION OF DACA

### A.    Deferred Action for Childhood Arrivals

In 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program, which allowed certain undocumented aliens[1] who had been brought to the United States as children to be treated as low priorities for removal under the federal immigration laws.  See AR 1.[2]  According to the Secretary's memorandum (the "DACA Memo"), these young people generally "lacked the intent to violate the law" when they entered the United States as children and, in many cases, "kn[e]w only this country as home" and had "contributed to [the] country in significant ways."  AR 1–2.  DACA was therefore undertaken as "an exercise of . . . prosecutorial discretion" to "ensure that our enforcement resources are not expended on these low priority cases."  AR 1.

DACA was available to any undocumented alien who: (1) came to the United States when she was under the age of sixteen; (2) had lived in the United States continuously since at least June 15, 2007; (3) was enrolled in school or had graduated from high school or been honorably discharged from the military; (4) had not been convicted of certain criminal offenses and posed no threat to national security or public safety; and (5) was under the age of thirty.  AR 1.  Aliens who met these criteria were eligible for renewable, two-year grants of "deferred action" on their

---

[1] Some courts, including the Supreme Court, have referred to aliens who are unlawfully present in the United States as "illegal" instead of "undocumented."  See, e.g., Texas v. United States, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (explaining that this "is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law" (citation omitted)); but see Mohawk Indust., Inc. v. Carpenter, 558 U.S. 100, 103 (2009) (using the term "undocumented immigrants").  Because both terms appear in the record materials here, and because, as at least one court has noted, "there is a certain segment of the population that finds the phrase 'illegal alien' offensive," Texas v. United States, 86 F. Supp. 3d 591, 605 n.2 (S.D. Tex. 2015), the Court will use the term "undocumented."

[2] Citations to "AR" refer to the administrative record.  See Joint Appendix [ECF No. 60].

removal from the United States.  AR 2–3; see 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some [removal] cases lower priority").  As the DACA Memo was careful to point out, however, the program "confer[red] no substantive right, immigration status or pathway to citizenship," as "[o]nly the Congress, acting through its legislative authority, can confer these rights."  AR 3.

Individuals who received deferred action under DACA were also eligible for a host of other benefits under preexisting statutes and DHS regulations.  These benefits included work authorization, 8 C.F.R. § 274a.12(a)(11), social security numbers, id. § 1.3(a)(4)(vi), advance parole (i.e., preauthorization to travel to the United States without a visa), id. § 212.5, and a limited class of public assistance, such as state and federal aid for medical emergencies, 8 U.S.C. §§ 1611(b)(1), 1621(b)(1).  Benefits like these allowed DACA recipients to work, travel abroad, access credit, and otherwise lead productive lives during their periods of deferred action.

To be considered for deferred action under DACA, an applicant had to provide DHS with certain identifying information, including her name, mailing address, and contact information.  See Decl. of Maria De La Cruz Perales Sanchez ("Perales Decl.") [ECF No. 28-8] ¶ 11; see also Form I-821D, U.S. Citizenship and Immigration Servs., Consideration for Deferred Action for Childhood Arrivals, https://www.uscis.gov/i-821d.  Although many applicants feared that this information would later be used to initiate removal proceedings against them, see Perales Decl. ¶¶ 10, 24, the Department assured applicants that their information would in most cases be "protected from disclosure to [U.S. Immigration and Customs Enforcement ("ICE")] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings."  See U.S. Citizenship and Immigration Servs., Instructions for Consideration of Deferred Action for

Childhood Arrivals, https://www.uscis.gov/i-821d.  Relying on these representations, hundreds of thousands of undocumented aliens applied for and received deferred action under the DACA program.  See, e.g., Perales Decl. ¶ 10; Decl. of John Doe #1 ¶ 6; Decl. of John Doe #2 ¶ 5.  By late 2017, nearly 800,000 individuals had been granted deferred action under DACA.  AR 242.

## B.    Deferred Action for Parents of Americans

Two years after DACA's implementation, DHS issued a second memorandum, this time purporting to establish a deferred-action program called Deferred Action for Parents of Americans ("DAPA").  AR 37–41.  As its name suggests, DAPA would have offered deferred action to parents of U.S. citizens or lawful permanent residents who were themselves unlawfully present in the United States.[3]  AR 40–41.  The DAPA memorandum also purported to expand the DACA program in certain respects: it would have removed the thirty-year age cap, made the deferred-action grants last for three years instead of two, and required that an alien need only have been present in the United States since January 1, 2010 to be eligible.  AR 39–40.

Before DAPA took effect, a coalition of states, led by Texas, sued to block its implementation on grounds that it violated both the APA and the Take Care Clause of the Constitution.  See Texas, 86 F. Supp. 3d at 604 & n.1, 607 (citing U.S. Const. art. II, § 3).  The district court granted the states' motion for a preliminary injunction, concluding that they were likely to succeed on their procedural APA claim that DAPA (including its expansion of DACA) should have been promulgated using notice and comment.  Id. at 671–72; see 5 U.S.C. § 553.  In

---

[3] DAPA would have applied to any alien who: (1) had a son or daughter who was a U.S. citizen or lawful permanent resident; (2) had continuously resided in the United States since before January 1, 2010; (3) was physically present in the United States both on November 20, 2014 and the date of her application; (4) had no lawful basis to be present in the United States on November 20, 2014; (5) did not meet certain enforcement priorities; and (6) did not otherwise raise concerns that would make deferred action inappropriate in the agency's discretion.  See AR 40.

part, this was because the Department's implementation of <u>DACA</u> suggested that <u>DAPA</u> would not "genuinely leave[] the agency and its employees free to exercise discretion." <u>Texas</u>, 86 F. Supp. 3d at 604 at 670 (emphasis, alterations, and internal quotation marks omitted). The district court found that only about 5% of all DACA applications had been denied, and the government could not say how many of those had been denied for discretionary reasons. <u>Id.</u> at 609. This led the court to conclude that the DAPA Memo's suggestion that immigration officers could exercise case-by-case discretion was "merely pretext." <u>Id.</u> at 669 n. 101; <u>see</u> <u>Texas</u>, 809 F.3d at 173 (agreeing that although "[t]he DACA and DAPA Memos purport to grant discretion, . . . there was evidence from DACA's implementation that DAPA's discretionary language was pretextual").

The Fifth Circuit affirmed, holding that the states had demonstrated a likelihood of success on the merits not only of their procedural APA claim, but also on their substantive APA claim, because DAPA seemed to conflict with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status."[4] <u>Texas</u>, 809 F.3d at 179. But the court expressly declined to address the states' constitutional challenges. <u>See</u> <u>id.</u> at 146 n.3 (finding it "unnecessary" to address those claims "at this early stage of the proceedings"). It also rejected the government's threshold arguments—similar to the ones offered here—that the states lacked standing, <u>see</u> <u>id.</u> at 150–63, that the INA deprived the court of subject-matter jurisdiction, <u>see</u> <u>id.</u> at 164–65, and that DAPA's implementation was unreviewable under the APA, <u>see</u> <u>id.</u> at 165–72.[5] The government petitioned for certiorari, and in June 2016, an eight-Justice

---

[4] According to the Fifth Circuit, under the INA, the parent must generally "(i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limited number of family-preference visas from a United States consulate." <u>Texas</u>, 809 F.3d at 179–80.

[5] All parties agreed that DAPA was "committed to agency discretion by law," 5 U.S.C. §701(a)(2), to the extent that it "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a

Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. See United States v. Texas, 136 S. Ct. 2271 (2016) (mem).

On January 20, 2017, President Donald J. Trump was sworn into office, and his nominee for Secretary of Homeland Security, John F. Kelly, was confirmed that same day. Six months later, Secretary Kelly issued a memorandum rescinding DAPA, including its expansion of DACA, but leaving the original DACA program in place. AR 235–236. The Texas plaintiffs voluntarily dismissed their challenge to DAPA a few months later. See Pls.' Stipulation of Voluntary Dismissal, Texas v. United States, No. 14-CV-254 (S.D. Tex. Sep. 12, 2017), ECF No. 473.

## C.     The Rescission of DACA

On September 5, 2017, three months after DAPA's rescission, then-Acting Secretary of Homeland Security Elaine C. Duke issued a five-page memorandum rescinding DACA (the "Rescission Memo").[6]  See AR 252–56.  The Rescission Memo began by canvassing the procedural history of the Texas litigation, and then noted that "[a]lthough the original DACA policy was not challenged in [that] lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum."  AR 253. Specifically, the memorandum noted that "[t]he Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary," and that "[b]oth the district court and the Fifth Circuit concluded that implementation of the program did not comply with the [APA] because the Department did not implement it through notice-and-comment rulemaking."  AR 253–54.

---

class of what he deems to be low-priority illegal aliens," Texas, 809 F.3d at 166 ("[Plaintiffs] have not challenged the priority levels [the Secretary] has established, and neither the [district court's] preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities").  But the Fifth Circuit nonetheless found DAPA to be reviewable because it was "much more than nonenforcement: [i]t would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." Id.

[6] Secretary Kelly had since been appointed to serve as President Trump's chief of staff.

The memorandum also stated that in June 2017, after DAPA had been rescinded but before the <u>Texas</u> litigation was voluntarily dismissed, Texas and the other state plaintiffs in that case had sent a letter to Attorney General Jeff Sessions threatening to challenge DACA in court unless he rescinded the program by September 5, 2017.  AR 254; <u>see</u> AR 238–240 (Texas's demand letter).  Attorney General Sessions then sent a one-page letter to Acting Secretary Duke (the "Sessions Letter") instructing her to rescind DACA.  AR 251.  The Sessions Letter explained that the program had been "effectuated by the previous administration through executive action, without proper statutory authority and . . . after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch."  <u>Id.</u>  The letter also noted that because DACA suffered from "the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."  <u>Id.</u>  The letter instructed Acting Secretary Duke to "consider" implementing "an orderly and efficient wind-down process" for the program.  <u>Id.</u>

In light of the <u>Texas</u> litigation and the Sessions Letter, the Rescission Memo concluded, "it is clear that the . . . DACA program should be terminated."  AR 255.  Given "the complexities associated with winding down the program," however, the Department decided to "provide a limited window in which it will adjudicate certain requests for DACA and associated applications."  <u>Id.</u>  Thus, the Department would adjudicate any properly filed DACA applications that were pending as of September 5, 2017, as well as any new applications for the renewal of DACA benefits that were filed on or before October 5, 2017 by persons whose benefits were set to expire on or before March 5, 2018.  It would also honor (in most cases) existing grants of

deferred action, work authorization, and advance parole.  But it would reject all other DACA applications, including any initial applications filed after September 5, 2017, and all pending and future applications for advance parole under the DACA program.  Effectively, then, DACA benefits were made unavailable to any alien who had not already applied, and existing DACA grants would be allowed to expire permanently beginning in March 2018.  Finally, like the earlier DACA and DAPA memorandums, the Rescission Memo stated that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  AR 256.

## II.    LEGAL CHALLENGES TO DACA'S RESCISSION

Since September 2017, legal challenges to DACA's rescission have been filed in federal district courts throughout the country.  Two of these challenges have made their way to the federal courts of appeals, and one has been to the Supreme Court.  Because these challenges generally involve similar administrative and constitutional claims, the Court will not address the plaintiffs' assertions in each case in detail.  Nevertheless, a brief overview of this pending litigation landscape will be useful to understand the state of DACA's rescission today.[7]

### A.  <u>Regents of the University of California v. DHS</u>

The first set of challenges to DACA's rescission was filed in September 2017 in federal district court in California.  <u>See</u> <u>Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.</u>, 279 F. Supp. 3d 1011, 1026 (N.D. Cal. 2018).  The plaintiffs in those cases are the University of California, the State of California and several other states, a group of individual DACA recipients,

---

[7] One case, <u>Park v. Sessions</u>, No. 17-cv-1332 (E.D. Va. filed Nov. 21, 2017), was dismissed pursuant to a stipulation by all parties on March 1, 2018, before any relief was granted.  The Court will not discuss that case further.

two California municipalities, and a labor union.  See id.  Though not formally consolidated, the cases were all assigned to U.S. District Judge William H. Alsup.  See Case Management Scheduling Order, Regents, No. 17-5211 (N.D. Cal. Sept 22, 2017), ECF No. 49.

