# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br> DONALD J. TRUMP, et al., <br><br>     Defendants. | Civil Action No. 17-1907 (JDB) |
| TRUSTEES OF PRINCETON UNIVERSITY, et al., <br><br>     Plaintiffs, <br><br>     v. <br><br> UNITED STATES OF AMERICA, et al., <br><br>     Defendants. | Civil Action No. 17-2325 (JDB) |

## MEMORANDUM OPINION

This litigation concerns the Department of Homeland Security's ("DHS") September 5, 2017 decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program. In April 2018, this Court held that decision unlawful and set it aside, concluding both that it was reviewable under the Administrative Procedure Act ("APA") and that the reasons given to support it were inadequate. See NAACP v. Trump, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). However, because the Court also determined that DHS could possibly remedy the decision's inadequacies—at least in theory—the Court stayed its order of vacatur for a period of ninety days. See id.

That ninety-day period has now expired. In the interim, DHS has issued a new memorandum "concur[ring] with and declin[ing] to disturb" its September 2017 rescission

decision.  Mem. from Sec'y Kirstjen M. Nielsen ("Nielsen Memo") [ECF No. 71-1] at 3.[1]  Also, the government has now moved the Court to revise its April 2018 order, arguing that the Nielsen Memo demonstrates that DACA's rescission was neither unlawful nor subject to judicial review. See Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Mot.") [ECF No. 74].

For the reasons explained below, the government's motion will be denied.  Although the Nielsen Memo purports to offer further explanation for DHS's decision to rescind DACA, it fails to elaborate meaningfully on the agency's primary rationale for its decision: the judgment that the policy was unlawful and unconstitutional.  And while the memo offers several additional "policy" grounds for DACA's rescission, most of these simply repackage legal arguments previously made, and hence are "insufficiently independent from the agency's evaluation of DACA's legality" to preclude judicial review or to support the agency's decision.  NAACP, 298 F. Supp. 3d at 235. Finally, the memo does offer what appears to be one bona fide (albeit logically dubious) policy reason for DACA's rescission, but this reason was articulated nowhere in DHS's prior explanation for its decision, and therefore cannot support that decision now.

By choosing to stand by its September 2017 rescission decision, DHS has placed itself in a dilemma.  On the one hand, it cannot rely on the reasons it previously gave for DACA's rescission, because the Court has already rejected them.  On the other, because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983), DHS also cannot rely on new reasons that it now articulates for the first time.  The government's attempt to thread this

---

[1] Although NAACP v. Trump, Civil Action No. 17-1907, was filed first, at the Court's direction most of the papers in these two cases were filed in Princeton v. United States, Civil Action No. 17-2325.  See Min. Order, Princeton (D.D.C. Jan. 18, 2018).  Thus, unless otherwise noted, references to the docket refer to the Princeton action.

needle fails. The motion to revise the Court's April 2018 order will therefore be denied, and the Court's vacatur of DACA's rescission will stand.

## BACKGROUND[2]

The DACA program offers renewable, two-year grants of deferred action to certain undocumented aliens who were brought to the United States as children. See NAACP, 298 F. Supp. 3d at 216 (describing DACA's eligibility criteria in greater detail). A grant of deferred action under DACA guarantees not only that the recipient will not be removed from the United States during the relevant time period, but also that she will be able to live, work, and contribute to society in various ways. See id. at 216–17 (discussing DACA's ancillary benefits). Since DACA's implementation in 2012, nearly 800,000 individuals have received grants of deferred action under the program. Id. at 17.

In 2014, DHS implemented a similar program, Deferred Action for Parents of Americans ("DAPA"), which would have offered renewable grants of deferred action to the noncitizen parents of U.S. citizens or lawful permanent residents. Id. at 217. Before DAPA could take effect, however, several states—led by Texas—challenged it in federal court. Id. A district court preliminarily enjoined DAPA in 2015, and the following year the Supreme Court affirmed the district court's preliminary injunction by an equally divided vote. See id. at 217–18 (citing United States v. Texas, 136 S. Ct. 2271 (2016) (mem)). Litigation over DAPA continued until June 2017, when, following the election of President Trump, DHS rescinded the program. Id. at 18.

On September 5, 2017, purportedly in response to threats from the plaintiffs in the Texas litigation, DHS rescinded the DACA program as well. Id. at 218–19. A flurry of court challenges

---

[2] Because the facts and procedural history of this case were recounted at length in the Court's prior opinion, see NAACP, 298 F. Supp. 3d at 216–223, the Court will review them here only briefly.

followed, each of whose procedural history is described more fully in the Court's prior opinion. See id. at 219–22. For present purposes, it suffices to say that DACA's rescission has been preliminarily enjoined by two district courts, one in California and one in New York, and that the government's appeals of those injunctions are currently pending. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018), appeal docketed, No. 18-15068 (9th Cir. Jan. 16, 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 437–38 (E.D.N.Y. 2018), appeal docketed, No. 18-485 (2d Cir. Feb. 20, 2018). Also currently pending before the Fourth Circuit is an appeal of a Maryland district court's dismissal of a challenge to DACA's rescission. Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 779 (D. Md. 2018), appeal docketed, No. 18-1522 (4th Cir. May 8, 2018).