Shortly after the actions were filed, the government filed an administrative record consisting of "fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation."  Regents, 279 F. Supp. 3d at 1028.  "All non-public materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged."  Id. (citation omitted).  The district court ordered the government to complete the record, denying many of the government's claims of privilege.  Id. at 1028–29.  The government petitioned the Ninth Circuit for a writ of mandamus, but the court of appeals denied the petition.  See In re United States, 875 F.3d 1200 (9th Cir. 2017).  The government then sought the same relief from the Supreme Court, which construed the government's mandamus petition as a petition for a writ of certiorari, granted it, vacated the Ninth Circuit's order, and directed the district court to "first resolve[] the Government's threshold arguments," since those arguments, "if accepted, likely would eliminate the need for the District Court to examine a complete administrative record."  In re United States, 138 S. Ct. 443, 444–45 (2017) (per curiam).

While the litigation over the administrative record was pending, the plaintiffs filed a motion for preliminary injunctive relief, and the government moved to dismiss the plaintiffs' complaints both for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  See Regents, 279 F. Supp. 3d at 1029.  Then, following the Supreme Court's instruction to first address the government's threshold arguments, the district court denied the government's Rule 12(b)(1) motion and granted the plaintiffs' motion for a preliminary

injunction. Id. at 1036–37. The injunction directed DHS to resume accepting applications for the renewal of DACA benefits, although it did not require the agency to accept new DACA applications or to afford current DACA beneficiaries advance parole. See id. at 1048–49.

In a separate order entered a few days later, the district court denied the government's Rule 12(b)(6) motion except as to the plaintiffs' notice-and-comment and Regulatory Flexibility Act claims. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No 17-CV-05211, 2018 WL 401177, at *2 (N.D. Cal. Jan. 12, 2018). The government appealed both orders, and the Ninth Circuit set an expedited briefing schedule. See Order, Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No. 18-15068 (9th Cir. Jan. 17, 2018), ECF No. 2. The government also petitioned the Supreme Court for a writ of certiorari before judgment, but the Supreme Court denied the petition. See Order, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., No. 17-1003 (U.S. Feb. 26, 2018). The government's appeal is currently pending before the Ninth Circuit.

**B.      Batalla Vidal v. Duke**

The second challenge also came about in September 2017 when Martin Batalla Vidal, an individual DACA beneficiary who was already engaged in litigation with the Department over the revocation of his employment authorization, amended his complaint to assert a challenge to DACA's rescission. See Batalla Vidal v. Duke, No. 16-CV-4756, 2017 WL 5201116, at *4 (E.D.N.Y. Nov. 9, 2017). His challenge was later consolidated with two others before Judge Nicholas G. Garaufis of the U.S. District Court for the Eastern District of New York. Id. The plaintiffs in the three cases include Mr. Batalla Vidal, the State of New York, fourteen other states and the District of Columbia, and Make the Road New York, a nonprofit. See id. at *4 & n.5.

Shortly after the consolidation of the three actions, another dispute arose regarding the scope of the administrative record. The district court ordered the government to produce certain

documents, see id. at *6–7, and, on the government's petition for mandamus, the Second Circuit stayed discovery pending the district court's resolution of "issues of jurisdiction and justiciability." Id. at *8. The government then filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). Id.

The district court denied the government's Rule 12(b)(1) motion (except as to some plaintiffs that the court found lacked standing), see id. at *20, but it later certified its decision for an interlocutory appeal, see Batalla Vidal v. Nielsen, 16-CV-4756, 2018 WL 333515, at *1 (E.D.N.Y. Jan. 8, 2018). The Second Circuit then held the government's petition for leave to file an interlocutory appeal in abeyance pending the district court's resolution of the government's Rule 12(b)(6) motion and the plaintiffs' motion for a preliminary injunction, which the plaintiffs had filed while issues related to the interlocutory appeal were being litigated. See Certified Order, Nielsen v. Vidal, No. 18-122 (2d Cir. Jan. 31, 2018), ECF No. 46.

A few weeks later, the district court granted the plaintiffs' motion for a preliminary injunction. See Batalla Vidal v. Nielsen, 279 F. Supp. 401, 437–38 (E.D.N.Y. 2018). The scope of the court's injunction was the same as in Regents: it required the Department to resume consideration of renewal applications but did not require the consideration of initial applications or applications for advance parole. Id. at 437–38. The government took an interlocutory appeal, and the next day, the Second Circuit denied the mandamus petition that it had previously held in abeyance and vacated its earlier discovery stay. See Certified Order, In re Nielsen, No. 17-3345 (2d Cir. Feb. 21, 2018), ECF No. 181. The Second Circuit thereafter granted the government's motion to expedite the appeal, which is pending at this time. See Certified Order, Vidal v. Nielsen, No. 18-485 (2d Cir. Mar. 8, 2018), ECF No. 62.

While the expedited appeal was pending, the district court granted in part and denied in part the government's pending 12(b)(6) motion.[8] See Batalla Vidal v. Nielsen, No. 16-cv-4756, 2018 WL 1532370, at *1 (E.D.N.Y. Mar. 29, 2018). The court denied the motion as to plaintiffs' substantive APA claims for substantially the same reasons that it had previously found a substantial likelihood of success on the merits of those claims, id. at *3, but granted the motion as to their procedural APA and Regulatory Flexibility Act ("RFA") claims. Id. at *5–6. The court also denied the motion as to the plaintiffs' equal protection claims, id. at *6–10, although it granted the motion as to their information-sharing claim, concluding that the plaintiffs had "not plausibly alleged that DHS actually changed its information-sharing policy," id. at *11. Finally, the court granted the motion as to plaintiffs' procedural due process claim, except as to certain plaintiffs who alleged that their renewal applications had been improperly rejected as untimely or were erroneously deemed to contain minor clerical errors. Id. at *14.

### C.    Casa de Maryland v. DHS

The plaintiffs in the third case, CASA de Maryland v. U.S. Dep't of Homeland Security, 284 F. Supp. 3d 758 (D. Md. 2018), are individual DACA recipients and several nonprofit organizations. In March 2018, the district court (Judge Roger W. Titus) ruled that although DACA's rescission was reviewable, it did not violate the APA or the Equal Protection or Due Process Clauses. See id. at 770, 773–77, 779. The district court summarized its decision to depart from the Regents and Batalla Vidal courts on the substantive APA claim as follows:

> The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious.

---

[8] That motion also sought dismissal under Rule 12(b)(1) (on standing and mootness grounds) of the Batalla Vidal plaintiffs' procedural due process claim, which had been presented for the first time in their third amended complaint. Batalla Vidal, 2018 WL 1532370, at *12–13. The court denied the motion to dismiss on that ground.

> Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a reasoned decision to rescind DACA based on the Administrative Record . . . . Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

Id. at 767–768 (citation omitted). However, the district court did grant one form of relief not granted by the courts in Regents or Batalla Vidal: it enjoined DHS from "using information provided by Dreamers through the DACA program for enforcement purposes," explaining that so doing would violate applicable principles of equitable estoppel. Id. at 779. As of the date of this decision, neither party has appealed the district court's order, although the time in which to do so has not yet expired. See Fed. R. App. P. 4 (a)(1)(B).

## III. THE PRESENT CHALLENGES TO DACA'S RESCISSION

The cases currently before this Court, NAACP v. Trump and Princeton v. United States, were filed in September and November 2017, respectively, and have been consolidated for purposes of the dispositive motions pending in each. The plaintiffs in the Princeton action are Princeton University, Microsoft Corporation, and Maria de la Cruz Perales Sanchez, a DACA beneficiary and Princeton undergraduate. See Compl. ("Princeton Compl.") [ECF No. 1] at 12. The plaintiffs in the NAACP action are the National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union ("UFCW"). See First Amended Complaint at 3–5, NAACP, No. 17-cv-1907 (D.D.C. Oct. 24, 2017), ECF No. 10 ("NAACP FAC"). Both sets of plaintiffs challenge DACA's rescission on various administrative and constitutional grounds, including that it was arbitrary and capricious, see Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J.

("Princeton MSJ") at 11–38; that it should have undergone notice-and-comment procedures, see id. at 38–41; that its effects on "small entities" should have been analyzed pursuant to the RFA, 5 U.S.C. §§ 601–12, see NAACP FAC 16–17; and that it violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments, see Princeton Compl. at 35–40.

The government has filed motions to dismiss in both actions.  It argues: (1) that plaintiffs' APA claims should be dismissed because DACA's rescission was "committed to agency discretion by law" and is therefore unreviewable under 5 U.S.C. § 701(a)(2), see Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Princeton MTD") [ECF No. 8] at 14–21; (2) that a provision of the INA, 8 U.S.C. § 1252(g), deprives the Court of subject-matter jurisdiction, see id. at 21–24; (3) that all plaintiffs but Ms. Perales Sanchez lack Article III and prudential standing, see id. at 24–25; Mem. in Supp. of Defs.' Mot. to Dismiss, No. 17-cv-1907 (D.D.C. Nov. 8, 2018) ("NAACP MTD") at 14–18; and (4) that plaintiffs have failed to state a claim under the APA, the RFA, and the Constitution, Princeton MTD at 27–44.

Plaintiffs have moved for summary judgment only on their APA claims, or alternatively, for preliminary injunctive relief "[t]o the extent the Court wishes to see [the discovery] issues [in Regents and Batalla Vidal] litigated before granting final judgment to the Plaintiffs."  Princeton MSJ at 3 & n.1.  Unlike the plaintiffs in Regents and Batalla Vidal, however, plaintiffs here have not challenged the completeness of the administrative record, see 5 U.S.C. § 706 (providing that, in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party" (emphasis added)), and the government urges the Court to decide the pending motions on the current record, see Princeton MTD at 3 ("[T]he Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside

the Rescission Policy if it disagrees."). Finally, plaintiffs have also moved for a preliminary injunction preventing DHS from sharing or otherwise using DACA beneficiaries' personal information for immigration enforcement purposes. See Princeton MSJ at 48–53.

The Court initially set a motions hearing in this case for February 2018, but the hearing was continued at the parties' request pending the government's petition for certiorari before judgment in the Regents case. See January 26, 2018 Min. Order. That petition was denied in late February, and the Court held a motions hearing in mid-March. The parties' motions are now ripe for decision.

**DISCUSSION**

I.    S&#x1D1C;BJECT-M&#x1D00;TTER J&#x1D1C;RISDICTION

**A.  The Immigration and Nationality Act**

The government argues that the Court lacks jurisdiction over all of plaintiffs' claims—administrative and constitutional—under 8 U.S.C. § 1252(g), a provision of the INA that states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." On its face, that language removes jurisdiction only as to the three listed actions of the Attorney General. The government argues that "[t]he denial of deferred action is a step toward the commencement of removal proceedings against an alien" and that "the INA's careful scheme for [removal] proceedings" suggests that such denials may be challenged only through individual removal proceedings, and hence § 1252(g) strips the Court of jurisdiction over plaintiffs' challenge here. Defs.' Reply in Supp. of their Mot. to Dismiss ("Defs.' Reply") [ECF No. 56] at 10.

The government's position contradicts not only the plain language of § 1252(g) but also the Supreme Court's interpretation of that language in Reno v. American–Arab Anti-Discrimination Committee ("AAADC"), where the Court specifically rejected the argument that "the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. 471, 482 (1999). Rather, the Court explained, § 1252(g) applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" Id. (listing "part[s] of the deportation process" that fall outside of § 1252(g)'s scope, including "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). Because the rescission of DACA is neither the commencement of a proceeding, the adjudication of a case, nor the execution of a removal order, § 1252(g) is inapplicable here pursuant to the provision's plain language.