The cases before this Court, which present challenges to DACA's rescission on both administrative and constitutional grounds, were filed in late 2017 and consolidated for purposes of the dispositive motions filed in each. See NAACP, 298 F. Supp. 3d at 222–23. After holding a hearing on those motions, the Court entered judgment in plaintiffs' favor on their APA claims. See id. at 223, 249. The Court held, among other things, that: (1) DHS's September 5, 2017 decision to rescind DACA was reviewable under the APA because it was predicated chiefly on the agency's legal judgment that DACA was unlawful, see id. at 226–235; and (2) the decision was arbitrary and capricious because (a) DHS's legal judgment was inadequately explained, see id. at 238–240, and (b) the other reasons offered for DACA's rescission—mainly, the purported "litigation risk" that DACA would be preliminarily enjoined by the district court in Texas—were insufficiently reasoned, see id. at 241–243. Hence, the Court vacated DACA's rescission on

administrative grounds, see id. at 243–46, and deferred ruling on the bulk of plaintiffs'

constitutional claims, id. at 246.

However, because the Court's decision was based in large part on its conclusion that DHS's

legal judgment was "virtually unexplained," the Court stayed its order of vacatur for 90 days to

allow DHS "to better explain its view that DACA is unlawful." Id. at 249. During that 90-day

period, the Court explained,

> the Secretary of Homeland Security or her delegate may reissue a memorandum
> rescinding DACA, this time providing a fuller explanation for the determination
> that the program lacks statutory and constitutional authority. Should the
> Department fail to issue such a memorandum within 90 days, however, the
> Rescission Memo will be vacated in its entirety, and the original DACA program
> will be restored in full.

Id. at 245–46. The order accompanying the Court's opinion directed the parties to inform the

Court before the stay expired as to "whether DHS has issued a new decision rescinding DACA

and whether the parties contemplate the need for further proceedings in this case." Apr. 24, 2018

Order [ECF No. 69] at 2.[3]

---

[3] Soon after this Court issued its decision, several of the plaintiffs in the Texas litigation filed a new case challenging DACA in a federal district court in Texas. See Texas v. United States, No. 1:18-cv-68 (S.D. Tex. filed May 1, 2018) ("Texas II"). The Texas II plaintiffs assert that DACA is procedurally and substantively invalid under the APA and that it violates the Constitution's Take Care Clause, U.S. Const. art. II, § 3. See Compl. ¶¶ 351–56, Texas II (S.D. Tex. May 1, 2018). The plaintiffs have filed a motion for a preliminary injunction in that case, see Pls.' Mot. for a Prelim. Inj., Texas II (S.D. Tex. May 2, 2018), which is currently pending. The government opposes the motion only insofar as it seeks nationwide relief. See Fed. Defs.' Response to Pls.' Mot. for a Prelim. Inj. at 17, Texas II (S.D. Tex. June 8, 2018). Otherwise, although the government acknowledges that "[i]n similar situations, courts have typically held that the appropriate course is for a district court to refrain from issuing a conflicting injunction," id. at 17 (citations omitted), it nonetheless suggests that, assuming "that preliminary injunctive relief is appropriate," the district court should stay its order for fourteen days to allow the government to seek emergency relief from the Supreme Court, id. at 17–18. Other parties, including the State of New Jersey, have intervened as defendants and opposed the plaintiffs' preliminary injunction motion in full. See, e.g., Def.–Intervenor State of N.J.'s Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj., Texas II (S.D. Tex. July 21, 2018). A hearing on the plaintiffs' motion is currently set for Wednesday, August 8, 2018.

In late June, Secretary of Homeland Security Kirstjen M. Nielsen issued a memorandum responding to the Court's order. See Nielsen Memo at 1. Instead of issuing a new decision rescinding DACA, as the Court's order had contemplated, Secretary Nielson simply "declin[ed] to disturb" the earlier decision to rescind the program by then-Acting Secretary of Homeland Security Elaine C. Duke.[4] Id. Secretary Nielsen then went on to offer several reasons why "the decision to rescind the DACA policy was, and remains, sound." Id.

Specifically, Secretary Nielsen opined that: (1) "the DACA policy was contrary to law"; (2) regardless of whether DACA was in fact contrary to law, the program "was appropriately rescinded . . . because there are, at a minimum, serious doubts about its legality"; and (3) other "sound reasons of enforcement policy" supported DACA's rescission. Id. at 2. The reasons in this last category included that: (a) DHS "should not adopt public policies of non-enforcement of [federal] laws for broad classes and categories of aliens," particularly aliens whom "Congress has repeatedly considered but declined to protect"; (b) "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis"; and (c) "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." Id. at 2–3. Finally, Secretary Nielsen wrote that although she was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country," she nonetheless "do[es] not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons [given] for ending [it]." Id. at 3.

---

[4] Secretary Nielsen replaced Acting Secretary Duke as Secretary of Homeland Security on December 6, 2017.

In July, following the issuance of the Nielsen Memo, the government filed the instant motion to revise the Court's April 24, 2018 order. According to the government, the Nielsen Memo demonstrates that DHS's September 2017 decision to rescind DACA was neither subject to judicial review nor arbitrary and capricious. See Gov't's Mot. at 1–2. This is so, the government contends, because Secretary Nielsen's articulation of "serious doubts" regarding DACA's legality, see id. at 5–13, as well as her "additional" discussion of enforcement-policy concerns, see id. at 14–16, "confirm[]" that the rescission was both an exercise of enforcement discretion (as opposed to a legal judgment) and, at a minimum, reasonable, id. at 1. Thus, the government asks the Court either to dismiss all of plaintiffs' claims (including their constitutional claims) or to enter judgment in its favor. See id. at 18–19. Finally, the government states that, if the Court denies the motion, it intends to seek "a further continuation of the stay of the vacatur order," either "to consider seeking a stay pending appeal or to give DHS time to appropriately prepare" to accept new DACA applications, "which DHS has generally not accepted since September 5, 2017." Id. at 19 n.4.