The government's only response is that DACA's rescission is a "step toward" the removal of specific aliens. See Defs.' Reply at 10; but see id. at 2 (stressing elsewhere that rescission "does not, in itself, exert the agency's coercive power over any individual"). True, the Supreme Court said in AAADC that § 1252(g) was "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." 525 U.S. at 487. But there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which plaintiffs' challenge might interfere. Cf. id. (concluding that § 1252(g) stripped jurisdiction over selective deportation claims brought by six aliens who were then in removal proceedings). Thus, the government's reliance on AAADC is misplaced,

and § 1252(g) does not bar review here.  <u>Accord</u> <u>Regents</u>, 279 F. Supp. 3d at 1031–1033 (rejecting

the government's § 1252(g) argument); <u>Batalla Vidal</u>, 2017 WL 5201116, at *12–13 (same).

## B.    Article III Standing

The government also asks the Court to dismiss the claims brought by Princeton and

Microsoft, <u>Princeton</u> MTD at 24–25, and by all plaintiffs in the <u>NAACP</u> action, <u>see</u> <u>NAACP</u> MTD

at 14–17, for lack of Article III standing.  In so moving, the government urges the Court to conduct

a "claim-by-claim analysis" of each plaintiff's standing as to each claim.  Defs.' Reply 11.

Such a detailed analysis is unnecessary, however, at least in <u>Princeton</u>.  The government

does not dispute that the individual plaintiff, Ms. Perales Sanchez, has Article III standing to assert

each claim in the complaint.[9]  <u>See</u> <u>Princeton</u> MTD 24–25 (seeking dismissal only as to the "[n]on-

[i]ndividual [p]laintiffs"); <u>Princeton</u> Compl. 30–38 (listing Ms. Perales Sanchez as a plaintiff on

each count).  And as the Supreme Court has recently reaffirmed, Article III requires only that "[a]t

least one plaintiff . . . have standing to seek each form of relief requested in the complaint."  <u>Town</u>

<u>of Chester v. Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1651 (2017).  In <u>Princeton</u>, that "one plaintiff"

is Ms. Perales Sanchez, and no further analysis of any other plaintiff's standing is necessary.

---

[9] Nor could they.  Ms. Perales Sanchez clearly satisfies the "irreducible constitutional minimum" of standing as to DACA's rescission: her inability to renew her DACA benefits is (1) an "injury in fact," which is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical"; it is (2) "fairly traceable" to DHS's decision to rescind DACA; and it is (3) "likely to be redressed" by a decision of this Court invalidating DACA's rescission.  <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547–48 (2016) (internal quotation marks omitted).  And although the Court ultimately concludes that plaintiffs fail to state a claim as to DHS's alleged plans to share DACA beneficiaries' information with immigration enforcement agencies, the Court concludes—and the government does not dispute—that Ms. Perales Sanchez has standing to assert that claim as well.  <u>See</u> Princeton Compl. ¶ 108 (alleging that DHS has "revised [its] assurances about information sharing" and now "offer[s] only to prevent personal information from being provided 'proactively' to agencies responsible for facilitating removal"); <u>cf.</u> <u>Clapper v. Amnesty Int'l</u>, 568 U.S. 398, 411 (2013) (finding that the plaintiffs' asserted injury was too speculative when it relied on a hypothetical sequence of government actions that culminated in their communications being monitored).

In NAACP, however, there is no individual plaintiff.  The organizational plaintiffs—the NAACP and two labor unions—therefore must rely on their own standing to survive the government's motion to dismiss.  These plaintiffs assert that they have "associational standing," which requires each of them to plead that "(1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit."  AARP v. EEOC, 226 F. Supp. 3d 7, 16 (D.D.C. 2016) (citation omitted).  As in Princeton, if one of the three NAACP plaintiffs has standing, then an analysis of the remaining plaintiffs' standing is unnecessary.

The parties do not dispute that the NAACP plaintiffs meet the third prong of the test for representational standing—they do.  See NAACP MTD at 16–17 (not arguing that the participation of individual members should be required).  And although the government contends that the NAACP plaintiffs fail the first prong because their complaint does not "name a specific member with standing," see id. at 16, each plaintiff provided an anonymous affidavit from at least one of its members stating that the member was a DACA beneficiary, see, e.g., Princeton MSJ, Ex. W [ECF No. 28-17] (declaration of NAACP member), and the government does not seriously dispute—nor could it—that these affidavits are sufficient.[10]  Thus, the only remaining issue is whether the rescission of DACA is germane to the organizational plaintiffs' purposes.

---

[10] The government initially argued that the organizational plaintiffs had to name these members.  See NAACP MTD at 16.  The authority for that proposition is tenuous, however, see Young Am.'s Found. v. Gates, 560 F. Supp. 2d 39, 49 (D.D.C. 2008) ("[I]t is not clear that [associational standing] actually requires a name-specific identification."), aff'd, 573 F.3d 797 (D.C. Cir. 2009); Doe v. Stincer, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought . . . ."), and the government did not renew the argument in its reply brief, see Defs.' Reply at 12–13.

The germaneness requirement is "undemanding" and requires "mere pertinence between litigation subject and organizational purpose." Humane Soc. of the U.S. v. Hodel, 840 F.2d 45, 58 (D.C. Cir. 1988). Here, the NAACP has alleged that its purpose is to "ensure the political, educational, social, and economic equality of all persons," particularly "people of color." NAACP Compl. at 3–4. This mission is "pertinent" to the subject of the litigation here, because plaintiffs have alleged that "[n]early all of the DACA registrants—more than 95%—are people of color," id. at 12, and that DACA confers various educational, social, and economic benefits on those individuals, see id. at 2. At this stage of the litigation, these allegations are sufficient to establish the NAACP's standing—which, in turn, is sufficient to establish the standing of the other two plaintiffs in the NAACP action. See Hodel, 840 F.2d at 59 (concluding that an association's "members' aesthetic interest in viewing live animals and birds" was sufficiently germane to a lawsuit whose purpose was "keeping animals and birds alive and well"). Thus, at least one plaintiff has standing to assert every claim in both of the actions currently before the Court, and the government's motions to dismiss for lack of standing will be denied.

## II.    ADMINISTRATIVE CHALLENGES

As noted above, plaintiffs assert various administrative challenges to DACA's rescission, including that it was arbitrary and capricious, that it required notice and comment, and that it ran afoul of RFA's requirement that an agency consider the effects of its actions on small entities. The government raises two threshold arguments that apply only to plaintiffs' administrative claims: first, that DACA's rescission was unreviewable under the APA's carve-out for actions "committed

to agency discretion by law," 5 U.S.C. § 701(a)(2);[11] and second, that plaintiffs fall outside the "zone of interests" protected by the APA and RFA. The Court will first address the government's threshold arguments and then proceed to the merits of plaintiffs' claims.

## A. Reviewability

The APA "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has explained the difference between § 701(a)(1) and (a)(2) as follows:

> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is <u>drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion</u>. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely.

Heckler v. Chaney, 470 U.S. 821, 828 (1985) (emphasis added). Thus, in determining whether a particular agency action is "committed to agency discretion by law," courts ask whether "statutes are drawn in such broad terms that in a given case there is no law to apply." <u>Id.</u> (citations and internal quotation marks omitted); <u>see also</u> <u>Drake v. FAA</u>, 291 F.3d 59, 70 (D.C. Cir. 2002) ("[T]he 'no law to apply' formula has come to refer to the search for substantive legal criteria against which an agency's conduct can be seriously evaluated.").

One category of agency action that the Court has held to be "presumptively unreviewable" under § 701(a)(2) is an agency's decision "not to institute enforcement proceedings." <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993) (citing <u>Chaney</u>, 470 U.S. at 831). The Supreme Court first

---

[11] "[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." <u>Sierra Club v. Jackson</u>, 648 F.3d 848, 854 (D.C. Cir. 2011) (citations omitted).

identified this presumption in <u>Chaney</u>, a case in which a group of death-sentenced prisoners petitioned the Food and Drug Administration ("FDA") to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. <u>See</u> 470 U.S. at 823. The FDA refused, explaining not only that was it "unclear" that it had "jurisdiction over the unapproved use of approved drugs for human execution," but also that given the absence of any "danger to the public health or a blatant scheme to defraud," even if the agency did have jurisdiction, it would "decline to exercise [that jurisdiction] under [its] inherent discretion to decline to pursue certain enforcement matters." <u>Id.</u> at 824–25. The plaintiffs filed suit, seeking an order directing the FDA to take enforcement action. The district court granted summary judgment for the agency, holding that its decision not to act was unreviewable under § 701(a)(2), but the court of appeals reversed with instructions to order the agency to "fulfill its statutory function." <u>Id.</u> at 825–27.

The Supreme Court granted certiorari and reversed. "[A]gency decisions to refuse enforcement," the Court explained, are "general[ly] unsuit[able] for judicial review" for several reasons. <u>Id.</u> at 831. Such decisions call for "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies." <u>Id.</u> Moreover, nonenforcement decisions generally do not involve the exercise of "<u>coercive</u> power over an individual's liberty or property rights"; they provide no "focus for judicial review"; and they "share[] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." <u>Id.</u> at 832. For these reasons, such decisions have "traditionally been 'committed to

agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition." Id. Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Id. The Court was careful to note, however, that this presumption of unreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833. Critically for purposes of this case, moreover, the Court reserved judgment on whether the presumption applies where an agency "refuse[s] . . . to institute proceedings based solely on the belief that it lacks jurisdiction." Id. at 833 n.4 (internal quotation marks omitted).

Although the Supreme Court has not yet answered the question reserved in Chaney, the D.C. Circuit has addressed it. In Crowley Caribbean Transport, Inc. v. Pena, for example, the issue was whether Chaney's presumption of unreviewability applied to the Maritime Administration's refusal to take an enforcement action under a provision of the Merchant Marine Act of 1936 (the "1936 Act") that the agency thought was inapplicable as a matter of law. See 37 F.3d at 672–73. The D.C. Circuit began by noting that Chaney had reserved judgment on almost exactly this issue and then observed that two intervening circuit decisions seemed to have answered the question in contradictory ways. See id. at 675–76 (citing Safe Energy Coal. of Mich. v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477 (D.C. Cir. 1989) (presumption of unreviewability applied to the agency's refusal, based on its interpretation of its own regulations, to take enforcement action against a nuclear reactor); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 244–45 (D.C. Cir. 1986) (presumption of unreviewability did not apply to the Department of Labor's refusal, based on its interpretation of the labor laws, to take enforcement action in response to a union complaint)).

After noting that "[a]s a circuit, we seem to have no explicit rule on how to proceed when we have inconsistent precedents," id. at 675, the court relied on language from an intervening Supreme Court decision, ICC v. Brotherhood of Locomotive Engineers ("BLE"), 482 U.S. 270 (1987), to resolve the intra-circuit split. BLE held that an agency's refusal to reconsider a decision on the basis of "material error"—that is, because it was erroneous when made, not because of changed circumstances or newly discovered evidence—is "committed to agency discretion by law" under § 701(a)(2), even if it is based on the agency's interpretation of a statute. Id. at 278– 84. In reaching this conclusion, the Supreme Court rejected what it took to be the concurrence's suggestion that "if [an] agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."[12] Id. at 283. To refute this proposition, the Court explained,

> it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

Id. Citing this passage, the Crowley court concluded that BLE, "though not in the Chaney context, squarely rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions." Crowley, 37 F.3d at 676. Thus, the court held, there was "no basis for review of the Maritime Administrator's single-shot non-enforcement decision." Id.