Plaintiffs offer several arguments in response. First, they contend, the Court should not even consider Secretary Nielsen's memorandum, because it is not "the new agency action [the] Court anticipated [DHS] might take" during the ninety-day stay-of-vacatur period. See Pls.' Opp'n to Defs.' Mot. to Revise the Court's Apr. 24, 2018 Order ("Pls.' Opp'n") [ECF No. 75] at 3–8. Second, they argue that if the Court considers the Nielsen Memo at all, it should consider only the memorandum's legal analysis, because the remainder of the memorandum offers impermissible post hoc rationalizations of DHS's rescission decision. See id. at 8–10 (citing Food Mktg. Inst. v. ICC, 587 F.2d 1285, 1290 (D.C. Cir. 1978)). Third, they contend that even if the Court considers the Nielsen Memo in full, its arguments present no reason to reconsider the Court's prior

determination that DACA's rescission was both judicially reviewable, see id. at 10–14, and arbitrary and capricious, see id. at 15–20.  Therefore, plaintiffs ask the Court to deny DHS's motion and to allow the vacatur of DACA's rescission to take effect.  See id. at 20.

## ANALYSIS

## I.    THE COURT WILL CONSIDER THE NIELSEN MEMO

As a threshold matter, plaintiffs argue that the Court should refuse to consider the Nielsen Memo it its entirety, because instead of issuing a new rescission decision, the memo simply adopts and further explains DHS's September 2017 rescission decision.  See Pls.' Opp'n at 3–8.[5]  The government objects that this argument "inappropriately elevate[s] form over substance" and that agencies "routinely rectify decisions that are deemed inadequately supported on remand without vacatur."  Reply in Supp. of Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Reply") [ECF No. 76] at 1 (citations omitted).  Here, the Court agrees with the government.  It will therefore consider the Nielsen Memo.

As the government correctly points out, courts regularly remand challenges to agency action for further "elaboration of [the agency's] reasoning."  A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995).  Nonetheless, relying on Judge Silberman's separate opinion in Checkosky v. SEC, 23 F.3d 452 (D.C. Cir. 1994), plaintiffs appear to suggest that courts can consider such further explanations only before holding an agency action unlawful—and that, consequently, this Court is powerless to consider the Nielsen Memo's explanation of DHS's rescission decision because it has already held that decision unlawful.  See Pls.' Opp'n at 4

---

[5] Plaintiffs brand DHS's failure to issue a new agency action as a "litigation tactic" that seeks to avoid "major consequences for the litigation pending in the Second and Ninth Circuits—which could potentially include, among other things, triggering remands to the district courts or raising possible mootness questions and prompting new complaints."  Pls.' Opp'n at 1, 8.

("[W]hile courts do sometimes solicit further explanation of an action <u>before</u> deciding whether it is arbitrary and capricious, that is not what this Court did here.").

But neither Judge Silberman's opinion in <u>Checkosky</u> nor any of the other cases on which plaintiffs rely go so far. Rather, Judge Silberman explained that "courts will often . . . pause before exercising full judicial review and remand to the agency for a more complete explanation" and noted that "[i]n <u>many</u> of these cases"—but not all of them—courts "make clear" that they "have not found the agency action to be arbitrary and capricious." <u>Checkosky</u>, 23 F.3d at 463 (opinion of Silberman, J.) (emphasis added); <u>see, e.g.</u>, <u>City of Charlottesville v. FERC</u>, 661 F.2d 945, 954 (D.C. Cir. 1981) (reversing an agency's orders because they "were not based upon substantial evidence" and remanding for further proceedings); <u>id.</u> at 955 (Wald, J., concurring) (urging the agency "on remand to attempt a clearer articulation and reconciliation of its" apparently contradictory explanations for its orders). Thus, although it may be true that courts <u>usually</u> consider additional explanation before invalidating an agency's action, plaintiffs cite no authority for the proposition that courts <u>must</u> maintain this order of operations. Indeed, such a rule would be inconsistent with the district courts' broad discretion to reconsider their decisions before they become final. <u>See</u> Fed. R. Civ. P. 54(b); <u>AARP v. EEOC</u>, 292 F. Supp. 3d 238, 241 n.1 (D.D.C. 2017) ("[A] district court order remanding a case to an agency for significant further proceedings is not final." (quoting <u>Pueblo of Sandia v. Babbitt</u>, 231 F.3d 878, 880 (D.C. Cir. 2000))).

Here, the Court gave DHS ninety days to remedy the deficiencies in its September 2017 rescission decision. Although plaintiffs are correct that the Court's opinion and order anticipated

that DHS would do so by way of a new agency action (if it did so at all),[6] the Court will not

disregard Secretary Nielsen's memorandum simply because she chose a somewhat different path.

Instead, the Court will treat the memo as what it purports to be: a "further explanation" of the

rescission decision, Nielsen Memo at 1, which the government contends forms a basis for revising

the Court's April 2018 order. Likewise, the Court will construe the government's motion for a

revised order as a motion for reconsideration of the Court's April 2018 decision. See Gov't's

Reply at 3 n.2 (proposing that, "[a]t a minimum, the Court could simply reconsider its [April 2018]

Order"); Fed. R. Civ. P. 54(b) (district courts may "revise[]" nonfinal decisions "at any time" prior

to the entry of final judgment).