The D.C. Circuit in Crowley was careful to preserve another line of circuit precedent, however, which holds that Chaney's presumption of unreviewability does not apply to "an

_____

[12] The concurrence disputed this characterization of its argument. See id. at 290 n.2 (Stevens, J., concurring in the judgment). Its point was that because an agency's action can be sustained only on the grounds invoked by the agency, "when an agency explains that it has denied a petition for reopening based on . . . its reading of a statute or a constitutional provision, its decision cannot be sustained on the conjecture that it has the discretion to deny reopening on a variety of grounds." BLE, 482 U.S. at 290–291 (Stevens, J., concurring in the judgment).

agency's announcement of its interpretation of a statute, even when that interpretation is advanced in the context of a decision not to take enforcement action." Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993) (citations and internal quotation marks omitted).[13] The key difference, the Crowley court explained, was that while the case before it involved an agency's refusal to act on a single complaint, those prior cases involved "an agency's statement of a general enforcement policy" that was either "expressed . . . as a formal regulation after the full rulemaking process . . . or . . . otherwise articulated . . . in some form of universal policy statement." Crowley, 37 F.3d at 676. The court then pointed out the "ample reasons for distinguishing the two":

> [First,] general statements [of enforcement policy] . . . are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,' a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy . . . .

Id. at 677 (quoting Chaney, 470 U.S. at 833 n.4). Thus, the court concluded in Crowley, an individual nonenforcement decision is presumptively unreviewable even if it is based solely on legal grounds, even though "an agency's statement of a general enforcement policy may be reviewable for legal sufficiency." Id. at 676–677.

---

[13] See id. (holding that the presumption of unreviewability did not apply to the agency's determination that a statutory requirement applied to the plaintiffs, even though that determination was made in a policy statement that communicated the agency's intent not to enforce that requirement); Nat'l Wildlife Fed'n v. EPA, 980 F.2d 765, 773 (D.C. Cir. 1992) ("[T]he presumption of unreviewability of agency nonenforcement decisions is inapplicable or at least rebutted [where a plaintiff] raises a facial challenge to [an agency's] statutory interpretation embodied in [a regulation] and does not contest a particular enforcement decision.").

The D.C. Circuit has applied Crowley only once, in OSG Bulk Ships, Inc. v. United States, 132 F.3d 808 (D.C. Cir. 1998). In that case, a plaintiff challenged the Maritime Administration's longstanding policy of refusing to enforce a different provision of the 1936 Act against certain vessels. See id. at 811 (explaining that the agency had "long allowed" vessels built with the aid of a federal subsidy that was reserved for ships that would be operated exclusively in foreign trade to enter the domestic shipping market at the end of their economic lives). Citing Crowley for the proposition that while "agencies' nonenforcement decisions are generally unreviewable . . . , an agency's adoption of a general enforcement policy is subject to review," the court concluded that the Maritime Administration's policy was not presumptively unreviewable because it was not a "single-shot non-enforcement decision." Id. at 812 (citation omitted).

The government contends that Chaney's presumption of unreviewability applies here. See Princeton MTD at 17. Like the FDA's refusal to take the enforcement actions at issue in Chaney, the government argues, DHS's decision to rescind a deferred-action policy like DACA involves a "complicated balancing" of the agency's enforcement and resource-allocation priorities, and it resembles the "[c]hanges in policy as to criminal prosecutorial discretion" that "regularly occur within and between presidential administrations." Defs.' Reply at 2–3, 26. Moreover, the Supreme Court has said that the concerns that counsel against judicial review in the criminal context are "greatly magnified in the deportation context," where delaying removal "is often the principal object of resistance to a deportation proceeding" and where delays "permit and prolong a continuing violation" of the federal immigration laws. AAADC, 525 U.S. at 490. Nor do Crowley and OSG apply here, the government argues, because those cases involved an agency's

interpretation of a specific statutory provision, whereas this case involves the agency's evaluation of its overall statutory authority.

Plaintiffs resist the application of Chaney's presumption on two grounds. First, they argue, Chaney itself involved a decision not to enforce a statute, whereas DACA's rescission was, in essence, a decision to resume enforcing the immigration laws. Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") [ECF No. 23] at 6. This matters because two of Chaney's reasons for its presumption apply "unique[ly] to non-enforcement decisions": the absence of the exercise of "coercive power" over any person, and the lack of any "focus for judicial review." Id.

This distinction is unpersuasive. For one thing, the rescission of DACA does not actually require the Department to initiate removal proceedings against any specific alien; rather, it simply removes a mechanism by which certain aliens otherwise could have been considered for deferred action. Thus, like the FDA's nonenforcement decision in Chaney, there are no agency proceedings here to provide a "focus for judicial review," 470 U.S. at 832, and DACA's rescission does not itself involve the exercise of coercive power over any person.[14]

Moreover, Chaney's remaining rationales apply here with equal force. An agency's decision to revoke a nonenforcement policy involves the same prioritization and resource-allocation considerations as its decision to implement such a policy. See Chaney, 470 U.S. at 831.

_____

[14] True, there is an element of coercion in the revocation of work authorization and other benefits associated with DACA. But the revocation of those benefits is not itself an enforcement decision and is therefore not properly analyzed under Chaney. See 470 U.S. at 832. Indeed, at least one other court has concluded that the withholding of work authorization and similar discretionary benefits is unreviewable under § 701(a)(2) simply because "[t]here are no statutory standards . . . to apply." See Perales v. Casillas, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office of the then-Immigration and Naturalization Service to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period); cf. Texas, 809 F.3d at 166–68 (holding that conferring such benefits, especially "in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization," was a nondiscretionary determination sufficient to permit APA review).

And both types of decisions are substantially immunized from judicial review in the criminal context.  See United States v. Armstrong, 517 U.S. 456, 464 (1996) ("[T]he decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion[,] . . . subject to constitutional constraints." (citations omitted)).  Thus, although the D.C. Circuit has at times warned against extending Chaney "outside of [the] context" of "decisions not to take enforcement action," Robbins v. Reagan, 780 F.2d 37, 46 (D.C. Cir. 1985) (rejecting Chaney's application to a decision to withhold federal funding from a homeless shelter), this Court has little difficulty concluding that Chaney extends to the revocation of nonenforcement decisions.

Second, plaintiffs contend that under Crowley and OSG, any general enforcement policy is exempt from Chaney's presumption of unreviewability, regardless of whether it is premised on a legal interpretation.  See Pls.' Opp'n at 7; Tr. Of Mots. Hr'g [ECF No. 64] ("Oral Arg. Tr.") at 21:6–11.  Concededly, there is some language in the post-Crowley case law to support this view. See, e.g., OSG, 132 F.3d at 812 (stating that "an agency's adoption of a general enforcement policy is subject to review"); Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth., 283 F.3d 339, 343 (D.C. Cir. 2002) (noting "our assumption in Crowley that a district court might have jurisdiction over an agency's articulation of its general enforcement policy").

But plaintiffs' reading of this language is unpersuasive for at least two reasons.  First, it is in substantial tension with Chaney itself, where the plaintiffs had asked the FDA to take "various investigatory and enforcement actions" against drug manufacturers, state prisons, and "all those in the chain of distribution who knowingly distribute or purchase the drugs [at issue] with intent to use them for human execution."  470 U.S. at 824; see id. at 842 (Marshall, J., concurring in the judgment) (noting that "the number of people currently affected by the alleged misbranding is

around 200"). These facts suggest that the FDA's refusal to act in that case was more than just a one-off nonenforcement decision.[15] Second, plaintiffs' broad reading of <u>Crowley</u> and <u>OSG</u> is unnecessary to support the holdings of those cases, which both involved nonenforcement decisions based solely on agency statutory interpretation. <u>See</u> <u>Crowley</u>, 37 F. 3d at 672–73; <u>OSG</u>, 132 F.3d at 810 Better, then, to adhere to the lines that the D.C. Circuit and the Supreme Court have actually drawn: between legal interpretations couched as broad enforcement policies (which are reviewable, as in <u>OSG</u>), individual enforcement decisions (which are presumptively unreviewable, as in <u>Crowley</u>), and discretionary enforcement policies (which are presumptively unreviewable, as in <u>Chaney</u> itself).

Indeed, the government's reading of <u>Crowley</u> and <u>OSG</u> proceeds essentially along these lines. In the government's view, those cases stand for the proposition that "if [an] agency's <u>interpretation of a statute</u> is embedded in a non-reviewable enforcement policy, the former may be reviewable as such," but "the enforcement policy itself" is presumptively insulated from review. Defs.' Reply at 6 (emphasis added). Thus, according to the government, <u>Crowley</u> and <u>OSG</u> address the "flipside" of the Supreme Court's <u>dictum</u> in <u>BLE</u>: just as an otherwise unreviewable agency action (like a refusal to reconsider an earlier decision, as in <u>BLE</u>, or a nonenforcement decision, as in <u>Chaney</u> and <u>Crowley</u>) does not become reviewable simply because the agency acts on the basis of its interpretation of a statute, an otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion. <u>See</u> Oral Arg. Tr. at 15:5–13.

---

[15] Justice Brennan joined the Court's opinion on the understanding that it applied only to "[i]ndividual, isolated nonenforcement decisions." <u>Id.</u> at 839 (Brennan, J., concurring). Seven other justices joined the majority opinion in full, however, and none of them took Justice Brennan's view.

The Court has no quarrel with this statement of the law as a general matter, but it is unpersuaded by the government's attempt to apply that law to this case. The government contends that the Crowley/OSG exception does not apply here because the Rescission Memo "does not contain an embedded interpretation of the INA (or any other statute)." Defs.' Reply at 6. But the Sessions Letter makes clear that DACA's rescission was based (at least in significant part) on the Attorney General's view that the program lacked "proper statutory authority." AR 251.

As best the Court can tell, the government's response is that Crowley and OSG are distinguishable because they involved an agency's determination that a specific statutory provision applied to a particular course of conduct, whereas this case—like Chaney—involves an agency's determination as to the scope of its statutory (and here, also constitutional) authority. See Oral Arg. Tr. at 57:24–58:9 (arguing that Crowley applies only "where there's an interpretation of a substantive provision of the statute"); id. at 8:12–15 ("Plaintiffs nowhere point to any provision in the INA that would substantively constrain the Secretary's decision . . . to rescind or discontinue DACA."). But this strikes the Court as a distinction without a difference. To say that a particular agency action is "without statutory authority" is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply. See, e.g., 6 U.S.C. § 202(5) (authorizing the Department to "[e]stablish[] national immigration enforcement policies and priorities"). The Court fails to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision. See City of Arlington v. FCC, 569 U.S. 290, 299–300 (2013) (rejecting, for purposes of determining the proper standard of judicial review, a similar distinction between "jurisdictional" and "nonjurisdictional" agency

interpretations and concluding that "there is <u>no difference</u>, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has"). The government's attempt to avoid <u>Crowley</u> and <u>OSG</u> on these grounds therefore fails.

The government's reliance on <u>BLE</u> is equally unavailing. For one thing, as <u>Crowley</u> recognized, <u>BLE</u> addressed the reviewability of enforcement decisions only in <u>dictum</u>; its actual holding concerned the reviewability of an agency's refusal to reconsider a prior decision. <u>See Crowley,</u> 37 F.3d at 676; <u>BLE</u>, 482 U.S. at 278–84. Moreover, the best account of <u>BLE</u> is the one that the D.C. Circuit actually gave in <u>Crowley</u>, where the court relied on <u>BLE</u> to conclude that <u>Chaney</u>'s presumption of unreviewability applies to <u>individual</u> nonenforcement decisions. <u>See Crowley</u>, 37 F.3d at 676–77. In the same breath, however, the D.C. Circuit reaffirmed its view that general enforcement policies are exempt from <u>Chaney</u>'s presumption of unreviewability where they are predicated solely on the agency's view of what the law requires. <u>See id.</u> This treatment of <u>BLE</u> by the <u>Crowley</u> court is not only sensible—after all, <u>BLE</u>'s <u>dictum</u> concerned a prosecutor's decision not to bring a <u>single</u> criminal charge—but it is also binding on this Court.