## II.    MOST OF THE NIELSEN MEMO'S ARGUMENTS ARE NOT POST HOC RATIONALIZATIONS

Next, plaintiffs contend that the Court should disregard "nearly the entire Nielsen Memo"

because none of the justifications it offers—aside from DACA's purported illegality—were

articulated by Acting Secretary Duke in her initial September 5, 2017 memorandum rescinding the

DACA program (the "Duke Memo"), J.A. [ECF No. 60] at 252–56. Pls.' Opp'n at 8–10. With

one notable exception, the Court disagrees. Although many of the Nielsen Memo's rationales are

quite attenuated from those offered in the Duke Memo and its supporting documentation, only one

is so far afield as to constitute an impermissibly post hoc rationalization for DACA's rescission.

Although "post hoc rationalizations 'have traditionally been found to be an inadequate

basis for review' of agency decisions," the D.C. Circuit has clarified that this rule "does not

_____

[6] See Apr. 24, 2018 Order at 2 (directing the parties to inform the court as to whether DHS had "issued a new decision rescinding DACA"); NAACP, 298 F. Supp. 3d at 246 (deferring ruling on plaintiffs' constitutional claims in part because DHS "could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims"); see also Pls.' Opp'n at 5 ("[T]he import of this Court's stay was not that the agency should take another crack at defending the Duke Memo, but that the agency should be afforded an opportunity to replace its void decision seamlessly with a new one.").

prohibit [an agency] from submitting an amplified articulation" of the reasons for its decision following a remand. Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted). Indeed, the rule's purpose is simply to prevent courts from considering "rationales offered by anyone other than the proper decisionmakers," such as those appearing "for the first time in litigation affidavits and arguments of counsel"; it is not meant to be "a time barrier which freezes an agency's exercise of its judgment . . . and bars it from further articulation of its reasoning." Id. (citation omitted). Hence, when faced with an explanation offered for the first time on remand, a court must determine whether it is an "amplified articulation" of the agency's prior reasoning (which must be considered), Alpharma, 460 F.3d at 6 (citation omitted), or instead "a new reason for why the agency could have" taken the action (which must be disregarded), Delta Air Lines, Inc. v. Export–Import Bank of U.S., 85 F. Supp. 3d 436, 453 (D.D.C. 2015); see Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013) (stating that an agency's further explanation on remand "must be more than a barren exercise of supplying reasons to support a pre-ordained result" (citation omitted)).

Here, plaintiffs argue that the bulk of the Nielsen Memo falls in the latter category. Specifically, they contend, Secretary Nielsen's assertion of "serious doubts" about DACA's legality "does not amplify or explicate" the Duke Memo's prediction that DACA would be abruptly enjoined in the Texas litigation; rather, "it silently abandons it." Pls.' Opp'n at 10. Similarly, plaintiffs argue that the various "purported 'reasons of enforcement policy'" raised in the Nielsen Memo "have no foundation in the Duke Memo at all." See id.

Plaintiffs overstate the novelty of the Nielsen Memo's arguments. Although the Nielsen Memo certainly expands on the Duke Memo's points, most of its arguments are not so detached

from the earlier document as to appear post hoc.  For example, the Nielsen Memo contends that "serious doubts" about DACA's legality could "undermine public confidence in . . . the rule of law" and lead to "burdensome litigation."  Nielsen Memo at 2.  Similarly, the Duke Memo expressly relied on a September 4, 2017 letter from Attorney General Jeff Sessions (the "Sessions Letter"), see J.A. at 254–55, which cited "the costs and burdens" associated with rescinding DACA in response to "potentially imminent litigation," and opined that "[p]roper enforcement of our immigration laws is . . . critical . . . to the restoration of the rule of law in our country," J.A. at 251. The Nielsen Memo's "serious doubts" rationale strikes this Court as a permitted amplification, rather than a prohibited post hoc rationalization, of these statements in the Sessions Letter.

The same is true of the Nielsen Memo's remaining "policy" justifications (again, save one). Like the Nielsen Memo, which faults DACA for protecting a class of aliens whom Congress has "repeatedly considered but declined to protect," Nielsen Memo at 2, the Duke Memo relied on "Congress's repeated rejection of proposed legislation that would have accomplished a similar result" as DACA, J.A. at 254.  Similarly, the Nielsen Memo's concerns about "individualized, case-by-case" discretion, Nielsen Memo at 3, parallel the Duke Memo's observation that DACA was "meant to be applied only on an individualized case-by-case basis" and that DHS "has not been able to identify specific denial cases . . . based solely upon discretion," J.A. at 253.

The same cannot be said, however, about the Nielsen Memo's concern with "project[ing] a message" to noncitizen children (and their parents) who would attempt to enter the United States unlawfully.  Nielsen Memo at 3.  Nothing in the Duke Memo or the Sessions Letter even remotely parallels the Nielsen Memo's discussion of a "pattern" of illegal immigration by minors, and neither document mentions the "tens of thousands of minor aliens [who] have illegally crossed or

12

been smuggled across our border in recent years," id. Indeed, the closest either document comes

is the Sessions Letter's assertion that "[p]roper enforcement of our immigration laws is . . . critical

to the national interest," J.A. at 251, but this statement is far too vague—on some level, nearly any

policy statement could be seen as an explication of an agency's view of the "national interest."