Nor do the concerns that counsel against judicial review in the immigration context carry much force where, as here, a party seeks judicial review of a legal judgment embedded in an immigration enforcement policy. Unlike judicial review of individual removal proceedings, review of an enforcement policy does not itself delay the removal of any specific alien. <u>See AAADC</u>, 525 U.S. at 490–91 (noting that delay "is often the principal object of resistance to a deportation proceeding" and that it prolongs "an ongoing violation of United States law"). And there is no danger of "chilling law enforcement by subjecting the [agency's] motives . . . to outside

inquiry," since the court need only examine the immigration authority's legal reasoning. Id. at 490 (alteration omitted). Although many immigration decisions touch on subjects that courts are ill-equipped to consider, such as diplomacy or national security, see id. at 491, an agency's interpretation of a statute is a much more natural subject for judicial review. Thus, while immigration policies are generally "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference," there are good reasons to scrutinize a policy more carefully when it is based solely on an agency's reading of domestic statutory law. Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).

Properly understood, then, the Crowley/OSG exception to Chaney's presumption of unreviewability applies to a legal interpretation phrased as a general enforcement policy, even if that interpretation concerns the scope of the agency's lawful enforcement authority. And that is essentially what we have here.

But the government has one final line of defense. According to the government, DACA was rescinded not only because of its supposed illegality, but also because of the Attorney General's assessment of what the government now calls "litigation risk"—that is, the likelihood that DACA would have been invalidated had it been challenged in the Texas litigation. See Defs.' Reply at 17; AR 254–55. At first blush, this seems to be a "discretionary" consideration that makes this case more like Chaney, where the agency refused to take enforcement action not only because it thought that it lacked jurisdiction (a legal reason), but also because the alleged violations did not implicate the agency's enforcement priorities (a discretionary reason). See 470 U.S. at 824–25.

It is not difficult to imagine a case where a court's preliminary disapproval of an agency's nonenforcement policy could lead the agency to rescind that policy for bona fide discretionary

reasons. See Chaney, 470 U.S. at 831 (identifying "whether the agency is likely to succeed if it acts" as one of several such reasons). For example, the agency could conclude that the costs of defending the policy in court would outweigh its benefits to the public, or that the negative publicity that would surround the litigation would undermine the policy's effectiveness. In such cases, the decision to rescind would be "discretionary" in a meaningful sense: the agency would have weighed the policy's costs and benefits and decided that the former outweighed the latter.

But where an agency asserts that a nonenforcement policy is unlawful and then asserts "litigation risk" as a separate ground for the policy's rescission, there are reasons to be more suspicious. After all, if an agency could insulate from judicial review any legal interpretation simply by framing it as an enforcement policy and then offering as an additional, "discretionary" justification the assertion that a court would likely agree with the agency's interpretation, then Crowley would be a dead letter. Moreover, because such an assertion would depend (at least in part) on the correctness of the agency's view of the policy's unlawfulness, it would be unlike the independent discretionary ground that triggered the presumption of unreviewability in Chaney itself. See 470 U.S. at 824–25 (noting the FDA's statement that even if it had jurisdiction, it would still decline to act pursuant to its "inherent discretion to decline to pursue certain enforcement matters"). For these reasons, litigation-strategy justifications deserve closer scrutiny when they are accompanied by agency assertions of unlawfulness.

Here, the Department rescinded DACA for legal reasons—its purported statutory and constitutional defects—and then offered as an additional reason the fact that a federal court of appeals had held that DAPA, a related but distinct deferred-action program, likely suffered from similar defects. See Defs.' Reply at 17 (citing the "litigation risk posed by the proceedings in

33

Texas and the consequent potential for massive disruption were the policy [to be] immediately enjoined"). Although this additional justification was not a bare assertion that a court would likely agree with the agency's view of the law—since it relied on an actual court's view of a concededly similar legal issue—it nonetheless raises many of the same concerns. The Crowley/OSG rule would be seriously undermined if an agency could insulate from judicial review any legal interpretation stated as a general enforcement policy simply by pointing to one case where one court tentatively agreed with the agency on a similar legal issue. Moreover, the Department's conclusion that the Fifth Circuit's decision to uphold a preliminary injunction of DAPA suggests that a court would likely also impose a preliminary injunction of DACA necessarily relies on the Department's legal analysis of the similarities between the two policies—which, like the Department's view of DACA's legality itself, does not qualify for Chaney's presumption of unreviewability. Thus, the Court concludes that the Department's litigation-risk justification was too closely bound up with its evaluation of DACA's legality to trigger Chaney's presumption of unreviewability here.

When the litigation-risk justification falls away, all that is left to support DACA's rescission is the Department's determination that the program was implemented without proper statutory and constitutional authority—a legal determination which, when made in the context of a general enforcement policy, is not subject to Chaney's presumption of unreviewability. Thus, like every other court that has considered the question thus far, the Court concludes that DACA's rescission was not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Regents, 279 F. Supp. 3d at 1029–31; Batalla Vidal, 2017 WL 5201116, at *9–12; Casa De Maryland, 284 F. Supp. 3d at 770. The Court will therefore proceed to the merits of plaintiffs' APA claims.

\*　　\*　　\*

To summarize: an agency's decision whether to take an enforcement action is presumptively unreviewable, and that presumption can normally be rebutted only by pointing to statutory language that constrains the agency's exercise of its enforcement discretion.  See Chaney, 470 U.S. at 832–33.  Under circuit precedent, however, an enforcement decision is exempt from the presumption of unreviewability if: (1) it is expressed as a general enforcement policy; and (2) it relies solely on the agency's view of what the law requires.  See OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–677.  This rule not only accords with the applicable case law, but it also preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons.

Here, DACA's rescission was a general enforcement policy predicated on DHS's legal determination that the program was invalid when it was adopted.  And although the government has sought to cast the Department's assessment of "litigation risk" as a discretionary justification that brings this case within Chaney's ambit, that justification is insufficiently independent from the agency's evaluation of DACA's legality to trigger Chaney's presumption of unreviewability.  Thus, the Crowley/OSG exemption applies, and the government's motions to dismiss will be denied to the extent that they assert § 701(a)(2) as a bar to APA review.

### B.　　Whether Plaintiffs Possess a Cause of Action Under the APA and RFA

The government also argues that the non-individual plaintiffs "lack a cause of action under the APA" because they "cannot meet the zone-of-interest test" used to determine prudential standing.  Defs.' Reply at 13–14; see also NAACP MTD at 18 (framing this argument as one of "prudential standing").  However, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs

to raise that claim." Mt. States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

Thus, because it is undisputed that Ms. Perales Sanchez's interests fall within the zone regulated by the INA,[16] the Court need not consider prudential standing in Princeton. And the NAACP plaintiffs have prudential standing for essentially the same reason as Ms. Perales Sanchez: each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA. See Hodel, 840 F.2d at 61 (concluding that, "[f]or similar reasons [that the court found Article III standing], the interests of [the association's] members also fall within the zone of interests protected by the Endangered Species Act").

The NAACP plaintiffs' RFA claims are another matter. See NAACP FAC 75–82 (alleging that the Department failed to conduct an analysis of the effect of DACA's rescission on "small entities," as required by the RFA). "The RFA provides that 'a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review . . . .'" Nw. Min. Ass'n v. Babbitt, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) (quoting 5 U.S.C. § 611(a)(1)); see also 5 U.S.C. § 601(6) (defining a "small entity" to mean, as relevant here, a "small organization"); id. § 601(4) (defining a "small organization" to be "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field"). Given this statutory language, "the RFA extends standing to seek judicial review only to a 'small entity.'" Babbitt, 5 F. Supp. 2d at 13. But as the government points out, the NAACP plaintiffs' complaint "contains only a single conclusory allegation that [they] fall within the statutory definition, and any factual support for that claim is

---

[16] Nor could there be any dispute. As a DACA beneficiary, Ms. Perales Sanchez is "[her]self the subject of the contested regulatory action." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987) ("The 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff should be heard to complain of a particular agency decision. . . . [It] denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.").

missing from (and arguably contradicted by) the declarations submitted in support of their motion for summary judgment." Defs.' Reply at 14 (citation omitted) (quoting <u>Princeton</u> MSJ, Ex. R at 2595 [ECF No. 28-17] (declaration from the president of the AFT, stating that "[t]he AFT is a national labor union representing approximately 1.7 million members"); <u>id.</u> at 2618 (declaration from the president of the NAACP, stating that "[t]he NAACP is the nation's largest . . . civil rights organization"); <u>id.</u> at 2639–40 (declaration from the president of the UFCW, stating that the union "is a labor organization" representing "1.3 million members")). Thus, the <u>NAACP</u> plaintiffs have not established prudential standing on their RFA claim, and that claim will be dismissed.

### C.     Procedural Validity

The Court turns now to the merits of plaintiffs' administrative claims, beginning with their argument that DACA's rescission should have undergone notice-and-comment rulemaking. The APA generally requires notice-and-comment procedures whenever an agency creates, amends, or repeals a rule.[17] <u>See</u> 5 U.S.C §§ 551(5), 553(b)–(c). A rule is exempt from this requirement, however, if it is an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." <u>Id.</u> § 553(b)(A). Here, plaintiffs assert that DACA's rescission was a "substantive" or "legislative" rule that should have undergone notice and comment, <u>Princeton</u> MSJ at 38–41, while the government contends that DACA's rescission was "a general statement of policy regarding how DHS will exercise its enforcement discretion," Defs.' Reply at 27. On this point, the government has the better of the argument. <u>Accord</u> <u>Regents</u>, 2018

---

[17] The parties do not dispute that DACA's rescission is a "rule" for APA purposes. <u>See</u> 5 U.S.C. § 551(4) (defining a "rule," in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); <u>see also</u> <u>Texas</u>, 809 F.3d at 171 n.122 (noting that the government likewise did not dispute that DAPA was a rule).

WL 401177, at *2 (dismissing the notice-and-comment challenge to DACA's rescission); Batalla

Vidal, 2018 WL 1532370, at *5–6 (same); Casa De Maryland, 284 F. Supp. 3d at 772 (same).

The key question in distinguishing between legislative rules (which must undergo notice

and comment) and general statements of policy (which need not) is whether the statement in

question has a "present binding effect." Elec. Privacy Info. Ctr. (EPIC) v. DHS, 653 F.3d 1, 7

(D.C. Cir. 2011). "An agency pronouncement will be considered binding as a practical matter if

it either appears on its face to be binding, or is applied by the agency in a way that indicates it is

binding." Id. (citation omitted); see Lincoln, 508 U.S. at 197 (describing general statements of

policy as "statements issued by an agency to advise the public prospectively of the manner in

which the agency proposes to exercise a discretionary power" (citation omitted)).

Plaintiffs contend that DACA's rescission has a present binding effect because it "presently

bars DACA beneficiaries from obtaining advance parole or applying to renew DACA relief" and

"presently bars DHS officials from exercising their prior discretion in reviewing DACA

applications or advance-parole applications." Princeton MSJ at 40. But this characterization of

DACA's rescission is misleading. The Rescission Memo states the Department's intent to "reject

all DACA initial requests" filed after September 5, 2017 and "not [to] approve any

new . . . applications for advance parole," AR 255; thus, its binding effect is "prospective[]," 

Lincoln, 508 U.S. at 197 (citation omitted), rather than "present," EPIC, 653 F.3d 7 (citation

omitted).[18] Moreover, the memo expressly states that it places "no limitations . . . on the otherwise

lawful enforcement or litigation prerogatives of DHS," AR 255, which further suggests that it is

---

[18] Although technically the memo does "presently bar DHS officials" from considering DACA and advance-parole applications, Princeton MSJ at 40, this argument proves too much. Any general statement of agency policy will presently bind the agency's employees; the question, rather, is whether the statement "purport[s] to bind those subject to it." EPIC, 653 F.3d at 7 (citation omitted). The Rescission Memo does not.

without present binding effect, cf. McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1319 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion . . . so that he, she, or they will automatically decline to entertain challenges to the statement's position, then the statement is binding . . . .").