Consequently, the Court will decline to consider the Nielsen Memo's "messaging" rationale,

which appears for the first time on remand and is therefore impermissibly post hoc. See Food

Mktg. Inst., 587 F.2d at 1290 ("Post-hoc rationalizations by the agency on remand are no more

permissible than are such arguments when raised by appellate counsel during judicial review.").[7]

In sum, although none of the Nielsen Memo's rationales for DACA's rescission relate back

perfectly to the Duke Memo's, only one—the messaging rationale—is so attenuated as to comprise

"a new reason for why the agency could have" rescinded DACA. Delta Air Lines, 85 F. Supp. 3d

at 453. The Court will therefore consider all of the Nielsen Memo except its messaging rationale.

## III. THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER DETERMINATION THAT DACA'S RESCISSION WAS SUBJECT TO JUDICIAL REVIEW

This Court previously held that DHS's September 2017 decision to rescind the DACA

program was subject to judicial review despite the APA's exception for "agency action [that] is

committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see NAACP, 298 F. Supp. 3d at

234. This was so, the Court explained, because although the Supreme Court has held enforcement

decisions to be "presumptively unreviewable," NAACP, 298 F. Supp. 3d at 234 (citing Heckler v.

Chaney, 470 U.S. 821, 832–33 (1985)), the D.C. Circuit recognizes an exception for "general

enforcement polic[ies]" that "rel[y] solely on the agency's view of what the law requires," id. (first

---

[7] Of course, had Secretary Nielsen opted to issue a new decision rescinding DACA, the explanations offered in her memorandum would be contemporaneous and, consequently, not post hoc. She did not do this, however.

citing <u>OSG Bulk Ships, Inc. v. United States</u>, 132 F.3d 808, 812 (D.C. Cir. 1998); and then citing

<u>Crowley Caribbean Transp., Inc. v. Peña</u>, 37 F.3d 671, 676–77 (D.C. Cir. 1994)).[8]  This rule

reflects the commonsense notion that "an otherwise reviewable" legal interpretation "does not

become presumptively unreviewable simply because the agency characterizes it as an exercise of

enforcement discretion."  <u>Id.</u> at 231.

The Court held that DACA's rescission was reviewable under this exception because it was

"predicated on DHS's legal determination that the program was invalid when it was adopted."  <u>Id.</u>

at 233.  The Court rejected what it took to be the government's attempt to distinguish between an

agency's "interpretation of a specific statutory provision" (which the government conceded was

reviewable) and its "conclusion that it lacks statutory authority" (which the government contended

was unreviewable), explaining that "[t]o say that a particular agency action is 'without statutory

authority' is simply to say that no statutory provision authorizes that action."  <u>Id.</u> at 232 (citing

<u>City of Arlington v. FCC</u>, 569 U.S. 290, 299–300 (2013)).[9]  The Court also rejected the

government's reliance on what it had termed "litigation risk"—that is, the adverse consequences

that would follow if DACA were struck down in litigation—explaining that "<u>Crowley</u> would be a

dead letter" if an agency "could insulate from judicial review any legal determination simply by

---

[8] The D.C. Circuit's recent decision in <u>CREW v. FEC</u> confirms this Court's reading of Circuit law.  <u>See</u> 892 F.3d 434, 441 n.11 (D.C. Cir. 2018) ("[I]f [an agency] declines to bring an enforcement action on the basis of its interpretation of [a statute], the [agency's] decision is subject to judicial review.").

[9] In its present motion, DHS attempts to relitigate this issue, contending that "Secretary Nielsen's further explanation of DACA's questionable legality also underscores why <u>Crowley</u> does not permit judicial review of an enforcement decision simply because that decision rests on a legal rationale."  Gov't's Mot. at 7.  Once again, DHS attempts to draw a "distinction between the non-reviewability of an <u>enforcement decision</u>, and the potential reviewability of the <u>supporting rationale</u> on its own terms," <u>id.</u> at 8, and contends that "even if a general legal rationale in the Duke or Nielsen Memos could be carved out for review on its own terms, that would not justify reviewing the enforcement decision to rescind DACA itself," <u>id.</u> at 9.  But the Court rejects this novel proposition.  As the D.C. Circuit has recently confirmed, although "[t]he law of this circuit 'rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions," <u>CREW</u>, 892 F.3d at 442 (citation omitted), an agency action is not "non-reviewable" in the first place if it is "based entirely on its interpretation of the statute," <u>id.</u> at 441 n.11.

framing it as an enforcement policy" and then tacking on a boilerplate assertion that "a court would likely agree with the agency's interpretation." Id. at 233.

Neither the Nielsen Memo nor the government's motion provides a sufficient basis for reconsidering the Court's earlier determination that DACA's rescission was judicially reviewable. To start with, Secretary Nielsen makes clear that her decision not to disturb DACA's rescission is predicated first and foremost on her view that "the DACA policy was contrary to law." Nielsen Memo at 2. Thus, this case continues to be like Crowley and OSG: at bottom, it involves an enforcement policy that is predicated on the agency's view of what the law requires.

Nor do the Nielsen Memo's remaining rationales immunize from judicial review DHS's decision to rescind DACA. The first of these revolves around Secretary Nielsen's "serious doubts about [DACA's] legality," which she says would lead her to rescind the policy regardless of "whether the courts would ultimately uphold it or not." Id. These doubts, Secretary Nielsen explains, raise concerns like "the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." Id. According to the government, this rationale renders DACA's rescission unreviewable because it "cannot be meaningfully distinguished from other 'bona fide discretionary reasons' that this Court found acceptable" in its prior opinion, "such as an agency's fear that 'negative publicity . . . would undermine the policy's effectiveness.'" Gov't's Mot. at 7 (quoting NAACP, 298 F. Supp. 3d at 233).