Finally, the fact remains that the Rescission Memo withdrew a prior memorandum, which was itself issued without notice and comment, regarding how DHS intended to "exercise [its] prosecutorial discretion." AR 1. The Rescission Memo is therefore a clear example of a "statement[] by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Lincoln, 508 U.S. at 197 (citation omitted); see Regents, 2018 WL 401177, at *2 ("For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment."). Hence, the rescission of DACA was exempt from notice and comment as a general statement of agency policy.[19]

### D.     Substantive Validity

The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.

---

[19] Plaintiffs also argue that DACA's rescission "'alter[s] the rights or interests of parties'" (and hence is not a rule of "agency organization, procedure, or practice") and "makes a 'substantive change' to the statutory or regulatory regime" (and hence is not an interpretive rule). Princeton MSJ at 39–40 (quoting EPIC, 653 F.3d at 5–7). The government does not contend that DACA falls under either of these alternative exceptions to the notice-and-comment requirement, however, and the Court therefore will not address these arguments.

Ins. Co., 463 U.S. 29, 43 (1983)).  "[I]f an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable."  Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989).  However, because "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," post hoc explanations that the agency did not articulate when it acted are insufficient.  SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).

Here, the Department never stated, and the government does not now contend, that DACA's rescission reflected a change in the agency's immigration enforcement priorities. Instead, the government points to two reasons for DACA's rescission: first, the Department's legal conclusion that DACA was unconstitutional and without statutory authority; and second, its assessment of what it now calls "litigation risk"—the likelihood that DACA would have been abruptly enjoined in the Texas litigation.  Because these were the only reasons given by the agency, DACA's rescission can be sustained only on those grounds, even if the agency could have validly rescinded DACA as an exercise of its enforcement discretion.  See Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" (citation omitted)).

### 1.    The Department's Conclusion that DACA Was Unlawful

Plaintiffs first attack DHS's reliance on DACA's purported unlawfulness as a reason to rescind DACA.  They argue both that DHS failed adequately to explain its legal conclusion, see Princeton MSJ at 11–17, and that even if DHS's explanation were adequate, its conclusion was erroneous, see id. at 17–27.  The Court agrees that DHS's decision was inadequately explained,

and hence it need not address the alternative argument that DHS's conclusion was substantively incorrect.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." <u>Encino Motorcars</u>, 136 S. Ct. at 2125. Thus, when an agency reverses a prior decision, it must "provide a reasoned explanation for the change." <u>Id.</u> That explanation need not be "more detailed . . . than what would suffice for a new policy created on a blank slate," but it must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." <u>Id.</u> at 2125–26 (quoting <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009)); <u>see also</u> <u>id.</u> at 2126 ("[A]n 'unexplained inconsistency' in agency policy 'is a reason for holding an interpretation to be an arbitrary and capricious change . . . .'" (alterations and citation omitted)).

In concluding that DACA was unlawful, DHS purported to identify both statutory and constitutional defects with the program. For its part, the Rescission Memo pointed to "the Supreme Court's and the Fifth Circuit's rulings" in the <u>Texas</u> litigation and then cited the Sessions Letter, <u>see</u> AR 255, which stated that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress's repeated rejection of proposed legislation that would have accomplished a similar result." AR 251. The Sessions Letter also stated that "[s]uch an open-ended circumvention of the immigration laws was an unconstitutional exercise of authority by the Executive Branch," and later, in its concluding paragraph, it cited the Executive's duty to "faithfully execute the laws passed by Congress." <u>Id.</u> It also opined that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." <u>Id.</u>

This scant legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful. In concluding that DACA was implemented "without statutory authority," neither the Sessions Letter nor the Rescission Memo cited any statutory provision with which DACA was in conflict. Cf. Encino Motorcars, 136 S. Ct. at 2127 (rejecting as inadequate an agency's statement that a particular statutory exemption "does not include [certain] positions and the [agency] recognizes that there are circumstances under which the requirements for the exemption would not be met"). True, both documents pointed to the Fifth Circuit's decision in Texas, which held that DAPA likely conflicted with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." Texas, 809 F.3d at 179. But the government does not meaningfully dispute that, unlike DAPA, "DACA has 'no analogue in the INA.'" Defs.' Reply at 22 (quoting Regents, 279 F. Supp. 3d at 1042). Thus, the Fifth Circuit's statutory analysis is inapposite.[20] The Department's conclusion that DACA was implemented without statutory authority—based only on an incongruous reference to the Fifth Circuit's decision on DAPA— therefore cannot support the program's rescission.

---

[20] The Fifth Circuit also concluded that "there was evidence from DACA's implementation that DAPA's discretionary language was pretextual." Texas, 809 F.3d at 173; see id. at 172–176 (upholding the district court's factual finding that although "the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, . . . those statements were 'merely pretext' because only about 5% of [DACA] applications . . . had been denied" and because the government could not identify how many of those had been denied for discretionary reasons (footnote omitted)). But the Fifth Circuit relied on that finding only to conclude that DAPA should have been promulgated using notice-and-comment rulemaking, not that it conflicted substantively with the INA. See id. at 171–178. And although OLC had orally advised the Department that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria," AR 21 n.8, neither the Rescission Memo nor the Sessions Letter identified this purported flaw as a reason for DACA's invalidity.

The Department's explanation for its conclusion that DACA was unconstitutional was equally opaque. The Sessions Letter made a fleeting reference to the Attorney General's "duty to . . . faithfully execute the laws passed by Congress," AR 251, which could be read to invoke the President's constitutional duty to "take Care that the Laws be faithfully executed." <u>See</u> U.S. Const. art. II, § 3. But the letter made no attempt to explain why DACA breached that duty.[21] This failure was particularly acute in light of a thirty-three page memorandum prepared in 2014 by the Office of Legal Counsel ("OLC"), which deduced "from the nature of the Take Care duty" no fewer than "four general . . . principles governing the permissible scope of enforcement discretion" and concluded that DAPA, a similar deferred-action program, was consistent with all of them. AR 9–10, 14–36.[22] And although the Sessions Letter asserted that DACA suffered from "the same . . . constitutional defects that the courts recognized as to DAPA," AR 251, the Fifth Circuit's decision in <u>Texas</u> did not actually identify any such defects. Indeed, it expressly declined to address the plaintiffs' constitutional claims. <u>See</u> 809 F.3d at 146 n.3. Like its evaluation of its statutory authority to implement DACA, then, the Department's analysis of DACA's constitutionality was so barebones that the Court cannot "discern[]" the "path" that the agency

---

[21] At least one commentator has identified a second possible constitutional argument in the Sessions Letter: "The Obama administration's open-ended reading of certain definitional provisions of the Immigration and Nationality Act (INA) would run afoul of the nondelegation doctrine." <u>See</u> Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM) https://www.lawfareblog.com/understanding-sessionss-justification-rescind-daca; <u>see also</u> <u>Texas</u>, 809 F.3d at 150 (noting that the plaintiffs there had asserted "constitutional claims under the Take Care Clause" and the "separation of powers doctrine"). The government does not raise these arguments, however, so the Court will not consider them.

[22] The OLC memorandum did not directly address the Department's authority to implement DACA. <u>See</u> AR 5–14 (discussing the agency's authority to "prioritize the removal of certain categories of aliens over others"); AR 14–36 (discussing the agency's authority to implement DAPA). However, the memo did state that OLC had "orally advised" the Department that DACA was lawful so long as "immigration officials retained discretion to evaluate each application on an individualized basis." AR 21 n.8 ("[T]he concerns animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.").

followed.  Encino Motorcars, 136 S. Ct. at 2125 (citation omitted).[23]  Thus, it too cannot support

DACA's rescission.

The Department's failure to give an adequate explanation of its legal judgment was

particularly egregious here in light of the reliance interests involved.  See Encino Motorcars, 136

S. Ct. at 2126.  The Rescission Memo made no mention of the fact that DACA had been in place

for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of

whom had structured their education, employment, and other life activities on the assumption that

they would be able to renew their DACA benefits.[24]  The Supreme Court has set aside changes in

agency policy for failure to consider reliance interests that pale in comparison to the ones at stake

here.  See, e.g., Encino Motorcars, 136 S. Ct. at 2126 (setting aside the Department of Labor's

interpretation of a statutory exemption from the Fair Labor Standards Act's overtime-pay

requirements, in part because the agency had failed to address "decades of industry reliance" on

its prior view that the exemption applied to a particular class of employees).  Because DHS failed

---

[23] Neither Encino Motorcars nor any of its predecessor cases explicitly required an agency to address its prior views on the legality of its prior policy.  See, e.g., Fox, 556 U.S. at 515 (explaining that "[a]n agency may not . . . depart from a prior policy sub silentio" (first emphasis added)).  But where, as here, the OLC provides an agency with an opinion that suggests a legal framework for evaluating the legality of a particular program and the agency later rescinds that policy on legal grounds, failure to even consider OLC's thorough analysis is arbitrary and capricious.  See Trevor W. Morrison, Stare Decisis in the Office of Legal Counsel, 110 Colum. L. Rev. 1448, 1464 (2010) ("OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled."); Hispanic Affairs Project v. Acosta, 263 F. Supp. 3d 160, 178 (D.D.C. 2017) (concluding that an "agency's non-consideration of [certain] OLC memoranda—whether deliberate or inadvertent—is all the more reason to consider them in reviewing the agency's action," because "[a] contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices").

[24] See, e.g., Perales Decl. ¶¶ 21–22 (if DACA were rescinded, Ms. Perales Sanchez would have to abandon her plans of conducting postgraduate research in Mexico and then applying to law school, because she could no longer travel abroad, take out student loans, or work lawfully in the United States);  Decl. of Jane Doe #2, Ex. S to Princeton MSJ [ECF No. 28-17] ¶¶ 11–13 (current special education teacher and DACA beneficiary would lose her job and would have to abandon her plans of pursuing a doctorate in audiology);  Decl. of Jane Doe #5, Ex. X to Princeton MSJ [ECF No. 28-17] ¶ 11 (current undergraduate student and DACA beneficiary would have to abandon her plans of attending law school).  Plaintiffs filed a motion for leave to file pseudonymous declarations with their summary judgment motion.  See Pls.' Mot. for Leave to Allow Three Declarants to Proceed by Pseudonym [ECF No. 22].  The government did not oppose the motion, so the Court will treat it as conceded and grant it.  See Local Civ. R. 7(b).

to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission.

## 2. Litigation Risk

The Department's second justification for DACA's rescission was its conclusion that, if DACA were challenged in the Texas litigation, the district court there would enter a "nationwide injunction" that "would have prompted an immediate—and chaotic—end to the policy." Defs.' Reply at 15. Plaintiffs contend that this "litigation risk" conclusion was arbitrary and capricious and hence cannot sustain DACA's rescission. Princeton MSJ at 28–36. They are correct.

As an initial matter, plaintiffs assert that the government's litigation-risk argument is an "impermissible post hoc rationalization" of the Department's decision to rescind DACA. Princeton MSJ at 28. Here, plaintiffs miss the mark. Although both the Rescission Memo and the Sessions Letter focused primarily on DACA's statutory and constitutional defects, the Sessions Letter did state that DAPA was "enjoined on a nationwide basis" and that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." AR 251. Moreover, the Rescission Memo went on to cite this concern as grounds for its decision to "wind [DACA] down in an efficient and orderly manner." AR 254. Together, these statements were sufficient to express the Department's concern that a nationwide injunction in the Texas litigation would abruptly shut down the DACA program. See Chenery, 332 U.S. at 196.