But as the Court's opinion explained in the very next paragraph, it is difficult to conclude that such policy assertions are "bona fide" when they are accompanied by an assertion from the

agency that its longstanding policy is "<u>unlawful</u>."  <u>NAACP</u>, 298 F. Supp. 3d at 233.[10]  In this

respect, the "serious doubts" rationale suffers from the same defect as the "litigation risk"

rationale: accepting it here would permit agencies to insulate their legal judgments from judicial

review simply by couching them as enforcement policies and then adding a boilerplate assertion

that any other course of action would lead to litigation and undermine confidence in the rule of

law.  Judicial review of agency legal determinations cannot be so easily evaded.

Next, the Nielsen Memo asserts a handful of "sound reasons of enforcement policy" that it

argues would justify DACA's rescission "regardless of whether . . . the DACA policy [is] illegal

or legally questionable."  Nielsen Memo at 2.  First among these is the memo's claim that, "if a

policy concerning the ability of this class of aliens to remain in the United States is to be adopted,

it should be enacted legislatively."  <u>Id.</u> at 3.  But the Court rejected the government's reliance on

this argument in its prior opinion, concluding that the government had failed to explain why "an

agency's view as to which branch of government ought to address a particular policy issue is an

assessment appropriately committed to the agency's discretion."  <u>NAACP</u>, 298 F. Supp. 3d at 243

n.28.  Like the litigation-risk and substantial-doubts rationales, then, this legislative-inaction

rationale is simply another legal determination dressed up as a policy judgment, and it cannot

render DACA's rescission immune from judicial review.

The memo's second "policy" justification asserts that "DHS should only exercise its

prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-

case basis."  Nielsen Memo at 3.  This is so, Secretary Nielsen claims, not because "a categorical

---

[10] While the Court's opinion did not suggest that an agency cannot rescind a policy in response to an adverse court judgment <u>notwithstanding</u> the agency's continued belief in the policy's legality, it did suggest that where (as here) the agency rescinds a policy after doing an about-face as to its legality, "there are reasons to be more suspicious."  <u>NAACP</u>, 298 F. Supp. 3d at 233.

deferred-action policy" like DACA raises legal or constitutional concerns—as previously argued—but rather because such a policy "tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case." Id. In essence, the Secretary claims that even though DACA "on its face . . . allow[s] for individual considerations," id., it should nonetheless be rescinded because its programmatic nature somehow misleads those charged with its implementation into applying it categorically.

As an initial matter, this rationale strikes the Court as specious. It would be one thing for a challenger other than DHS to claim that although DACA calls for case-by-case discretion in theory, its application is categorical in practice. Indeed, this argument was made by the plaintiffs in the Texas litigation. See Texas v. United States, 809 F.3d 134, 171–72 (5th Cir. 2015), aff'd by an equally divided Court, 136 S. Ct. 2271 (2016) (mem). But when made by the agency itself, the argument becomes a non sequitur: if Secretary Nielsen believes that DACA is not being implemented as written, she can simply direct her employees to implement it properly. An agency head cannot point to her own employees' misapplication of a program as a reason for its invalidity.

Specious though it may be, this rationale nonetheless presents as the sort of policy consideration that, when offered as an independent reason for adopting a general enforcement policy, might foreclose judicial review. When viewed in the broader context of this litigation, however, this rationale reveals itself to be yet another attempt to disguise an objection to DACA's legality as a policy justification for its rescission.

Throughout the litigation over DAPA and DACA, the programs' challengers have consistently claimed that although DACA "facially purports to confer discretion," in practice deferred action was categorically granted to anyone who met the program's eligibility criteria.

17

<u>Texas</u>, 809 F.3d at 171–72. This argument was offered by the <u>Texas</u> plaintiffs as a reason that DAPA should have undergone notice-and-comment rulemaking, <u>see id.</u>, and by the government in this case as a reason to uphold DHS's conclusion that DACA was unlawful, <u>see</u> Reply in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. [ECF No. 55] at 22 ("While [the Fifth Circuit's] finding [that DACA was applied categorically] had to be 'extrapolated' to invalidate DAPA, it <u>directly</u> dooms DACA itself . . . ." (citation omitted)). Likewise, the Duke Memo cast DACA's alleged categorical application as an issue of lawfulness, explaining that deferred action was "meant to be applied only on an individualized case-by-case basis," not to "confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." <u>See</u> J.A. at 253. Even a 2014 memorandum by the Office of Legal Counsel (the "OLC Memo") cautioned that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." J.A. at 21 n.8.

Taken in context, then, Secretary Nielsen's claim that rescinding DACA would further her policy objective of ensuring the distribution of deferred action grants on a "case-by-case" basis is simply a repackaging in policy terms of an oft-repeated objection to DACA's lawfulness. And while a remand provides an agency the opportunity to elaborate on its prior positions in good faith, it is not an opportunity for the agency to alter those positions—particularly where the chief design of doing so appears to be to defeat judicial review. The Court therefore concludes that the Nielsen Memo's individualized-discretion rationale does not preclude judicial review here.