Nevertheless, this concern does not withstand review under the familiar arbitrary and capricious standard. See State Farm, 463 U.S. at 43. First, as already noted, there was good reason to doubt that the second of the Fifth Circuit's holdings in Texas—that DAPA conflicted with the express provisions of the INA, see 809 F.3d at 178–86—would extend to DACA, because the INA

45

does not prescribe a statutory naturalization process for DACA-eligible individuals.  And although the Fifth Circuit's holding that DAPA should have undergone notice-and-comment rulemaking likely would have extended to DACA,[25] see id. at 170–78, it simply does not follow that the district court in Texas was likely to issue an injunction bringing DACA to an abrupt halt.

For one thing, it is black-letter administrative law that when a court sets aside an agency action as procedurally invalid, the proper remedy is to remand the action to allow the agency an opportunity to conduct the required notice-and-comment procedures.  See Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (observing that "[w]e have previously remanded without vacating when the agency failed to follow notice-and-comment procedures"); C. & S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where the agency "may well be able to justify its decision . . . and it would be disruptive to vacate [the challenged] rule").  It is true, as the government points out, that in Texas the district court preliminarily enjoined DAPA based solely on the program's failure to have undergone notice-and-comment rulemaking.  See Texas, 86 F. Supp. 3d at 677.  DAPA was challenged before it took effect, however.  See Texas, 809 F.3d at 149.  By contrast, as of September 5, 2017 (the date by which the Texas plaintiffs had threatened to challenge DACA, see AR 239), DACA would have been in place for over five years, and hundreds of thousands of applicants would have already been granted deferred action under the program.  Thus, assuming that the district court in the Texas litigation would have found DACA defective only on procedural grounds (as a fair reading of the

---

[25] Because DAPA had not yet been implemented, the Fifth Circuit relied in large part on "extrapolation" from evidence regarding DACA's implementation to conclude that DAPA would not "genuinely leave the agency and its employees free to exercise discretion" and hence was a substantive rule that should have undergone notice and comment.  Texas, 809 F.3d at 171–176.  The government is correct that "[w]hile that finding had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself," at least as far as notice and comment are concerned.  Defs.' Reply at 22 (citations omitted).

Fifth Circuit's opinion would suggest), it seems doubtful that the court would have preliminarily enjoined DACA instead of remanding it to the Department, perhaps without vacatur, to undergo notice-and-comment rulemaking.

On the other hand, if the <u>Texas</u> district court were to find that DACA was substantively invalid—or indeed, unconstitutional—injunctive relief rather than remand may have been the more likely remedy. But it still does not follow that the district court's injunction would have brought the DACA program to an "immediate" and "chaotic" halt. Defs.' Reply at 15. As the Fifth Circuit has repeatedly recognized, district courts have "broad discretion" to "fashion[] equitable relief," <u>Crawford v. Silette</u>, 608 F.3d 275, 278 (5th Cir. 2010), including injunctive relief, <u>see</u> <u>ODonnell v. Harris County</u>, 882 F.3d 528, 537 (5th Cir. 2018) (noting that a district court's injunction is reviewed for abuse of discretion). In light of this discretion, it strains credulity to suggest that the district court would have enjoined DACA immediately and completely without allowing DHS any opportunity to wind the program down. Thus, regardless of the grounds on which the district court in <u>Texas</u> might have ultimately invalidated DACA, the Department's insistence that an "immediate—and chaotic—end to the policy" would have resulted, Defs.' Reply at 15, is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," <u>State Farm</u>, 463 U.S. at 43, and was therefore arbitrary and capricious.

*       *       *

If, as the Court has concluded, <u>see</u> <u>supra</u> Part II.A, an agency's general enforcement policy is reviewable to the extent that it is premised on a legal judgment, it follows that the agency must

explain that judgment in sufficient detail to permit meaningful judicial review.[26]  See Encino

Motorcars, 136 S. Ct. at 2127.  Here, the Department's conclusory statements were insufficient to

explain the change in its view of  DACA's lawfulness.[27]  Moreover, the agency's prediction

regarding the outcome of threatened litigation over DACA's validity—specifically, that the district

court in the Texas litigation would immediately halt the program, without any opportunity for a

wind-down—was so implausible that it fails even under the deferential arbitrary and capricious

standard.  DACA's rescission will therefore be set aside.[28]

---

[26] The parties dispute the standard of review that would apply to the agency's statutory and constitutional analysis had it been adequately explained.  The government maintains that it would be reviewed for a "clear error of judgment"—that is, under the ordinary test for arbitrary and capricious agency action.  State Farm, 463 U.S. at 43 (citation omitted); see Oral Arg. Tr. at 68:5–18.  Plaintiffs contend that review would be de novo.  See Teva Pharm. USA, Inc. v. FDA, 441 F.3d 1, 5 (D.C. Cir. 2006) (finding agency action arbitrary and capricious where the agency "mistakenly thought itself bound" by certain D.C. Circuit precedent); Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law.").  The district court in Batalla Vidal has suggested a third option: because "neither the Sessions Letter nor the DACA Rescission Memo carry the 'force of law,'" that court concluded, the Department's "interpretation of the legality of the DACA program is [not] entitled to formal or controlling deference."  Batalla Vidal, 279 F. Supp. 3d at 421 n.9 (E.D.N.Y. 2018) (quoting Mead, 533 U.S. at 226–27).  Rather, it would be treated only as persuasive.  See Mead, 533 U.S. at 234–35 (explaining that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the Chevron pale" and instead deserve "respect proportional to [their] 'power to persuade'" (quoting Christensen v. Harris Cty., 529 U.S. 576, 587 (2000); then Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  Because the Court does not reach the merits of the Department's conclusions that DACA lacked statutory and constitutional authority, however, it expresses no opinion as to what standard of review would apply.

[27] The district court in Casa de Maryland reached the opposite conclusion.  See 284 F. Supp. 3d at 772 (finding that DHS had a "reasonable basis" to conclude that DACA was unlawful based on "the DAPA litigation, the threatened legal challenge, and the Attorney General's advisory letter").  But that court's brief discussion of the issue failed to address the limited applicability of the Fifth Circuit's Texas decision to DACA, the inadequacy of the Sessions Letter itself, DHS's failure to address DACA beneficiaries' reliance interests, and the implausibility of an injunction issuing in the Texas litigation that would put an immediate end to DACA.  Therefore, this Court respectfully disagrees with the Casa de Maryland court's analysis.

[28] The government also urges the Court to construe the Department's statement that DACA was "unconstitutional in part because it was an 'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected" as an "independent policy judgment" that "immigration decisions of [DACA's] magnitude should be left to Congress."  Defs.' Reply at 21 (quoting AR 251 and citing Syracuse Peace Council, 867 F.2d at 657–58 (holding that if an agency offers two justifications for its decision, one constitutional and one discretionary, and if a court is "persuaded" that the agency would have reached the same result on discretionary grounds had it "foregone its ruminations on the constitutional issue," the court may avoid the constitutional issue and uphold the agency action only on the discretionary ground)).  But the government offers no support for the proposition that an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion.  Cf. Chaney, 470 U.S. at 831 (listing such assessments).

## E.    Remedy

Having concluded that DACA's rescission violated the APA, the question of remedy remains.  As an initial matter, the Court will reject the government's invitation to confine its grant of relief strictly to the plaintiffs in this action.  See Defs.' Reply at 44–45.  As plaintiffs point out, the D.C. Circuit has previously rejected an agency's suggestion that "the named plaintiffs alone should be protected by [an] injunction," explaining that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).  Moreover, as the Fifth Circuit noted in Texas, the immigration context counsels strongly in favor of nationwide relief: "the Constitution requires 'an uniform Rule of Naturalization,'" 809 F.3d at 187 (quoting U.S. Const. art. I, § 8), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly,'" id. at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384), "and the Supreme Court has described immigration policy as 'a comprehensive and unified system,'" id. at 188 (quoting Arizona v. United States, 567 U.S. 387, 401 (2012)). Thus, the Court concludes that nationwide relief is appropriate here.

The only remaining issue, then, is what form the Court's relief should take.  "[U]nsupported agency action normally warrants vacatur."  Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005).  But courts have discretion to remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision," and if "vacating would be disruptive."  Radio-TV News Directors Ass'n v. FCC, 184 F.3d 872, 888 (D.C. Cir. 1999) (alteration in original) (citation omitted); see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("The decision

whether to vacate depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed." (citation omitted)).  Alternatively, a court may vacate the unlawful action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified.  See Friends of Earth, Inc. v. EPA, 446 F.3d 140, 148 (D.C. Cir. 2006) (remanding to the district court with instructions to vacate an agency rule but noting that the district court possessed "remedial discretion . . . to stay [its] order on remand"); Nat. Res. Def. Council, Inc. v. EPA, Civ. Action No. 16-1861 (JDB), 2018 WL 1568882, at *8 (D.D.C. Mar. 30, 2018) (vacating a rule but staying the order of vacatur until such time as the agency promulgated a replacement); see also A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding and providing for "automatic[]" vacatur unless the agency justified its decision within 90 days); Rodway v. USDA, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding and giving the agency 120 days to complete the rulemaking process).

Here, the first Allied-Signal factor—the seriousness of the action's defects—favors remand without vacatur, although not unequivocally.  On the one hand, it is certainly possible that the Department could articulate a valid reason for DACA's rescission.  For example, it could offer a coherent legal argument that DACA conflicts with the INA or violates the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, or it could explain why, as a matter of policy, DACA-eligible individuals should no longer be low-priority targets for removal. Accord Batalla Vidal, 279 F. Supp. 3d at 408 ("Defendants indisputably can end the DACA program.").  But there is some evidence in the record to suggest that the Department would not have rescinded DACA but for its supposed illegality.  See, e.g., Ex. 119 to Princeton MSJ [ECF No. 28-15] at 2003 (congressional testimony of DHS officials that DACA beneficiaries are "a

benefit to the country" and that "[w]e need to regularize their status through some legal means"). And although it seems that no court has yet passed judgment on DACA's constitutionality, at least one court in this district has concluded that DACA was likely "consistent with, rather than contrary to, congressional policy." Arpaio v. Obama, 27 F. Supp. 3d 185, 208–09 (D.D.C. 2014) (concluding that the plaintiff's substantive APA challenge to DACA was unlikely to succeed on the merits), aff'd, 797 F.3d 11 (D.C. Cir. 2015) (affirming only on standing grounds). Thus, although the substantive flaws in DACA's rescission are curable in theory, the Department may face practical obstacles when attempting to remedy them. Nonetheless, there remains a "non-trivial likelihood" that the agency could justify DACA's rescission on remand, WorldCom, Inc. v. FCC, 288 F.3d 429, 434 (D.C. Cir. 2002), so the first Allied-Signal factor supports remand without vacatur.

The second Allied-Signal factor—the risk of disruption—also tips slightly in favor of remand without vactur. On the one hand, two courts have already preliminarily enjoined DACA's rescission, see Regents, 279 F. Supp. 3d at 1047–50; Batalla Vidal, 279 F. Supp. 3d at 437–38, which suggests that vacatur would cause little disruption, at least initially.[29] On the other hand, neither injunction applies to initial DACA applications, which the Department has stopped accepting. Thus, vacating DACA's rescission could lead to "an interim change"—an influx of initial DACA applications—"that may itself be changed" if DHS later provides a sufficient

---

[29] True, both preliminary injunctions are currently the subjects of expedited appeals. This fact actually favors vacatur, however, because if both injunctions are overturned, then this Court's order of vacatur would preserve DACA pending the Department's revised explanation for the program's rescission, thereby maintaining the status quo.

explanation for DACA's rescission.[30]  Allied-Signal, 988 F.2d at 150–151 (citation omitted).  On

balance, therefore, the two Allied-Signal factors tend to favor remand without vacatur.

However, the Court is also mindful that, as several judges of the D.C. Circuit have noted,

remand without vacatur "sometimes invites agency indifference."  In re Core Comm'n, Inc., 531

F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives

to the open-ended remand without vacatur"); see Nat. Res. Def. Council v. EPA, 489 F.3d 1250,

1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an

indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such.").