Finally, the memo asserts that "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration

laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years."  Nielsen Memo at 3.  As the Court has already explained, this rationale is a post hoc rationalization and hence is not entitled to consideration on remand.  See Food Mktg. Inst., 587 F.2d at 1290.  But even if the Court were to consider this rationale, it would not immunize DACA's rescission from judicial review.

With this messaging rationale, Secretary Nielsen finally articulates (albeit in a single sentence) what might be properly characterized as a policy reason for DACA's rescission: a judgment that DACA's benefits—whatever they may be—are outweighed by the fact that, in Secretary Nielsen's view, the policy encourages noncitizen children and their parents to enter the United States illegally.  Of course, this rationale is not without its logical difficulties: after all, DACA is available only to those individuals who have lived in the United States since 2007, see NAACP, 298 F. Supp. 3d at 216, so the "tens of thousands of minor aliens" who Secretary Nielsen asserts have illegally entered the United States "in recent years" would not even be eligible under the program.  But no matter.  The question for reviewability purposes is not whether the rationale makes sense, but rather whether it transforms DACA's rescission from a decision based "solely on [DHS's] belief that it lacks jurisdiction," Chaney, 470 U.S. at 833 n.4, into a decision based on "factors which are peculiarly within [DHS's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies," id. at 831.

Even if the messaging rationale were sufficiently grounded in the Duke Memo so as to be an amplification rather than a post hoc rationalization, ultimately it would still be too little, too late.  Although the Nielsen Memo states several paragraphs earlier that each of its reasons is "separate and independently sufficient" to support DACA's rescission, Nielsen Memo at 1, the

document's cursory discussion of the messaging rationale—which is articulated in a single sentence on the last page of the three-page memorandum—does not support this assertion. See NAACP, 298 F. Supp. 3d at 233–34 (noting that, in Chaney, the agency took the position that "even if it had jurisdiction, it would still decline to act pursuant to its 'inherent discretion to decline to pursue certain enforcement matters'" (quoting Chaney, 470 U.S. at 824–25)). The Court would not conclude that this solitary sentence in the Nielsen Memo wholly transmutes the explanation for DACA's rescission from an issue of law into an issue of policy.

In any case, the Court need not reach this conclusion because, as it has already explained, the messaging rationale is merely a post hoc rationalization of DACA's rescission. And because, as explained above, the other rationales offered by the Nielsen Memo are "insufficiently independent from the agency's evaluation of DACA's legality" to defeat review, id. at 235, the Court declines to reverse its prior conclusion that DACA's rescission is reviewable. The government's motion for reconsideration will therefore be denied as to reviewability.

## IV. THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER DETERMINATION THAT DACA'S RESCISSION WAS ARBITRARY AND CAPRICIOUS

The Court now turns to whether the Nielsen Memo provides a basis for revising the Court's prior determination that DACA's rescission was arbitrary and capricious. See id. at 237–43. As explained below, it does not.

Most glaringly, the Nielsen Memo provides almost no meaningful elaboration on the Duke Memo's assertion that DACA is unlawful. The Nielsen Memo again ignores the 2014 OLC Memo laying out a comprehensive framework for evaluating the lawfulness of nonenforcement policies in the immigration context, see J.A. at 4–36—an omission that plaintiffs properly characterize as "mystifying," Pls.' Opp'n at 18, given the Court's prior emphasis on the document, see NAACP,

298 F. Supp. 3d at 239 & n. 22.[11]  Instead, like the Duke Memo before it, the Nielsen Memo relies primarily on the one-page Sessions Letter and on the Fifth Circuit's ruling in the DAPA litigation. See Nielsen Memo at 2.  But as this Court has already said, the Sessions Letter's conclusory legal assertions are themselves inadequately explained, and the Fifth Circuit's analysis in the DAPA case is "inapposite" here given the meaningful distinctions between DAPA and DACA, which include DAPA's open-ended nature, broad scope, and apparent conflict with express provisions of the INA.  See NAACP, 298 F. Supp. 3d at 238–40 (citing Texas, 809 F.3d at 179).

In response, Secretary Nielsen states that "[a]ny arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful." Nielsen Memo at 2.  But she does not explain why.  Secretary Nielsen also asserts that the Fifth Circuit's DAPA ruling was based not on any particular statutory conflict, but rather on DAPA's "incompatibility . . . with the INA's comprehensive scheme."  Id.  But as plaintiffs correctly point out, see Pls.' Opp'n at 15–16, even if this were an accurate characterization of the Fifth Circuit's opinion,[12] the Nielsen Memo offers no clue as to how an agency official, a court, or anyone else would go about determining whether a particular nonenforcement policy meets Secretary Nielsen's

---

[11] As was true with respect to the Duke Memo, the mere fact that the OLC Memo appears in the administrative record, even when combined with the Nielsen Memo's statement that Secretary Nielsen has "considered . . . the administrative record," Nielsen Memo at 1, does not amount to meaningful consideration for purposes of the APA. Nor does the Court agree that "the OLC Memo has little significance, especially given that its analysis as to DAPA was later rejected by the Fifth Circuit (in a decision affirmed by an equally divided Supreme Court) as well as by the Attorney General." Gov't's Mot. at 13.  For one thing, the Fifth Circuit did not expressly disapprove the OLC Memo; indeed, the one time it mentioned the memo, it cited it as an authoritative source.  See Texas, 809 F.3d at 184 n.197. And in any case, to the extent that the panel majority's analysis in Texas was inconsistent with OLC Memo, its decision was affirmed by an equally divided Supreme Court and so is not binding outside of the Fifth Circuit.  See Nichols v. United States, 511 U.S. 738, 750 (1994) (Souter, J., concurring in the judgment) (noting that "a decision . . . by an equally divided [Supreme] Court" is "entitled to no precedential value").  Similarly, the one-page Sessions Letter did not directly address the OLC Memo or expressly overrule its analysis. J.A. at 251.