This concern is particularly acute here, where each day that the agency delays is a day that aliens

who might otherwise be eligible for initial grants of DACA benefits are exposed to removal

because of an unlawful agency action.  Moreover, although the preliminary injunctions in Regents

and Batalla Vidal currently protect aliens who have already received DACA grants, those

injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future.

These concerns suggest that time is of the essence here, and the Court need not ignore this reality

in crafting a remedy.  Cf. Rodway, 514 F.2d at 817–18 (ordering that regulations concerning the

food stamp system be revised "with expedition"—that is, within 120 days—because "[i]n matters

as vital as basic nutrition there is no excuse for delay").

---

[30] Nor would it be proper for the Court to vacate DACA's rescission except as to initial applications.  While a court has discretion to craft preliminary injunctive relief based on a number of equitable factors, see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 24 (2008), its discretion in fashioning administrative remedies is somewhat more limited, see Harmon, 878 F.2d at 494–95 ("Courts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule . . . [or to] draw[] a line which the agency itself has never drawn.").  Here, there is no principled basis to distinguish between initial DACA applications and renewal applications, since the Rescission Memo's substantive invalidity stems chiefly from its inadequately explained rationale.  The Court therefore will not fashion an ad hoc order of vacatur along these lines.

In light of the <u>Allied-Signal</u> factors, which tip in favor of remand without vacatur, and the troubling humanitarian consequences of the delays that remedy might invite, the Court will adopt an intermediate course: it will vacate DACA's rescission but stay its order of vacatur for 90 days. During that time, the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its entirety, and the original DACA program will be restored in full. This means, among other things, that the agency will be required to resume accepting initial DACA applications and applications for advanced parole.

## III. CONSTITUTIONAL CHALLENGES

The government has also moved under Rule 12(b)(6) to dismiss the three constitutional claims asserted in plaintiffs' complaints for failure to state a claim. <u>See</u> <u>Princeton</u> MTD 37–44; <u>NAACP</u> MTD 37–43. Two of these claims—one grounded in equal protection, <u>see</u> Pls.' Opp'n at 24–27, and the other in due process, <u>id.</u> at 27–32—are challenges to DACA's rescission itself. The third argues that the Department may not, consistent with applicable due process principles, use DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, and plaintiffs seek a preliminary injunction to that effect. <u>Id.</u> at 32–35.

In light of its decision to vacate DACA's rescission, the Court will defer ruling on the government's motion to dismiss plaintiffs' first two constitutional challenges. Because plaintiffs have failed to plausibly allege facts to support their information-sharing claim, however, that claim will be dismissed without prejudice.

## A.    Challenges to DACA's Rescission

As noted, plaintiffs' constitutional challenges to DACA's rescission proceed along two lines.  First, plaintiffs argue that DACA's rescission violates the equal protection guarantee of the Fifth and Fourteenth Amendments, because it deprives undocumented aliens of certain benefits that remain available to aliens who are lawfully present in the United States.  Pls.' Opp'n at 24–27 (citing Plyler v. Doe, 457 U.S. 202 (1982); then Romer v. Evans, 517 U.S. 620 (1996)).  Second, plaintiffs maintain that DACA's rescission deprives existing DACA beneficiaries of their liberty and property interests in renewing their DACA benefits without due process of law.  Id. at 27–31.

The Court will defer ruling on the government's motions to dismiss these two constitutional claims.  To begin with, because the Court has already concluded that DACA's rescission violates the APA, it is not necessary to address plaintiffs' constitutional claims now.  See Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205 (2009) (noting that courts generally avoid deciding constitutional issues unnecessarily); Texas, 809 F.3d at 146 n.3 (declining to reach plaintiffs' constitutional challenges to DAPA and instead affirming only on APA grounds).  Moreover, litigation over similar constitutional issues has either reached or progressed past the motion-to-dismiss stage in three other cases, see Regents, 2018 WL 401177, at *2–7; Batalla Vidal, 2018 WL 1532370, at *6–14; Casa de Maryland, 284 F. Supp. 3d at 773–777, and the Court is especially reluctant unnecessarily to address constitutional issues that have already been thoroughly considered by other courts.  Finally, the Department could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims.[31]  At this stage

---

[31] For example, the Department might provide for procedures through which an existing DACA recipient could contest the revocation of her DACA benefits—something that the current Rescission Memo does not do.  Such procedures could, at least in theory, be relevant to plaintiffs' procedural due process claim.

of the proceedings, then, the Court will defer ruling on the government's motion to dismiss plaintiffs' constitutional challenges to DACA's rescission.

### B. Information-Sharing Claim

Plaintiffs seek a preliminary injunction preventing DHS from sharing DACA beneficiaries' personal information with immigration enforcement authorities or otherwise using it for immigration enforcement purposes.  See Princeton MSJ at 48–53; Pls.' Opp'n at 32–35.  The government has moved to dismiss plaintiffs' information-sharing claim, arguing primarily that DHS had previously stated its intent not to use DACA beneficiaries' personal information in this way and that plaintiffs have not plausibly alleged that the agency has since changed its policy.  See Princeton MTD at 41–42; Defs.' Reply at 36–37.  The government also contends that even if the Department had changed its information-sharing policy, there would be no due-process violation, because that policy has always stated that it "may be modified, superseded, or rescinded at any time."  Princeton MTD at 43 (citation omitted); Defs.' Reply at 37–39 (citation omitted).

To secure preliminary injunctive relief, plaintiffs "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest."  Winter, 555 U.S. at 20.  Here, the third and fourth prongs of this test—the equities and the public interest—clearly favor plaintiffs, who allege that the Department intends to use DACA beneficiaries' identifying information against them despite its earlier assurances that it would not do so, which induced the beneficiaries to provide the information in the first place.

Plaintiffs have also demonstrated a likelihood of success on the merits—as least as to their legal theory.  Plaintiffs rely on two cases, Cox v. Louisiana, 379 U.S. 536 (1965), and Raley v. Ohio, 360 U.S. 423 (1959), for the general proposition that "[d]ue process forbids the Government

from making and then breaking promises about the legal consequences of a specific action." Princeton MSJ at 48. In Raley, the Supreme Court found a due process violation where four individuals were convicted of failing to answer questions posed by Ohio's Un-American Activities Commission after the chairman of that commission had specifically represented to the individuals that they could refuse to answer pursuant to a state-law privilege. See 360 U.S. at 437–38; see also id. at 438 ("[T]o sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."). And in Cox, the Court, relying on Raley, held that it violated due process to convict demonstrators under a statute that prohibited demonstrating "near" a courthouse where "the highest police officials of the city . . . in effect told the demonstrators that they could meet where they did." 379 U.S. at 571; see also Santobello v. New York, 404 U.S. 257, 262 (1971) (recognizing a substantive due process right to enforce the terms of a plea agreement). This argument is sufficiently persuasive to support preliminary injunctive relief.

The sticking point here is the second prong—the likelihood of irreparable harm. Several factors convince the Court that the harm to DACA beneficiaries of having their information shared with immigration enforcement authorities, though likely irreparable, is insufficiently imminent to justify preliminary injunctive relief. League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (harm is irreparable only if it is "so 'imminent that there is a clear and present need for equitable relief . . . .'" (alterations and citation omitted)). For one thing, the Department has recently reaffirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the

DACA policy." USCIS, DHS, Frequently Asked Questions: Rejected DACA Requests Q5, https://www.uscis.gov/daca2017/mail-faqs (last updated Feb. 14, 2018).[32] This fact was enough to persuade one other district court to dismiss a similar information-sharing claim. See Batalla Vidal, 2018 WL 1532370, at *10–11. On the other hand, two courts have reached the opposite conclusion, see Regents, 2018 WL 401177, at *4–5; Casa de Maryland, 284 F. Supp. 3d at 777–79, and one of those courts has already granted the injunctive relief that plaintiffs seek here, see Amended Order, Casa de Maryland, No. 17-cv-2942 (D. Md. Mar. 15, 2018), ECF No. 49 (enjoining the Department from (1) using or sharing DACA beneficiaries' personal information except as originally specified on the DACA application forms and instructions and (2) changing its information-sharing policy without the Court's preapproval). But that injunction now in place further belies any suggestion that irreparable harm to DACA beneficiaries is imminent—their information cannot now be used as they fear. Hence, the Court concludes that plaintiffs have failed to demonstrate that they are entitled to preliminary injunctive relief on their information-sharing claim, and their motion for preliminary injunctive relief will be denied.

The Court also concludes that plaintiffs have failed to state a claim. See Fed. R. Civ. P. 12(b)(6). Plaintiffs point to a discrepancy between a prior statement by the Department that DACA beneficiaries' information would be "protected from disclosure" and a later statement issued on the date of DACA's rescission that the information would not be "proactively" provided to immigration enforcement authorities. See Princeton Compl. ¶ 51. Even if this discrepancy were sufficient to plausibly allege that DACA beneficiaries' information has

---

[32] This document does not appear in the administrative record, but the Court takes judicial notice of it. See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

been or will be used inconsistently with DHS's stated information-sharing policy, the agency has since reaffirmed its commitment to that prior policy, and the Court may take judicial notice of that fact in ruling on the government's motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Vasser v. McDonald, 228 F. Supp. 3d 1, 10 (D.D.C. 2016) ("Courts may take judicial notice of matters of a general public nature without converting the motion to dismiss into one for summary judgment." (alterations and citation omitted)).[33] Thus, the government's Rule 12(b)(6) motion will be granted as to plaintiffs' information-sharing claim.

## CONCLUSION

Executive Branch officials possess relatively unconstrained authority to enforce the law against certain violators but not others. Ordinarily, the exercise of that authority is subject to review not in a court of law, but rather in the court of public opinion: members of the public know how their elected officials have used their enforcement powers, and they can hold those officials accountable by speaking out, by petitioning their representatives, or ultimately at the ballot box. When an official claims that the law requires her to exercise her enforcement authority in a certain way, however, she excuses herself from this accountability. Moreover, if her view of the law is incorrect, she may needlessly forego the opportunity to implement appropriate enforcement priorities and also to demonstrate those priorities to the public.

---

[33] For similar reasons, the Court will not address the argument made by amici LatinoJustice PRLDEF (and others) that DHS's breach of the information-sharing policy would violate the Privacy Act of 1974, 5 U.S.C. § 552a, and the agency's own privacy rules. See Br. of LatinoJustice PRLDEF, et al., as Amicus Curiae [ECF No. 36-2].

Fortunately, neither Supreme Court nor D.C. Circuit precedent compels such a result. Rather, the cases are clear that courts have the authority to review an agency's interpretation of the law if it is relied on to justify an enforcement policy, even when that interpretation concerns the lawful scope of the agency's enforcement discretion. See Chaney, 470 U.S. at 832–33; OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–77. Under this rule, an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both.

Here, the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful. That legal judgment was virtually unexplained, however, and so it cannot support the agency's decision. And although the government suggests that DACA's rescission was also predicated on the Department's assessment of litigation risk, this consideration is insufficiently distinct from the agency's legal judgment to alter the reviewability analysis. It was also arbitrary and capricious in its own right, and thus likewise cannot support the agency's action. For these reasons, DACA's rescission was unlawful and must be set aside.

For the reasons given above, then, the Court will vacate the Department's September 5, 2017 decision to rescind the DACA program. The Court will stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful. The Court will also deny the government's motion to dismiss for lack of subject-matter jurisdiction, its motion to dismiss plaintiffs' APA claims on reviewability grounds, and its motion to dismiss plaintiffs' substantive APA claim; grant the government's motion to dismiss plaintiffs' procedural APA claim, the NAACP plaintiffs' RFA claim, and plaintiffs' information-sharing claim; and defer ruling on the government's motion to dismiss plaintiffs' remaining constitutional claims.

Finally, the Court will also grant plaintiffs' motion for partial summary judgment as to their substantive APA claim, deny that motion as to their procedural APA claim, and deny their motion for preliminary injunctive relief on their information-sharing claim.  A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>April 24, 2018</u>