[12] But see Texas, 809 F.3d at 184 n. 197 ("[O]ur conclusion turns on whether the INA gives DHS the power to create and implement a sweeping class-wide rule changing the immigration status of the affected aliens without full notice-and-comment rulemaking, especially where—as here—the directive is flatly contrary to the statutory text." (emphasis added)).

test for "compatibility" with the overall statutory scheme. Thus, like the Duke Memo before it, the Nielsen Memo offers nothing even remotely approaching a considered legal assessment that this Court could subject to judicial review.

Nor do the Nielsen Memo's remaining rationales persuade the Court to revise its prior conclusion that DACA's rescission was arbitrary and capricious. As the Court has already indicated, those rationales carry varying degrees of persuasive force, and some may fall below the APA's standard of rationality. But as the D.C. Circuit has explained, "[w]here . . . an agency has set out multiple independent grounds for a decision," courts will uphold that decision "so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec., 769 F.3d 1127, 1149 (D.C. Cir. 2014) (citation omitted).

Here, Secretary Nielsen states in a somewhat conclusory fashion that each of the grounds offered in her memo is "independently sufficient" to support DACA's rescission. Nielsen Memo at 1. The Court is skeptical of this assertion, particularly given its conclusion that three of those grounds—the substantial-doubts, legislative-inaction, and individualized-discretion rationales— simply recapitulate the Secretary's inadequately explained legal assessment, and that the remaining ground—projecting a message to would-be illegal immigrants—appears nowhere in the Duke Memo and is therefore post hoc. Even assuming that these rationales are indeed independent and that at least one is sufficiently rational to survive APA review, however, DACA's rescission would still be arbitrary and capricious because the Nielsen Memo—like the Duke Memo before it—fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program. See NAACP, 298 F. Supp. 3d at 240.

Although this time around the Nielsen Memo at least "acknowledge[s] how heavily DACA beneficiaries had come to rely on" the program, id., it does little more than that. Instead of considering DACA's benefits to DACA recipients and to society at large, see Pls.' Opp'n at 19–20, Secretary Nielsen simply states that "the asserted reliance interests" are outweighed by DACA's "questionable legality . . . and the other reasons for ending the policy," and then goes on to suggest that she should not even have to consider those interests. See id. (asserting that "issues of reliance would be best considered by Congress"). However, it is not up to Secretary Nielsen—or even to this Court—to decide what she should or should not consider when reversing agency policy. Rather, the requirements are set by the APA, as interpreted by the Supreme Court: "When an agency changes its existing position, it . . . must . . . be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125–26 (2016).

Like the Duke Memo, the Nielsen Memo demonstrates no true cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are. "It would be arbitrary and capricious to ignore such matters," Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1209 (2015) (citation omitted), and it is so here. Nor, given the inadequacy of the Nielsen Memo's explanation of why DACA is unlawful, can the Court accept as sufficient its bare determination that any reliance interests are outweighed by "the questionable legality of the DACA policy and the other" fatally intertwined reasons listed in the memo. Nielsen Memo at 3. Because the Nielsen Memo fails to provide an adequate justification for the decision to rescind DACA—much less the "more substantial justification" that the APA requires when an agency's "prior

policy has engendered serious reliance interests," <u>Perez</u>, 135 S. Ct. at 1209—the Court sees no reason to change its earlier determination that DACA's rescission was arbitrary and capricious.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court again concludes that DHS's September 2017 decision to rescind the DACA program, as now explained in the Duke and Nielsen Memos, was both subject to judicial review and arbitrary and capricious. The Court has already once given DHS the opportunity to remedy these deficiencies—either by providing a coherent explanation of its legal opinion or by reissuing its decision for bona fide policy reasons that would preclude judicial review—so it will not do so again. Consequently, the government's motion to reconsider the Court's April 24, 2018 order will be denied. Per the government's request, however, the Court will continue the stay of its order of vacatur for a brief period—twenty days—to permit the government to determine whether it intends to appeal the Court's decision and, if so, to seek a stay pending appeal. In all other respects, the Court's April 24, 2018 order will remain in force.

Finally, a few words about the nature of the relief being granted by this Court. The Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program. Rather, the Court simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision. <u>See</u> 5 U.S.C. § 706(2). A conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or <u>post hoc</u> policy assertions, simply will not

do.  The Court therefore reaffirms its conclusion that DACA's rescission was unlawful and must be set aside.[13]  A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  August 3, 2018

---

[13] The Court also notes that the propriety of so-called nationwide injunctions, such as the ones issued by district courts in California and New York in related litigation, has recently been called into question.  See, e.g., Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018) (noting but declining to address the issue); City of Chicago v. Sessions, 888 F.3d 272, 293 (7th Cir. 2018) (concluding that the district court did not "abuse[] its discretion in determining that the scope of the injunction should be nationwide"), reh'g granted, No. 17-2991 (7th Cir. June 4, 2018) (granting rehearing en banc "only as to the geographic scope of the preliminary injunction entered by the district court").  That debate is not implicated here, however, where the Court is vacating an agency action pursuant to the APA, as opposed to enjoining it as a violation of the Constitution or other applicable law.  See 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").